**No. 22-1864**

In the

# United States Court of Appeals
## For the Third Circuit

---

Consumer Financial Protection Bureau,

*Plaintiff-Appellee,*

v.

National Collegiate Master Student Loan Trust, et al.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Delaware, Case No. 1:17-cv-1323
Honorable Stephanos Bibas

---

## JOINT BRIEF FOR APPELLANTS

---

Nicholas J. Giles
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

Francis J. Aul
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Washington, DC 20006

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

*Counsel for Defendants-Appellants*
*(Additional Counsel Listed on Inside Cover)*

Allyson B. Baker
Meredith L. Boylan
Sameer P. Sheikh
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700
AllysonBaker@paulhastings.com

*Counsel for Intervenor-Appellant*
*Transworld Systems, Inc.*

Joshua Kipnees
George A. LoBiondo
PATTERSON BELKNAP WEBB &
    TYLER
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2838
jkipnees@pbwt.com

*Counsel for*
*Intervenor-Appellant*
*Ambac Assurance Corporation*

# CORPORATE DISCLOSURE STATEMENTS

Defendant-Appellants National Collegiate Master Student Loan Trust, The National Collegiate Student Loan Trust 2003-1, The National Collegiate Student Loan Trust 2004-1, The National Collegiate Student Loan Trust 2004-2, The National Collegiate Student Loan Trust 2005-1, The National Collegiate Student Loan Trust 2005-2, The National Collegiate Student Loan Trust 2005-3 The National Collegiate Student Loan Trust 2006-1, The National Collegiate Student Loan Trust 2006-2, The National Collegiate Student Loan Trust 2006-3, The National Collegiate Student Loan Trust 2006-4, The National Collegiate Student Loan Trust 2007-1, The National Collegiate Student Loan Trust 2007-2, The National Collegiate Student Loan Trust 2007-3, and The National Collegiate Student Loan Trust 2007-4 each certify pursuant to Fed. R. App. P. 26.1 and L.A.R. 26.1.1 that it is not a publicly traded corporation and is not owned by a parent company.

Intervenor-Appellant Ambac Assurance Corporation certifies pursuant to Fed. R. App. P. 26.1 and L.A.R. 26.1, that it is a wholly owned subsidiary of Ambac Financial Group, Inc., and that there are no other

parent corporations or publicly held corporations that hold 10% or more of its stock.

Intervenor-Appellant Transworld Systems Inc. certifies pursuant to Fed. R. App. P. 26.1 and L.A.R. 26.1.1 that it is a wholly owned subsidiary of Aston Acquisition Corp. and that no publicly held corporation holds 10% or more of its stock.

Dated: September 23, 2022          */s/ Jonathan Y. Ellis*
                                   Jonathan Y. Ellis

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................... 1

STATEMENT OF JURISDICTION ........................................... 4

STATEMENT OF THE ISSUES ............................................. 5

STATEMENT OF RELATED CASES AND PROCEEDINGS ............... 5

STATEMENT OF THE CASE ................................................ 6

A.  Legal Background ...................................................... 6

B.  The Defendant Trusts ................................................ 9

C.  The Present Controversy ........................................... 14

SUMMARY OF ARGUMENT .............................................. 19

STANDARD OF REVIEW .................................................. 23

ARGUMENT .................................................................. 23

I.  THE TRUSTS ARE NOT "COVERED PERSONS" UNDER
    THE CFPA. ............................................................. 24

    A.  The Trusts Do Not "Engage" in the "Offering or
        Providing" of Consumer Financial Products or Services
        Under the CFPA. ................................................... 24

        1.  *The ordinary meaning of the term "engage" does
            not encompass the Trusts' passive role.* ................. 24

        2.  *The CFPA's structure confirms the ordinary
            meaning of the text.* ...................................... 26

        3.  *The broader statutory context demonstrates
            Congress's targeted approach to the CFPB's
            UDAAP enforcement authority.* ............................ 29

        4.  *The CFPA's drafting history further underscores
            the limited reach of the phrase "covered person."* ..... 31

    B.  The District Court Erred in Holding That the Trusts
        Are Covered Persons. ............................................. 33

II.   ALTERNATIVELY, THE COMPLAINT SHOULD BE
      DISMISSED TO REMEDY THE SEPARATION-OF-
      POWERS VIOLATION. .................................................. 40

      A.    Director Cordray's Initiation of This Enforcement
            Action Inflicted a "Here-and-Now" Injury That Should
            Be Remedied. ....................................................... 40

            1.    *By insulating him from removal, the CFPA left
                  Director Cordray unconstitutionally
                  unaccountable to the President and thus the
                  American people.* ......................................... 41

            2.    *Targeted by Director Cordray's unconstitutional
                  enforcement authority, the Trusts suffered a "here-
                  and-now" injury.* ......................................... 43

      B.    Absent Timely and Valid Ratification, the Appropriate
            Remedy For an Enforcement Action Initiated by an
            Unaccountable Executive Official Is Dismissal. ................. 45

      C.    The CFPB's Ratification Was Untimely. ............................. 49

      D.    *Collins v. Yellen* Does Not Require a Different Result. ........ 53

            1.    Collins *does not displace well-established
                  remedial principles.* ..................................... 53

            2.    *Even if* Collins *governs this case, dismissal is
                  required.* .................................................. 60

CONCLUSION ............................................................... 68

CERTIFICATE OF COMPLIANCE ....................................... 70

CERTIFICATE OF SERVICE............................................... 71

# TABLE OF AUTHORITIES

**Page**

## Cases

*Advanced Disposal Services East, Inc. v. NLRB*,
820 F.3d 592 (3d Cir. 2016) ............................................... 21, 47, 50, 51

*Barbato v. Greystone Alliance, LLC*,
916 F.3d 260 (3d Cir. 2019) ............................................... 23, 31, 37, 38

*BedRoc Ltd., LLC v. United States*,
541 U.S. 176 (2004) ................................................................................ 24

*Benjamin v. V.I. Port Auth.*,
684 F. App'x 207 (3d Cir. 2017) .......................................................... 50

*Bowsher v. Synar*,
478 U.S. 714 (1986) ......................................................................... 44, 45

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ............................................................... 11

*Cable Invs., Inc. v. Woolley*,
867 F.2d 151 (3d Cir. 1989) ................................................................. 32

*CFPB v. CashCall, Inc.*,
35 F. 4th 734 (9th Cir. 2022) ............................................................... 60

*CFPB v. Citizens Bank, N.A.*,
504 F. Supp. 3d 39 (D.R.I. 2020) .................................................. 46, 49

*CFPB v. Access Funding, LLC*,
No. 16-3759, 2021 WL 2915118 (D. Md. July 12, 2021) ..................... 48

*CFPB v. Navient Corp.*,
523 F. Supp. 3d 681 (M.D. Pa. 2021).............................................. 48, 49

*CFPB v. NDG Fin. Corp.*,
No. 15-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016)............... 39

*CFPB v. RD Legal Funding, LLC,*
No. 17-0890, 2022 WL 799429 (S.D.N.Y. Mar. 16, 2022) ............ 52, 63

*CFPB v. Seila Law LLC,*
997 F.3d 837 (9th Cir. 2021) ........................................................ 21, 46

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ................................................................ *passim*

*Covington v. Int'l Ass'n of Approved Basketball Officials,*
710 F.3d 114 (3d Cir. 2013) .................................................................. 36

*FEC v. NRA Political Victory Fund,*
6 F.3d 821 (D.C. Cir. 1993) .................................................................. 48

*FEC v. NRA Political Victory Fund,*
513 U.S. 88 (1994) .................................................................................. 50

*FEC v. Legi-Tech, Inc.,*
75 F.3d 704 (D.C. Cir. 1996) .......................................................... 47, 48

*Free Enterprise Fund v. Public Company Accounting
Oversight Board,*
561 U.S. 477 (2010) .................................................................. 43, 45, 65

*Haro v. City of Los Angeles,*
745 F.3d 1249 (9th Cir. 2014) ............................................................. 25

*John Doe Co. v. Cordray,*
849 F.3d 1129 (D.C. Cir. 2017) ........................................................... 51

*Lucia v. SEC,*
138 S. Ct. 2044 (2018) ........................................................................... 65

*Menominee Indian Tribe of Wis. v. United States,*
136 S. Ct. 750 (2016) ............................................................................. 52

*Meyer v. Holley,*
537 U.S. 280 (2003) ............................................................................... 35

*Morrison v. Olson,*
487 U.S. 654 (1988) ............................................................................... 58

*In re Nat'l Collegiate Student Loan Trusts 2003-1, et al.,*
971 F.3d 433 (3d Cir. 2020) .................................................. 9, 12, 13, 14

*Oklahoma v. Castro-Huerta,*
142 S. Ct. 2486 (2022) ........................................................ 39

*Rotkiske v. Klemm,*
140 S. Ct. 355 (2019) .......................................................... 37

*Russello v. United States,*
464 U.S. 16 (1983) .............................................................. 32

*Ryder v. United States,*
515 U.S. 177 (1995) ............................................................ 65

*Seila Law LLC v. CFPB,*
140 S. Ct. 2183 (2020) .................................................. *passim*

*Shalala v. Illinois Council on Long Term Care, Inc.,*
529 U.S. 1 (2000) ............................................................ 59, 60

*Smith v. United States,*
508 U.S. 223 (1993) ............................................................ 24

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) ........................................................ 65

*United States v. Arthrex, Inc.,*
141 S. Ct. 1970 (2021) ........................................................ 45

*United States v. Graham,*
305 F.3d 1094 (10th Cir. 2002) ........................................... 26

*United States v. Juvenile Male,*
564 U.S. 932 (2011) ............................................................ 64

*United States v. Morrison,*
449 U.S. 361 (1981) ........................................................ 21, 45

*United States v. Nagarwala,*
438 F. Supp. 3d 821 (E.D. Mich. 2020) ............................... 25

*Util. Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014) ...................................................................... 26

**Constitutional Provision**

U.S. Const., Art. II, § 1, cl. 1 ..................................................... 41

**Statutes**

12 U.S.C. § 5481.................................................................. *passim*

12 U.S.C. § 5491(c)...................................................................... 9

12 U.S.C. § 5515(e)(4) ............................................................... 33

12 U.S.C. § 5531(a) ............................................... 1, 6, 8, 26, 36

12 U.S.C. § 5536(a)(1)(B).......................................... 1, 6, 35

12 U.S.C. § 5562....................................................................... 7

12 U.S.C. § 5564 ........................................................ 7, 22, 50

12 U.S.C. § 5565 ................................................................ 4, 7

15 U.S.C. § 45 ...................................................... 6, 7, 29, 30

15 U.S.C. § 1692................................................................... 30

15 U.S.C. § 1692a(6) ....................................... 7, 30, 38

15 U.S.C. § 1692f ................................................... 7, 30

15 U.S.C. § 7211 ................................................................. 43

28 U.S.C. § 1292(b) ........................................ 4, 5, 19, 23

28 U.S.C. § 1331.................................................................... 4

28 U.S.C. § 1345.................................................................... 4

Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010) ..................... 6

**Other Authorities**

12 C.F.R. § 1083.1(a) ............................................................... 7

17 C.F.R. § 229.1101(c)(2)(ii) ................................................. 10

Asset-Backed Securities, Final Rule,
   70 Fed. Reg. 1506 (Jan. 7, 2005) ....................................... 10

John Berlau, *Why Hasn't Trump Fired CFPB's Cordray?*
   Forbes.com (Aug. 10, 2017) ................................................ 61

Br. in Opp. to Mot. for J. on Pleadings, *CFPB v. Navient Corp.*,
   No. 17-0101, Dkt. 518 (M.D. Pa. July 24, 2020) ................. 49

Elizabeth Dexheimer, *Trump Said to Weigh Political Risks
   of Firing CFPB's Cordray*, Bloomberg (Mar. 10, 2017) ..................... 61

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   H.R. 4173, 11th Cong. § 4002(9) (2009) ....................... 20, 32

Editorial Board, *Mr. Trump Goes After Consumer Financial
   Protection Bureau*, NYT (Mar. 22, 2017) ..................... 61, 62

Engage, Black's Law Dictionary (11th ed. 2019) ................... 25

Engage, Webster's New World College Dictionary (4th ed. 1999) ......... 25

Engage, Webster's Unabridged Dictionary of the English
   Language (2001) ................................................................ 25

Hearing Transcript, *CFPB v. Law Offices of Crystal Moroney*,
   No. 20-3240, Dkt. 34-5 (S.D.N.Y. Aug. 18, 2020) ............. 48

Renae Merle, *Richard Cordray is Stepping Down as Head of
   Consumer Financial Protection Bureau*, Washington Post
   (Nov. 15, 2017) .................................................................. 61

## INTRODUCTION

Under the Consumer Financial Protection Act (CFPA), the Consumer Financial Protection Bureau (CFPB) has authority to prevent certain entities ("covered persons") that "engage[]" in the offering of consumer financial products or services from committing unfair, deceptive, or abusive acts or practices (UDAAP).  12 U.S.C. §§ 5531(a), 5536(a)(1)(B).  The CFPB's complaint in this case targets allegedly unlawful conduct by loan servicers collecting on defaulted student-loan debt.  But the complaint asserts no claims against those loan servicers, nor even the entities that engaged them.

Instead, the defendants are 15 statutory trusts formed to purchase, pool, and securitize student-loan debt.  The Trusts are passive securitization vehicles.  They have no employees and no directors.  They cannot and do not *act* for themselves.  They have no right or ability to control the conduct of the loan servicers.  They are not, in any ordinary sense, "engage[d]" in offering any consumer financial service and therefore are not subject to the CFPB's UDAAP authority.

The district court initially appeared to agree.  In considering the CFPB's first complaint, Judge Noreika expressed "doubt" that the Trusts

were "covered persons" under the CFPA.  She stopped short of a holding to that effect, however, dismissing the complaint instead based a second fundamental flaw in the CFPB's action.  When the CFPB sued the Trusts in 2017, Director Richard Cordray headed the agency.  As the Supreme Court held in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), Director Cordray's insulation from presidential removal violated the Constitution's separation of powers.  And although the CFPB attempted to ratify this action post-*Seila Law*, the ratification was ineffective because it came after the three-year statute of limitations had run. Relying on established precedent from this Court and others, Judge Noreika dismissed the first complaint on that ground.

After the CFPB filed an amended complaint, the case was reassigned to Judge Bibas, sitting by designation.  Although nothing in the amended complaint meaningfully addressed either of Judge Noreika's concerns, Judge Bibas refused to dismiss it, holding that the Trusts were "covered persons" under the statute, and that, in light of the Supreme Court's decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the constitutional violation recognized in *Seila Law* warranted no retrospective relief for the Trusts.

