**22-1864**

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

❖❖

CONSUMER FINANCIAL PROTECTION BUREAU,

*Plaintiff-Appellee,*

—v.—

NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST, ET AL.,

*Defendants-Appellants.*

APPEAL PURSUANT TO 28 U.S.C. § 1292(B) FROM AN ORDER
OF THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE, ENTERED ON DECEMBER 13, 2021
CIVIL ACTION NO. 1:17-CV-01323-SB

**BRIEF OF THE SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION AND THE CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA, AS *AMICI CURIAE*
IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

KEVIN CARROLL
SECURITIES INDUSTRY AND FINANCIAL
  MARKETS ASSOCIATION
1099 New York Avenue N.W.
Washington, D.C. 20005
(202) 962-7300
kcarroll@sifma.org

JANET GALERIA
TYLER S. BADGLEY
U.S. CHAMBER LITIGATION CENTER
1615 H Street N.W.
Washington, D.C. 20062
(202) 463-5337
jgaleria@uschamber.com

STEPHEN NICKELSBURG
  *Counsel of Record*
CLIFFORD CHANCE US LLP
2001 K Street N.W.
Washington, D.C. 20006
(202) 912-5000
steve.nickelsburg@cliffordchance.com

ROBERT HOUCK
BENJAMIN PEACOCK
MINJI REEM
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
(212) 878-8000

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* the Securities Industry and Financial Markets Association and the Chamber of Commerce of the United States of America each states that it does not have a parent corporation and that no publicly held company owns 10 percent or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................... iii

INTEREST OF *AMICI CURIAE* ............................................................................ 1

INTRODUCTION ..................................................................................................... 3

SUMMARY OF ARGUMENT ................................................................................. 7

ARGUMENT .............................................................................................................. 8

I.   THE STATUTORY HISTORY OF THE CFPA DEMONSTRATES THAT CONGRESS DID NOT INTEND TO INCLUDE PASSIVE SECURITIZATION TRUSTS IN THE DEFINITION OF "COVERED PERSONS" SUBJECT TO THE CFPB'S ENFORCEMENT POWER ........... 8

II.  THE CFPB'S POSITION IS INCONSISTENT WITH THAT OF THE INDUSTRY'S PRIMARY REGULATOR, AS THE SEC DOES NOT IMPOSE DIRECT OBLIGATIONS OR LIABILITIES ON PASSIVE SECURITIZATION TRUSTS ....................................................................... 15

   A.   Regulation AB Does Not Impose Direct Obligations or Liabilities on Passive Securitization Trusts ............................................................. 16

   B.   The SEC's Dodd-Frank Rules for Asset-Backed Securities Do Not Impose Obligations or Liabilities on Passive Securitization Trusts. ..19

III. INCLUDING PASSIVE SECURITIZATION TRUSTS AS "COVERED PERSONS" UNDER THE CFPA WOULD INCREASE THE COST AND REDUCE THE AVAILABILITY OF CONSUMER DEBT. ......................... 22

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ashton v. Pierce*,
  716 F.2d 56 (D.C. Cir.), *amended*, 723 F.2d 70 (D.C. Cir. 1983) ................ 14, 15

*Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ...................................................... 5

*Mohasco Corp. v. Silver*,
  447 U.S. 807 (1980) ........................................................................... 10, 14

**STATUTES**

12 U.S.C. § 5481 ....................................................................................... 2

12 U.S.C. § 5481(6)(A) .......................................................................... 7, 8

12 U.S.C. § 5511(c)(4) .............................................................................. 7

15 U.S.C. § 78p ....................................................................................... 19

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010) ......................................... 11

**REGULATIONS**

17 C.F.R. § 229.1100 .............................................................................. 16

17 C.F.R. § 229.1101(c)(1) ..................................................................... 17

17 C.F.R. § 229.1101(c)(2)(ii) ................................................................ 17

17 C.F.R. § 240.3a12-12 ........................................................................ 19

17 C.F.R. § 240.15Ga-1 .......................................................................... 21

17 C.F.R. § 240.17g-5 ............................................................................ 21

17 C.F.R. § 246.1-22 ................................................................. 20

Credit Risk Retention,
    79 Fed. Reg. 77602 (Dec. 24, 2014) ................................... 20

Asset-Backed Securities Disclosure and Registration,
    79 Fed. Reg. 57184 (Sept. 24, 2014) ........................... 17, 18

Asset-Backed Securities,
    70 Fed. Reg. 1506 (Jan. 7, 2005) ........................... 17, 18, 19

Disclosure for Asset-Backed Securities Required by Section 943 of the
    Dodd-Frank Wall Street Reform and Consumer Protection Act,
    76 Fed. Reg. 4489 (Jan. 26, 2011) ..................................... 21

**OTHER AUTHORITIES**

Baird Webel et al., Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street
    Reform and Consumer Protection Act: Background and Summary*,
    (Apr. 21, 2017), https://crsreports.congress.gov/product/pdf/R/R41350 .... 9, 10, 11

