IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Docket No. 22-1864

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff-Appellee

v.

NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST, *et al.*,

Defendants-Appellants.

On Appeal From: The United States District Court for the District of Delaware
(Docket No. 1:17-cv-1323-SB)
Sat Below: The Honorable Stephanos Bibas, United States Circuit Judge, sitting by designation

**BRIEF OF STRUCTURED FINANCE ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF APPELLANTS AND REVERSAL**

Rachel Rodman
**CADWALADER,
WICKERSHAM & TAFT LLP**
700 Sixth Street, N.W.
Washington, D.C. 20001
(202) 682-2210

Ellen V. Holloman
**CADWALADER,
WICKERSHAM & TAFT LLP**
200 Liberty Street
New York, NY 10028
(212) 504-6200

*Attorneys for Amicus Curiae*
Structured Finance Association

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus curiae* certifies that the Structured Finance Association is a nonprofit corporation. It has no parent corporation, and no publicly held corporation owns more than 10 percent of its stock.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ...................................................i

TABLE OF CONTENTS ........................................................ii

STATEMENT OF INTEREST AS AMICUS CURIAE...........................1

SUMMARY OF ARGUMENT .................................................2

ARGUMENT .................................................................6

    I.    SECURITIZATIONS ARE DESIGNED TO ISOLATE AND ALLOCATE RISK.......................................6

        A.    The Mechanics of Securitization...................................6

        B.    Securitization Allocates Risk, Not Eliminates Risk… .........................................13

    II.    THE LEGAL STANDARD ADOPTED BY THE DISTRICT COURT WOULD HARM INVESTORS AND INCREASE COSTS FOR CONSUMERS. ...................15

        A.    Securitization Plays a Key Role in the National Economy........................................15

        B.    The District Court's Covered Person Ruling Misunderstands the Trust's Role and Poses a Material Threat to the Securitization Market.......................................................21

    III.    A COVERED PERSON MUST DIRECTLY PARTICIPATE IN OFFERING OR PROVIDING A CONSUMER FINANCIAL PRODUCT OR SERVICE.............................................................25

        A.    The District Court's Interpretation of Covered Person Lacks Legal Support..........................26

B.  Statutory Context Demonstrates That a Covered Person Must Directly Offer or Provide the Consumer Financial Product or Service. ........................................................ 28

C.  The District Court's Rule Supplants the Common Law of Agency and Risks Establishing Broad Vicarious Liability for Unfair and Deceptive Acts and Practices. ................... 32

CONCLUSION ................................................................ 36

CERTIFICATE OF BAR MEMBERSHIP ............................................. 37

CERTIFICATE OF COMPLIANCE........................................................ 38

CERTIFICATE OF FILING AND SERVICE ......................................... 39

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES:

*Allen v. LaSalle Bank,*
   629 F.3d 367 (3d Cir. 2011) .............................................................. 29

*Arangure v. Whitaker,*
   911 F.3d 333 (10th Cir. 2018) ........................................................... 34

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
   501 U.S. 104 (1991) ........................................................................... 32

*Circuit City Stores, Inc. v. Adams,*
   532 U.S. 105 (2002) ........................................................................... 27

*Haro v. City of Los Angeles,*
   745 F.3d 1249 (9th Cir. 2014) ..................................................... 28, 34

*I-L Logging Co. v. Mfrs. & Wholesalers Indem. Exch.,*
   273 P.2d 212 (Ore. 1954) ................................................................... 28

*Selia Law v. Consumer Financial Protection Bureau,*
   140 S. Ct. 2183 (2020) ......................................................................... 3

*Siluk v. Merwin,*
   783 F.3d 421 (3d Cir. 2015) .............................................................. 29

*Sw. Airlines Co. v. Saxon,*
   142 S. Ct. 1783 ................................................................... 27,  28, 34

*Taylor v. Prudential Ins. Co. of Am.,*
   253 N.Y.S. 55 (N.Y. Sup. Ct. 1931) .................................................. 28

*In re Thurmon,*
   625 B.R. 417 (Bankr. W.D. Mo. 2020) .............................................. 28

*U.S. v. Torres,*
   383 F.3d 92 (3d Cir. 2004) .......................................................31, 34-35

*United States v. Texas,*
    507 U.S. 529 (1992) ............................................................ 34

**Statutes**

12 U.S.C.:
    § 5481(6) ...................................................... 4, 21, 25, 29
    § 5481(19) ............................................................. 29
    § 5481(25) ............................................................. 29
    § 5481(25)(A) ......................................................... 29
    § 5481 (25)(C)(ii) ..................................................... 30
    § 5481(26) ............................................................. 29
    § 5581 (26)(C) ........................................................ 31
    § 5536(a)(1) .......................................................... 30
    § 5536(a)(1)(B) ....................................................... 31
    § 5561(1) ............................................................. 31
    § 5563 ................................................................ 31
    § 5565(c) ............................................................. 32
    § 5566 ................................................................ 32

Del. Code Ann. tit. 12 § 3801(i) ................................ 8, 21

**Other Authorities**

RESTATEMENT (THIRD) AGENCY:
    § 1.01 cmt. (c) ....................................................... 33
    § 1.01 cmt. (f) ....................................................... 33
    § 1.02 ................................................................ 33

Antonin Scalia & Bryan A. Garner, *Reading Law: The
Interpretation of Legal Texts* § 52 (2012) ........................... 34

JASON H.P. KRAVITT & CHRISTINE VINCENT, SECURITIZATION
OF FINANCIAL ASSETS § 2.01 (3rd ed. Supp. 2022) .............. 10

Black's Law Dictionary (11th ed. 2019) ............................ 27

Oxford English Dictionary (2nd ed. 2000) .......................... 27

American Bar Association, *Introduction to Securitizations*
(Jan. 27, 2022),
https://www.americanbar.org/groups/business_law/publica
tions/blt/2022/02/securitizations/.................................................. 16, 17