Each holding is wrong and warrants reversal. The district court's statutory holding rests entirely on an overbroad definition of the word "engage," at odds with the word's ordinary meaning, the statute's carefully circumscribed structure, its place in the broader statutory scheme, and its statutory history. Congress knows how to grant an agency broad authority to regulate actors involved in consumer transactions. But it took a targeted approach to the CFPB's UDAAP authority, granting that authority over only a carefully defined group of actors—those actually engaged in the offering of certain consumer financial services ("covered persons") and certain affiliated entities ("service providers," "affiliates," and "related persons"). The Trusts do not fit into the former category, and the CFPB has never even alleged they fit into the latter.

The district court's constitutional holding relies on a similarly overbroad reading of the Supreme Court's decision in *Collins*. Unlike *Seila Law*, *Collins* did not concern the CFPB or an enforcement action. It involved an attempt by private investors in Fannie Mae and Freddie Mac to obtain a windfall by vacating agency action intended to address a national crisis. In rejecting that gambit, the Supreme Court did not

purport to overrule or abrogate well-established precedent concerning the appropriate remedy for a separation-of-powers violation in the enforcement context. The district court erred in finding otherwise.

Importantly, reversal threatens neither the CFPB itself nor the ability to police UDAAP violations like those alleged here. The Trusts are not seeking to dismantle the agency, and they have never disputed that the statute reaches *somebody*. (Indeed, the CFPB already settled with one loan servicer based on allegations in this very case.) And the relief sought by the Trusts is no broader than what Judge Noreika already granted or strongly suggested was available. Judge Bibas' contrary holdings were error. The district court's judgment should be reversed.

## STATEMENT OF JURISDICTION

The district court has jurisdiction under 28 U.S.C. §§ 1331 and 1345 and 12 U.S.C. § 5565(a)(1). The court denied Appellants' motion to dismiss on December 13, 2021, JA1-10, and certified its order for interlocutory appeal on February 11, 2022, JA11-20. Appellants filed a timely petition for permission to appeal under 28 U.S.C. § 1292(b) on

February 21, 2022, which this Court granted.  JA21-22.  This Court has jurisdiction under 28 U.S.C. § 1292(b).

## STATEMENT OF THE ISSUES

1.    Whether, under the Consumer Financial Protection Act, the Defendant Trusts are "covered persons," against which the Consumer Financial Protection Bureau may pursue a UDAAP claim.

2.    Whether the district court erred in refusing to dismiss this enforcement action initiated by the Bureau while its Director was insulated from presidential removal in violation of the constitutional separation of powers.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court.  The related cases or proceedings of which Appellants are aware are:

- *CFPB v. NCMSLT*, No. 17-cv-1323 (D. Del.);

- *CFPB v. NCMSLT*, No. 19-mc-67 (D. Del.);

- *CFPB v. NCMSLT*, No. 19-mc-108 (D. Del.); and

- *DiCello Levitt & Casey LLC v. Objecting Minority Noteholders*, No. 19-cv-352 (D. Del.).

## STATEMENT OF THE CASE

### A.    Legal Background

The CFPA was enacted in 2010 as part of the statute commonly referred to as Dodd-Frank. *See* Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010). The Act created the CFPB, an agency tasked with, among other things, regulating the offering and provision of consumer financial products and services under federal consumer protection laws. *See Seila Law*, 140 S. Ct. at 2192. Congress entrusted the administration of certain existing federal statutes to the newly created CFPB. *See id.* at 2193. It also created a prohibition against "any unfair, deceptive, or abusive act or practice" committed by certain financial persons and institutions ("covered person[s]" or "service provider[s]"). 12 U.S.C. § 5536(a)(1)(B). And it authorized the CFPB to take action to prevent those entities from committing such acts or practices "in connection with" offering consumer financial products or services. 12 U.S.C. § 5531(a).

This was a new law, but not a new concept. The Federal Trade Commission Act (FTCA), for one, had long prohibited "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). And, the Fair Debt Collection Practices Act (FDCPA) had similarly banned the

use of "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

In targeting unfair practices, Congress has traditionally taken one of two tacks. Some statutes, like the FTCA, reach a broad swath of actors, subject to limited and enumerated exemptions. The Federal Trade Commission (FTC) is "empowered and directed" to police all "persons, partnerships, or corporations, *except* banks, savings and loan institutions[,] . . . credit unions[,] common carriers[,] air carriers and foreign air carriers," and those "subject to the Packers and Stockyards Act." 15 U.S.C. § 45 (emphasis added). Other statutes, like the FDCPA, take the inverse approach, targeting *only* a carefully defined group—*e.g.*, "debt collector[s]," 15 U.S.C. § 1692f; *see* 15 U.S.C. § 1692a(6) (defining "debt collector").

The CFPA takes the more targeted route. The CFPB's powers within its sphere of authority are broad; the CFPB may promulgate rules, conduct investigations, initiate administrative adjudications, and prosecute civil actions seeking a range of remedies. *See* 12 U.S.C. §§ 5562; 5564(a), (f); 5565(a), (c)(2); 12 C.F.R. § 1083.1(a). But the agency's UDAAP authority extends only to a limited and defined set of

actors ("covered person[s] or service provider[s]") that participate in a limited set of activities (namely, offering or providing "consumer financial product[s] or service[s]"). 12 U.S.C. § 5531(a).

Under the CFPA, a "covered person" is "any person that engages in offering or providing a consumer financial product or service" and "any affiliate of [such] a person . . . if such affiliate acts as a service provider to such [covered] person." 12 U.S.C. § 5481(6); *see* 12 U.S.C. § 5481(26) (deeming certain "related persons" to also be "covered persons"). And a "service provider" is "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service." 12 U.S.C. § 5481(26).

The CFPA further defines a "financial product or service," 12 U.S.C. § 5481(15), to include "extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit" and "collecting debt related to any consumer financial product or service" for consumers' "personal family or household purposes." 12 U.S.C. §§ 5481(5), (15)(A)(i).

From its inception, the CFPB's single Director was "appointed by the President with the advice and consent of the Senate . . . for a term of five years, during which the President may remove the Director from office only for 'inefficiency, neglect of duty, or malfeasance in office.'" *Seila Law*, 140 S. Ct. at 2193 (quoting 12 U.S.C. § 5491(c)(1), (3)).  In 2020, the Supreme Court held that these restrictions on the President's removal authority violated the constitutional separation of powers.  *Id.* at 2197.  The Court further held that the removal provision was severable from the remainder of the Act, permitting the CFPB to continue to operate with a Director removable by the President at will.  *Id.* at 2211. As to the "appropriate remedy," the Court remanded for lower courts "to consider whether the civil investigative demand [at issue] was validly ratified" and if so, whether ratification "is legally sufficient to cure the constitutional defect." *Id.* at 2208.

## B.    The Defendant Trusts

The Defendants-Appellants Trusts are 15 passive securitization vehicles formed between 2001 and 2007, prior to the enactment of the CFPA.  JA305; *see generally In re Nat'l Collegiate Student Loan Trusts 2003-1, et al.*, 971 F.3d 433 (3d Cir. 2020) (*In re NCSLTs*).  Creatures of

9

Delaware statutory law, the Trusts were formed to acquire a pool of private student loans, to issue securitized notes on those loans, and to provide for the servicing of the loans and the distribution to noteholders of the loan payments made by borrowers. *See* JA107 (Trust Agreement § 2.03(a)). The Trusts have no officers or employees; in plain terms, they cannot *do* anything for themselves. *See also* 17 C.F.R. § 229.1101(c)(2)(ii) (issuers of "asset-backed securities" are "limited to passively owning or holding the pool of assets, issuing the asset-backed securities supported or serviced by those assets, and other activities reasonably incidental thereto"); Asset-Backed Securities, Final Rule, 70 Fed. Reg. 1506, 1511 (Jan. 7, 2005) ("[T]here is essentially no business or management . . . of the issuing entity, which is designed to be a solely passive entity.").

Accordingly, the Trusts are managed only pursuant to a series of governing agreements with various third parties. These include Trust Agreements, Administration Agreements, Indenture Agreements, a Special Servicing Agreement (SSA), and a Default Prevention and Collection Services Agreement (DPCSA).[1] *See* JA305-06.

---

[1] The Amended Complaint specifically references and relies upon these agreements. *See* JA387-91 (¶¶ 28, 30-33, 38-40, 45-50). This Court may

Among the primary agreements are the Trust Agreements, which appoint an Owner Trustee. JA109 (Trust Agreement § 3.02(b)(i)).[2] The Owner Trustee has both the power and the duty to "act on behalf of the Trust subject to direction by the Owners." JA107 (*Id.* § 2.03(b)(i)). The current Owner Trustee is Wilmington Trust Company. JA103.

The Owner Trustee entered into two further types of primary agreements. Under the Administration Agreements, the Owner Trustee delegated certain powers to act on the Trusts' behalf to an Administrator. The Administrator must "perform, or cause to be performed, its duties and obligations and the duties and obligations of the Owner Trustee on behalf of the Issuer" with certain limitations. JA150 (*Id.* § 1(c)(i)). But the Administrator is "not . . . subject to the supervision of the [Trusts] or the Owner Trustee with respect to the manner in which it accomplishes the performance of its obligations." JA152 (*Id.* § 5).

Under separate Indenture Agreements, the Owner Trustee then granted "all rights, powers and options" of the Trusts to an Indenture

---

thus consider them at the dismissal stage as "document[s] *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted).

[2] As relevant here, the governing agreements for each trust are substantively identical.

Trustee, including in connection with the securitized student loans. JA230 (Indenture Agreement App. A (Definition of "Grant")). In broad terms, the Indenture Trustee has the right "generally to do and receiv[e] anything that the [Trust] is or may be entitled to do or receive" when the notes are outstanding. *Id.*; *see* JA180 (*id.* § 3.07(f)). U.S. Bank serves as the Indenture Trustee for the Trusts. JA230.

As this Court has noted, this process of securitizing private student loans "works well when the students do not default on their loans." *In re NCSLTs*, 971 F.3d at 437. But regrettably, some student borrowers do default. This was especially true in 2008 and 2009, during the financial crisis. Compounding this problem for the Trusts, a firm that had guaranteed payment of the student loans underlying 12 of the 15 Trusts declared bankruptcy in 2009. In connection with servicing defaulted student loans, multiple parties entered into a Special Servicing Agreement, appointing the initial Special Servicer, which was tasked with collecting payments from past-due and defaulted borrowers, JA322-55, and retaining U.S. Bank as the Backup Special Servicer, in case the primary Special Servicer resigned or was removed. *See In re NCSLTs*, 971 F.3d at 440.

In 2012, the primary Special Servicer resigned, making U.S. Bank the Successor Special Servicer.  *Id.*  In this role, U.S. Bank assumed "the rights, duties and obligations of the Special Servicer" "to the extent expressly required to be assumed and performed by the Back-Up Special Servicer."  JA322-25, 328 (SSA §§ 2.B, 8.A).  The SSA provides that, in this capacity, U.S. Bank serves as an "independent contractor" not "subject to the supervision of the Trusts."  JA336 (*Id.* § 17).  By the SSA's own terms, moreover, nothing in that agreement "shall be construed to impose any liability" on the Trusts, and the Successor Special Servicer lacks "any express, implied or apparent authority to incur any obligation or liability on behalf" of the Trusts.  JA337 (*Id.* § 18).

There is one more relevant agreement.  In the SSA, the Successor Special Servicer is contractually prohibited from itself collecting on past-due and defaulted loans.  JA323-25 (*Id.* § 2.B(i), (xiv)).  So, from its inception, the SSA was coupled with a separate *sub*servicing agreement—the DPCSA—between the primary Special Servicer and another party (now Intervenor-Appellant Transworld Systems Inc.) that would actually service delinquent loans in the event the primary Special Servicer resigned or was removed—which, as noted, came to pass in 2012.

*See* JA476-573; *see also In re NCSLTs*, 971 F.3d at 440. It is the *sub*servicers whose alleged conduct is the focus of the CFPB's complaint. *See* JA389, 391, 393 (¶¶ 44, 50, 51, 71).

### C.    The Present Controversy

1.    In September 2014, the CFPB issued a civil investigative demand (CID) to each of the Trusts for information concerning collections lawsuits brought against borrowers who defaulted on student loans owned by the Trusts. JA367. Two years later, in 2016, the CFPB notified each Trust of its intent to begin enforcement proceedings under the CFPA's UDAAP provision. JA368-69. During this time, the CFPB's single Director—Richard Cordray—was statutorily removable by the President only for inefficiency, neglect, or malfeasance. JA374. The Supreme Court decided *Seila Law*, finding the removal provision unconstitutional and severable from the statute, in June 2020. 140 S. Ct. at 2192.

A law firm purporting to represent the Trusts engaged with the CFPB. JA367. Despite serious questions as to the firm's authority to represent the Trusts—raised to the CFPB by the Owner Trustee and others—the CFPB negotiated with that firm a Proposed Consent

Judgment (PCJ) purporting to resolve its investigation as to the Trusts' liability. *Id.* On September 18, 2017, the CFPB—still led by Director Cordray—filed this action against the Trusts and moved simultaneously for approval of the PCJ. JA77-92; Dkt. 3. Numerous parties successfully intervened and objected, including Intervenor-Appellants Ambac Assurance Corporation[3] and Transworld. Dkt. 4, 9; JA163. The district court (Noreika, J.) denied the CFPB's motion to approve the PCJ, holding that the law firm purporting to represent the Trusts lacked that authority. JA303-17.

Certain intervenors then moved to dismiss the CFPB's complaint, arguing (among other theories) that the district court lacked subject matter jurisdiction because the Trusts were not "covered persons" under the CFPA. The court expressed "some doubt that the Trusts are 'covered persons' under the plain language of the statute." JA371. Ultimately, however, the court did not need to decide the statutory question in light of certain intervenors' separate argument that the separation-of-powers violation identified in *Seila Law* deprived the CFPB of authority to

---

[3] Ambac serves as the note insurer for several of the Trusts. *See* Dkt. 95 at 4.

initiate the enforcement action against the Trusts when it did, and that a subsequent Director's attempt to ratify the suit was ineffective. The district court held that "the complaint, initially filed by a Director unconstitutionally insulated from removal, cannot still be enforced." JA379. While expressing skepticism that the agency could cure this defect via amendment or otherwise, the court afforded the CFPB the opportunity to replead. JA380.