*Credit Encyclopedia Series: Structured Finance Encyclopedia,* Fitch Ratings*,*
    https://www.fitchratings.com/campaigns/structured-finance-encyclopedia ...... 5, 6

Heath P. Tarbert, *The Dodd-Frank Act—Two Years Later*,
    66 CONSUMER FIN. L.Q. REP. 373 (2012) ....................................... 9, 19

H.R. Rep. No. 111-517 (2010) ................................................................ 11

Letter from Andrew J. Pincus on behalf of the U.S. Chamber of Commerce, to the
    H. Comm. on Fin. Serv. on Perspectives on the Consumer Financial Protection
    Agency (Sept. 30, 2009) ........................................................................ 12

Reed D. Auerbach & Charles A. Sweet*, Offerings of Asset-Backed Securities*
    (4th ed. 2022) ............................................................................. 4, 5, 23

Restoring American Financial Stability Act,
    S. 3217 ................................................................. 10, 11, 12, 14

S. Rep. No. 111-176 ................................................................. 20

Sasha Padbidri, *CFPB lawsuit, potential rating downgrades add to NCSLT struggles*, Global Capital (Sept. 25, 2017), https://www.globalcapital.com/securitization/article/28mtafkevrmvtb35ui8zk/cfpb-lawsuit-potential-rating-downgrades-add-to-ncslt-struggles ........................... 24

The Consumer Financial Protection Agency Act, H.R. 3126 .......................................................................... 10, 11, 12, 13

*The Impact of Financial Regulatory Restructuring on Small Businesses and Community Lenders Before the H. Comm. on Small Bus.,* 111th Cong. (2009) ................................................................. 12, 13, 14

The Wall Street Reform and Consumer Protection Act of 2009, H.R. 4173 ........................................................................... 10, 11, 12, 14

*US Asset Backed Securities Statistics*, SIFMA (Aug. 2, 2022), https://www.sifma.org/resources/research/us-asset-backed-securities-statistics/ . 3

## INTEREST OF *AMICI CURIAE*[1]

The Securities Industry and Financial Markets Association ("SIFMA") is the leading trade association for broker-dealers, investment banks, and asset managers operating in the U.S. and global capital markets.  On behalf of the industry's one million employees, SIFMA advocates on legislation, regulation, and business policy affecting retail and institutional investors, equity and fixed-income markets and related products and services.  SIFMA serves as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency.  It also provides a forum for industry policy and professional development.  SIFMA is the U.S. regional member of the Global Financial Markets Association.

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation.  The Chamber represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to

---

[1]     SIFMA and the Chamber affirm that no counsel for a party authored this Brief in whole or in part and that no person other than SIFMA and the Chamber, their members, or their counsel has made any monetary contributions intended to fund the preparation or submission of this Brief.  *See* Fed. R. App. P. 29(a)(4)(E).

1

represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus* briefs in cases, like this one, that raise issues of concern to the nation's business community.

*Amici* represent the interests of numerous participants in the asset securitization market, including loan originators, sponsors, and underwriters; institutional investors; and credit-rating agencies. They share a strong interest in the first question certified for interlocutory appeal: Whether, under the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5481 *et seq.*, the Appellant Trusts are "covered persons" subject to the enforcement authority of the Consumer Financial Protection Bureau ("CFPB").[2]

In short, passive investment trusts such as the Appellant Trusts were never intended to be, and are not, "covered persons." *Amici* submit this Brief to provide important information and context relating to passive securitization trusts, including the nature of such trusts, the history of the "covered person" definition in the CFPA—in particular, the deletion from the legislation of overbroad language that arguably could have covered passive trusts—and the potential adverse impact of the

---

[2]     *Amici* also support the position of Appellants with respect to the second certified question regarding the constitutional infirmity of this enforcement action. However, this Brief will focus on the CFPB's erroneous application of the CFPA to passive securitization trusts.

2

CFPB's position on asset securitization markets and, as a consequence, to the very consumers the CFPA is intended to protect.

## INTRODUCTION

Securitization is a mechanism for loan originators to package and sell loans into the capital markets, and it plays a crucial role in providing credit to consumers at affordable rates.  Because the capital markets comprise a broad array of investors, securitization increases and diversifies the number and type of entities that may invest in loans, including consumer loans.  Securitization also removes loans from the balance sheets of loan originators, freeing up capital to make new loans.  A significant, beneficial effect of the securitization of consumer debt is the creation of a wider and deeper pool of liquidity, making consumer credit more widely available at more favorable interest rates.