Board of Governors of the Fed. Reserve Sys., *Economic Well-
Being of U.S. Households in 2021* 71 (May 2022),
https://www.federalreserve.gov/publications/files/2021-
report-economic-well-being-us-households-202205.pdf; ................... 18

College Bd., *Trends in College Pricing and Student Aid 2021*
(2022), https://research.collegeboard.org/media/pdf/trends-
college-pricing-student-aid-2021.pdf ........................................... 16, 17

Fed. Reserve Bank of N.Y., *Quarterly Report on Household
Debt and Credit, 2022: Q2* 1 (Aug. 2022),
https://www.newyorkfed.org/microeconomics/hhdc .................... 18, 20

Fitch Ratings, *NCSLT Ruling Could Be Negative for US
Consumer Structured Finance*, (Feb. 8, 2022),
https://www.fitchratings.com/research/structured-
finance/ncslt-ruling-could-be-negative-for-us-consumer-
structured-finance-08-02-2022 ......................................................... 23

Moody's Investors Service, *CFPB's step forward in trust suit
spurs risks across consumer securitizations*, (Feb. 28,
2022),   https://www.moodys.com/researchdocumentconten
tpage.aspx?docid=PBC_1318913 ....................................................... 25

N.Y., *Quarterly Report on Household Debt and Credit, 2022:
Q2* 1 (Aug. 2022),
https://www.newyorkfed.org/microeconomics/hhdc .................... 17, 20

Office of the Comptroller of the Currency, *Asset
Securitization: Comptroller's Handbook* 2 (Nov. 1997),
https://www.occ.treas.gov/publications-and-
resources/publications/comptrollers-handbook/files/asset-
securitization/pub-ch-asset-securitization.pdf ............................ 15, 16

vi

Office of the Comptroller of the Currency, *Comptroller's Handbook: Student Lending* 5 (May 2016), https://www.occ.gov/publications-and-resources/ publications/comptrollers-handbook/files/student-lending/pub-ch- student-lending.pdf ...................................................................................19

Sec. Indus. & Fin. Mkts. Ass'n, *US ABS Issuance and Outstanding* (Sept. 7, 2022), https://www.sifma.org/resources/research/us-asset- backed-securities-statistics/...................................................... 3, 19, 20

Sec. Indus. & Fin. Mkts. Ass'n, *US MBS Issuance and Outstanding* (Sept. 7, 2022), https://www.sifma.org/resources/research/us-mortgage- backed-securities-statistics/;...................................................... 3, 19, 20

U.S. Dep't Educ. Fed. Student Aid Office, *The US Department of Education Offers Low-Interest Loans to Eligible Students to Help Cover the Cost of College or Career School* (last visited Sept. 29, 2022), https://studentaid.gov/understand-aid/types/loans/subsidized- unsubsidized#how-much ...................................................................18

U.S. Dep't of the Treasury, A Financial System That Creates Economic Opportunities: Capital Markets 18 (Oct. 2017), https://home.treasury.gov/system/files/136/A-Financial- System-Capital-Markets-FINAL-FINAL.pdf......................... 16, 20 21

## STATEMENT OF INTEREST AS AMICUS CURIAE[1]

Structured Finance Association is a member-based trade industry advocacy group focused on improving and strengthening the broader structured finance and securitization market to help its members and public policy makers responsibly grow credit availability for consumers and businesses across all communities. With over 370 members, SFA represents all stakeholders in the securitization market, including consumer and commercial lenders, institutional investors, financial intermediaries, law firms, accounting firms, technology firms, rating agencies, servicers, and trustees. SFA was established with the core mission of supporting a robust and liquid securitization market, recognizing that securitization is an essential source of core funding for the real economy. As part of that core mission, SFA is dedicated to furthering public understanding among members, policy makers, consumer and business advocacy groups, and other constituencies about structured finance, securitization, and related capital markets.

---

[1] SFA affirms that no counsel for a party authored this brief in whole or in part and that no person other than SFA, its members, or its counsel has made any monetary contributions intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

SFA is uniquely positioned to address the scope of the Consumer Financial Protection Bureau's authority over securitization trusts. While SFA's members play diverse roles and have varying perspectives on securitization transactions, all members have a strong interest in ensuring that the multi-trillion dollar U.S. securitization market is not materially disrupted.

## SUMMARY OF ARGUMENT

The legal question before this Court is critically important to the U.S. securitization industry. Securitization is a type of financing that increases the flow of capital into the U.S. economy so Americans can finance purchases, such as homes, automobiles, and college tuition, at a lower cost. Securitization does this by transforming individual consumer loans into tradeable financial instruments, *i.e.,* securities, that are more readily sold to bond investors. The process benefits consumers and investors. It increases the availability of credit to consumers. And it creates investments that asset managers with a fiduciary responsibility can buy to match their clients' investment objectives and risk tolerance, while at the same time providing diversification alternatives to equity and other fixed-income markets. As a result of the industry's success,

today securitization represents approximately a quarter of the entire bond market and finances $11.9 trillion, or roughly three-quarters, of the $15.6 trillion of total household debt.[2] As such, securitization provides essential credit to families and individuals, and there are more low-risk bond options for institutional investors to grow their clients' savings.

The ruling below has the potential to materially disrupt this critical market. The specific issue presented in this appeal concerns the reach of a powerful federal financial regulator called the Consumer Financial Protection Bureau. Congress created the Bureau in the aftermath of the Great Recession to ensure fair, transparent, and competitive markets for consumer financial products and services. In service of that mission, Congress granted the Bureau "potent" enforcement power to prevent "covered persons" from committing unfair, deceptive, or abusive acts or practices. *See Selia Law v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2193 (2020). Status as a covered person is thus a precondition

---

[2] Sec. Indus. & Fin. Mkts. Ass'n, *US MBS Issuance and Outstanding* (Sept. 7, 2022), https://www.sifma.org/resources/research/us-mortgage-backed-securities-statistics/; Sec. Indus. & Fin. Mkts. Ass'n, *US ABS Issuance and Outstanding* (Sept. 7, 2022), https://www.sifma.org/resources/research/us-asset-backed-securities-statistics/.

to the Bureau's exercise of one of its most important enforcement powers—the UDAAP prohibition—in most cases.