One month later, the CFPB filed an amended complaint—the operative one here. JA381-402. The amended complaint alleges that the Trusts were created "to acquire a pool of private student loans, to issue notes secured by that pool of student loans, and to service and collect on those student loans." JA386-87 (¶¶ 26-33). It alleges that the Trusts are "covered persons" under the CFPA because they "engage" in debt collection through "the actions of entities acting within the prescribed authority of relevant Trust-Related Agreements" and that these actions "are, legally, the actions of the Trusts themselves." *Id.* And it claims that the Trusts violated the CFPA's prohibition against unfair or deceptive practices when the subservicers allegedly (1) initiated collections lawsuits supported by false or misleading affidavits and

testimony, (2) improperly notarized such affidavits, (3) initiated collections lawsuits without the intent or ability to prove its claims, and (4) attempted to collect time-barred debt. JA391-95 (¶¶ 51-87). The amended complaint seeks legal and equitable relief, including civil monetary penalties and injunctive relief against the Trusts. JA401-02 (¶¶ 124-25).

Appellants, along with several others, again moved to dismiss. *See* Dkt. 367. Appellants again argued that the Trusts were not "covered persons" under the CFPA because they are passive securitization vehicles that do not take any action related to a consumer financial service and do not control the subservicers. Additionally, the Trusts and Ambac renewed the argument that the CFPB lacked authority to initiate the action, and that the subsequent Director's purported ratification was untimely and ineffective.[4]

2.    Following reassignment of the case to Judge Bibas, the district court denied the renewed motion to dismiss. JA1-10.

---

[4] Transworld took no position on the ratification question. *See* Dkt. 367 at 7 n.1.

First, the district court concluded that the Trusts were "covered persons" under the CFPA. The court reasoned that the term "engage" was "broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise." JA8. And it concluded that the Trusts were engaged in the business of "collecting debt and servicing loans when they [allegedly] contracted with the servicers and subservicers to collect their debt and service their loans." JA8-9.

Second, the district court relied on the Supreme Court's intervening decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), to reach a new conclusion on the constitutional question. The district court interpreted *Collins* to hold that "an unconstitutional *removal* restriction does not invalidate agency action so long as the agency head was properly *appointed*." JA5. It thus reasoned that the CFPB's actions were not void when taken and need not have been ratified. *Id.* And it concluded that the Trusts could not prove that "the removal provision harmed" them in a manner warranting relief because, in its view, the "suit would have been filed even if the director had been under presidential control." JA6.

After the district court certified its order for interlocutory appeal under 28 U.S.C. § 1292(b), JA11-20, Appellants petitioned this Court for permission to appeal, which the Court granted.  JA21-22.

## SUMMARY OF ARGUMENT

1.    The Trusts are not "covered persons" under the CFPA's UDAAP provision because they do not "engage[] in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6).  As courts have recognized and dictionaries show, the ordinary meaning of the word "engage" requires active involvement, and the Trusts are not actively involved in "offering or providing" any financial products or services. Instead, the Trusts are passive securitization vehicles that cannot act for themselves.  The district court's conclusion that "engage" is broad enough to cover indirect involvement by passive entities like the Trusts was wrong.

The structure of the CFPA confirms that the ordinary meaning of "engage" applies here.  Congress carefully crafted the UDAAP provision to reach specific, defined categories of actors: those who offer financial products and services ("covered persons") and those who form specific relationships with them (*e.g.*, "service providers" and "affiliates").  An

interpretation of "engage" that sweeps in indirect, passive involvement undermines this precision.

It is also at odds with how Congress legislates in this area. When targeting unfair or deceptive practices, Congress knows how to delegate wide-ranging enforcement authority, *e.g.,* the FTCA, and it knows how to carefully circumscribe regulation of only certain types of entities, *e.g.*, the FDCPA. With the CFPA, Congress took the latter, more targeted, route. The district court's expansion of the Bureau's UDAAP authority subverts this design.

Finally, the history of the CFPA further bolsters the conclusion that the Trusts are not "covered persons." The bill that would eventually become the CFPA would have afforded the CFPB UDAAP authority over "any person who engages *directly or indirectly* in [certain] financial activity." Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R. 4173, 11th Cong. § 4002(9)(A) (2009) (emphasis added). But Congress ultimately adopted narrower language, omitting the phrase "directly or indirectly" from the final version. *See* 12 U.S.C. § 5481(6). This deletion confirms that Congress did not intend "covered persons" to

reach entities like the Trusts that are—at most—*indirectly* involved in offering financial services.

2.    In the alternative, this action should be dismissed to remedy the separation-of-powers violation in the initation of this suit.    The Bureau sued the Trusts in 2017, when Director Richard Cordray was statutorily removable by the President only for cause.    The Supreme Court later held that this tenure protection violated Article II.    *See Seila Law*, 140 S. Ct. at 2183.    An enforcement action initiated by an unconstitutionally structured agency inflicts "a 'here-and-now' injury," *id.* at 2196, that demands a remedy tailored "to the injury suffered." *United States v. Morrison*, 449 U.S. 361, 364 (1981).

Dismissal is the only sufficient remedy here.    To be sure, courts have recognized that agencies, once constitutionally structured, may cure similar constitutional injuries by ratifying their prior decisions.    *See, e.g.*, *CFPB v. Seila Law LLC*, 997 F.3d 837, 846 (9th Cir. 2021).    But the agencies must still have authority to carry out the ratified task *at the time of ratification.    See Advanced Disposal Services East, Inc. v. NLRB*, 820 F.3d 592, 602 (3d Cir. 2016).    If this authority has lapsed, ratification is ineffective.    The CFPB's attempted ratification in this case came after

21

the statute of limitations on the alleged violations had expired.  *See* 12 U.S.C. § 5564(g)(1).  With ratification unavailable, dismissal is the only remedy that will redress the constitutional injury inflicted upon the Trusts.

Rejecting this established remedial framework, the district court relied on a purportedly new rule announced in *Collins v. Yellen*.  But *Collins* is distinguishable.  First, it involved a different sort of constitutional injury.  *Collins* was not an enforcement action; the challengers went to court voluntarily as plaintiffs and took aim at generally applicable agency action.  Second, that agency action—the adoption of an agreement known as the "third amendment"—was free of constitutional error when first taken, unlike the initiation of the suit against the Trusts.  And third, the *Collins* plaintiffs sought vastly different—and more expansive—relief than the Trusts do here.  *Collins* should not be read to foreclose an established remedy that was never at issue.

Even if *Collins* is applicable, moreover, the Trusts are still entitled to dismissal.  The Trusts suffered the precise "harm" that *Collins* held would merit retrospective relief: President Trump publicly noted his

22

desire to fire Director Cordray, was thwarted by an unconstitutional removal provision, and Director Cordray subsequently filed this action against the Trusts.  The district court's contrary conclusion relied on a faulty reading of *Collins*, importing a heightened requirement for showing "harm" that is nowhere in the majority opinion.

## STANDARD OF REVIEW

This Court reviews *de novo* questions certified for interlocutory appeal under 28 U.S.C. § 1292(b).  *Barbato v. Greystone Alliance, LLC*, 916 F.3d 260, 264 (3d Cir. 2019).

## ARGUMENT

The district court erred in declining to dismiss this action for two independent reasons.  First, the court should have dismissed this action because the Trusts are not "covered persons" under the CFPA.  The CFPB has not alleged any other basis for making them subject to the agency's UDAAP enforcement authority, nor has it alleged any cause of action outside its UDAAP authority.  Second, even if not, the court should have dismissed this action to remedy the harm inflicted upon the Trusts through the unconstitutional exercise of unaccountable executive power against them.

## I.   THE TRUSTS ARE NOT "COVERED PERSONS" UNDER THE CFPA.

The dispositive statutory question in this case is whether the Trusts are subject to the CFPB's UDAAP enforcement authority because they "engage[] in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6).  They do not.  All the traditional tools of statutory interpretation—text, structure, context, and history—confirm that the term "engage" in § 5481(6) requires active participation in the activity at issue and does not extend to passive securitization vehicles like the Trusts.  The district court erred in concluding otherwise.

### A.   The Trusts Do Not "Engage" in the "Offering or Providing" of Consumer Financial Products or Services Under the CFPA.

#### 1.   *The ordinary meaning of the term "engage" does not encompass the Trusts' passive role.*

The interpretation of a statute "begins with the statutory text." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004).  When a term is left undefined by the statute, courts should "construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228 (1993).  As a matter of ordinary meaning, to "engage" in an activity requires active participation, not a mere passive or indirect connection to it.

24

In both general and legal dictionaries, "engage" requires active and volitional involvement. To "engage" in an activity is to "involve" or "occupy oneself" with that activity, to "take part" in it and "be active." *See, e.g.*, Engage, Black's Law Dictionary (11th ed. 2019) ("To employ or involve oneself; to take part in; to embark on."); Webster's Unabridged Dictionary of the English Language at 644 (2001) ("[T]o occupy oneself; become involved."); Webster's New World College Dictionary at 471 (4th ed. 1999) ("[T]o occupy or involve oneself; take part; be active.").

An individual engages in gardening by planting flowers and pulling weeds. A firefighter engages in fighting fire. But the gardener's landlord is not engaged in gardening—even if he requires a cut of the proceeds. And "dispatchers do not have the 'responsibility to *engage* in fire suppression.'" *Haro v. City of Los Angeles*, 745 F.3d 1249, 1257 (9th Cir. 2014) (emphasis added). In plain terms, engaging is hands-on.

This ordinary understanding of the term is echoed throughout the law. As one court recently put it: "Plainly, if one is engaged in an activity, one is *actively* involved in it, *i.e.*, *doing* the activity." *United States v. Nagarwala*, 438 F. Supp. 3d 821, 826 (E.D. Mich. 2020); *see Haro*, 745 F.3d at 1257 (The "term most logically refers to those who are dispatched

to the fire scene and actively engage the fire."); *United States v. Graham*, 305 F.3d 1094, 1102 (10th Cir. 2002) ("The term 'engage' is commonly defined as 'to occupy or involve oneself; take part; be active.'") (citation omitted).

      2.    *The CFPA's structure confirms the ordinary meaning of the text.*

The statutory structure of the CFPA, moreover, demonstrates that Congress used "engage" in accordance with its ordinary meaning. "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014) (citation omitted). The CFPA's articulation of the actors and entities which the CFPB may regulate supports a narrow reading of the UDAAP provision and confirms that a "covered person" must be actively involved in offering a consumer financial product or service.

The CFPA carefully identifies the types of actors the Bureau's UDAAP authority reaches, focusing on the specifics both of their conduct and of their relationships with other industry participants. As noted, the CFPB's UDAAP enforcement authority extends to "covered persons" and "service providers." 12 U.S.C. §§ 5531(a), 5481(6), (26). A "covered

person" is anyone who "engages in offering or providing a consumer financial product or service" or "any affiliate of [such] a person . . . if such affiliate acts as a service provider to [the covered] person." *Id.* § 5481(6). An "affiliate" is "any person that controls, is controlled by, or is under common control with another person." *Id.* § 5481(1).

For non-banks, a "related person . . . shall be deemed to mean a covered person" as well. *Id.* § 5481(25). "Related person" is another carefully (and exhaustively) defined term: it includes "any director, officer, or employee charged with managerial responsibility," a "controlling shareholder of" a covered person, or a covered person's "agent." *Id.* § 5481(25)(C)(i). It includes "any shareholder, consultant, joint venture partner, or other person . . . who materially participates in the conduct of the affairs of [a] covered person." *Id.* § 5481(25)(C)(ii). And it also includes "any independent contractor" of a covered person "who knowingly or recklessly participates" in wrongdoing. *Id.* § 5481(25)(C)(iii).

Finally, a "service provider" is "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service" but

excludes certain services like support services, ministerial services, and advertising. *Id.* § 5481(26). A "service provider" may also be a "covered person" in their own right "to the extent that such person engages in the offering or provision of its own consumer financial product or service." *Id.* § 5481(26)(C).

In short, the CFPA delineates the scope of the CFPB's UDAAP enforcement authority with precise, granular definitions. It includes particular persons and entities that directly participate in the offering or provision of financial products or services (*i.e.*, covered persons), and certain other persons and entities that enter into specific relationships (and related conduct) with those covered persons (*i.e.*, affiliates, related persons, service providers). Each of those categories are carefully circumscribed and painstakingly defined. This detailed scheme is incompatible with the district court's gestalt approach to "covered person" status. And it is fundamentally undermined by the district court's broad definition of "engage" that confers "covered person" status on entities only passively or indirectly connected to the offering of a consumer financial product or service.

3.  *The broader statutory context demonstrates Congress's targeted approach to the CFPB's UDAAP enforcement authority.*

Other delegations of authority under consumer protection statutes underscore Congress's targeted approach to the scope of the CFPB's UDAAP enforcement authority.  Congress takes different approaches when setting the bounds of agency authority.  Some delegations are broad, subjecting a wide range of actors to an agency's investigatory and enforcement powers.  Others are more targeted, conscribing the agency's enforcement powers or targeting prohibitions on a particular group of actors, a particular type of conduct, or both.  The CFPA is an example of the latter.

Consider the FTCA.  Similar to the CFPA, the FTCA authorizes the FTC to prevent "[u]nfair methods of competition" and "unfair or deceptive acts or practices."  15 U.S.C. § 45(a)(1)-(2).  Yet quite unlike the CFPA, the FTC's enforcement authority broadly reaches virtually all "persons, partnerships, or corporations," with limited exceptions that are express in the statute. 15 U.S.C. § 45; *see* pp. 6-7, *supra*.  What is more, the FTCA is not bound by industry.  Although Congress confined the CFPB's UDAAP enforcement authority to financial products and services, it

empowered the FTC to police anything "in or affecting commerce."   15 U.S.C. § 45(a)(1).

The FDCPA, by contrast, offers an instructive example of Congress's narrower approach.   That statute also targets "abusive, deceptive, and unfair" practices.   15 U.S.C. § 1692.   But Congress circumscribed the FDCPA, both in scope and reach.   It reaches only "debt collector[s]."   15 U.S.C. §§ 1692f, 1692a(6).   And it applies only to "unfair or unconscionable means" used "to collect or attempt to collect any debt." 15 U.S.C. § 1692f.   These two schemes reveal that Congress knows how to legislate in this area.   It can cast a net just as easily as it can spearfish. With the CFPB's UDAAP authority, it did the latter.

Indeed, in at least one important respect, the CFPA is even *narrower* than the FDCPA.   The FDCPA defines a debt collector as a person (1) "in any business the principal purpose of which is the collection of any debts," or (2) "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).   In other words, a debt collector is *either* a person in the business of collecting debts *or* a person who "regularly collects" debt.   As the Court explained in *Barbato v. Greystone Alliance LLC*,

*supra*, the first "principal purpose" definition focuses not on "the *act* of collecting" but "*what* is collected, namely, the acquired debts"; "[a]s long as a business's *raison d'être* is obtaining payment on the debts that it acquires, it is a debt collector" regardless of who is doing the collecting. 916 F.3d at 267. By contrast, the second "regularly collects" definition "describ[es] the actions of those [Congress] intended the definition to cover." *Id.* "[B]y its terms, the 'principal purpose' definition sweeps more broadly than the 'regularly collects' definition." *Id.* at 267-68.