Securitization thus plays a key role in the provision of credit to U.S. consumers.  Indeed, more than half of outstanding U.S. consumer debt is securitized. In 2021, securitized debt comprised $8.6 trillion of consumer debt, accounting for 72% of the $16.6 trillion total U.S. consumer debt outstanding.  *US Asset Backed Securities Statistics*, SIFMA (Aug. 2, 2022), https://www.sifma.org/resources/research/us-asset-backed-securities-statistics/.  As of the fourth quarter of 2021, approximately $146 billion of student loan debt, $11.5287 trillion of residential mortgage debt, $220.6 billion of automobile loan

3

debt, and $53.9 billion in credit card receivables was securitized. *Id.* Billions more in other types of consumer debt is securitized, including such diverse instruments as cell phone contracts, boat and recreational vehicle loans, and equipment loans. *Id.*

To allow for loans to be accurately valued and sold to investors, they are placed into entities whose only purpose is to hold the loans. These "passive securitization trusts" have no assets apart from the loans. The trusts have no employees; they are legally separate from the sponsor, the depositor and the other entities involved in the securitization process; and engage only indirectly—if at all—in providing any consumer financial service. They exist solely to hold the loans, to receive loan payments, and to allocate those payments according to their constitutive documents, with most of the payments going to investors.

Investors participate in passive securitization trusts by purchasing asset-backed securities ("ABS"), which are securities derived from the pool of underlying assets held in the trusts (*i.e.*, the loans). Several parties participate in the transactions that create these asset-backed securities. "Originators" issue loans that are ultimately placed in the trust. "Sponsors," which may or may not be affiliates of the originators, acquire loans from one or more originators. A sponsor then packages the loans together and sells them to a "depositor," which usually is a special-purpose-vehicle affiliate of the sponsor. *See* Reed D. Auerbach & Charles A. Sweet, *Offerings of Asset-Backed Securities* § 1.02 (4th ed. 2022) ("Offerings of ABS");

*see also Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 462–64 (S.D.N.Y. 2015). The depositor deposits the loans into the trust in exchange for certificates. The depositor then sells the certificates to an underwriter, who takes them to market. *Nomura Holding Am., Inc.*, 104 F. Supp. 3d at 464. In this manner, "[s]ecuritization . . . separate[es] the risks inherent in any pool of receivables from the other risks related to the originator." Offerings of ABS § 2.01.

The cash flows generated by borrower payments on the underlying loans are used to make payments to investors on a fixed schedule. *Id.* This requires a party to collect payments, pursue non-paying borrowers, and remit the payments to the passive securitization trust. *Credit Encyclopedia Series: Structured Finance Encyclopedia*, Fitch Ratings 7 ("Fitch Structured Finance Encyclopedia"), https://www.fitchratings.com/campaigns/structured-finance-encyclopedia.

"[T]he primary goal of securitization is to issue ABS whose credit risk can be evaluated by credit rating agencies and investors based solely on the projected cash flows from the underlying asset pool, together with any credit enhancement mechanisms that are embedded in the securitization structure." Offerings of ABS § 1.02. Because securitizations are structured to isolate the assets from the risks of the originator, depositor, and other parties, credit ratings agencies consider only a limited number of factors when assigning credit ratings to them. For example, Fitch Ratings considers "the credit profile of the underlying assets, the legal and financial

structure of the transaction, credit enhancement, liquidity protection mechanisms, [and] isolation from the risk of default of the securitization's counterparties." Fitch Structured Finance Encyclopedia 9. If this isolation were disturbed, ratings agencies and securitization investors would have to consider a much wider array of risks, including the creditworthiness and operational risks of the sponsor and other parties to the securitization.

By seeking to treat passive securitization trusts as "covered persons" subject to its enforcement authority, the CFPB risks undermining the structure of consumer debt securitizations. This will upset the expectations of securitization investors, who did not anticipate that the securitizations in which they invested might face these sorts of operational risks. And because investors demand a higher return for riskier investments, the added complexity and risk resulting from treating passive securitization trusts as covered persons will raise the cost and lower the level of investment in consumer debt—increasing the cost and reducing access to consumer credit.

## SUMMARY OF ARGUMENT

The CFPB has enforcement authority under the CFPA against "covered persons." 12 U.S.C. § 5511(c)(4). The CFPA defines a "covered person" in relevant part as "any person that engages in offering or providing a consumer financial product or service . . . ." 12 U.S.C. § 5481(6)(A).

In holding that the Appellant Trusts are "covered persons" under the CFPA, the district court surveyed dictionary definitions of "engage," including—"to embark in any business" or to "enter upon or employ oneself in an action." Mem. Op. at 8 (internal quotation marks omitted). The court then summarily concluded, without consideration of context, that the Appellant "Trusts 'embark[ed] in [the] business' of collecting debt and servicing loans when they contracted with the servicers and subservicers to collect their debt and service their loans." *Id.* at 8–9 (alterations in original). The court thus reached a result that is both contrary to the intent of Congress in enacting the CFPA and inconsistent with the well-established understanding of the role of passive securitization vehicles such as the Appellant Trusts, which by their passive nature "embark in" no business at all.