Yet, no federal appellate court has interpreted the term "covered person." Congress provided the following definition in the Consumer Financial Protection Act: a "covered person" is a person that "engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). The district court ruled that a person need not directly participate in offering or providing a consumer financial product or service to "engage" in the activity. Rather, the court held that the term "engage" means "to embark in any business" and that it is "broad enough to encompass actions taken *on a person's behalf by another*, at least where that action is central to his enterprise." Mem. Op., *Consumer Fin. Protection Bureau v. Nat'l Collegiate Master Student Loan Trust*, No. 17-cv-1323-SB, Dkt. 380 at 8 (D. Del. Dec. 31, 2021) (hereinafter, "Mem. Op.") (emphasis added).

The defendants in this case are Delaware statutory securitization trusts. Like most trusts established as part of a securitization transaction, they are special purpose financing vehicles. Such vehicles have no employees or operations; they do not *do* anything. Their purpose

is to hold assets to facilitate the financing of those assets by bond investors. Yet the district court ruled that the defendant trusts "engage" in offering or providing a consumer financial product or service because they entered into contracts with independent service providers (*i.e.,* loan servicers) to perform services that the trusts had no way to perform themselves: collect payments and debt on the student loans owned by the trusts. *Id.* at 8–9.

That is a legal error with grave consequences for the multi-trillion dollar U.S. securitization market. For the reasons below, this Court should reject the district court's interpretation of "covered person."

*First*, SFA will explain how securitizations are structured and summarize the basic mechanics behind the student loan securitizations at issue in this case. At bottom, securitizations are carefully considered transactions whose primary purpose is to isolate pooled assets and allocate risk. *See* Section I.

*Second*, SFA will explain how the district court's ruling upsets that fundamental premise. By attributing the conduct of a loan servicer to a securitization trust, the district court's ruling subjects the trusts (and, by extension, the trusts' assets held for the benefit of bond investors) to the

Bureau's UDAAP enforcement authority, thereby disrupting the contractual expectations investors have in these types of investments. That expectation comprises a key aspect of the industry's success. *See* Section II.

*Third*, the case law, statutory context, and federal policy support interpreting "covered person" to require direct participation in offering or providing a consumer financial product or service. The district court's ruling to the contrary was an error. *See* Section III.

## ARGUMENT

## I.  SECURITIZATIONS ARE DESIGNED TO ISOLATE AND ALLOCATE RISK.

### A.    The Mechanics of Securitization.

A key distinction of securitization, as compared to other financing transactions, is that it permits a pool of loans to be isolated and then deliberately allocates risks among the participants in the transaction. To illustrate this feature, we describe below the mechanics of a typical consumer securitization.

Broadly speaking, securitization is the pooling of assets that generate regular cash flows into a special purpose vehicle, often a trust; the trust issues securities to bond investors; and the cash flows generated

6

by the trust's assets fund the interest and principal payments to the investors. The types of assets pooled into securitization vehicles vary widely. Some of the most common assets include residential real estate mortgages, commercial real estate mortgages, credit card receivables or, as in this case, student loans.

The securitization process begins with a "sponsor." The sponsor is responsible for identifying or "designating" the loans to be included in the pool of assets, which is referred to as the "collateral pool." The sponsor is often the financial institution that originated the loans. However, the sponsor can also be an affiliate of the originating financial institution or a separate entity that has purchased the loans from the originating financial institution.

Next, the sponsor sells the collateral pool to an "issuer." The issuer has no say in the loans designated for inclusion in the collateral pool. The issuer is a special purpose vehicle with no employees, officers, directors, or operations. The issuer acts only by operation of law, by operation of contract (transaction indenture), or by instruction from transaction parties with authority to direct the issuer.

7

In the vast majority of consumer loan securitizations, the issuer is a trust—not an LLC, corporation, or other type of legal entity. Trusts are well-suited for the role of issuer because a trust is permitted to act as a passive owner for the assets deposited into it. Here, the defendant trusts are Delaware statutory trusts governed by the Delaware Statutory Trust Act. *See* Joint Br. for Appellants, Dkt. 33, at 1. Importantly for the securitization industry, under the Delaware Statutory Trust Act,  a statutory trust, may, but need not, engage in any business activity at all. Rather, it may, among other permitted purposes, be organized "for the purpose of holding or otherwise taking title to property, whether in an active or custodial capacity" Del. Code Ann. tit. 12 § 3801(i).

The issuer then sells interest-bearing securities to bond investors, typically through an investment bank underwriter. A portion of the proceeds received from the sale of the securities to investors is collected by the issuer and paid to the sponsor in exchange for the securitized loans. The sponsor often will use the cash proceeds generated from the sale of such securities to (1) make new consumer loans (if the sponsor is the originating financial institution), or (2) buy new consumer loans from other originating financial institutions (if the sponsor is not the

8

originating financial institution). In essence, the issuer is a financing vehicle for sponsors that raises capital for future loans or for other business capital needs.

Investors in consumer securitizations are generally paid as follows: the funds from the consumers' payments on their loans are used to pay the amounts owed to the investors who own the securities. The priority and manner of payments to investors is prescribed by contract. The securities are often divided into tranches or classes, each with its own payment terms as well as a specified ranking as to the priority in which each tranche will receive payments of, or be allocated losses on, the underlying assets. Generally, the most senior tranches have first priority to receive distributions after pre-determined expenses of the issuer and interest on the bonds have been paid. Due to the lower risk profile for the most senior tranches, these securities are typically triple-A rated by one or more credit rating agency signifying that they present a relatively low risk of default. This makes senior tranches a suitable investment option for more conservative investment objectives. Thus, investors in senior tranches of consumer loan securitizations generally include a broad

range of institutional investors such as insurance companies, pension funds, banks, and other investment funds.