The CFPA includes only the second, narrower type of definition. An entity becomes a "covered person" by the conduct it "engages" in—akin to the action-based approach of the FDCPA's "regularly collects" prong—and not because of its "primary purpose." By defining the CFPB's authority only by "specify[ing] who must do the collecting" or offer another financial product or service, Congress thus swept more narrowly in the CFPA's covered-person provision than it did in the FDCPA. *Id.* at 267-68.

4. *The CFPA's drafting history further underscores the limited reach of the phrase "covered person."*

Finally, the drafting history of the CFPA further supports the limited scope of the covered-person provision. When initially introduced,

the bill's first draft defined "covered person" in more sweeping terms: "any person who engages *directly or indirectly* in a financial activity, in connection with the provision of a consumer financial product or service." Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R. 4173, 11th Cong. § 4002(9)(A) (2009) (emphasis added).  Indeed, the definition was so broad that the bill explicitly exempted from the definition "the Secretary, the Department of the Treasury, [and] any person collecting Federal taxes for the United States." *Id.* § 4002(9)(B).

The meaning of "covered person," however, was narrowed while the bill was under consideration.  The final bill enacted into law omits the capacious "directly or indirectly" phrase—as well as the corresponding exemption for government officials.  *See* 12 U.S.C. § 5481(6).  "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23-24 (1983).  So too with language proposed to expand a statute's reach.  *See Cable Invs., Inc. v. Woolley*, 867 F.2d 151, 156 (3d Cir. 1989).  The district court effectively overrode this intent, reinserting "indirectly" where Congress

saw fit to omit it.  *Cf.* 12 U.S.C. § 5515(e)(4) (retaining the phrase "directly or indirectly" in another CFPA provision).

## B.  The District Court Erred in Holding That the Trusts Are Covered Persons.

Under the better reading of the CFPA, the Trusts are not "engaged" in providing financial products or services because they are not actively involved in any servicing or collection efforts.  As the amended complaint alleges, the entities directly involved in those activities are the servicers, including the subservicers.  And, as the district court recognized, the Trusts exercise no ongoing supervision or control over the performance of the Special Servicer—much less the subservicers themselves.  In short, the CFPB's UDAAP enforcement authority extends to a range of entities involved in the servicing and collecting of the student loans at issue here. But the Trusts are not among them.

The district court thus erred in concluding that the Trusts are "covered persons" under the CFPA on the theory that "they 'engaged in' servicing loans and collecting debt through their contractors."  JA2. According to the court, the term "engage" is "broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise."  JA8.  And so, according to the court,

the Trusts engaged in "collecting debt and servicing loans when they contracted with the servicers and subservicers to collect their debt and service their loans." JA8-9. That reasoning is flawed in several respects.

1. Most fundamentally, the district court erred by failing to interpret the CFPA in light of the statute's structure, context, and history. The court relied almost exclusively on two dictionary definitions to support its reading of the term "engage." That term, the court concluded, "means 'to embark in any business' or 'to enter upon or employ oneself in an action'"—a meaning it found "broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise." JA8. As explained, this "broad" meaning of "engage"—encompassing actions taken exclusively by another—departs from its ordinary meaning, which requires active participation in the task, and is inconsistent with the definitions on which the district court itself relied. *See* pp. 24-26, *supra.* But even if it were a possible meaning of the text in the abstract, the remaining tools of statutory construction— structure, context, and history—all confirm that Congress intended the

ordinary meaning to apply here. The court erred by failing to rely on those fundamental tools of statutory construction.

2.   The district court further erred by adopting a definition of "engage" that reaches beyond the "common-law . . . principles," which are the "background" against which "Congress is understood to legislate." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). The court held that "engage" "encompass[es] actions taken on a person's behalf by another," even if the ultimate actor is an independent contractor, not subject to the Trusts' control. JA8-9. At common law, attributing to one person "actions taken on [that] person's behalf by another" is a quintessential question of agency. And the court provided no basis for concluding that Congress intended to sweep broader than those principles here. If anything, Congress's careful articulation of the various actors subject to the CFPB's UDAAP enforcement authority suggests the opposite. *See* pp. 26-28, *supra*.[5]

---

[5] A broad reading of "engage" may have further unintended consequences still—if, for instance, it were relied upon to expand not just who is subject to the Bureau's UDAAP enforcement authority, but also whose acts they may be held liable for. *See* 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

"An agency relationship," this Court has observed, "is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 120 (3d Cir. 2013) (quotations and citation omitted). Had the district court applied this familiar standard, it would have been forced to grapple with the various trust documents incorporated by reference in the complaint, which demonstrate on their face that neither the Special Servicer nor the subservicers are "control[led]" or "direct[ed]" by the Trusts or other Trust parties. Rather, multiple parties contracted with the initial Special Servicer, and the initial Special Servicer contracted with the subservicers that actually serviced the loans. Under that agreement, the Special Servicer is an "independent contractor . . . not . . . subject to the supervision of the Trusts," and has the sole authority to hire and oversee the subservicers. JA323, 336-37 (SSA §§ 2.B(i)-(iii), 17); *see* JA107, 109-10, 111-12 (Trust Agreement §§ 2.03, 3.02, 4.01); JA152 (Administration Agreement § 5; JA171-72 (Indenture Agreement (Granting Clause)). The Trusts are not even signatories to the agreement between the Special Servicer and the subservicers. *See* JA475-573.

It does not help matters that the district court suggested that another entity's conduct might be attributed to the Trusts only where the conduct was "central to [their] enterprise." JA8. While such a limiting principle might eliminate some of the most absurd applications of the court's interpretation, it has no basis in the statutory text, and does nothing to reconcile the court's holding with the common law. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 360-61 (2019) ("It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" (quotation omitted)). The result is a statutory interpretation unmoored from both the text and background principles.

In this regard, the district court's reliance on this Court's decision in *Barbato* is telling. *See* JA9. The district court summarized *Barbato* as holding that "a 'passive debt owner' counted as a 'debt collector' under the Fair Debt Collection Practices Act when it contracted with a third party to collect debt on its behalf." JA9 (citing *Barbato*, 916 F.3d at 266-68). True enough. But the district court has the significance of that holding exactly backwards. The definition of "debt collector" in the FCPA includes both (1) entities "in any business the principal purpose of which is the collection of any debts" *and* (2) those "who regularly collect[]" debts.

37

15 U.S.C. § 1692a(6).  In *Barbato*, this Court held that entities who "hir[e] a third party to do [the] collecting" qualify as "debt collectors" *only* under the first definition, not the second.  916 F.3d at 261, 268.  Here, the district court determined that the Trusts qualify as "covered persons" by applying a definition almost identical to the FDCPA's *second* definition.  *See* JA7-9 (concluding that the Trusts are "engaged in" "the business of collecting debt and servicing loans," which are "core aspects of the[ir] business model").  But the CFPA *lacks* any analog to the FDCPA's "primary purpose" definition.  By explaining that "passive debt owners" qualify as "debt collectors" only under an FDCPA definition that the CFPA lacks, *Barbato* powerfully undermines the decision below, rather than supports it.

3.    Finally, the district court erred to the extent that its interpretation of the CFPA was based on a concern that a narrower interpretation would leave the CFPB without recourse.  In reaching its conclusion, the court appeared to express concern that the Trusts might escape the reach of the CFPB by "contract[ing] . . . out" "a key part of their business."  JA9.  Even if that were a result to be avoided, it has no bearing here.  In interpreting a federal statute, it is the role of the court

"to declare what the law is, not what" one might "think the law should be." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2504 (2022).

In any event, such concerns are misplaced. The CFPB has ample authority to pursue the actors who actually *engage* in behavior the agency believes warrants enforcement—as well as their affiliates, service providers, and various related persons. Transworld has already entered into a separate consent order with the Bureau, in 2017, addressing loan-servicing allegations that substantially overlap with those alleged in the complaint. *See* Dkt. 54-2; *see also CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *20 (S.D.N.Y. Dec. 2, 2016) (holding that the CFPB may seek disgorgement from "relief defendants" not otherwise subject to direct liability).

What the CFPB cannot do is stretch its authority beyond the limits Congress imposed. Passive entities that do not *do* anything by their own accord are not "covered persons" as the agency now asserts. Because the Trusts' alleged status as a "covered person" is a predicate for the only causes of action in the CFPB's complaint, the district court's order should be reversed and this case should be remanded with instructions to dismiss the complaint.

## II.    ALTERNATIVELY,    THE    COMPLAINT    SHOULD    BE DISMISSED TO REMEDY THE SEPARATION-OF-POWERS VIOLATION.[6]

Because the Complaint fails to state a claim under the CFPA, this Court need not reach the constitutional question also certified by the district court.  If the Court does reach the issue, however, it offers an alternative ground for reversal:  the district court should have dismissed this action to remedy the separation-of-powers violation in the CFPB's enforcement against the Trusts.  Then-Director Cordray initiated this suit against the Trusts—a quintessential exercise of executive power— while unconstitutionally insulated from presidential supervision.  This unaccountable enforcement inflicted on the Trusts "a 'here-and-now' injury" that only dismissal can remedy here, where the CFPB's attempt at ratification came too late.  *Seila Law*, 140 S. Ct. at 2196.  The district court erred by construing *Collins* to foreclose this relief.

### A.    Director Cordray's Initiation of This Enforcement Action Inflicted a "Here-and-Now" Injury That Should Be Remedied.

When Director Cordray began this action against the Trusts, his freedom from presidential supervision violated Article II, and his

---

[6] Consistent with its position below, Transworld takes no position on this question.

unconstitutional exercise of that authority imposed harm on the Trusts that demands a remedy.

> 1.  *By insulating him from removal, the CFPA left Director Cordray unconstitutionally unaccountable to the President and thus the American people.*

When the CFPB filed this suit in September 2017, JA77, "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violate[d] the separation of powers." *Seila Law*, 140 S. Ct. at 2197; *see* JA9.

As the Supreme Court would explain, the "entire 'executive Power,' belongs to the President alone." *Seila Law*, 140 S. Ct. at 2197 (quoting U.S. Const., Art. II, § 1, cl. 1). While "lesser executive officers" may of course "'assist . . . in discharging the duties of his trust,'" they "must remain accountable to the President, whose authority they wield." *Id.* (citation omitted). Lesser officials generally must be removable at will by the President because it is the "power to remove" through which the President "supervise[s] those who wield executive power on his behalf." *Id.* at 2191; *see Collins*, 141 S. Ct. at 1787 ("[T]he Constitution prohibits even 'modest restrictions' on the President's power to remove the head of an agency with a single top officer[.]"). Such accountability to the

President ultimately ensures accountability to the People and safeguards their liberty. *See id.* at 2203 (The Framers "divide[d] power everywhere except for the Presidency, and render[ed] the President directly accountable to the people through regular elections."); *Collins*, 141 S. Ct. at 1780.

In *Seila Law*, the Court held that, by insulating the single Director of the CFPB from removal by the President except for cause, the CFPA vested executive power instead in a "single individual accountable to no one." *Id.* at 2203. Director Cordray was "neither elected by the people nor meaningfully controlled (through the threat of removal) by someone who [wa]s." *Id.* Yet he was empowered, "without meaningful supervision," to "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Id.* at 2203-04. That "insulation from removal by an accountable President . . . render[ed] the agency's structure unconstitutional." *Id.* at 2204.

> 2. *Targeted by Director Cordray's unconstitutional enforcement authority, the Trusts suffered a "here-and-now" injury.*

When the CFPB initiated this enforcement action against the Trusts prior to *Seila Law*, the Trusts suffered an immediate and legally cognizable injury. As the Court explained in *Seila Law*, when targeted for enforcement by unaccountable executive power, regulated third parties suffer "a 'here-and-now' injury . . . that can be remedied by a court." *Seila Law*, 140 S. Ct. at 2196.

While made express in *Seila Law*, the roots of this holding date to two of the Court's earlier removal cases. In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Court considered the structure of the Public Company Accounting Oversight Board (PCAOB). 561 U.S. 477, 484 (2010). Like the CFPB, the PCAOB enjoyed wide-ranging enforcement authority—"significant executive power"—while its Board members were removable only "for good cause." *Id.* at 486, 514 (quoting 15 U.S.C. § 7211). When an accounting firm being investigated by the Board sued the agency, the Supreme Court agreed that the PCAOB was vested with "executive power without the Executive's oversight" in violation of Article II. *Id.* at 487, 489. And the Court held

that the firm was "entitled" to a remedy for its injury—specifically, "declaratory relief sufficient to ensure that" the regulations "to which they are subject *will be enforced only by a constitutional agency accountable to the Executive.*"  *Id.* at 513 (emphasis added) (citing *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)).

*Bowsher* is also instructive.  There, the Court considered the functions of the Comptroller General, who was removable not by the President, but by Congress.  478 U.S. at 732.  Because the Comptroller General wielded executive powers, the Court held the removal limitations unconstitutional:  "the Comptroller General's presumed desire to avoid removal by pleasing Congress . . . creates the here-and-now subservience to another branch that raises separation-of-powers problems."  *Id.* at 727 n.5 (citation omitted).  Consistent with *Free Enterprise*, the defendants were awarded declaratory relief to ensure that the Comptroller General could not unlawfully exercise those executive powers, and the Supreme Court affirmed.  *See id.* at 721.

When the CFPB initiated this suit, the Trusts suffered the same type of "here-and-now injury" recognized in *Seila Law*, *Free Enterprise Fund*, and *Bowsher*.  Director Cordray wielded "executive power without

the Executive's oversight," *Free Enterprise Fund*, 561 U.S. at 484, 498,

haling the Trusts into a complex and protracted battle in federal court

while he was protected by an unconstitutional statutory restriction on his

removal. This inflicted a constitutional injury, and the Trusts are

entitled to relief sufficient to ensure that the CFPA is "enforced only by

a constitutional agency accountable to the Executive." *Id.* at 513.

### B.    Absent Timely and Valid Ratification, the Appropriate Remedy For an Enforcement Action Initiated by an Unaccountable Executive Official Is Dismissal.

In this case, the appropriate remedy for the Trust's "here-and-now"

injury is dismissal. As a "general rule," remedies for constitutional

injuries "should be tailored to the injury suffered from the constitutional

violation." *Morrison*, 449 U.S. at 364; *see United States v. Arthrex, Inc.*,

141 S. Ct. 1970, 1997 (2021) (Breyer, J., concurring) ("any remedy" for an

Article II violation "should be tailored to the constitutional violation").