*Amici* support the arguments of the Appellant Trusts as set forth in the Appellants' Brief, and write to provide important context regarding the error in the district court's conclusion. *First*, in enacting the CFPA, Congress specifically considered and rejected including in the definition of "covered persons" even entities

7

that are "indirectly" engaged in providing consumer products or services. Treating wholly remote, passive entities such as the Trusts as "covered persons" is flatly contrary to that clear congressional intent. *Second*, subjecting passive securitization trusts to liability would be inconsistent with the broader regulatory framework. The securitization industry's primary regulator, the SEC, has long chosen not to impose obligations or liabilities on passive investment vehicles such as the Trusts. *Third*, imposing direct liabilities on passive securitization trusts would frustrate the expectations of securitization investors and would make credit more costly and less available, with the perverse effect of harming the very consumers that the CFPA is intended to protect. This Court should reverse the district court's decision and hold that passive securitization vehicles are not "covered persons" under the CFPA.

## ARGUMENT

### I. THE STATUTORY HISTORY OF THE CFPA DEMONSTRATES THAT CONGRESS DID NOT INTEND TO INCLUDE PASSIVE SECURITIZATION TRUSTS IN THE DEFINITION OF "COVERED PERSONS" SUBJECT TO THE CFPB'S ENFORCEMENT POWER.

The district court failed to consider the statutory history of the CFPA, which demonstrates that passive securitization trusts are not "covered persons" subject to the CFPB's enforcement power, because they are not directly involved in "providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A).

Congress enacted the CFPA as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"). Dodd-Frank was Congress' response to the 2008 financial crisis. The Act targeted multiple sectors of the finance industry that Congress perceived to have played a role in causing or exacerbating the crisis. For example, it created new lending standards for mortgages, subjected credit-rating agencies to new disclosure requirements and heightened legal liability, established new reporting and registration requirements for hedge funds, and gave the CFTC oversight of OTC derivatives, swaps clearing, and reporting requirements. *See* Heath P. Tarbert, *The Dodd-Frank Act—Two Years Later*, 66 CONSUMER FIN. L.Q. REP. 373, 376–378 (2012); *see generally* Baird Webel et al., Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Background and Summary* (2017), https://crsreports.congress.gov/product/pdf/R/R41350 ("CRS on Dodd-Frank"). Tellingly, Congress did not target passive securitization vehicles in the comprehensive provisions of the Act.

In enacting the CFPA, Congress expressly considered and ultimately rejected a definition of "covered person" that would have brought any entity that "*indirectly* . . . engages in offering or providing a consumer financial product or service" within the ambit of the CFPA (emphasis added). Eliminating this language narrowed the potential coverage of the statute by excluding even "indirect" participants. It necessarily follows that Congress intended to exclude wholly passive entities from

coverage. *See Mohasco Corp. v. Silver*, 447 U.S. 807, 822–24 (1980) (stating that Congress "expressly rejected [] language" where the House deleted language from a statute before enactment).

An examination of the House and Senate bills that formed the basis for Dodd-Frank demonstrates the evolution of the statutory language. Predecessor bills to the CFPA included the Restoring American Financial Stability Act (S. 3217), the Consumer Financial Protection Agency Act (H.R. 3126), and the Wall Street Reform and Consumer Protection Act of 2009 (H.R. 4173). The progression of these bills shows that Congress did not intend to include as "covered persons" entities such as passive securitization vehicles that do not play a direct role in the conduct Congress was seeking to target.

As enacted, the CFPA is Title X of the Dodd-Frank Act. On July 8, 2009, Chairman Barney Frank of the House Committee on Financial Services introduced H.R. 3126, the "Consumer Financial Protection Agency Act" (Title X). H.R. 3126, 111th Cong. (July 8, 2009). This bill went through a lengthy process, culminating in the House after numerous revisions as H.R. 4173, the Wall Street Reform and Consumer Protection Act of 2009 ("Dodd-Frank Act"), which the House passed on December 11, 2009.

In parallel, on November 16, 2009, the Senate Committee on Banking, Housing, and Urban Affairs issued a committee print of the Restoring American

Financial Stability Act of 2009 ("RAFSA") (S. 3217).  CRS on Dodd-Frank at 2.

After a lengthy process, the Senate ultimately inserted language from RAFSA into

the House version of the Dodd-Frank Act, and passed this updated version.  S. 3217,

111th Cong. (as incorporated into H.R. 4173 as an amendment, May 20, 2010); H.R.

4173, 111th Cong. (as passed by Senate in lieu of S. 3217, May 20, 2010).