At the other end of the risk spectrum is the residual, equity, or ownership interest.[3] These interest holders are paid last in the waterfall and thus have the most risk. Residual interest holders are also the first to absorb credit losses on the underlying trust assets—often referred to as the "first loss position"—and therefore are most exposed to default risk. By absorbing losses before more senior tranches, residual interests and any subordinated classes of bonds provide credit enhancement[4] to the senior tranches, reducing the volatility of distributions and risk associated with the senior tranches.

After the securitization transaction closes, oversight, administration, and management of the issuer and its assets are performed by various parties, including trustees, servicers, and administrators. **Trustees** are typically banks appointed by the issuer to

---

[3] *See, e.g.*, JASON H.P. KRAVITT & CHRISTINE VINCENT, SECURITIZATION OF FINANCIAL ASSETS § 2.01 (3rd ed. Supp. 2022) (defining "residual interest" as "the most subordinated claim on a pool of securitized assets").

[4] Credit enhancement is a risk-reduction method that provides protection, in the form of financial support, to help cover losses on securitized assets.

perform limited administrative duties relating to the securities and to enforce certain provisions of the securitization agreements, all as specifically enumerated in the relevant trust agreements and indentures. There are different types of trustees, including indenture trustees and owner trustees. **Servicers** interact and communicate with borrowers, collect and process payments on the underlying assets, and handle delinquent and defaulted assets. Servicers also remit the payments they collect to the trustee for distribution to investors, as prescribed in the transaction documents. And **administrators** handle certain administrative functions and corporate management services on behalf of the issuer.

A summary of the parties to a securitization transaction is set forth in the following table:

| Party | Role in Securitization |
|---|---|
| Originator | Originators generate the assets to be securitized (*e.g.*, by making loans to borrowers). |
| Sponsor | The sponsor—often the same entity as the originator—identifies and pools the assets to be securitized before selling them to the issuer. |
| Issuer | The issuer—usually a trust—purchases the assets, then sells securities backed by the assets to third party investors. These securities are typically separated into different classes or tranches and each tranche is typically assigned a rating, by at |

| Party | Role in Securitization |
|---|---|
| | least one credit rating agencies, that indicates its creditworthiness. |
| Underwriter | The underwriter organizes and markets the securitization's securities for sale to third-party investors, and often sells the securities as well. |
| Bond Investor | Bond investors purchase the securities and are therefore entitled to receive principal repayments and interest based on cash flows generated by the assets in the collateral pool.<br><br>How and when investors are paid, or are allocated losses resulting from the performance of the asset pool, depends on which tranche or class of securities have been purchased by the investor. |
| Trustee | Trustees are banks appointed by the issuer (usually a trust) to perform limited administrative duties relating to the securities and to enforce certain provisions of the securitization agreements. Trustees generally oversee the disbursement of cash flow to investors pursuant to the securitization waterfall. |
| Indenture Trustee | Indenture Trustees administer the trust that issues the classes or tranches of securities that are sold to investors, pursuant to an indenture, and, under specified conditions, act on behalf of the investors. |
| Owner Trustee | Owner Trustees administer the trust that issues certificates representing beneficial ownership interests in the issuer's equity, and, under specified conditions, act on behalf of the residual interest holders (*i.e.*, parties that purchase or retain the certificates). |
| Servicer | Servicers provide payment collections services and remit payments they collect to the trustee. |
| Administrator | Administrators typically consist of a trustee or affiliate of the sponsor that handles certain administrative functions and corporate management services on behalf of the issuer. |

| Party | Role in Securitization |
|---|---|
| Residual interest holders | Residual interest holders, who hold certificates representing beneficial ownership interests in the issuer, typically occupy the most junior position in the securitization waterfall, and as such, are generally first to absorb losses and are paid only the "residual" cash flow (if any). |

### B.    Securitization Allocates Risk, Not Eliminates Risk.

Unlike equity securities and corporate bonds, a distinguishing feature of securitizations is that they limit investment risk and reward to the performance of the pooled assets. The purpose of selling the loans to an issuer-trust is to legally separate (*i.e.*, isolate) the assets from the bankruptcy risk introduced by the sponsor. Specifically, the sponsor's true sale of consumer loans to the issuer-trust protects investors from the credit risk of the originator and the sponsor, which includes their potential insolvency. In addition, a traditional securitization trust, like defendants in this case, is a newly-formed entity, with no assets other than the designated loans and no liabilities, employees, operations, or operating history. The trusts cannot and do not have the authority to undertake any specific action in connection with the assets they hold. Rather, in accordance with the transaction documents and the negotiated expectations of the parties, typically the trustee, on behalf of the trust,

13

contracts with third parties to perform all servicing functions necessary to administer the assets they hold. These features of a trust allow investors to take on *only* the risk and reward of the performance of the pooled assets. But, importantly, they also mean that investors can look *only* to the collateral pool for repayment of their investment in the securitization.

The process of securitization does not eliminate legal risk or allow transaction parties, including third party service providers, to evade responsibility for regulatory violations related to the pooled assets. Rather, those risks are allocated on a known basis to the transaction parties:  the originator retains liability for regulatory violations during the origination of the loans, the trustee retains liability for errors during the performance of its limited duties, and the servicer retains liability for regulatory violations during the servicing of the loans. The critical point is that the assets backing the securities sold to investors are insulated from those risks, which means *the investors in the securities issued by the trusts* also are insulated from those risks. That essential feature is what allows securitization to take an individual loan between a consumer and

a lender and turn it into a liquid financial instrument that serves as an investment vehicle for investors across the global economy.