*Free Enterprise Fund* confirms that a federal statute may be "enforced

*only* by a constitutional agency accountable to the Executive." 561 U.S.

at 508, 513 (emphasis added). Yet the Trusts are subject to this

enforcement action because of the enforcement decisions of an agency

*un*accountable to the Executive. In the circumstances of this case, the

appropriately tailored remedy for the unconstitutional initiation of these enforcement proceedings is dismissal of those proceedings.

To be sure, courts have held that the injury caused by an enforcement action initiated while an agency was inadequately supervised by the President may sometimes be addressed through ratification by a constitutionally accountable official. "The basic idea," as one court put it, "is that a legitimate agent (here, the CFPB Director, post-*Seila Law*) can ratify a decision made previously by an improper agent (the Director, pre-*Seila Law*) on behalf of a principal (the CFPB itself)." *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 50 (D.R.I. 2020).

The Ninth Circuit endorsed this approach on remand in *Seila Law* itself. The challenger's "only cognizable injury" there, the court noted, "arose from the fact that the agency issued the CID and pursued its enforcement while headed by a Director who was improperly insulated from the President's removal authority." *Seila Law*, 997 F.3d at 846. Yet post-severance, the Director is under "adequate presidential oversight and control," so her decision to ratify earlier acts of executive power "remedies any constitutional injury." *Id.*

The D.C. Circuit took a similar approach in *Federal Election Commission v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996). There, while an enforcement action was pending, another case found the FEC's structure unconstitutional based on "the presence of [] two congressional officers as non-voting *ex officio* members." *Id.* at 706. The FEC "voted to reconstitute itself" and exclude the *ex officio* members, and then ratified its prior enforcement decision. *Id.* at 706-07. In light of the ratification, the court held that dismissal was not "necessary." *Id.* at 708. The "post-reconstitution ratification," it held, was "an adequate remedy for the . . . constitutional violation." *Id.* at 709.

This Court followed suit in *Advanced Disposal Services East, Inc. v. NLRB*, 820 F.3d 592 (3d Cir. 2016), albeit in a somewhat different posture. At issue there was a "quorum violation which stripped" the NLRB and its director "of the authority to oversee [a] Union election." *Id.* at 602. Once "properly constituted," the NLRB ratified the previous decision, leaving this Court to consider "whether this 'remedy adequately addressed the prejudice' . . . stemming from [the] unauthorized conduct." *Id.* (quoting *Legi-Tech*, 75 F.3d at 708). "If so," this Court answered, "'dismissal is neither necessary nor appropriate.'" *Id.* (quoting *Legi-Tech*,

75 F.3d at 708).  Because the Court found the ratification proper, it held that the constitutional injury was remedied.  *Id.* at 605-06.

But where ratification is unavailable or ineffective, the pre-*Collins* consensus was that dismissal was appropriate and required.  *See, e.g.*, *CFPB v. Access Funding, LLC*, No. 16-3759, 2021 WL 2915118, at *16 (D. Md. July 12, 2021) ("[T]he question before this Court is whether [the constitutional] defect has been cured by ratification *or whether dismissal is required*.") (emphasis added); *CFPB v. Navient Corp.*, 523 F. Supp. 3d 681, 702 (M.D. Pa. 2021) (recognizing that an enforcement suit may "require dismissal" if not "timely ratified"); *CFPB v. Law Offices of Crystal Moroney*, No. 20-3240, Dkt. 34-5, at *65-67 (S.D.N.Y. Aug. 18, 2020) (holding that an effective ratification renders dismissal "neither necessary nor appropriate"); *see also FEC v. NRA Political Victory Fund*, 6 F.3d 821, 828 (D.C. Cir. 1993) ("Here, . . . appellants raise the constitutional challenge as a defense to an enforcement action, and we are aware of no theory that would permit us to declare the Commission's structure unconstitutional without providing relief to the appellants in this case.").

Indeed, this straightforward remedial rule—dismiss unless ratified—was repeatedly endorsed by the CFPB itself in both word and deed. In this very case, the CFPB called out what it considered a "simple fact": that "ratification . . . provides the remedy for the Constitutional violation" at issue. JA359; *see also* Br. in Opp. to Mot. for J. on Pleadings, *CFPB v. Navient Corp.*, No. 17-0101, Dkt. 518, at 8 (M.D. Pa. July 24, 2020). Its own "ratification," the agency declared, "cured any problem with the initial filing and prosecution of this case." JA357; *see* JA404-05 ("[t]he Court . . . agreed with the Bureau that ratification could potentially cure any problem stemming from the removal restriction"). And the agency has consistently taken this approach, ratifying its own constitutionally infirm enforcement decisions post-*Seila Law*—*see, e.g.*, *Citizens Bank*, 504 F. Supp. 3d at 44; *Navient Corp.*, 523 F. Supp. 3d at 686. These actions would have been meaningless if a remedy were not otherwise appropriate and required.

## C. The CFPB's Ratification Was Untimely.

Consistent with this approach, CFPB Director Kathleen Kraninger tried to ratify on July 9, 2020—"a few weeks after the Supreme Court's decision in *Seila Law*." JA375; *see* JA318-20. But as Judge Noreika

recognized (and Judge Bibas did not disagree), that ratification was ineffective.

For an agency's ratification to be effective, "the ratifier must, at the time of ratification, still have the authority to take the action to be ratified." *Advanced Disposal*, 820 F.3d at 602. "[I]t is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, *but also at the time the ratification was made.*" *Id.* (quoting *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994)). As the Supreme Court explained, if an act "must be performed before a specific time," ratification of that act "is not effective . . . unless made before such time." *NRA Political Victory Fund*, 513 U.S. at 98. If ratification comes after the statute of limitations has expired, it is "simply . . . too late in the day to be effective." *Id.*; *accord Benjamin v. V.I. Port Auth.*, 684 F. App'x 207, 212 (3d Cir. 2017).

So it is here. Under Dodd-Frank, the CFPB must bring an enforcement action no "more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). The CFPB discovered the alleged violations far more than three years before its July 2020 ratification, having served each Trust with a notice of its

intent to begin enforcement proceedings in 2016. JA367-68. Director Kraninger's ratification was therefore ineffective and dismissal is the only remedy that can "adequately address[] the prejudice . . . stemming from [the CFPB's] unauthorized conduct." *Advanced Disposal*, 820 F.3d at 602.

The CFPB concedes that Director Kraninger's ratification "came more than three years after" the date it discovered its allegations. *See* JA375. And although the agency urged the district court to equitably toll the statute of limitations to deem the ratification timely, that argument fails. Equitable tolling is an extraordinary remedy to preserve the right of the injured to *seek* a remedy; here, it would extend the CFPB's ability to *avoid* one. *Cf. John Doe Co. v. Cordray*, 849 F.3d 1129, 1137 (D.C. Cir. 2017) (Kavanaugh, J., dissenting) ("the equities favor the people whose liberties are being infringed, not the unconstitutionally structured agency"). If equitable tolling applied for the simple reason that the Supreme Court did not decide *Seila Law* until after the statute had run, an agency could *always* invoke the doctrine to ratify enforcement actions initiated by an unaccountable executive official regardless of how untimely constitutional accountability was restored.

In any event, even if equitable tolling could ever save untimely agency ratification, the district court correctly determined in the first dismissal order that it is unavailable here. *See* JA375-78. Equitable tolling is only available to a litigant who "pursu[ed] his rights diligently." *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 755 (2016). And, here, as the district court explained, despite ample notice of the potential unconstitutionality of the CFPB's structure—and specifically, the removal restrictions on its Director—the agency has failed to identify "a single act that it took to preserve its rights in this case in anticipation of the constitutional challenges." JA375-78; *see id.* (collecting cases involving "constitutional challenges" to the CFPB's structure prior to *Seila Law*). Indeed, even after given the chance to amend its complaint specifically to address any such efforts, the operative complaint mentions none. It does not allege, for example, that Acting Director Mick Mulvaney, who served from November 2017 to December 2018 without the statutory removal restrictions, *CFPB v. RD Legal Funding, LLC*, No. 17-0890, 2022 WL 799429, at *3 (S.D.N.Y. Mar. 16, 2022), attempted such a ratification. And with good reason. Mulvaney, the CFPB conceded below, chose not to ratify the enforcement

decision in this case, *see* Dkt. 348-1, at 40:7-10, though he did ratify at least three other pending enforcement proceedings during his tenure as Acting Director, *see* Dkt. 348, at 1 & n.1. The CFPB cannot plausibly claim to have diligently pursued its rights in this matter.

### D. *Collins v. Yellen* Does Not Require a Different Result.

Applying this long-established remedial framework, and finding the CFPB's attempted ratification ineffective, Judge Noreika properly dismissed the initial complaint in this case. *See* JA373-79. Yet Judge Bibas changed course less than a year later based on the Supreme Court's intervening decision in *Collins v. Yellen*, *supra*. *See* JA5-7. Noting that "litigation" can be "a moving target," the district court held that *Collins* announced a "new rule" that saved the CFPB's case from dismissal. That was error.

#### 1. Collins *does not displace well-established remedial principles*.

*Collins* does not move the target for those challenging enforcement actions initiated by an unaccountable agency head. To the contrary, the *Collins* decision *reaffirms* that an unconstitutional removal provision merits retrospective relief where it inflicts harm on the party challenging it. 141 S. Ct. at 1788-89. It does not change the fact that such

enforcement inflicts a "here-and-now injury" that may be remedied by a court. It does not alter the requirement that a constitutional injury be met with a tailored remedy. And it does not question that, absent effective ratification, dismissal of an enforcement action is the appropriate tailored remedy for that harm.

a. *Collins* concerned an affirmative challenge to the structure of the Federal Housing Finance Agency (FHFA), an independent agency created during the 2008 housing crisis. Among other responsibilities, FHFA was "tasked with regulating" government-backed mortgage financers Fannie Mae and Freddie Mac "and, if necessary, stepping in as their conservator or receiver." *Id.* at 1770. By congressional design, FHFA, like the CFPB, was led by "a single Director, whom the President could remove only 'for cause.'" *Id.* at 1770.

After FHFA placed Fannie and Freddie into conservatorship, it then negotiated various "agreements for the companies with the Department of Treasury," designed to ensure their liquidity and ability to lend. *Id.* One such agreement, called "the third amendment," ultimately caused Fannie and Freddie "to transfer enormous amounts of wealth to Treasury." *Id.* "These payments totaled approximately $200

billion," the Court calculated, "which is at least $124 billion more than the companies would have had to pay" under the "formula that previously applied." *Id.* at 1774.

Shareholders of the two companies sued the FHFA and its director challenging the third amendment. *Id.* at 1775. As relevant here, they argued that the Director's insulation from removal absent "cause" rendered the FHFA's structure unconstitutional. *Id.* And they sought "various forms of equitable relief," including "an injunction ordering Treasury to return to Fannie Mae and Freddie Mac all the dividend payments that were made under the third amendment" and "an order vacating and setting aside the third amendment." *Id.* The Supreme Court agreed that the agency's structure violated the separation of powers under a "straightforward application of [the] reasoning in *Seila Law*." *Id.* at 1783.

Turning to the remedy, however, the Court rejected the plaintiffs' argument that "the third amendment must be completely undone" and the funds returned. *Id.* at 1787-88. First, the Court observed that, at the time of the third amendment's adoption, the FHFA was led by an Acting Director, rather than a Senate-confirmed one. *Id.* It reasoned that,

because the Acting Director was "removable at will," there existed no grounds for "setting aside the third amendment in its entirety." *Id.* at 1787. The only wrongful actions that might warrant a remedy, the Court reasoned, were "the actions that confirmed Directors have taken to *implement* the third amendment during their tenures." *Id.*

The Court also declined to set aside the third amendment based on those actions. Because "there was no constitutional defect in the statutorily prescribed method of appointment" for the confirmed Directors, the Court found "no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" and "no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void." *Id.* at 1787-88. "We therefore see no reason to hold," the Court explained, "that the third amendment must be completely undone." *Id.* at 1788.

Nevertheless, the Court refused to find that the shareholders were not entitled to any relief. *Id.* at 1788. An unconstitutional removal provision, the Court reiterated, can "inflict compensable harm" that would demand a remedy. *Id.* at 1789. That "possibility . . . c[ould ]not be ruled out" in *Collins*. *Id.* Despite the error-free adoption of the third

amendment and the properly appointed implementing Directors, the Court offered two "example" circumstances that would warrant relief in that case. *Id.* "Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal." *Id.* "Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way." *Id.* In either situation, the statutory removal restrictions "would clearly cause harm." *Id.* The Court remanded the case to permit the shareholders to make a similar showing of harm that would warrant relief. *Id.*

b.   Contrary to the district court, *Collins* did not announce a "new rule" that "an unconstitutional removal restriction does not invalidate agency action so long as the agency head was properly appointed." JA2, 5. While removal is a common thread, *Collins* is distinguishable from this case and *Seila Law* in several respects.

Principally, the nature of the constitutional injury is different because *Collins* was not an enforcement action. If the injury is different,

the remedy may be as well.  The Trusts were targeted specifically and directly with a "quintessentially executive power."  *Seila Law*, 140 S. Ct. at 2200.  They are being forced to defend themselves against the CFPB's attempt to "seek daunting monetary penalties . . . in federal court."  *Id.* In other words, this "wolf comes as a wolf."  *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

The same was not true in *Collins*.  The third amendment did not "compel" the plaintiff-shareholders to do anything.  They were not specifically targeted; the third amendment was generalized in its goals and nationwide in its scope, and the right the shareholders asserted was one "shared by everyone in this country."  *Collins*, 141 S. Ct. at 1781. Moreover, the shareholders did not face "daunting monetary penalties," *Seila Law*, 140 S. Ct. at 2200; they came to court voluntarily as plaintiffs. Given this state of affairs, the Court's remand for consideration of whether the *Collins* plaintiffs suffered compensable harm does not undermine the well-settled and well-recognized harm that the Trusts have suffered here.

Moreover, the adoption of the third amendment was constitutionally sound.  As the Court explained, the Acting Director who

adopted the third amendment was removable at will. *See Collins*, 141 S. Ct. at 1787. The Court thus considered only the "subset of actions" that improperly insulated Directors took "to *implement* the third amendment during their tenures." *Id.* Where the initiation of agency action caused no constitutional harm, it would hardly be a proportional and tailored response to require the action "be completely undone." *Id.* at 1788. But, here, Director Cordray *initiated* the enforcement action against the Trusts while he was improperly insulated from removal. Dismissing that suit (without prejudice) is a well-accepted remedy for that harm.