In the end, the House and Senate both adopted the House language,[3] and the

Dodd-Frank Act was signed into law on July 21, 2010.  Dodd-Frank Wall Street

Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

The early versions of both the House and the Senate bills defined "covered

person" as one who "*directly or indirectly*" engages in the provision of financial

products or services.  Specifically, the July 8, 2009 draft of H.R. 3126, the November

10, 2009 discussion draft of S. 3217, and the December 2, 2009 draft of H.R. 4173,

all defined "covered person" as "any person who engages *directly or indirectly* in a

financial activity, in connection with the provision of a consumer financial product

or service" (emphasis added).  *See* H.R. 3126, 111th Cong. (as introduced to House,

---

[3]    On June 30, 2010, after Conference Committee, the House agreed to the final language of the Dodd-Frank Act. H.R. Rep. No. 111-517 (2010) (Conf. Rep.); H. Roll Call Vote No. 413 on H.R. 4173, 111th Congress (June 30, 2010), https://clerk.house.gov/Votes/2010413.  The Senate agreed to this language on July 15, 2010.  H.R. Rep. No. 111-517 (2010) (Conf. Rep.); S. Roll Call Vote No. 208 on H.R. 4173, 111th Congress (July 15, 2010), https://www.senate.gov/legislative/LIS/roll_call_votes/vote1112/vote_111_2_00208.htm.

July 8, 2009); S. 3217, 111th Cong. (discussion draft Nov. 10, 2009), https://www.llsdc.org/assets/DoddFrankdocs/bill-111th-s3217-discussion-draft.pdf; H.R. 4173, 111th Cong. (as introduced to House, Dec. 2, 2009).

This broad language received immediate, negative attention, including from *Amicus* Chamber of Commerce. The Chamber voiced its concerns in a September 30, 2009 letter to the House Committee on Financial Services. This letter specifically warned that H.R. 3126 was overbroad because it did "not focus on entities that are solely, or even principally, engaged in financial service activities." Instead, the broad proposed language "cast[] an extremely broad net that would encompass a vast segment of the entire economy." Letter from Andrew J. Pincus on behalf of the U.S. Chamber of Commerce, to the H. Comm. on Fin. Serv. on Perspectives on the Consumer Financial Protection Agency (Sept. 30, 2009).

The House further addressed the overbreadth of the proposed language in a hearing on September 23, 2009, in the House Committee on Small Business. In prepared and live testimony, industry experts including the Chamber warned of the adverse impact and unintended consequences of the bill, including the "covered person" definition.

In written testimony, David T. Hirschmann of the Chamber stated that the proposed "covered person" definition was "the wrong way to enhance consumer protections and will have significant and harmful unintended consequences for

consumers, for the business community, and for the overall economy." *The Impact of Financial Regulatory Restructuring on Small Businesses and Community Lenders Before the H. Comm. on Small Bus.*, 111th Cong. 72 (2009) (statement of David T. Hirschmann, U.S. Chamber of Commerce).  Specifically, Mr. Hirschmann warned that the "indirectly" language would cover a broad swath of market participants whose functions relate only tangentially to consumer financial services.  *Id*. at 76.

A representative from the mortgage industry made the related point that the overbroad "direct or indirect" language would assign too much power to a new and untested agency, in areas that had long been the province of well-established regulators.  Warning that the broad language of H.R. 3126 could give the CFPB jurisdiction "over all persons covered by the statutes the agency implements, including banks and bank affiliates, non-bank entities, and institutions currently regulated exclusively by one of the federal prudential regulators," the National Association of Mortgage Brokers cautioned that "the CFPA may be regulating in areas that have not been addressed by Congress and therefore, not subject to hearings, oversight or certain checks and balances." *The Impact of Financial Regulatory Restructuring on Small Businesses and Community Lenders Before the H. Comm. on Small Bus.*, 111th Cong. 83 (2009) (statement of Mike Anderson, Vice-Chairman of Government Affairs, National Association of Mortgage Brokers).  The

Association specifically advocated for a narrower definition of "covered person." *Id*. at 84.

Shortly after this testimony urging the narrowing of the definition of "covered person," the "indirectly" language was removed. None of the March 15, 2010 "committee print" draft of S. 3217, the April 15, 2010 draft of S. 3217, or the May 20, 2010 draft of H.R. 4173, included the broad "directly or indirectly" language. Instead, they defined "covered persons" as the term was ultimately enacted: "any person that engages in offering or providing a consumer financial product or services." *See* S. 3217, 111th Cong. (Comm. Print Mar. 15, 2010); *see also* S. 3217, 111th Cong. (as introduced to Senate, Apr. 15, 2010); *see also* H.R. 4173, 111th Cong. (as passed by Senate in lieu of S. 3217, May 20, 2010).

The statutory history shows that Congress plainly knew how to authorize the CFPB to regulate entities "directly or indirectly" involved in the provision of financial services, that Congress expressly considered giving the CFPB this broad mandate, and that Congress decided not to do so. Statutory history, including language expressly rejected by Congress, is an important and appropriate factor for construing the language of a statute as enacted. *Ashton v. Pierce*, 716 F.2d 56, 62 (D.C. Cir.), *amended*, 723 F.2d 70 (D.C. Cir. 1983). And where, as here, Congress considers and changes proposed statutory language, courts should interpret the change as deliberate, *Mohasco Corp.*, 447 U.S. at 822–24, and "may not assume"

14

that Congress made a change for "no reason at all."  *Ashton*, 716 F.2d at 62.