## II.    THE LEGAL STANDARD ADOPTED BY THE DISTRICT COURT WOULD HARM INVESTORS AND INCREASE COSTS FOR CONSUMERS.

### A.    Securitization Plays a Key Role in the National Economy.

Securitization as a financial practice dates back to the 1970s, beginning with the third-party financing of pools of mortgages.[5] Prior to this, banks issuing loans would typically engage in portfolio lending—*i.e.*, holding loans until they matured or were paid off. However, the portfolio lending model suffered from a number of disadvantages. Under the portfolio lending model, a bank's funds available for loans were limited by the financial institution's deposits and debt, which created a necessary limitation on the number and amount of loans offered and therefore how competitive loan terms would likely be. The portfolio lending model also potentially exposed lenders to high levels of risk, as financial institutions

---

[5] Office of the Comptroller of the Currency, *Asset Securitization: Comptroller's Handbook* 2 (Nov. 1997) [hereinafter *Comptroller's Handbook*],                    https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/asset-securitization/pub-ch-asset-securitization.pdf.

that issued loans to various segments of borrowers in different markets and geographic areas would necessarily be exposed to significant financial risk if those particular segments of borrowers, markets, or geographic areas experienced an economic downturn. The development of securitization mitigated these risks for banks, and also allowed banks to transfer credit risks from customer lending to the broader financial system by expanding the investor base for such loans.[6]

Securitization has other benefits too. It benefits bank and non-bank sponsors by providing access to the capital markets to finance consumer lending whereby a large portion of the securitization bonds they sell can "obtain higher [bond credit] ratings than if such companies were to obtain a traditional loan," thus reducing the cost of borrowing.[7] It benefits investors by enabling investment in different types of assets without exposure to the credit risk of the sponsor. While securitizations are an

---

[6] U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities: Capital Markets* 18 (Oct. 2017) [hereinafter *Treasury Report*], https://home.treasury.gov/system/files/136/A-Financial-System-Capital-Markets-FINAL-FINAL.pdf.

[7] American Bar Association, *Introduction to Securitizations* (Jan. 27, 2022),
https://www.americanbar.org/groups/business_law/publications/blt/2022/02/securitizations/

16

appealing investment opportunity to a broad range of investors, the "diversification benefits, liquidity, and yield" of these investments are particularly attractive to institutional investors who manage money for pension plans, mutual funds and other savings plans.[8] Moreover, securitizations offer investors a high degree of flexibility, because the securities issued by the issuer-trust can be structured to meet investors' differing asset diversification, risk, and duration requirements.[9]

Student lending benefits significantly from securitization. For the 2021-2022 academic year, the average cost of one year at a four-year private college was $51,690.[10] Likewise, the average annual costs for an in-state and out-of-state student at a public university were $22,690 and $39,510, respectively.[11] Due to the high cost of post-secondary education, 30% of all adults incurred at least some debt for their education, with

---

[8] *Id.*

[9] *Comptroller's Handbook*, *supra* note 5, at 4.

[10] College Bd., *Trends in College Pricing and Student Aid 2021* at 10 (2022), https://research.collegeboard.org/media/pdf/trends-college-pricing-student-aid-2021.pdf.  This figure is inclusive of tuition, fees, and room and board.

[11] *Id.*

outstanding student debt in the United States amounting to approximately $1.59 trillion in total.[12] Federal student loans are limited to a certain dollar amount, an amount dependent upon factors such as the school and type of borrower.[13] Thus, private student loans are often the only option available to cover tuition costs above federal loan limits.

Student loans, however, present challenges and risks for lenders that distinguish them from other forms of consumer debt. These include the significant time lag between loan advances and repayment, the counter-cyclical nature of student borrowing, and the student borrowers' lack of certainty in finding a stable, reliable source of funds to repay loans after graduation.[14] Through the process of securitization, lenders can

---

[12] Bd. of Governors of the Fed. Reserve Sys., *Economic Well-Being of U.S. Households in 2021* 71 (May 2022), https://www.federalreserve.gov/publications/files/2021-report-economic-well-being-us-households-202205.pdf; Fed. Reserve Bank of N.Y., *Quarterly Report on Household Debt and Credit, 2022: Q2* 1 (Aug. 2022), https://www.newyorkfed.org/microeconomics/hhdc.

[13] *See* U.S. Dep't of Educ. Fed. Student Aid Office, *The US Department of Education Offers Low-Interest Loans to Eligible Students to Help Cover the Cost of College or Career School* (last visited Sept. 29, 2022), https://studentaid.gov/understand-aid/types/loans/subsidized-unsubsidized#how-much.

[14] Office of the Comptroller of the Currency, *Comptroller's Handbook: Student Lending* 5 (May 2016), https://www.occ.gov/publications-and-

partly offset these risks by allocating the risk to groups of third parties, thus allowing lenders to provide student borrowers with access to more loans at lower interest rates.

Securitization also benefits the national economy, including facilitating efficient access to capital markets, minimizing issuer-specific limitations on the ability to raise capital, and monetizing illiquid assets. For these reasons, securitization has become a fundamental source of capital to support the national economy. As of the end of the fourth quarter of 2021, securitization provided $11.9 trillion in funding for consumer loans.[15] This represents 76% of the $15.6 trillion of total household debt.[16] The volume of securities issuances also provides another means of demonstrating the prevalence of securitization in the

---

resources/publications/comptrollers-handbook/files/student-lending/pub-ch-student-lending.pdf.

[15] Sec. Indus. & Fin. Mkts. Ass'n, *US MBS Issuance and Outstanding* (Sept. 7, 2022), https://www.sifma.org/resources/research/us-mortgage-backed-securities-statistics/; Sec. Indus. & Fin. Mkts. Ass'n, *US ABS Issuance and Outstanding* (Sept. 7, 2022), https://www.sifma.org/resources/research/us-asset-backed-securities-statistics/.

[16] Fed. Reserve Bank of N.Y., *Quarterly Report on Household Debt and Credit, 2022: Q2* 1 (Aug. 2022), https://www.newyorkfed.org/microeconomics/hhdc

economy. In 2021, there were over $4 trillion in new mortgaged-backed securities and asset-backed securities issuances, of which $33 billion were new issues of student loan securitizations.[17] With respect to student loans specifically, approximately $143 billion of student loan debt is currently securitized as of the fourth quarter of 2021.[18]

The high level of securitization in the economy has allowed for significant investment into lending markets. The fact that $11.9 trillion of household debt is currently financed by securitization represents trillions of dollars in loans that might not have otherwise been made available to borrowers without the access to funding provided by securitization. The U.S. government has expressly described securitization as "a vital financial tool to facilitate growth in our domestic

---

[17] Sec. Indus. & Fin. Mkts. Ass'n, *US MBS Issuance and Outstanding* (Sept. 7, 2022), https://www.sifma.org/resources/research/us-mortgage-backed-securities-statistics/; Sec. Indus. & Fin. Mkts. Ass'n, *US ABS Issuance and Outstanding* (Sept. 7, 2022), https://www.sifma.org/resources/research/us-asset-backed-securities-statistics/.