Finally, the requested relief in *Collins* and this case are meaningfully distinct. While the Trusts seek dismissal only of a single suit brought directly against them (which the agency failed to ratify in a timely manner), the *Collins* plaintiffs sought to reverse billions in payments made under agreements to which they were not even parties. The former is a well-established remedy tailored to a recognized constitutional injury. The latter would be virtually unprecedented.

Because *Collins* concerned *only* the latter, this Court should not assume it "overturn[ed], or so dramatically limit[ed], earlier authority *sub silentio.*" *Shalala v. Illinois Council on Long Term Care, Inc.*, 529

U.S. 1, 18 (2000); *see Collins*, 141 S. Ct. at 1799 (Gorsuch, J., concurring in part and dissenting in part) ("The only lesson I can divine is that the Court's opinion today is a product of its unique context [and] nothing it says undoes our prior guidance authorizing more meaningful relief in other situations.").[7]

>    *2.    Even if* Collins *governs this case, dismissal is required.*

    a.    Even if *Collins* did announce, *sub silentio*, a "new rule" applicable here, the Trusts are still entitled to dismissal. Emphasizing that "retrospective relief" remained available, *Collins* noted the "possibility that [an] unconstitutional restriction" on removal could "inflict compensable harm." 141 S. Ct. at 1789. The Trusts suffered precisely this sort of "harm" here. Indeed, the Trusts' experience with Director Cordray closely resembles those *Collins* held out as "example[s]"

---

[7] To be sure, the district court is not alone in overreading *Collins*. In *CFPB v. CashCall, Inc.*, the Ninth Circuit held in a similar context that *Collins* "made clear that despite the unconstitutional limitation on the President's authority to remove the Bureau's Director, the Director's actions were valid when taken." 35 F. 4th 734, 742 (9th Cir. 2022). Initiating an enforcement action against the defendant there, the Ninth Circuit observed, "Director Cordray exercised power that he lawfully possessed." *Id.* at 743. But the Ninth Circuit made the same mistakes the district court did, conflating the drastic remedy requested in *Collins* with a targeted remedy for a direct enforcement action against an individual defendant.

meriting relief. *Id.* "[S]uppose," the Court offered, "that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way." *Id.* That "would clearly cause harm." *Id.*

That is what happened here. President Trump's dissatisfaction with Director Cordray was no secret, nor was the fact that the agency's unique structure was among the forces constraining him. *See, e.g.*, John Berlau, *Why Hasn't Trump Fired CFPB's Cordray?*, Forbes.com (Aug. 10, 2017) (noting mounting pressure for Trump to fire Cordray, who "has been empowered by the CFPB's glaring lack of accountability"); Renae Merle, *Richard Cordray is Stepping Down as Head of Consumer Financial Protection Bureau*, Washington Post (Nov. 15, 2017) ("Trump has on at least two occasions griped about Cordray in private and wondered what to do about his tenure, according to two financial industry executives who attended the meetings. Under the agency's current structure, Trump could only fire Cordray for cause."); Elizabeth Dexheimer, *Trump Said to Weigh Political Risks of Firing CFPB's Cordray*, Bloomberg (Mar. 10, 2017); Editorial Board, *Mr. Trump Goes*

*After Consumer Financial Protection Bureau*, NYT (Mar. 22, 2017) ("Last week, however, the administration signaled it wanted to fire Mr. Cordray.").

Such rare public evidence that the CFPA's unconstitutional removal restrictions thwarted the President's ability to supervise the executive power exercised by the CFPB powerfully confirms that the subjects of that unaccountable, undemocratic authority suffered compensable harm. Indeed, where the public record demonstrates that an executive officer retains their executive position (and thus their executive authority) only by virtue of an unconstitutional statutory restriction on their removal, the harm suffered by the objects of that arrogated power is indistinguishable from the harm suffered under the authority of executive officers who were not properly appointed in the first instance. In either case, the officer exercises executive authority that they possess only by virtue of the unconstitutional provision.

b. The district court found an inadequate showing of harm under *Collins* on two grounds. Neither has merit.

First, even accepting *Collins* applies, the district court applied the wrong standard. In the court's view, to show compensable harm under

*Collins*, a challenger must "show that the agency action would not have been taken *but for* the President's inability to remove the agency head." JA5-6 (citing *Collins*, 141 S. Ct. at 1788). Nothing in the *Collins* majority opinion conditions relief on proving "but for" causation. That standard was articulated *only* in Justice Kagan's concurring opinion for three Justices. *See Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring in part and dissenting in part) (suggesting retrospective relief should be available "only when the President's inability to fire an agency head affected the complained-of decision"); *see also RD Legal Funding*, 2022 WL 799429, at *6 (recognizing that the standard applied here echoes Justice Kagan's concurrence). Justice Alito's majority opinion, by contrast, explained that any time the President was thwarted in his desire to remove a principal executive officer, "the statutory provision would clearly cause harm." *Collins*, 141 S. Ct. at 1789 (majority op.). The *Collins* majority did not require a further showing (nearly impossible) that the removal provision was directly responsible for the challenged agency action.

The district court's overly restrictive reading of *Collins* is also impossible to square with other relevant precedents that the Court

expressed no intention to disturb.  In *Seila Law*, for example, the Court rejected the court-appointed amicus's argument that the law firm lacked Article III standing to seek the dismissal of the CID unless it could show the CID would not have been issued "if the responsible official had been subject to the President's control."  *Seila Law*, 140 S. Ct. at 2196.  As the Court explained, "a litigant challenging governmental action as void on the basis of the separation of powers is *not required to prove* that the Government's course of conduct would have been different in a 'counterfactual world.'"  *Id.* (emphasis added).

In *Collins*, the Court cautioned against overreading *Seila Law*'s "holding on standing" to mean that all "actions taken by such an officer are void *ab initio* and must be undone."  141 S. Ct. at 1788 n.24.  But the district court committed the converse error here.  If *Collins* conditions retrospective relief on the precise showing that *Seila Law* disavowed, then the challenger in that case would not have been able to establish standing to seek the retrospective relief that it did.  After all, Article III requires a litigant to establish, for each requested form of relief, a "likel[ihood]" that a favorable judicial decision would "redress[]" that injury.  *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011).

Indeed, if such a but-for showing were required to establish "compensable harm," it is not clear that litigants could establish standing to seek (much less, actually obtain) even *prospective* relief. *See Collins*, 141 S. Ct. at 1787. Such relief is available only if the "risk of [future] harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021). It would be a rare litigant who could show that, but for the presence of a particular executive officer, a federal agency would not take action against them. And the Court has similarly never required such a showing to seek or obtain meaningful prospective relief. *See Free Enterprise Fund*, 561 U.S. at 513 (finding that the plaintiffs were "entitled" to prospective relief to ensure they are subject to enforcement "only by a constitutional agency accountable to the Executive" without requiring a showing that only an unaccountable agency would pursue such an action). Even if some sliver of litigants could make such a showing, remedies for separation-of-powers violations exist not only to cure violations, "but also 'to create incentives'" to raise them. *Lucia v. SEC*, 138 S. Ct. 2044, 2055 n.5 (2018) (quoting *Ryder v. United States*, 515 U.S. 177, 183 (1995)). The district court's reading of *Collins* would have the opposite effect.

Second, the district court dismissed the suggestion that the Trusts suffered harm because subsequent Acting Directors of the agency continued the action against them.  JA6.  That "the CFPB did not change its litigation strategy once the removal protection was eliminated," the court noted, "is strong evidence that this suit would have been brought regardless."  *Id.*  But this elides the critical distinction between initiating an action and merely continuing one already underway.  Simply because an Acting Director chose not to abandon an action does not mean one properly accountable to President Trump would have *initiated* it in the first instance.  Indeed, this logic (were it sound) would foreclose the possibility of injury in *Seila Law* as well.  That case was also initiated by Director Cordray but continued through the courts under multiple Directors, including one who was removable by the President at will.  And yet the CFPB insisted there that remand was necessary, arguing that "the ratification question . . . *must* be resolved before granting . . . relief." CFPB Reply Br. 23, *Seila Law*, *supra* (emphasis added).

If this Court considers *Collins* the analytical polestar here, dismissal is warranted because the Trusts suffered the requisite "harm." At the very least, this Court should remand to allow further proceedings

on this issue before the district court. The Supreme Court decided *Collins* two days before briefing on the Trusts' motion was complete. And though the district court requested supplemental briefing on two questions, whether the Trusts suffered "harm" under *Collins* was not among them. The Trusts submit that the record, along with judicially noticeable sources, provides sufficient evidence to prove such harm. If this Court disagrees, however, a remand will allow the Trusts an opportunity to present such evidence below—an opportunity unavailable to them until now.

## CONCLUSION

For the foregoing reasons, the district court's order should be reversed and the case remanded with instructions to dismiss the complaint.

Dated: September 23, 2022   Respectfully submitted,

           */s/ Jonathan Y. Ellis*
           N.C. Bar No. 41220

Nicholas J. Giles      Jonathan Y. Ellis
MCGUIREWOODS LLP    MCGUIREWOODS LLP
Gateway Plaza       501 Fayetteville St.
800 East Canal Street    Suite 500
Richmond, VA 23219    Raleigh, NC 27601
           (919) 755-6688
Francis J. Aul       jellis@mcguirewoods.com
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Washington, D.C. 20006

*Counsel for Defendants-Appellants*

Allyson B. Baker
Meredith L. Boylan
Sameer P. Sheikh
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700
AllysonBaker@paulhastings.com

*Counsel for Intervenor-Appellant
Transworld Systems, Inc.*

Joshua Kipnees
George A. LoBiondo
PATTERSON BELKNAP WEBB &
    TYLER
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2838
jkipnees@pbwt.com

*Counsel for
Intervenor-Appellant
Ambac Assurance Corporation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because:

- This brief contains 12,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Century Schoolbook font using Microsoft Word.

The text of the electronic brief is identical to the text in the paper copies.

At least one of the attorneys whose names appear on this brief is a member of the bar of this Court.

The electronic version of this brief has been scanned for viruses using CrowdStrike Falcon Sensor, Version 6.40.15406.0, and no virus was detected.

/s/ Jonathan Y. Ellis
Jonathan Y. Ellis

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2022, the foregoing was filed with the Clerk of the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis

**No. 22-1864**

In the

# United States Court of Appeals
## For the Third Circuit

―――――――

Consumer Financial Protection Bureau,
*Plaintiff-Appellee*,

v.

National Collegiate Master Student Loan Trust, et al.,
*Defendants-Appellants*.

―――――――

On Appeal from the United States District Court
for the District of Delaware, Case No. 1:17-cv-1323
Honorable Stephanos Bibas

―――――――

## JOINT APPENDIX – VOLUME I (pp. 1-25)

―――――――

Kevin E. Friedl
CONSUMER FINANCIAL
    PROTECTION BUREAU
1700 G Street, N.W.
Washington, DC 20552
(202) 435-9268
kevin.friedl@cfpb.gov

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

*Counsel for Plaintiff-Appellee*

*Counsel for Defendants-Appellants*

*(Additional Counsel Listed on Inside Cover)*

Allyson B. Baker
Meredith L. Boylan
Sameer P. Sheikh
PAUL HASTINGS LLP
2050 M. Street, N.W.
Washington, D.C. 20036
(202) 551-1700
allysonbaker@paulhastings.com

*Counsel for Intervenor-Appellant
Transworld Systems, Inc.*

Joshua Kipnees
George A. LoBiondo
PATTERSON BELKNAP WEBB &
    TYLER
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2838
jkipnees@pbwt.com

*Counsel for Intervenor-Appellant
Ambac Assurance Corporation*

# TABLE OF CONTENTS

**Page**

**Volume I (pp. 1-25)**

Memorandum Opinion Denying Motion to Dismiss Amended
Complaint (Dec. 13, 2021) (Doc. 380) ................................................ 1

Memorandum Opinion Certifying Questions for Interlocutory
Appeal (Feb. 11, 2022) (Doc. 397) ..................................................... 11

Order Certifying Questions for Interlocutory Appeal
(Feb. 11, 2022) (Doc. 398) .................................................................. 20

Third Circuit Order Granting Petition for Permission to
Appeal Under 28 U.S.C. § 1292(b)
(Apr. 29, 2022) (Doc. 401) .................................................................. 21

Notice of Appeal (Apr. 29, 2022) (Doc. 402) .......................................... 24

**Volume II (pp. 26-474)**

District Court Docket Report, No. 1:17-cv-1323 .................................... 26

Complaint (Sept. 18, 2017) (Doc. 1) ...................................................... 77

Exhibits to Declaration re: Motion to Intervene filed by GSS
Data Services, Inc. (Sept. 26, 2017) (Doc. 13)

Exhibit A – Trust Agreement (Doc. 13-1)...................................... 93

Exhibit B – Administration Agreement (Doc. 13-2) ................... 147

Order Granting Movants' Motions to Intervene
(Oct. 19, 2018) (Doc. 96) .................................................................. 163

Exhibit to Declaration in Support of Intervenors' Consolidated
Answering Brief to CFPB's Motion to Approve Proposed
Consent Judgment (Mar. 19, 2020) (Doc. 239)

Exhibit 3 – Indenture (Doc. 239-1) ............................................. 164

Memorandum Opinion Denying CFPB's Motion to Approve
Proposed Consent Judgment (May 31, 2020) (Doc. 272) ............ 303

Notice of Ratification filed by CFPB (July 17, 2020) (Doc. 308).......... 318

Exhibit to Declaration re: Opening Brief in Support of Motion
to Dismiss filed by Ambac Assurance Corporation
(July 17, 2020) (Doc. 310)

Exhibit 1 – Special Servicing Agreement (Doc. 310-1) ............... 321

Opposition to Intervenors' First Motions to Dismiss filed by CFPB
(Aug. 17, 2020) (Doc. 320)

Selected Excerpts, pp. i, 5-12 ....................................... 356

Memorandum Opinion Denying Intervenors' First Motions to
Dismiss (Mar. 26, 2021) (Doc. 359)............................... 365

Order re: Memorandum Opinion Denying Intervenors' First
Motions to Dismiss (Mar. 26, 2021) (Doc. 360) .......................... 380

First Amended Complaint (Apr. 30, 2021) (Doc. 362)......................... 381

Opposition to Motion to Dismiss Amended Complaint filed by
CFPB (June 11, 2021) (Doc. 368)

Selected Excerpts, pp. i, 2-10 ....................................... 403

Notice of Supplemental Authority filed by CFPB re: *Collins v.
Yellen* (U.S.) (June 30, 2021) (Doc. 371)

Selected Excerpts, pp. 1-3 ........................................... 413

Response to Notice of Supplemental Authority filed by Ambac
Assurance Corporation (July 1, 2021) (Doc. 372) ....................... 416

Second Notice of Supplemental Authority filed by CFPB
(July 14, 2021) (Doc. 373)

Selected Excerpts, pp. 1-3 ........................................... 418

Response to Second Notice of Supplemental Authority filed by
    Ambac Assurance Corporation (July 15, 2021) (Doc. 374) ......... 421

Supplemental Letter Brief re: Oct. 13, 2021 Oral Order filed by
    CFPB (Oct. 27, 2021) (Doc. 377) .................................................. 423

Supplemental Letter Brief re: Oct. 13, 2021 Oral Order filed by
    Movants (Oct. 27, 2021) (Doc. 378)............................................... 434

Petition for Permission to Appeal Under 28 U.S.C. § 1292(b),
    No. 22-8010 (filed Feb. 21, 2022) ................................................. 444

**Volume III (pp. 475-573) – SEALED**

Exhibit to Sealed Declaration re: Opening Brief in Support of
    Motion to Dismiss filed by Ambac Assurance
    Corporation (July 10, 2020) (Doc. 302)

    Exhibit 2 – Default Prevention and Collection Services
    Agreement (Doc. 302-2)................................................................ 475

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CONSUMER FINANCIAL
PROTECTION BUREAU,

       *Plaintiff,*

    v.