Congress' express consideration and modification of the definition of "covered

person" mandate the conclusion that the deletion of "indirectly" was deliberate.

This history is dispositive as to the application of the CFPA to passive

securitization trusts—which are, at most, indirectly involved with the provision of

financial products or services.  Passive trusts exist solely to effectuate the pass-

through of cash flows from loans that third parties originate and service.  They do

not, and cannot, "engage in" offering or providing consumer financial products or

services such as the debt collection services at issue here—and they certainly do not

do so directly.

## II.    THE CFPB'S POSITION IS INCONSISTENT WITH THAT OF THE INDUSTRY'S PRIMARY REGULATOR, AS THE SEC DOES NOT IMPOSE DIRECT OBLIGATIONS OR LIABILITIES ON PASSIVE SECURITIZATION TRUSTS.

The position of the CFPB also stands starkly at odds with that of the primary

regulator of the securitization industry, the Securities and Exchange Commission

("SEC").  The SEC has a comprehensive regulatory framework for asset-backed

securities, and it has long avoided imposing direct obligations or liabilities on

passive securitization trusts.

The SEC imposes obligations and liabilities upon virtually every entity

involved in asset-backed securitization—except for passive securitization trusts.  For

example, the SEC's comprehensive set of regulations addressing publicly issued asset-backed securities, Regulation AB ("Reg AB"), imposes various registration, disclosure, and reporting requirements on loan sponsors, depositors, and servicers— but *not* on passive securitization trusts.  Likewise, the SEC's Dodd-Frank Rules regarding asset-backed securities—which consist of a host of rules targeting various entities involved in securitization—do not impose direct obligations or liabilities upon passive securitization trusts.  Imposing liability on passive securitization trusts as the CFPB seeks to do would run wholly contrary to the SEC's longstanding regulatory framework.

### A.   Regulation AB Does Not Impose Direct Obligations or Liabilities on Passive Securitization Trusts.

Reg AB and the SEC's related adopting releases over the years demonstrate the SEC's recognition of the role of passive securitization trusts in ABS securitizations and the importance of these entities' legal separation from the liabilities of other entities involved in the securitization process.

Reg AB, codified at 17 C.F.R. §§ 229.1100, *et seq.*, is a comprehensive set of regulations that governs registration, disclosure, and reporting requirements under the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act") for publicly offered securities that meet Reg AB's definition of an "asset-backed security."  The SEC originally adopted Reg AB in 2005 (prior to

16

the enactment of Dodd-Frank and the CFPA) and broadened it in 2014 (after the enactment) with the goal of increasing investor protections and promoting more efficient asset-backed markets.  *See* Asset-Backed Securities, 70 Fed. Reg. 1506 (Jan. 7, 2005) ("2005 Adopting Release"); Asset-Backed Securities Disclosure and Registration, Final Rule, 79 Fed. Reg. 57184 (Sept. 24, 2014) ("2014 Adopting Release").

The passive nature of the issuing entity (*i.e.*, the securitization trust) is critical to Reg AB's definition of an "asset-backed security."  To qualify as an "asset-backed security," the definition requires, in relevant part, that the issuing entity's "activities . . . are limited to passively owning or holding the pool of assets, issuing the asset-backed securities supported or serviced by those assets, and other activities reasonably incidental thereto."   17 C.F.R.  §§ 229.1101(c)(1), (c)(2)(ii).   This definition codifies the SEC's longstanding view that the "limited function and permissible activities" of the issuing entity are "fundamental" to the notion that an asset-backed security is essentially "a security that is to be backed *solely* by a pool of assets."  2005 Adopting Release at 1516 (emphasis added).  Consistent with this view, passive securitization trusts that issue asset-backed securities are "designed to be [] solely passive," and have "no business or management."  *See id.* at 1511, 1508, 1531.

Reg AB also explicitly distinguishes between the roles and responsibilities of passive securitization trusts and those of other parties such as the sponsor, depositor, and servicer. For example, the SEC recognized in its 2005 Adopting Release that the entity issuing the asset-backed securities (the trust) does not collect payments from obligors "[b]ecause the issuing entity is designed to be a passive entity." *Id.* at 1511. Instead, according to the SEC, one or more servicers are "generally necessary to collect payments from obligors of the pool assets, carry out the other important functions involved in administering the assets and to calculate and pay the amounts net of fees due to the investors that hold the asset-backed securities . . . ." *Id.* Thus, contrary to the district court's conclusion, debt collection and loan servicing are not "core aspects" of passive securitization trusts' business model. Mem. Op. at 9. Rather, as the SEC expressly stated, these activities are the domain of the servicer.

Further reflecting the passive nature of these vehicles, Reg AB does not include passive securitization trusts under the common registration, disclosure, and reporting requirements that it imposes on other participants in ABS securitizations— such as sponsors, depositors, and servicers. *See, e.g.*, 2014 Adopting Release at 57299–300 (requiring sponsor to report any changes in interest on Form 8-K); 57267 (imposing certification shelf transaction requirement on depositor's CEO); 57242 (describing amendments to Reg AB Items 1104, 1108, and 1110 requiring disclosure regarding sponsor, servicer, or 20% originator's interest retained in the transaction).