[18] *Id.*

economy," and has stated that securitization should be viewed "as a byproduct of, and safeguard to, America's global financial leadership."[19]

### B. The District Court's Covered Person Ruling Misunderstands the Trust's Role and Poses a Material Threat to the Securitization Market.

The Consumer Financial Protection Act defines "covered person" as "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). The district court ruled that the defendant securitization trusts are such a person because they "'embark[ed] in the business' of collecting debt and servicing loans when they contracted with the servicers and subservicers to collect their debt and service their loans." Mem. Op. at 8.

The district court misunderstands the role of the trust in a securitization. Securitization is not a joint venture among the participants to engage in business. Rather, the issuer-trust is a financing vehicle. It has no business. It is a special-purpose entity that owns assets, as expressly permitted by Delaware law. *See* Del. Code Ann. tit. 12 § 3801(i).

---

[19] *Treasury Report*, *supra* note 6, at 91.

True, the consumer loans backing the bonds must be serviced so that investors can be paid. But that does not mean the trust itself "embarked in the business" of servicing consumer loans. Again taking the dairy farmer analogy, many services are "central" to a dairy farmer's business. But a dairy farmer is no more engaged in the trucking business because it must hire a trucking company to transport its milk to customers, than an issuer-trust is engaged in the servicing business because it must hire a loan servicer to collect payments from borrowers.

If this Court adopts the district court's interpretation of "covered person" under the Act, it will pose a material threat to the U.S. securitization market. SFA does not take that position lightly. At its core, the district court's ruling exposes the issuer-trust—and its assets—to the regulatory risk of the loan servicer. In so doing, the ruling strikes at the foundational principle of securitization: the isolation of the issuer-trust's assets so that bond investors participate in *only* the performance risk of the assets themselves—not the alleged wrongdoings of a third-party servicer.

Disrupting this core feature of consumer loan securitizations will have many negative consequences. The ruling exposes the issuer-trust,

its assets, and its investors to unexpected and unpredictable legal costs and damages. According to Fitch Ratings, "[s]uch losses and legal expenses to defend related claims are not predictable and therefore cannot be accounted for quantitatively in the rating analysis."[20]

These unpredictable and asymmetric risks will cause bond credit ratings to become more volatile as ratings agencies struggle to predict and quantify the risk that the Bureau could sue issuer-trusts for regulatory violations committed by loan servicers.[21]

Additionally, bond investors will find it difficult to protect their interests in this environment. For one, trustees and investors, as compared to the originator and servicer of the underlying loans, lack access to, responsibility for, and knowledge of actions and information surrounding origination and servicing, making it very difficult to defend against claims asserted in relations to the actions of these third parties. For another, in a securitization structure, any litigation settlement that

---

[20] Fitch Ratings, *NCSLT Ruling Could Be Negative for US Consumer Structured Finance*, (Feb. 8, 2022), https://www.fitchratings.com/research/structured-finance/ncslt-ruling-could-be-negative-for-us-consumer-structured-finance-08-02-2022.

[21] *Id.*

would impact the trust assets typically requires unanimous consent of all current bond investors. But securitization bonds are often widely distributed with upwards of many tens to hundreds of investors. Moreover, due to the fact that securitization bonds are actively traded, combined with investor privacy regulations, simply identifying and communicating with bond investors in a securitization is very challenging and time consuming. Together with the fact that different tranches of bonds have different priority over trust cashflow, achieving unanimous consent regarding litigation strategy is practically impossible.

All these factors will lead bond investors, trustees and other transaction parties to charge higher prices to cover these new risks or potentially not participate at all. For example, low risk investors may find the uncertainty and potential magnitude surrounding these risks too great to invest at any price—especially as senior rated bonds are often sought by investors in part due to their cash flow predictability and low expected default risk. As a result, not only will the higher prices charged by some investors and the lack of participation by others lead to increased borrowing cost for consumers seeking to fund essential purchases, but

24

the $11.9 trillion of funding securitization provides to American households will be materially reduced.

Furthermore, in the event the Bureau "sue[s] trusts over servicers that run afoul of consumer protections, legal costs and potential damages will rise, exposing investors to additional risk."[22] If any legal fees and damages are paid using the issuer-trust assets, those costs will be borne by the investors, including pension fund and retirement plans. In effect, the district court's ruling could result in legal expenses and liability for wrongdoings of third-party servicers being passed down to Americans saving for retirement.

## III. A COVERED PERSON MUST DIRECTLY PARTICIPATE IN OFFERING OR PROVIDING A CONSUMER FINANCIAL PRODUCT OR SERVICE.

A covered person includes "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). The district court held that an entity qualifies as a covered person if it "embarks in" the business of offering or providing a consumer financial

---

[22] Moody's Investors Service, *CFPB's step forward in trust suit spurs risks across consumer securitizations*, (Feb. 28, 2022), https://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_1318913.

product or service. Mem. Op. at 8. Direct participation by the entity is not required. *Id.* Rather, the court held that the word "engage" as used in the statutory definition "is broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise." *Id.*

For three reasons, this Court should reject the district court's interpretation of "covered person." It is unsupported by the law. It is contrary to the statutory context. And, it disregards the common law of agency in favor of a far broader rule. This Court should instead interpret "covered person" to require direct, active, or personal involvement in offering or providing a consumer financial product or service.