NATIONAL COLLEGIATE MASTER
STUDENT LOAN TRUST et al.

      *Defendants.*

No. 1:17-cv-1323-SB

---

Carolyn I. Hahn, Colin T. Reardon, Gabriel S.H. Hopkins, Jane M.E. Peterson, Stephen C. Jacques, Tiffany Hardy, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C.

                                     *Counsel for Plaintiff.*

Daniel M. Silver, MCCARTHER & ENGLISH LLP, Wilmington, DE; Megan Ix Brison, Michael A. Weidinger, PINCKNEY WEIDINGER URBAN & JOYCE LLC, Wilmington, DE.

                                 *Counsel for Defendants.*

---

## MEMORANDUM OPINION

December 13, 2021

---

BIBAS, *Circuit Judge*, sitting by designation.

Sometimes litigation is a moving target. Legal rules can change while the parties are battling it out. Earlier this year, the National Collegiate Student Loan Trusts successfully argued that the Consumer Financial Protection Bureau's suit against them was untimely. This Court dismissed the case without prejudice, relying on then-prevailing precedent. But then the Supreme Court announced a new rule. And the CFPB renewed its suit. Applying the new rule, at least on the complaint before me, this case is timely.

Plus, the Trusts say the CFPB lacks authority to sue them because they are not "covered persons" under the Consumer Financial Protection Act. But they "engaged in" servicing loans and collecting debt through their contractors, so they fall within the statute. I must thus let the CFPB's case proceed.

## I. BACKGROUND

In 2017, the CFPB sued the Trusts for engaging in forbidden debt-collection and litigation practices. First Am. Compl., D.I. 362 ¶¶ 1–2. Now the Trusts move to dismiss. Understanding that motion requires us to take a whistle-stop tour through both this protracted enforcement action and the structure of the CFPB.

### A. The Trusts and the CFPB's enforcement

The Trusts were set up to securitize student loans. They bought a pool of 800,000 private loans, then sold notes secured by that pool to investors. *Id.* ¶¶ 27, 34. As students repaid their loans, the investors would take a cut. D.I. 54, at 4. Just like any other securitization, the value of the notes depended on the riskiness of the

2

**JA2**

underlying asset: the more students default on their loan payments, the less valuable the notes.

Thus, the Trusts have a powerful incentive to ensure that students do not miss loan payments. Since the Trusts have no employees, they collect debt and service the loans through third parties. First Am. Compl. ¶ 29.

To that end, in 2009 the Trusts contracted with a special servicer to collect "past-due and defaulted student loans" and to do "collections litigation." D.I. 54, at 5. The special servicer, in turn, entered into agreements with "subservicers," who would "conduct[] collections" and "oversee[] various law firms that [would] file collection lawsuits against borrowers in the name of the Trusts." *Id.*; *see* First Am. Compl. ¶¶ 38–44.

But the subservicers soon attracted the attention of the CFPB. After a lengthy investigation, it found that the subservicers had "executed and notarized deceptive affidavits" and "filed … collections lawsuits lacking" key evidence. First Am. Compl. ¶¶ 49–50. The CFPB concluded that they engaged in unfair and deceptive debt-collection practices. D.I. 54, at 1–2.

So in 2014, the CFPB started administrative proceedings against the Trusts. Though the parties reached a settlement and asked the Court to enter a consent decree, the Court declined. D.I. 272. That forced the CFPB to sue.

### B. The structure of the CFPB and the Trusts' first motion to dismiss

But midway through this litigation, the Supreme Court injected a new issue. Since its creation in 2008, the CFPB had been headed by a single director, insulated from removal by the President. Yet the Court said that structure "violate[d] the separation

3

of powers." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197, 2209 (2020). So it severed the removal restriction, leaving the rest of the statute intact.

That ruling implicated this enforcement action, which the CFPB filed in 2017 while headed by an improperly insulated director. Aware that such a director may have lacked the power to bring an enforcement action, a new director (now removable at will by the President) ratified the suit to cure any defect. D.I. 308-1.

But earlier this year, Judge Noreika ruled that the ratification came too late to save this suit. D.I. 359, at 8–14. All CFPB enforcement actions must be brought within three years of the date on which it discovers the violation. 12 U.S.C. § 5564(g)(1). Yet here, the CFPB admitted that "ratification … came more than three years after the date of discovery." D.I. 356, at 40:20−21. Plus, it could not show that the statute-of-limitations clock was extended by equitable tolling. So Judge Noreika dismissed the suit without prejudice, giving the CFPB another chance to explain why its suit was timely. D.I. 360.

After that ruling, the CFPB amended its complaint. And the Trusts brought this motion to dismiss, arguing that the new complaint suffered from the same timeliness defect as the first one. D.I. 367, at 7–11. They also contend that the Trusts do not count as "covered person[s]" under the Act and so cannot be targets of CFPB enforcement. *Id.* at 11; 12 U.S.C. § 5481(6).

To survive a motion to dismiss, a complaint must contain enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). I must accept all

allegations in the complaint as true and draw all inferences in favor of the nonmoving party. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014).

## II. THIS SUIT IS NOT YET TIME BARRED

The Trusts say the CFPB failed to ratify this suit before the statute-of-limitations clock ran out. But this assumes that unconstitutional removal protections automatically void agency action. And earlier this year, the Supreme Court rejected that premise. Thus, the CFPB stopped the clock when it sued. So on the compliant now before me, the suit is timely filed.

### A. There was no need for the CFPB to ratify this suit

The CFPB brought this suit while it was unconstitutionally structured. Back then, courts saw actions brought by improperly structured agencies as "ultra vires" and so void. *Collins v. Yellen*, 141 S. Ct. 1761, 1795 (2021) (Gorsuch, J., concurring in part). And void actions cannot stop the statute-of-limitations clock. Thus, to save the suit, an agency had to cure the constitutional defect, then ratify the action before the clock ran out. Here, ratification happened too late. So Judge Noreika dismissed this lawsuit.

Yet earlier this year, the Supreme Court undercut that reasoning. *Id.* at 1788 (majority opinion). It held that an unconstitutional *removal* restriction does not invalidate agency action so long as the agency head was properly *appointed*. Such an agency head has "authority to carry out the functions of the office." *Id.* So the agency's actions are not "void" and do not need to be "ratified," unless a plaintiff can show that the removal provision harmed him. *Id.* Put differently, he must show that the agency

5

**JA5**

action would not have been taken but for the President's inability to remove the agency head. *Id.*

That is not the case here. This suit would have been filed even if the director had been under presidential control. It has been litigated by five directors of the CFPB, four of whom were removable at will by the President. D.I. 377, at 2. And the CFPB did not change its litigation strategy once the removal protection was eliminated. This is strong evidence that this suit would have been brought regardless. Thus, the CFPB's initial decision to bring this suit was not ultra vires.

### B. At this stage, I may not decide whether this suit is time barred

Because the decision to bring this suit was a valid agency action, it is not untimely if it was *filed* within three years of the date on which the CFPB discovered the alleged violation. 12 U.S.C. § 5564(g)(1).

The Trusts argue that even under this test, the suit is time barred. The CFPB sued on September 18, 2017. Yet the Trusts say, the CFPB had discovered the alleged misconduct by September 4, 2014, when it issued a civil investigative demand asking the Trusts for information about possible violations. D.I. 367, at 19. If true, this suit is time barred.

But the Trusts' argument is premature. On this motion to dismiss, I may consider a statute-of-limitations defense only if "the face of the complaint demonstrates that the plaintiff's claims are untimely." *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015) (internal quotation marks omitted). Otherwise, the defendant would be forced to state facts necessary to anticipate and overcome an affirmative defense. *Id.*

Yet the Trusts fall afoul of this rule by relying on a civil-investigative-demand letter outside the complaint. *See* D.I. 302-3. Because I may not consider that letter, the Trusts' argument fails. Even if I *could* look at the letter, it does not unambiguously show that the CFPB knew about the alleged violations by September 4, 2014. The letter states that its purpose is to "determine whether [the Trusts] … engaged [in] … unlawful acts." *Id.* at 4. Such an investigation would have been pointless if the agency already knew about the Trusts' alleged misconduct.

The Trusts may still try to make out a statute-of-limitations defense, but that will have to wait until summary judgment.

### III. THE TRUSTS ARE "COVERED PERSONS" UNDER THE CONSUMER FINANCIAL PROTECTION ACT

The Trusts argue that the CFPB cannot bring an enforcement action against them because they are not "covered persons" as required under the Act. But this theory is undercut by the statute's text: the Trusts "engage in" servicing and collecting debt.

Start with the text. The CFPB may bring enforcement actions to "prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice." 12 U.S.C. §5531(a). Thus, it may sue only a "covered person" or a "service provider." The CFPB does not argue that the Trusts are "service provider[s]." *See* First Am. Compl. ¶8. So this suit may only proceed if they are "covered person[s]": "person[s] that engage[] in offering or providing a consumer financial product or service." 12 U.S.C. §5481(6).

The CFPB argues that the Trusts qualify because they "engage[] in" providing some of the "financial product[s] or service[s]" listed in the Act: "servicing loans,

**JA7**

including acquiring, purchasing, selling, brokering, or other extensions of credit" and "collecting debt." *Id.* §5481(6), (15)(A)(i), (x); First Am. Compl. ¶8. More precisely, it claims that the Trusts "engage in regular servicing of … loans" and "debt-collection activities through … [its] subservicers." *Id.* ¶¶35–36.

The Trusts do not deny that their subservicers collected debt or serviced loans. Instead, they contend that the CFPB cannot hold them liable for those actions. D.I. 367, at 13. The Trusts characterize themselves as "passive securitization vehicles … [that] take no action related to the servicing of student loans or collecting debt." *Id.* at 12.

So this dispute boils down to the breadth of the word "engage." Does a person "engage" in an activity if he contracts with a third party to do that activity on his behalf? Yes.

"Engage" means to "to embark in any business" or to "enter upon or employ oneself in an action." *Engage* (def. 16), Oxford English Dictionary (2d ed. 2000); *see also Engage*, Black's Law Dictionary (11th ed. 2019) ("To employ or involve oneself; to take part in; to embark on.").

That definition is broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise. Thus, if a dairy farmer contracts with a farmhand to milk his cows and never does that job himself, he is still employed in or in the business of milking cows.

So too here. The Trusts "embark[ed] in [the] business" of collecting debt and servicing loans when they contracted with the servicers and subservicers to collect their

debt and service their loans. Indeed, the CFPB alleges that the unfair and deceptive debt-collection practices happened in lawsuits brought on behalf of the Trusts, with the "relevant Trust … named [as the] plaintiff in the action." First Am. Compl. ¶ 37. Those suits could have proceeded only with the Trusts' involvement: with narrow exceptions, "a party … must assert his own legal rights and interests." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (internal quotation marks omitted). The subservicers could not have collected any debt without the Trusts' say-so.

True, the subservicers were independent contractors and not Trust employees. D.I. 302-1 § 17. But that is not dispositive. Debt collection and loan servicing are core aspects of the Trusts' business model. If they did not enforce debtors' obligations, their pool of loans would be less valuable, as would the notes they sell to investors. The Trusts cannot claim that they were not "engaged in" a key part of their business just because they contracted it out. *Cf. Barbato v. Greystone All., LLC*, 916 F.3d 260, 266−68 (3d Cir. 2019) (finding that a "passive debt owner" counted as a "debt collector" under the Fair Debt Collection Practices Act when it contracted with a third party to collect debt on its behalf).

Plus, if Congress wanted to allow enforcement against only those who *directly* engage in offering or providing consumer financial services, it could have said so. *See, e.g.*, 12 U.S.C. § 5481(15)(A)(vii)(I) (exempting some merchants from "covered person" status where they deal in "nonfinancial good[s] or service[s] sold *directly* … to the consumer").

**JA9**

Pushing back, the Trusts note that the Act expressly enumerates when a "related person" may be sued based on his relationship to a covered person. D.I. 367, at 14 (citing 12 U.S.C. §5481(25)). That provision, they reason, displaces common-law vicarious liability. Maybe so. But because the Trusts *themselves* count as covered persons, I need not decide whether a non-covered-person principal can ever be held vicariously liable for the acts of his covered-person agent.

\* \* \* \* \*

The Trusts argue that the CFPB was powerless to file this suit and that it filed too late. But both arguments fail. On the complaint now before me, this suit was timely filed. And the CFPB may sue the Trusts because they are "covered persons" under the Consumer Financial Protection Act. Thus, this enforcement action may proceed.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CONSUMER FINANCIAL
PROTECTION BUREAU,

        *Plaintiff,*

    v.

NATIONAL COLLEGIATE MASTER
STUDENT LOAN TRUST et al.

        *Defendants.*

No. 1:17-cv-1323-SB

---

Colin T. Reardon, Gabriel S.H. Hopkins, Jane M.E. Peterson, Stephen C. Jacques, Tiffany Hardy, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C.

        *Counsel for Plaintiff.*

Megan Ix Brison, Michael A. Weidinger, PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, DE.

        *Counsel for Defendants.*

---

## MEMORANDUM OPINION

February 11, 2022

---

BIBAS, *Circuit Judge*, sitting by designation.

Ordinarily, parties cannot appeal until a district court enters a final judgment. But if their case raises important and dispositive legal issues, they may seek permission to appeal early. This enforcement action falls into that rare category.