18

In addition, given the "restrictive activities of the issuing entity [the passive securitization trust] in connection with the ABS transaction," Reg AB exempts asset-backed securities altogether from certain Exchange Act disclosure requirements that are imposed on issuers of other types of securities. *See* 2005 Adopting Release at 1580; *see also* 17 C.F.R. § 240.3a12-12 (exempting asset-backed securities, as defined in Reg AB, from Exchange Act Section 16, 15 U.S.C. § 78p).

As a whole, the framework of Reg AB demonstrates the SEC's recognition that imposing direct obligations or liabilities on passive securitization trusts is inconsistent with the very nature of those entities, and that any obligations or liabilities related to issuing and servicing the underlying securities should rest with other parties such as the servicers.

## B.   The SEC's Dodd-Frank Rules for Asset-Backed Securities Do Not Impose Obligations or Liabilities on Passive Securitization Trusts.

The SEC's final Dodd-Frank Rules applicable to asset-backed securities likewise do not impose obligations on passive securitization trusts. These rules were enacted in the wake of the 2008 financial crisis, in parallel with the CFPA. Because one type of securitized product—mortgage-backed securities—was perceived to have played a key role in precipitating the financial crisis, the SEC responded by creating a host of new regulations targeting various entities involved in securitization. *See* Tarbert, 66 CONSUMER FIN. L.Q. REP. at 378. Tellingly, none of

these regulations impose direct obligations or liabilities upon passive securitization trusts.

For example, the final risk retention rules for asset-backed securities, codified in 17 C.F.R. §§ 246.1 to 246.22 ("Reg RR"), which were promulgated pursuant to Section 941 of Dodd-Frank, require that the party who organizes and initiates the securitization—the "securitizer" (*i.e.*, the sponsor/depositor—or, in certain circumstances, the originator)—retain at least a 5% credit risk in an asset-backed transaction. Credit Risk Retention, 79 Fed. Reg. 77602 (Dec. 24, 2014) ("Reg RR Adopting Release"). In recognition of the "broad purpose" of Dodd-Frank to "restore investor confidence in asset-backed finance, and permit securitization markets to resume their important role as sources of credit for households and businesses," the SEC issued Reg RR to ensure that the risks of assets underlying asset-backed securities are monitored and assessed by the parties best positioned to do so: the securitizers. Reg RR Adopting Release at 77655 & n.173 (quoting S. Rep. No. 111-176, at 129 (internal quotation marks omitted)). Thus, by requiring securitizers to retain an interest in the asset-backed transaction, Reg RR seeks to "align[] [the] economic interests" of those who "organize and initiate the securitizations" with those of investors by requiring securitizers to "have 'skin in the game'." *Id.*

Notably, while Reg RR imposes these obligations on securitizers, it does not require passive securitization trusts to maintain any of the credit risk of the asset-backed securities, evidencing the SEC's understanding of the issuing entity's wholly passive role in the securitization process. Simply put, the passive securitization trust has no behavior to influence and no interests to align, contrary to the apparent rationale of the district court here.

Similarly, Rule 15Ga-1, which imposes certain asset-review and repurchase-disclosure requirements on sponsors and depositors of asset-backed securities, does not impose any requirements on passive issuing entities. *See* Disclosure for Asset-Backed Securities Required by Section 943 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 76 Fed. Reg. 4489 (Jan. 26, 2011) (codified in 17 C.F.R. § 240.15Ga-1). The SEC's Dodd-Frank rules also impose disclosure obligations and conflict of interest requirements on other entities involved in securitizations—such as credit rating agencies and providers of third-party due diligence services for asset-backed securities—but not on the passive securitization trusts themselves. *See* 17 C.F.R. § 240.17g-5 ("Rule 17g-5").

In sum, the SEC, which has pervasive regulatory authority over the securitization industry, imposes obligations and liabilities upon every actor in the securitization process other than passive securitization trusts. This is because

imposing direct obligations or liabilities upon the trusts would serve no purpose and makes no sense, given their wholly passive role.

### III.  INCLUDING PASSIVE SECURITIZATION TRUSTS AS "COVERED PERSONS" UNDER THE CFPA WOULD INCREASE THE COST AND REDUCE THE AVAILABILITY OF CONSUMER DEBT.

Sweeping passive securitization trusts into the scope of "covered persons" has the potential to lead to new and unanticipated liability, undermining the securitization markets and ultimately making consumer credit more costly and less available. *First*, the CFPB's expansive interpretation of its enforcement authority under the CFPA would frustrate the expectations of securitization investors by creating a novel risk for which those investors had not bargained. *Second*, bringing passive securitization trusts within the scope of the "covered persons" definition would have the perverse effect of harming the very consumers that the CFPA was designed to protect. These effects would not be limited to student loans. They would impact multiple categories of routinely securitized consumer debt such as residential mortgages, credit card debt, auto loans and others, increasing the cost and thereby reducing the availability of affordable credit for those consumers who most need it.