## A.    The District Court's Interpretation of Covered Person Lacks Legal Support.

The district court correctly framed the legal issue now before this Court:  the fate of the Bureau's Amended Complaint "boils down to the breadth of the word 'engage.'" Mem. Op. at 8. Yet, the district court limited its analysis of that question to a selective reading of the dictionary definition of that word. That was an error. "Engage" has several definitions, including "to embark in any business," to "employ oneself in action," to "involve oneself," and "to take part in." *See id.* at 8

(quoting Oxford English Dictionary (2d ed. 2000) and Black's Law Dictionary (11th ed. 2019)). The district court based its ruling on one of these definitions—"to embark in any business"—while ignoring other, more natural readings such as to "employ oneself *in action*." *See* Mem. Op. at 8-9 (emphasis added).

Interpreting "engage" to require direct participation in the activity at issue is consistent with judicial interpretations. Just last term, the Supreme Court interpreted the scope of the Federal Arbitration Act's exemption for a "class of workers engaged in foreign or interstate commerce." *See Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783 , 1784(2022). The Court ruled that "any class of workers directly involved in transporting goods across state or international borders falls within" the exemption. *Id.* at 1789. The Court's holding built on its prior decision in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2002). There, the Court indicated that the class of workers subject to the exemption "must at least play a *direct* and 'necessary role in the free flow of goods' across borders" and "must be *actively* 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." *Saxon*, 142 S. Ct. at 1790 (quoting *Circuit City*, 532 U.S. at 121) (emphasis added).

Other courts have likewise interpreted the term "engage" to mean direct, active, or personal involvement. *See Haro v. City of Los Angeles*, 745 F.3d 1249, 1257 (9th Cir. 2014) (reasoning that "to engage in fire suppression" refers to "those who are dispatched to the fire scene and *actively engage* the fire."); *In re Thurmon*, 625 B.R. 417, 422 (Bankr. W.D. Mo. 2020) (interpreting "engaged in" in the Small Business Reorganization Act to mean "to be actively and currently involved"); *I-L Logging Co. v. Mfrs. & Wholesalers Indem. Exch.*, 273 P.2d 212, 216–17 (Ore. 1954) (interpreting "engaged in the employment" in insurance policy to mean "active in the work which the plaintiff was employed and paid to perform"); *Taylor v. Prudential Ins. Co. of Am.*, 253 N.Y.S. 55, 59 (N.Y. Sup. Ct. 1931) (interpreting "engaged in aviation operations" in insurance policy to mean "taking part in the operations of an airplane in some direct way"). We have identified no authority that adopts the district court's contrary interpretation of that term.

## B. Statutory Context Demonstrates That a Covered Person Must Directly Offer or Provide the Consumer Financial Product or Service.

Statutory terms must be interpreted in context. *See, e.g., Allen v. LaSalle Bank*, 629 F.3d 367 (3d Cir. 2011); *Siluk v. Merwin*, 783 F.3d

421, 427 (3d Cir. 2015). The statutory context of the Act supports delimiting covered persons to persons that directly offer or provide a consumer financial product or service.

As background, there are three types of persons covered under the Act, each subject to different obligations under the statutory scheme. Beginning with the broadest category, the Act defines "person" to mean "an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity." 12 U.S.C. § 5481(19). Next, a "covered person" is a subset of persons that "engage[] in offering or providing a consumer financial product or service." *Id.* § 5481(6). Last, a "service provider" and "related person" are another subset of persons that have an indirect role *in the business of a covered person.* A "service provider" is defined as "any person that provides a material service *to a covered person* in connection with the offering or provision by such covered person of a consumer financial product or service." 12 U.S.C. § 5481(26) (emphasis added). A "related person" includes, for example, a "controlling shareholder," or "consultant" or "joint venture partner" who "materially participates in the conduct or the affairs of *such covered person.*" *Id.* at § 5481(25)(C)(ii)

29

(emphasis added). Only covered persons, service providers, and related persons are subject to the Act's UDAAP prohibition. *See id.* § 5536(a)(1).

The district court's ruling turns this statutory construct on its head. It holds that a *non*-covered person is deemed to be a covered person solely because it contracts with a covered person. That is like saying a homeowner who hires a painter for his home—an asset he owns and must maintain—is now a painter.

That is not how Congress intended the Act to work. Rather, the statutory context demonstrates that Congress intended the UDAAP prohibition to cover (1) persons that have a direct and personal involvement in offering or providing consumer financial products or services (*i.e.,* covered persons), and (2) persons that have a substantial role *in the affairs of those covered persons* (*i.e.,* service providers, related persons). A typical securitization trust fits neither category. The trust does not directly and personally service the assets it owns. And the trust does not provide any services to, or play any role in the affairs of, loan servicers.

Further, the district court's interpretation of "engage" to mean "embark in any business" is at odds with how that word is used elsewhere

in the Act. *See United States v. Torres*, 383 F.3d 92, 102 (3d Cir. 2004)

("As a general canon of construction, the same words in the same statute

are interpreted in the same way."). To give just a few examples, the Act:

- prohibits a covered person from "engag[ing] in any unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a)(1)(B);

- authorizes investigations "for the purpose of ascertaining whether any person is or has been engaged in any conduct that is a violation" of Federal consumer financial law, *id.* § 5561(1);

- authorizes cease and desist orders where the Bureau determines that a covered person "is engaging or has engaged in an activity that violates a law, rule, or any condition imposed in writing on the person by the Bureau," *id.* § 5563;

- authorizes the Bureau to impose civil money penalties of $25,000 for each day a person "recklessly engages in a violation of a Federal consumer financial law," *id.* § 5565(c); and

- requires the Bureau to notify the Department of Justice if it obtains evidence that a person "has engaged in conduct that may constitute a violation of Federal criminal law," *id.* § 5566.

Congress's use of the word "engage" throughout in the Act conveys

direct and personal involvement in an activity, not "embarking on a

business." Being directly involved in an activity is also the most natural

reading of "engage." *See* Mem. Op. at 8 (holding that "'Engage' means 'to embark in any business' *or* to 'enter upon or employ oneself in an action.'") (emphasis added). That is the construction the Court should adopt here.