The parties' dispute raises two novel questions: What is the scope of the Consumer Financial Protection Bureau's enforcement authority? And is ratification required if a federal agency files suit while it is unconstitutionally structured? I answered both questions in denying a motion to dismiss, finding that the Bureau had authority to bring this suit and that it did not need to ratify. But the stakes are high—if I am wrong about either issue, this litigation must end now. So I certify both questions for interlocutory appeal.

## I. BACKGROUND

In 2017, the Bureau sued the National Collegiate Loan Trusts for engaging in forbidden debt-collection and litigation practices. D.I. 362 ¶¶ 1–2. Late last year, I denied the Trusts' motion to dismiss that enforcement action. Mem. Op., D.I. 380.

Back then, the Trusts argued that the Bureau lacked authority to sue them under the Consumer Financial Protection Act. And even if it had that authority, the Trusts claimed, the suit was untimely: the Bureau had filed its complaint while it was unconstitutionally structured, so it needed to ratify the suit after it was restructured and before the statute-of-limitations clock ran out. Yet it failed to do so. *See* D.I. 367.

I rejected those arguments. But now the Trusts ask me to certify both issues to the Third Circuit for an interlocutory appeal. Certification is appropriate only if "exceptional circumstances justify a departure from the basic policy of postponing

2

**JA12**

appellate review until after entry of a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978). Thus, I may not grant the Trusts' request unless they meet three requirements:

- they seek to appeal from an order that "involves a controlling question of law"

- about which there is "substantial ground for difference of opinion," and

- their appeal would "advance the ultimate termination of the litigation."

28 U.S.C. §1292(b). "The burden is on the [Trusts] to demonstrate that all three requirements are met." *Litgo N.J., Inc. v. Martin*, 2011 WL 1134676, at *2 (D.N.J. Mar. 25, 2011).

That is a high bar. But the Trusts meet it, so I certify two questions to the Third Circuit for an interlocutory appeal.

## II. I Certify the Statutory Question

The first question that the Trusts ask me to certify is whether they are "covered persons" subject to the Bureau's enforcement authority. D.I. 384, at 16. In other words, were they "engage[d] in offering or providing … consumer financial product[s] or service[s]," including "servicing loans" and "collecting debt"? 12 U.S.C. §5481(6), (15)(A)(i), (x).

In denying the Trusts' motion to dismiss, I found that they were. Mem. Op., D.I. 380, at 7−10. The Trusts own a large tranche of student debt. And to collect that debt, they "engaged in" loan servicing and debt collection through third-party servicers. True, third parties, not the Trusts, collected the debt and serviced the loans. But the

loan servicing and debt collection were crucial to the Trusts' business and could not have happened without their say-so. *Id.* at 8–9. And the statutory language is "broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise." *Id.* at 8.

But there is room for reasonable disagreement. Plus, a contrary reading of the statute would change the outcome of this lawsuit. So I find that the § 1292(b) factors favor certifying the issue for an interlocutory appeal.

*1. Controlling question of law.* "[C]ontrolling question[s] of law" are important to the case and include those issues that "if erroneous, would be reversible error on final appeal." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974). Here, the statutory-interpretation question is key: It determines whether this lawsuit may proceed against the Trusts. If the Trusts did not "engage in" collecting debt or servicing loans, the Bureau cannot sue them.

*2. Substantial ground for difference of opinion.* There is "substantial ground" for a difference of opinion if there is "genuine doubt … as to the correct legal standard." *N.J. Dep't of Treasury v. Fuld*, 2009 WL 2905432, at *2 (D.N.J. Sept. 8, 2009). That doubt may be caused by "the absence of controlling law on a particular issue," including where there are "statutory interpretation" questions that are "novel and complex." *Id.* (quotation marks omitted).

Here, the statutory-interpretation question is "novel" and there is no controlling precedent. I was the first judge to decide whether the Bureau may bring enforcement actions against creditors like the Trusts who contract out debt collection and loan

4

**JA14**

servicing. And earlier in this litigation, before the case was assigned to me, Judge Noreika expressed "some doubt" that the Trusts are covered persons "under the plain language of the statute." D.I. 359, at 6.

*3. Advancing termination of the litigation.* An appeal "materially advance[s]" the litigation if it would "eliminate the need for a trial." *Orson, Inc. v. Miramax Film Corp.*, 867 F. Supp. 319, 322 (E.D. Pa. 1994). That is so here. If the Third Circuit reverses on appeal and the Supreme Court does not intervene, this suit would stop there.

### III. I Also Certify the Constitutional Question

The Trusts ask me to certify a second question: whether the Bureau needed to ratify this suit before the statute of limitations ran out, having first filed it while the agency director was improperly insulated from presidential removal.

In denying the Trust's motion to dismiss, I held that there was no need for the Bureau to ratify its suit. D.I. 380, at 5. Though the suit was filed while the agency's director was unconstitutionally insulated, that did not mean the filing was invalid.

My holding relied on the Supreme Court's recent decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021). There, the Court held that an unconstitutional *removal* restriction does not invalidate agency action so long as the agency head was properly *appointed*. *Id.* at 1787. And if agency action is valid, it need not need be ratified. *Id.* at 1788. Thus, because the Bureau's director was properly appointed, its filing of this suit was enough to stop the limitations clock. *See* Mem. Op., D.I. 380, at 5 (applying *Collins* to this case in more detail).

**JA15**

Still, *Collins* is a very recent Supreme Court decision and lower courts have not yet hashed out its scope. If my reading is mistaken, I must dismiss this suit as untimely. Thus, the § 1292(b) factors support certifying the question for interlocutory appeal.

*1. Controlling question of law.* Reading *Collins* correctly is important to this case. *Katz*, 496 F.2d at 755. If I am wrong and the Bureau's initial filing of this suit was invalid, then it did not sue the Trusts before the statute of limitations ran out. *See* Mem. Op., D.I. 359, at 10–14 (holding that any ratification came too late to save this suit). That would make the Bureau's suit untimely, ending this case.

*2. Substantial ground for difference of opinion.* Plus, one can reasonably disagree about the scope of *Collins*. That case clarified the law. Before it was decided, courts saw actions brought by improperly insulated agency heads as "ultra vires" and so void. 141 S. Ct. at 1795 (Gorsuch, J., concurring in part). To give those actions legal force, agencies had to ratify them. *See, e.g., CFPB v. Navient Corp.*, 522 F. Supp. 3d 107, 111 (M.D. Pa. 2021) (requiring ratification for a suit to proceed because the Bureau had filed it while the agency was unconstitutionally structured). But *Collins* rejected that prevailing view. The Court explained that actions taken by an improperly insulated director are not "void" and do not need to be "ratified" unless a plaintiff can show that the removal provision harmed him. 141 S. Ct. at 1787–88.

The Trusts read *Collins* more narrowly. They say it is distinguishable because there the agency action was *initiated* "by an acting director" who was removable at will by the President; only later was it *implemented* by his improperly insulated

6

**JA16**

successors. D.I. 384, at 12. By contrast, this case was "marred by a constitutional defect from its inception." *Id.* Because *Collins* is distinguishable, they claim that the Supreme Court's decision in *Seila Law* should apply instead. *Id.* at 10 (citing *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2220 (2020)). And that case, they contend, demands ratification.

Yet the Trust's argument fails to persuade. True, in *Collins* the agency action was initiated by a constitutionally structured agency. 141 S. Ct. at 1787. But there, the harm caused by the agency action "continued … [under] a succession of [improperly insulated] Directors." So the Court considered whether their subsequent acts, implementing the initial action, should be set aside. And because all the directors "were properly appointed" it concluded there was "no reason to regard any [of their] actions … as void." So too here: all of the Bureau's directors were correctly appointed.

In any case, *Collins* was clear that *Seila Law* does *not* always demand ratification where an agency director is insulated from presidential removal. *Id.* (clarifying that the Court said "no such thing" in that case).

Still, one can reasonably disagree about the scope of *Collins*. Justice Gorsuch's concurrence said as much, noting that the Court's opinion raised an "important question" about how lower courts should resolve "the next" agency-insulation suit. *Id.* at 1799 (flagging that the Court's ruling may be a "product of its unique context").

Plus, the need for ratification after *Collins* is an issue in ongoing appeals across the country. *See* Appellant's Supp. Letter Br., *CFPB v. All Am. Check Cashing, Inc.*, No. 18-60302, (5th Cir. Dec. 17, 2021) (en banc) ("*Collins* … held that a party

demonstrates remediable injury whenever 'the President might have replaced the Director absent the removal restriction.'"); Appellant's Reply Br., *Integrity Advance, LLC v. CFPB*, No. 21-9521 (10th Cir. Sept. 3, 2021) (relying on Justice Gorsuch's *Collins* concurrence to limit the decision's scope). That litigation suggests that there is room for reasonable disagreement and thus supports an interlocutory appeal here.

*3. Advancing termination of the litigation.* Finally, certifying an appeal would materially advance this case by potentially "eliminat[ing] the need for a trial." *Orson, Inc.*, 867 F. Supp. at 322. If the Third Circuit disagrees with my reading of *Collins*, I must dismiss this suit as untimely, ending this case.

## IV. I STAY THIS CASE PENDING APPEAL

Having certified an appeal to the Third Circuit, I may stay this case pending that appeal. 28 U.S.C. § 1292(b). That discretion is part of my "inherent" authority to manage my docket to preserve "time and effort for [myself], for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254−55 (1936).

Here, I exercise that discretion and stay this case. A stay ensures that the parties will not waste their resources on discovery. Plus, it guards against government overreach: If the Trusts are right that the Bureau lacks authority to bring this enforcement action, it may not bring the judicial process to bear on them. That protection would be undercut if the Bureau could subject the Trusts to months of discovery while their appeal is pending.

\* \* \* \* \*

**JA18**

This case raises two novel, important, and dispositive issues. So I certify both for interlocutory appeal to the Third Circuit. And to avoid needless expense in the meantime, I stay this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CONSUMER FINANCIAL
PROTECTION BUREAU,

       *Plaintiff*,

    v.

                                   No. 1:17-cv-1323-SB

NATIONAL COLLEGIATE MASTER
STUDENT LOAN TRUST et al.

       *Defendants*.

## ORDER

1. I **GRANT** Defendants' Motion to Certify an Interlocutory Appeal [D.I. 383]. I thus certify the following two questions to the United States Court of Appeals for the Third Circuit:

   - Under the Consumer Financial Protection Act, are the defendant Trusts "covered persons" subject to the Consumer Financial Protection Bureau's enforcement authority?

   - After *Collins v. Yellen*, 141 S. Ct. 1761 (2021), did the Bureau need to ratify this suit before the statute of limitations ran out, having first filed it while the Bureau's director was improperly insulated from presidential removal?

2. I **STAY** this case pending the Defendants' interlocutory appeal to the Third Circuit.

Dated: February 11, 2022

                               _____
                               UNITED STATES CIRCUIT JUDGE

**JA20**

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

ACO-051

No. 22-8010

CONSUMER FINANCIAL PROTECTION BUREAU

v.

NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1;
NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3;
NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4,
Delaware Statutory Trusts

NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1;
NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3;
NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-3; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-4; AMBAC ASSURANCE CORPORATION;
TRANSWORLD SYSTEMS INC.,
Petitioners

(D. Del. No. 1-17-cv-01323)

**JA21**

Present:  KRAUSE, RESTREPO, and SMITH, <u>Circuit Judges</u>

1. Petition for Permission to Appeal under 28 U.S.C. Section 1292(b) by Intervenor Petitioners Ambac Assurance Corp, Transworld Systems Inc and Petitioner National Collegiate Master Student Loan Trust;

2. Response by Respondent Consumer Financial Protection Bureau to original proceeding Petition 1292(b);

3. Response by Intervenor Respondent US Bank NA to original proceeding Petition 1292(b).

Respectfully,
Clerk/kr

_____ORDER_____

The foregoing Petition is granted.

By the Court,

<u>s/ Cheryl Ann Krause</u>
Circuit Judge

Dated: April 29, 2022

kr/cc:  All Counsel of Record

A True Copy:

Patricia S. Dodszuweit, Clerk

**JA22**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**NOTICE**

**GRANT OF PERMISSION FOR LEAVE TO APPEAL**

The Court of Appeals has granted a petition for leave to appeal in this matter.

The $505.00 docketing and filing fee must be paid in the district court within 14 days after the entry of the order granting permission for leave to appeal, unless the petitioner is the United States government. Fed. R. App. P. 5. In addition, a cost bond must be filed if one is required under Fed. R. App. P. 7.

A notice of appeal does not need to be filed as a copy of the Court's order granting permission for leave to appeal which has been forwarded to the district court will serve as the notice of appeal.

The entry date of the order granting permission to appeal serves as the date of the filing of the notice of appeal for calculating time under the Federal Rules of Appellate Procedure. **Petitioner should notify the Court of Appeals in writing that the filing fee has been paid.**

Upon receipt of the notice from petitioner, the appeal will be opened on the general docket. All future filings regarding the appeal will be entered under the new docket number.

Very truly yours,
s/ Patricia S. Dodszuweit
 Clerk

By: s/Kirsi
Case Manager
267-299-4911

cc: All Counsel of Record

**JA23**

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

ACO-051

No. 22-8010

CONSUMER FINANCIAL PROTECTION BUREAU

v.

NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1;
NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3;
NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4,
Delaware Statutory Trusts

NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1;
NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3;
NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-3; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-4; AMBAC ASSURANCE CORPORATION;
TRANSWORLD SYSTEMS INC.,
Petitioners

(D. Del. No. 1-17-cv-01323)

**JA24**

Present:  KRAUSE, RESTREPO, and SMITH, <u>Circuit Judges</u>

1. Petition for Permission to Appeal under 28 U.S.C. Section 1292(b) by Intervenor Petitioners Ambac Assurance Corp, Transworld Systems Inc and Petitioner National Collegiate Master Student Loan Trust;

2. Response by Respondent Consumer Financial Protection Bureau to original proceeding Petition 1292(b);

3. Response by Intervenor Respondent US Bank NA to original proceeding Petition 1292(b).


                                                    Respectfully,
                                                    Clerk/kr

_____ORDER_____
The foregoing Petition is granted.


                                                    By the Court,

                                                    <u>s/ Cheryl Ann Krause</u>
                                                    Circuit Judge

Dated: April 29, 2022

kr/cc:  All Counsel of Record

A True Copy:

Patricia S. Dodszuweit, Clerk

**JA25**

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 23, 2022, the foregoing was filed with the Clerk of the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system, which will also serve counsel of record.

/s/ *Jonathan Y. Ellis*
Jonathan Y. Ellis