Subjecting passive securitization trusts to the CFPB's enforcement authority would add a new dimension of risk to securitizations. The trusts, by design, have no assets apart from the loans that they hold, and they have no source of income other than the payments on those loans. This design allows investors to "assume the risks

inherent in a discrete pool of financial assets but avoid the risks inherent in an operating company." Offerings of ABS § 2.01. But this also means that any liabilities imposed on the trust would necessarily diminish the funds available to pay investors, because a securitization trust, unlike an operating company, has no other funds on which to draw. Exposing passive securitization trusts to this sort of liability runs counter to the expectations of securitization investors, who invested in products based on the reasonable understanding backed by years of practice that these products do not carry operational risks. If the district court's decision stands, it will lead to a re-evaluation of risk, which could lead investors to reduce or exit their positions, as the investments may be riskier than the returns justify.

Compounding the problem, the specter of CFPB liability could lead credit-rating agencies to downgrade the credit ratings of securitizations, which could force investors to reduce or sell their positions. Public and private pension plans, insurance companies and university endowments are among the largest securitization investors. Many of these institutional investors are required by their constitutive documents to invest a large percentage of their assets in products that meet certain credit-rating thresholds. If securitization trusts fall below these thresholds, these investors would be forced to sell. And with many investors required to sell at once due to downgrades, these sales would likely occur at depressed prices, to the detriment of the underlying holders of those investments.

This is not merely a theoretical concern.  Following the filing of this lawsuit, Fitch placed 17 tranches of NCSLT transactions on "Ratings Watch Negative," signaling that a credit downgrade could occur.  Sasha Padbidri, *CFPB lawsuit, potential rating downgrades add to NCSLT struggles*, Global Capital (Sept. 25, 2017), https://www.globalcapital.com/securitization/article/28mtafkevrmvtb35ui8zk/cfpb-lawsuit-potential-rating-downgrades-add-to-ncslt-struggles.

Imposing operating risks on passive securitization trusts will also lead to correspondingly higher payments for newly generated securitizations, to the detriment of consumers seeking credit.  This is because investors will demand higher premiums in exchange for the additional risks that they are assuming.  Borrowers will then have to pay higher interest rates so that loans remain attractive.  As a consequence, consumer credit will be costlier and less available, as the current environment of rising interest rates makes clear.

The specter of CFPB liability would also harm consumers in other ways.  Any losses taken by public and private pensions as a result of exiting positions in consumer debt securitizations could impact retiree beneficiaries of those pensions.  Similarly, losses by insurance companies could lead to higher insurance premiums for consumers.  None of these impacts is consistent with the purpose and intent of the CFPA.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision that "covered persons" under the CFPA includes passive securitization trusts.

Dated: September 30, 2022

Of Counsel:

Kevin Carroll
SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION
1099 New York Avenue N.W.
Washington, D.C. 20005
(202) 962-7300
kcarroll@sifma.org

Janet Galeria
Tyler S. Badgley
U.S. CHAMBER LITIGATION CENTER
1615 H Street N.W.
Washington, D.C. 20062
(202) 463-5337
jgaleria@uschamber.com

Respectfully Submitted,

*s/ Stephen Nickelsburg*

Stephen Nickelsburg
*Counsel of Record*
CLIFFORD CHANCE US LLP
2001 K Street NW
Washington, DC 20006
(202) 912-5000
steve.nickelsburg@cliffordchance.com

Robert Houck
Benjamin Peacock
Minji Reem
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
(212) 878-8000
robert.houck@cliffordchance.com
benjamin.peacock@cliffordchance.com
minji.reem@cliffordchance.com

*Counsel for Amici Curiae*

## COMBINED CERTIFICATE OF COMPLIANCE

I, Stephen Nickelsburg, counsel for amici curiae, certify, pursuant to Local Appellate Rule 46.1(e), that I am a member in good standing of the Bar of this Court.

I further certify, pursuant to Federal Rule of Appellate Procedure 32(a)(5) and (6) and Local Appellate Rule 32.1(c), that this Brief complies with the typeface and type-style requirements of the Rules because the document was prepared in a proportionately spaced typeface, Times New Roman, 14-point, using Microsoft Word, and contains 5,381 words.

I further certify, pursuant to Local Appellate Rule 31.1(c), that a virus detection program has been run on the file using Webroot Endpoint Protection v9.0.32.60, and that no virus was detected by that program.

September 30, 2022

*s/ Stephen Nickelsburg*

**CERTIFICATE OF SERVICE**

I, Stephen Nickelsburg, hereby certify that on September 30, 2022, I electronically filed the foregoing Brief with the Clerk of Court by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.


*s/ Stephen Nickelsburg*