### C.  The District Court's Rule Supplants the Common Law of Agency and Risks Establishing Broad Vicarious Liability for Unfair and Deceptive Acts and Practices.

In ruling that the word "engage" is "broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise," Mem. Op. at 8, the district court deemed the defendant trusts "covered persons" based on one fact:  the existence of a contract between the trusts and a service provider. *Id.* This is a serious error.

It is well-established that Congress legislates against background principles of common law. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles"). In general, the common law of agency is used to determine whether the legal consequences of one person's actions should be attributed to another person. *See* Restatement (Third) Agency Ch. 2 Introductory Note.

Importantly, agency requires control: "[a] relationship of agency is not present unless the person on whose behalf action is taken has the right to control the actor." *Id.* § 1.01 cmt. (f). It is a fact-based assessment. *Id.* § 1.02. Agency thus "encompasses a wide and diverse range of relationships and circumstances," including "relationships between employer and employee, corporation and officer, client and lawyer, and partnership and general partner." *Id.* § 1.01 cmt. (c). As relevant here, merely entering into a contract to receive services from another is insufficient to establish agency. *Id.* § 1.01 cmt. (f).

The district court ignored these principles, instead fashioning a statutory interpretation of "engage" that holds the defendant trusts responsible for the activities of a service provider with no showing other than the existence of a contract for services. But the court was not at liberty to ignore common law principles of attribution and their requirements. The Supreme Court instructs that "[i]n order to abrogate a common-law principle the statute must speak directly to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1992). This "common-law presumption canon . . . presumes that the existing common law still applies unless the statute clearly indicates

otherwise." *Arangure v. Whitaker*, 911 F.3d 333, 342–43 (10th Cir. 2018); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 52 (2012).

Congress's use of the word "engage" is not enough to displace the common law of agency for determining if a person should be deemed a "covered person" based on the actions of another. "Engage" has several commonly used meanings. *See supra* at __. And courts have consistently interpreted that word to require direct, active, or personal participation in the underlying activity. *See, e.g.*, *Saxon*, 142 S. Ct. at 1789; *Haro*, 745 F.3d at 1257.

What is more, interpreting "engage" to supersede the requirements of agency law could have serious knock-on effects. Section 1036(a)(1)(B) makes it unlawful for a covered person "*to engage* in any unfair, deceptive, or abusive act or practice." As noted, the general rule is that the same statutory terms must be given the same interpretation. *Torres*, 383 F.3d at 102. If the district court's interpretation of "engage" was applied to the UDAAP prohibition in Section 1036, a principal would be liable as a matter of law for the unlawful acts of its third-party service providers, regardless of whether they are agents, so long as the acts were

"central" to the principal's enterprise. This Court should not adopt a statutory construction of "covered person" that would displace hundreds of years of agency law and materially expand vicarious liability under the Act simply because Congress used the word "engage."

A final point. Delimiting covered persons to those who directly offer or provide a consumer financial product or service is consistent with the Bureau's purposes and goals. In a securitization transaction, for example, both the originator and the loan servicer directly provide a consumer financial product or service. The originator extends credit to a consumer, and the loan servicer collects payments and debt from the consumer. Holding persons that directly provide these services responsible for their own conduct (including any legal violations that occurred) is consistent with the Bureau's purpose of enforcing Federal consumer financial law. It is also fair. The responsibility of persons that are not directly involved in those activities should not be addressed through a legally unsupported and strained reading of the statutory definition of "covered person." Rather, that question can be addressed as it often is in federal statutes: by applying the common law.

# CONCLUSION

This Court should reject the district court's statutory interpretation of "covered person" and reverse the district court's denial of Appellants' motion to dismiss.

Respectfully submitted,

CADWALADER,
WICKERSHAM & TAFT LLP

*/s/ Rachel Rodman*
Rachel Rodman
700 Sixth Street, N.W.
Washington, D.C. 20001
(202) 682-2210
rachel.rodman@cwt.com

Ellen V. Holloman
200 Liberty Street
New York, NY 10281
(212) 504-6200
ellen.holloman@cwt.com

*Attorneys for Amicus the*
*Structured Finance Association*

Dated:  September 30, 2022

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rule 46.1, I, Rachel Rodman, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

*/s/ Rachel Rodman*
Rachel Rodman

Dated: September 30, 2022

# CERTIFICATE OF COMPLIANCE

I, Rachel Rodman, Esquire, hereby certify that:

(1)    This brief complies with the type-volume limitations required by Fed. R. App. P. 32(a)(7)(B) because it contains 6,803 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f);

(2)    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using a proportionally spaced typeface, in 14-point font, using Microsoft Word 2016; and

(3)    This brief complies with 3d Cir. L.A.R. 31.0(c) because the electronic PDF of the brief has been prepared on a computer that is automatically protected with a virus detection program, namely a continuously updated version of Symantec, version 14.2.5569.2100, and no virus was detected.

/s/ *Rachel Rodman*
Rachel Rodman

September 30, 2022

## CERTIFICATE OF FILING AND SERVICE

I, Rachel Rodman, Esquire, hereby certify that:

On September 30, 2022, an electronic copy of this Brief of *Amicus Curiae* Structured Finance Association was filed with the Clerk of the United States Court of Appeals for the Third Circuit using the CM/ECF system. I certify that all participants in the case are registered Filing Users of CM/ECF and that service will be accomplished by the CM/ECF system.

I also certify that, pursuant to Fed. R. App. P. 25(a)(2)(B), 3d Cir. L.A.R. 31.1, 3d Cir. L.A.R. 113.1(a), ten copies of the Brief of *Amicus Curiae* Structured Finance Association are being dispatched to the Clerk's Office of the United States Court of Appeals for the Third Circuit for delivery within 5 days of filing.

/s/ *Rachel Rodman*

September 30, 2022

Rachel Rodman

**CADWALADER, WICKERSHAM & TAFT LLP**

700 6th Street N.W.

Washington, DC 20001

202-862-2210