No. 22-1864

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Consumer Financial Protection Bureau,

*Plaintiff-Appellee*,

*v.*

National Collegiate Master Student Loan Trust, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court
For the District of Delaware
Hon. Stephanos Bibas
Case No. 1:17-cv-01323

**BRIEF OF APPELLEE
CONSUMER FINANCIAL PROTECTION BUREAU**

Seth Frotman
    *General Counsel*
Steven Y. Bressler
    *Acting Deputy General Counsel*
Kristin Bateman
    *Acting Assistant General Counsel*
Kevin E. Friedl
    *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-9268
kevin.friedl@cfpb.gov

# TABLE OF CONTENTS

ISSUES PRESENTED..................................................................................1

RELATED CASES AND PROCEEDINGS............................................1

STATEMENT OF THE CASE.................................................................1

    A.   The Defendant-Trusts .................................................................1

    B.   The Bureau and the Consumer Financial Protection Act .......4

    C.   The Trusts' Violations of Law..................................................6

    D.   This Public Enforcement Action...............................................7

SUMMARY OF ARGUMENT ................................................................10

STANDARD OF REVIEW .....................................................................11

ARGUMENT ...........................................................................................12

I.    The Trusts are "covered persons" because they "engage in" the offering or
provision of consumer debt collection. ...........................................12

    A.   The Trusts have brought and arranged for others to help them in
bringing many tens of thousands of debt-collection suits. ....12

    B.   Under ordinary usage and in the context of the Consumer Financial
Protection Act, the Trusts "engage in" debt collection. .......16

    C.   The Trusts cannot hide their central role in collecting debt. ................19

        1.   *The Trusts can and do act, including by engaging in debt
collection.*..................................................................20

        2.   *The Trusts' other arguments are unpersuasive.*..........................24

II.   *Collins* forecloses the Trusts' request to dismiss the amended complaint
based on a statutory removal provision that caused them no harm. ...............34

    A.   Under *Collins*, the Trusts' argument fails because they challenge an
action the Bureau took under a fully removable Acting Director. ........34

    B.   Under *Collins*, the Trusts' argument fails because the removal
provision did not otherwise cause them harm. .....................37

        1.   *The removal provision had no effect on this action.* ...................38

        2.   *The Trusts' belated effort to find harm falls short.* ....................40

C.    The Trusts cannot avoid the clear holdings of *Collins*. .........................47

CONCLUSION .......................................................................................54

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Advanced Disposal Servs. E., Inc. v. NLRB*,
  820 F.3d 592 (3d Cir. 2016) ...............................................................52

*AT&T Co. v. Winback & Conserve Program, Inc.*,
  42 F.3d 1421 (3d Cir. 1994) ...............................................................31

*Barbato v. Greystone Alliance, LLC*,
  916 F.3d 260 (3d Cir. 2019) ....................................................... *passim*

*Bayview Loan Servicing, LLC v. 6364 Glenolden St. Tr.*,
  No. 19-17544, 2021 WL 4938115 (9th Cir. Oct. 22, 2021)..................43

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ...................................................................... 38, 50

*Calcutt v. FDIC*,
  37 F.4th 293 (6th Cir. 2022).............................................. 39, 42, 46, 48

*Canavan v. Beneficial Fin. Corp.*,
  553 F.2d 860 (3d Cir. 1977) ...............................................................30

*CFPB v. CashCall, Inc.*,
  35 F.4th 734 (9th Cir. 2022).................................................... 38, 48, 51

*CFPB v. RD Legal Funding, LLC*,
  No. 1:17-cv-00890, 2022 WL 799429 (S.D.N.Y. Mar. 16, 2022).... 39, 42, 43, 51

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
  No. 21-50826, 2022 WL 11054082 (5th Cir. Oct. 19, 2022)...................... *passim*

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021) ................................................................. *passim*

*Decker Coal Co. v. Pehringer*,
  8 F.4th 1123 (9th Cir. 2021)................................................................46

*Fairholme Funds, Inc. v. United States*,
  26 F.4th 1274 (Fed. Cir. 2022) ...........................................................35

*FEC v. NRA Pol. Victory Fund*,
   513 U.S. 88 (1994) ...............................................................53

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ............................................................50

*Garrett v. Wexford Health*,
   938 F.3d 69 (3d Cir. 2019) .................................... 35, 36, 37

*Hamilton Partners, L.P. v. Englald*,
   11 A.3d 1180 (Del. Ch. 2010) ..................................... 21, 24

*Henson v. Santander Consumer USA Inc.*,
   137 S. Ct. 1718 (2017) .........................................................27

*In re Nat'l Collegiate Student Loan Trusts 2003-1, et al.*,
   971 F.3d 433 (3d Cir. 2020) ............................. 3, 4, 15, 22

*In re Nat'l Collegiate Student Loan Trusts Litig.*,
   251 A.3d 116 (Del. Ch. 2020) ...........................................3, 4

*Integrity Advance, LLC v. CFPB*,
   48 F.4th 1161 (10th Cir. 2022) ..................................... 48, 51

*Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*,
   65 F. App'x 803 (3d Cir. 2003) ................................... 30, 31

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) .............................................................14

*Mager v. Wisconsin Cent. Ltd.*,
   924 F.3d 831 (6th Cir. 2019) ...............................................14

*Massachusetts Protective Ass'n v. Lewis*,
   72 F.2d 952 (3d Cir. 1933) ..................................................16

*Menominee Indian Tribe of Wis. v. United States*,
   577 U.S. 250 (2016) .............................................................53

*Milner v. Department of Navy*,
   562 U.S. 562 (2011) .............................................................29

*Nat'l Collegiate Student Loan Tr. 2006-1 v. Thomas*,
   322 So. 3d 374 (La. Ct. App. 2021) ....................................................23

*Nat'l Collegiate Student Loan Tr. 2007-3 v. Clayborn*,
   850 S.E.2d 787 (Ga. Ct. App. 2020) ..................................................23

*Paroline v. United States*,
   572 U.S. 434 (2014) ...........................................................................42

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
   507 U.S. 380 (1993) .................................................................... 14, 30

*Pollice v. Nat'l Tax Funding, L.P.*,
   225 F.3d 379 (3d Cir. 2000) ..............................................................26

*Riccio v. Sentry Credit, Inc.*,
   954 F.3d 582 (3d Cir. 2020) ..............................................................30

*Rop v. FHFA*,
   50 F.4th 562 (6th Cir. 2022) ....................................................... 44, 46

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ...................................................... 5, 6, 50, 53

*Taylor v. Nat'l Collegiate Student Loan Tr. 2007-1*,
   No. 2:19-cv-00120, 2021 WL 673458 (D. Utah Feb. 22, 2021)..........23

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*,
   944 F.2d 1149 (3d Cir. 1991) ............................................................29

**Statutes**

Consumer Financial Protection Act of 2010,
   Pub. L. No. 111-203, tit. X, 124 Stat. 1955 (July 21, 2010) ..................4

12 U.S.C. § 5481(5).................................................................... 5, 12

12 U.S.C. § 5481(6)............................................................... 5, 12, 25

12 U.S.C. § 5481(14)......................................................................5

12 U.S.C. § 5481(15)......................................................... 5, 12, 25, 29

12 U.S.C. § 5481(19) ............................................................... 5, 12, 18

12 U.S.C. § 5481(25) ................................................................. 18, 25

12 U.S.C. § 5481(26) ........................................................................25

12 U.S.C. § 5491(b) ..........................................................................5

12 U.S.C. § 5491(c) ................................................................... 5, 34

12 U.S.C. § 5511(a) ................................................................. 18, 19

12 U.S.C. § 5511(b) ............................................................ 4, 18, 19

12 U.S.C. § 5517(a) ........................................................................29

12 U.S.C. § 5517(d) ........................................................................29

12 U.S.C. § 5564(a) ..........................................................................5

12 U.S.C. § 5564(g) ........................................................................52

Delaware Statutory Trust Act, 12 Del. Code § 3801 *et seq.*......................................1

12 Del. Code § 3801(i) ................................................................ 12, 21

12 Del. Code § 3803(c)....................................................................21

12 Del. Code § 3804(a)....................................................................21

12 Del. Code § 3806 .......................................................................21

Federal Trade Commission Act

15 U.S.C. § 45(a) ............................................................................33

Fair Debt Collection Practices Act

15 U.S.C. § 1692a(6) ................................................................. 26, 27

15 U.S.C. § 1692e...........................................................................33

15 U.S.C. § 1692f...........................................................................33

## Rules

Fed. R. Civ. P. 15(c)..................................................................36

Fed. R. Civ. P. 17(a)..................................................................14

## Regulations

17 C.F.R. § 229.1101(c)...........................................................32

Asset-Backed Securities,
 70 Fed. Reg. 1506 (Jan. 7, 2005).........................................32

## Other Authorities

Br. for United States, *PHH Corp. v. CFPB*,
 No. 15-1177, 2017 WL 1035617 (D.C. Cir. Mar. 17, 2017) ..............................45

Stacy Cowley & Jessica Silver-Greenberg, *Lost Paperwork May Erase Student
 Debt for Tens of Thousands*, N.Y. TIMES, July 17, 2017 ....................................2

Elizabeth Dexheimer, *Trump Said to Weigh Political Risks of Firing CFPB's
 Cordray*, BLOOMBERG (March 10, 2017) .............................................41

*Engage*, AMERICAN HERITAGE DICTIONARY (5th ed. 2011) ....................................16

*Engage*, BLACK'S LAW DICTIONARY (9th ed. 2009) ................................................16

*Engage*, MERRIAM-WEBSTER.COM,
 www.merriam-webster.com/dictionary/engage ..................................................16

MODEL RULES OF PRO. CONDUCT r. 1.2 ....................................................15

MODEL RULES OF PRO. CONDUCT r. 1.4 ....................................................24

RESTATEMENT (THIRD) OF AGENCY § 1.02 (2006)...................................................31

RESTATEMENT (THIRD) OF AGENCY § 2.03 (2006)...................................................31

RESTATEMENT (THIRD) OF AGENCY § 4.02 (2006)...................................................51

S. Rep. No. 111-176 (2010) .............................................................. 4, 18

*In re Transworld Systems, Inc.*,
     2017-CFPB-0018, 2017 WL 7520640 (Sept. 18, 2017) .......................................7

Trust's Opp'n to Mot. To Dismiss, *Nat'l Collegiate Student Loan Trust
     2004-2 v. Martin*, No. 2015-cv-10002 (Ohio Com. Pl. Mar. 12, 2015),
     2015 WL 13285077 ..............................................................................22

Trust's Opp'n to Mot. To Dismiss, *Nat'l Collegiate Student Loan Trust
     2006-1 v. Zahler*, No. 15-sc-1092 (Ga. State Ct. Apr. 29, 2019),
     2019 WL 11890723 ........................................................................ 22, 23

6 Wright & Miller, Fed. Prac. & Proc. Civ. § 1476 (3d ed.) ...................................36

## ISSUES PRESENTED

1.     The Defendant-Trusts are business entities that have filed and recruited others to help them file tens of thousands of debt-collection suits brought in the Trusts' name and for their benefit. Do the Trusts "engage in" the offering or provision of debt collection?

2.     Are the Trusts entitled to dismissal of an amended complaint the Consumer Financial Protection Bureau filed while its Acting Director was removable by the President at will, on the basis of an invalid statutory removal restriction that did not apply to the Acting Director and that did not harm the Trusts?

## RELATED CASES AND PROCEEDINGS

This case has not previously been before the Court. The Bureau is not aware of any related cases or proceedings beyond those listed in the opening brief.

## STATEMENT OF THE CASE

### A.   The Defendant-Trusts

This interlocutory appeal arises from a public enforcement action brought by the Bureau. Defendants (the "Trusts") are 15 business entities organized as statutory trusts under Delaware law. *See* 12 Del. Code § 3801 *et seq.* They were established between 2001 and 2007, JA386, ¶26, during a boom time for the

1

securitization of consumer credit.[1] The Trusts' express purpose was to acquire a portfolio of student loans, issue securities backed by those loans, and service and collect on the loans. JA386, ¶27.

The Trusts have carried out that project on a massive scale. Collectively they have acquired more than 800,000 private student loans from originating lenders, mostly banks. JA387, ¶34. They regularly service these loans. JA388, ¶35. And they engage in debt collection to recover amounts allegedly owed on the loans. JA388, ¶¶36-37; *see generally* Stacy Cowley & Jessica Silver-Greenberg, *Lost Paperwork May Erase Student Debt for Tens of Thousands*, N.Y. TIMES, July 17, 2017, at A1 (reporting that the Trusts are "one of the nation's largest owners of private student loans" and describing their "aggressive[]" pursuit of borrowers), *available at* www.nytimes.com/2017/07/17/business/dealbook/student-loan-debt-collection.html.

The Trusts have filed many thousands of debt-collection suits—at least 94,000—against borrowers whose loans they claim to hold. JA388, ¶37; JA391, ¶51. In every such action, a Trust was the named plaintiff. JA388, ¶37; JA391, ¶52. The Trusts are also named as defendants in countersuits and other actions related to the alleged debts and defend such actions in their own names. JA388, ¶37.

---

[1] Citations to the Joint Appendix are noted as "JA__," to the district-court docket as "D.Ct. Doc. __," and to the docket in this appeal as "App. Doc. __."

The Trusts do not file and prosecute their collection actions alone. Instead, they arrange for a number of other entities (the "servicers") to help them. JA387, ¶29; JA388, ¶36. The servicers act as the Trusts' agents, JA387, ¶29, assisting the Trusts by helping file collection suits in the Trusts' name, on their behalf, and for their benefit against borrowers whose student loans the Trusts ostensibly own, JA391, ¶¶51-52. The Trusts represent in their governing agreements that the servicers' actions are, legally, the actions of the Trusts themselves. JA387, ¶33. The Trusts also represent that they—the Trusts—are responsible for compliance with federal law concerning the servicing and collection of student-loan debt. JA387, ¶32.

The Trusts operate within a broader business arrangement that dictates where the stream of payments from the student-loan portfolio ultimately flows. *See In re Nat'l Collegiate Student Loan Trusts 2003-1, et al.*, 971 F.3d 433, 438 (3d Cir. 2020) ("*In re NCSLT*") (describing this arrangement); *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 145-49 (Del. Ch. 2020) (same). Certain decisions involving the Trusts require input from the Trusts' owners, from the holders of the notes issued by the Trusts, from U.S. Bank—which, in its role as "indenture trustee," stands in a separate trust relationship with the noteholders—and sometimes from other entities. *See In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d at 146-47. The intricacies of that

3

arrangement, while generally not relevant to this appeal, have led to disputes over who has authority to take certain actions relating to the Trusts. *See id.* at 128; *In re NCSLT*, 971 F.3d at 438.

### B.    The Bureau and the Consumer Financial Protection Act

Congress established the Bureau in the wake of the 2008 financial crisis brought on and exacerbated by abuses in the origination, securitization, and servicing of consumer mortgage loans. *See* Consumer Financial Protection Act of 2010 ("CFPA"), Pub. L. No. 111-203, tit. X, 124 Stat. 1955 (July 21, 2010).

Congress intended the Bureau to address the "significant consumer protection issues" that contributed to the crisis as well as "future problems as they arise." S. Rep. No. 111-176, at 9-11 (2010). It charged the Bureau with ensuring that "consumers are protected from unfair, deceptive, or abusive acts and practices" and that "Federal consumer financial law is enforced consistently, without regard to the status of a person as a depository institution, in order to promote fair competition." 12 U.S.C. § 5511(b).

Congress expressed particular concern about the "sustained and devastating" effects of illegal debt-collection tactics. S. Rep. No. 111-176, at 19-20. The practices it specifically highlighted included: "us[ing] attorneys to file frequent lawsuits that [entities] are not prepared to litigate, and which may not be factually valid, with the expectation that a large number of consumers will default or will

not be prepared to defend themselves"; "filing suits past the statute of limitations"; and filing suits despite "collection attorneys not having any proof of the debt sued upon and falsely swearing they do." *Id.* at 20.

To address these and other problems, Congress authorized the Bureau to bring civil actions to obtain appropriate relief from "person[s]" that violate the "Federal consumer financial laws." 12 U.S.C. § 5564(a); *see also id.* at § 5481(19) (defining "person" to include unincorporated associations and trusts). The "Federal consumer financial laws" include the CFPA's key prohibition on "covered persons" engaging in unfair or deceptive practices. *Id.* §§ 5481(14), 5531, 5536(a)(1)(B). A "covered person" includes "any person" that "engages in offering or providing a consumer financial product or service." *Id.* § 5481(6). And a "consumer financial product or service" includes acquiring and servicing consumer loans (such as student loans) as well as collecting debt relating to such loans. *Id.* § 5481(5), (15)(A)(i), (15)(A)(x).

The Bureau is headed by a single Director appointed by the President. *Id.* § 5491(b). As enacted, the CFPA purported to limit the grounds on which the President could remove the Director. *Id.* § 5491(c)(3). The Supreme Court held in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), that the CFPA's removal provision is invalid but severable from the rest of the statute. As a result, although the Director cannot be shielded from at-will removal, the CFPA's other provisions

5

"remain fully operative." *Id.* at 2209 (plurality opinion); *see also id.* at 2245 (Kagan, J., concurring in the judgment with respect to severability).

### C.    The Trusts' Violations of Law

The Trusts employed unfair and deceptive tactics in bringing debt-collection suits against allegedly defaulted borrowers.

The Trusts filed suit despite lacking the basic documentation needed to prove they held the relevant student loans. JA394-95, ¶¶80-85. In doing so, they misrepresented to borrowers that their claims were supported by the valid and reliable evidence needed to actually obtain judgment. JA398-99, ¶¶106-09. The Trusts obtained at least $21 million in judgments against borrowers in these suits, despite the lack of evidence to substantiate their claims. JA394-95, ¶80. The filing of these suits without the intent or ability to actually prove the claims was not only a deceptive practice but an unfair one as well. JA400-01, ¶¶118-23. The Trusts also brought numerous suits demanding payment on time-barred debts. JA395, ¶¶86-87. In doing so, the Trusts misled borrowers that they had a legal right to obtain judgment through their collection suits. JA399, ¶¶113-16.

In support of the Trusts' collection suits, the Trusts' servicers executed and filed affidavits on the Trusts' behalf that falsely claimed personal knowledge of account records and the corresponding debt purportedly owed to the Trusts. JA396-97, ¶¶92-95. In many of these affidavits, the servicers also falsely claimed

personal knowledge of "chain of title" records establishing ownership of the loans. JA397, ¶¶96-97. Finally, the Trusts' agents, acting on behalf of the Trusts, improperly notarized more than 25,000 affidavits without placing affiants under oath or witnessing their signatures. JA393-94, ¶¶71-79; JA397-98, ¶¶101-04.

### D.   This Public Enforcement Action

The Bureau filed this action in September 2017 to address the Trusts' violations and obtain redress for injured consumers. At the time, the Bureau was headed by Director Richard Cordray, to whom the CFPA's removal provision purportedly applied.

Alongside its complaint, the Bureau filed a proposed consent judgment negotiated with counsel for the Trusts.[2] Multiple parties, playing various roles in the broader business arrangement described above, intervened to oppose the consent judgment. The district court—the Hon. Maryellen Noreika then presiding—ultimately denied entry of the consent judgment on the ground that counsel for the Trusts were not properly authorized to execute the judgment on the Trusts' behalf. JA303-17.

---

[2] Separately, the Bureau issued a consent order resolving claims against one of the Trusts' servicers—Transworld Systems—for its role in the illegal collection practices. *See In re Transworld Systems, Inc.*, 2017-CFPB-0018, 2017 WL 7520640 (Sept. 18, 2017). Under that order, Transworld agreed to pay a civil penalty and to comply with certain conduct provisions.

Shortly thereafter, the Supreme Court held in *Seila Law* that the Bureau's removal provision was invalid but severable. Ten days later, the Bureau's Director, Kathleen Kraninger, now indisputably removable at will by President Trump, formally ratified the decision to file this action. JA318; D.Ct. Doc. 308-1 (Director Kraninger's declaration of ratification).

Various intervenors moved to dismiss the Bureau's complaint. They said the complaint was void because it was filed before *Seila Law* held the removal provision invalid. They claimed the Bureau's prompt ratification came too late to be effective. And they argued that the Trusts are not "covered persons."

Judge Noreika dismissed the complaint. She appeared to agree that ratification could resolve any issue stemming from the removal provision, but she concluded that Director Kraninger's ratification came too late because the statute of limitations governing when the Bureau must file suit had expired by the time of the ratification. JA373-79. The court did not decide whether the Trusts were covered persons.

The court granted the Bureau leave to file an amended complaint, JA380, which the Bureau did in April 2021, JA381-402. By then, the Bureau was headed by Acting Director David Uejio. Like Director Kraninger after *Seila Law*, and like every subsequent head of the Bureau, Acting Director Uejio was indisputably removable at will.

8

The Trusts, now with new counsel, and joined by some intervenors, moved to dismiss the amended complaint on the same grounds as before. After that motion was briefed, the Supreme Court decided *Collins v. Yellen*, 141 S. Ct. 1761 (2021). *Collins* held that the invalidity of a statutory removal provision does not render particular agency actions invalid, and that challengers are entitled to relief with respect to such an action only if they can show that the provision caused them actual harm. *Id.* at 1787-88.

Some months later, this case was transferred to the Hon. Stephanos Bibas, sitting by designation. Judge Bibas ordered supplemental briefing on the effect of the removal provision, and the parties submitted lengthy briefs addressing, among other things, the decision in *Collins*. JA423-43.

Judge Bibas denied the motion to dismiss the amended complaint. JA1-10. *Collins*, he explained, "held that an unconstitutional *removal* restriction does not invalidate agency action so long as the agency head was properly *appointed*." JA5. "So the agency's actions are not 'void' and do not need to be 'ratified,' unless a plaintiff can show that the removal provision harmed him." JA5. The court observed that the Bureau has pursued its claims under the leadership of four consecutive officials who were indisputably removable at will. JA6. It had no difficulty concluding that the removal provision did not harm the Trusts.

After rejecting a statute-of-limitations argument not raised in this appeal, the court turned to the Trusts' claim that they are not covered persons because they do not "engage in" debt collection. It found that "this theory is undercut by the statute's text." JA7. Considering the broad meaning of the term "engage," it held that a person may "'engage' in an activity if he contracts with a third party to do that activity on his behalf"—at least where that activity "is central to his enterprise." JA8. The court further noted that the violations alleged here "happened in lawsuits brought on behalf of the Trusts," with the Trusts as the named plaintiffs—actions that therefore could not have proceeded "without the Trusts' say-so" and without their "involvement." JA9.

The Trusts moved to certify two questions for interlocutory appeal, which the district court did. JA20. This Court accepted the appeal. JA21-22.

## SUMMARY OF ARGUMENT

The Defendant-Trusts press two improbable arguments on appeal.

First, they claim they are not "covered persons" under the CFPA because they do not "engage in" the offering or provision of consumer debt collection. But the Trusts brought, as named plaintiffs, tens of thousands of debt collection suits across the country, demanding payment on student loans that the Trusts claim to own. That is "engagement" on a massive scale. The fact that the Trusts enlist others to assist them in filing suit does not erase the Trusts' central role—it is

merely an additional way in which the Trusts "engage in" the offering or provision of debt collection.

Second, the Trusts turn to an inoperative provision of the CFPA purporting to limit the President's power to remove the Bureau's Director. But their request to dismiss the amended complaint because of that provision is foreclosed by binding precedent. Under *Collins v. Yellen*, 141 S. Ct. 1761 (2021), a party cannot challenge an action—such as, here, the Bureau's amended complaint—overseen by a fully removable official based on a removal restriction that did not even apply.

*Collins* also held that a party can challenge actions by officials to whom a removal provision did apply, but that to garner relief with respect to such actions, the party must show the provision caused it harm. The Trusts cannot do so here. Indeed, they do not claim any causal connection at all between the removal provision and this case, which the Bureau has now pursued under multiple officials appointed by, and fully removable by, multiple Presidents. The Trusts are not entitled to dismissal of the amended complaint, with no relief for the borrowers they harmed, based on a statutory provision that not even they claim had any effect on this action.

## STANDARD OF REVIEW

The Court reviews *de novo* the issues of law raised in this appeal. *See Barbato v. Greystone Alliance, LLC*, 916 F.3d 260, 264 (3d Cir. 2019).

## ARGUMENT

**I.    The Trusts are "covered persons" because they "engage in" the offering or provision of consumer debt collection.**

The amended complaint adequately alleges that the Trusts are covered persons that "engage in" the offering or provision of consumer debt collection.

The CFPA defines "covered person" to include "any person" that "engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). It is undisputed that the Trusts are "persons." The statute under which they are organized defines them as "unincorporated associations," *see* 12 Del. Code § 3801(i), and the CFPA specifically includes "unincorporated associations" and "trusts" in the definition of "person," 12 U.S.C. § 5481(19). It is also undisputed that the consumer debt collection at issue in this case is a "consumer financial product or service." *See id.* § 5481(5), (15)(A)(x).

The question here is limited to whether the amended complaint plausibly alleges that the Trusts "engage in" the offering or provision of that debt collection. Plainly, it does.

**A.    The Trusts have brought and arranged for others to help them in bringing many tens of thousands of debt-collection suits.**

The Bureau's complaint describes how the Trusts have pursued thousands of debt-collection suits across the country. As the named plaintiffs in these suits, it is the Trusts that bring the actions and the Trusts that demand payment from

borrowers on loans that the Trusts claim to hold. The Trusts also recruit others to help them in collecting debt. These others include not only the attorneys who represent the Trusts in the collection suits, but also various servicers who act on the Trusts' behalf and assist the Trusts in filing and prosecuting the collection actions.

The amended complaint alleges that the Trusts were formed for the express purpose of acquiring, servicing, and collecting on student loans. JA386, ¶27. Consistent with those allegations, the Trust Agreement underlying each Trust provides that "[t]he purpose of the Trust is to engage in the following activities," and then lists, among other actions, "to provide for … the servicing of the Student Loans" and "[t]o engage in those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto." JA107, §2.03(a).

The Trusts do not act through employees or officers, yet they do act. They do so through other persons—for example, the "owner trustee," Wilmington Trust Co.—that are empowered to take action in the Trusts' name. JA387, ¶29. In this way, the Trusts have carried out their purpose by acquiring more than 800,000 student loans and arranging for the servicing of those loans. JA387-88, ¶¶34-35.

The Trusts further carry out their purpose by collecting debts allegedly owed on the loans they hold, including by bringing collection suits against borrowers. *See, e.g.*, JA388, ¶¶36-37; JA394, ¶80; JA395, ¶86. From November 2012 to April

13

2016, the Trusts brought more than 94,000 collection suits in courts across the country. JA391, ¶51. The relevant Trust was the named plaintiff in each suit. JA391, ¶52. And when borrowers have filed claims against a Trust relating to the alleged debts, the relevant Trust defended the action in its own name. JA388, ¶37.

As the named plaintiffs, the Trusts themselves press these collection suits. *See generally Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("[A] party generally must assert his own legal rights and interests." (quotation marks omitted)); Fed. R. Civ. P. 17(a) ("An action must be prosecuted in the name of the real party in interest."). It is the Trusts that own or claim to own the underlying student loans and to whom the debt is allegedly owed. JA387, ¶34; JA391, ¶52. Borrowers sued in these actions would naturally understand that it is the Trusts, not other entities, that are seeking to collect. When an action is successful, the resulting judgment is for the relevant Trust. *See* JA394-95, ¶80.

The collection attorneys who litigate the suits enter appearances on behalf of the Trusts and, in prosecuting the suits, act as the Trusts' agents. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396-97 (1993) (explaining that "each party is deemed bound by the acts of his lawyer-agent"); *see also Mager v. Wisconsin Cent. Ltd.*, 924 F.3d 831, 841-42 (6th Cir. 2019) (Sutton, J., concurring) (recounting "the well-worn adage … that the act of the attorney is the act of his client" and collecting related Supreme Court cases (quotation marks

omitted)). As the clients and named plaintiffs, the Trusts at all times retain rights to direct the conduct of the litigation. *See generally* MODEL RULES OF PRO. CONDUCT r. 1.2 (Am. Bar Ass'n) (explaining lawyers' obligations to abide by their clients' decisions). As Judge Bibas observed, the suits can proceed "only with the Trusts' involvement" and "with[] the Trusts' say-so." JA9.

The Trusts thus engage in consumer debt collection by bringing thousands of debt-collection suits against consumers.

The Trusts also engage in the offering or provision of debt collection by arranging for others to assist them in bringing collection suits. They do so by hiring servicers to ensure the servicing, collection, and litigation of delinquent and defaulted student loans. JA388, ¶¶36-38; *see also, e.g.*, JA322, §2.A (agreement entered into by two servicers and the Trusts; "Each of the Trusts hereby hires, designates and appoints the Special Servicer as a Servicer…"); *In re NCSLT*, 971 F.3d 433, 447 (3d Cir. 2020) (explaining that the Trusts have "the[] power and obligation to appoint servicers"). Pursuant to those agreements, certain servicers in turn are authorized to recruit, on the Trusts' behalf, subservicers that are paid by the Trusts and that also assist in collecting on the loans the Trusts claim to hold. JA388-90, ¶¶40-46.

The servicers and subservicers (collectively, "the servicers") play various roles in helping the Trusts bring collection suits. For instance, they have executed

and notarized deceptive affidavits on the Trusts' behalf and caused them to be filed in collection actions brought by the Trusts. *E.g.*, JA390-91, ¶¶49, 53-54. And they aid the Trusts in actually filing the suits. JA391, ¶50. In carrying out these duties, the servicers act on behalf of the Trusts and serve as the Trusts' agents. JA387-88, ¶¶29, 33, 39.

### B. Under ordinary usage and in the context of the Consumer Financial Protection Act, the Trusts "engage in" debt collection.

The plain meaning of the phrase "engage in" as well as its statutory context show that the Trusts engage in the offering or provision of debt collection by bringing collection suits and enlisting others to help them do so.

The term "engage in" is broad. It means "to take a part; to devote attention and effort; to employ one's self; to enlist; to carry on; to conduct; be busied; to occupy one's self." *Massachusetts Protective Ass'n v. Lewis*, 72 F.2d 952, 956 (3d Cir. 1933). Dictionaries reflect the same understanding. *See Engage*, BLACK'S LAW DICTIONARY (9th ed. 2009) ("To employ or involve oneself; to take part in; to embark on"); *Engage*, AMERICAN HERITAGE DICTIONARY 591 (5th ed. 2011) ("To involve oneself or become occupied; participate"); *Engage*, MERRIAM-WEBSTER.COM ("to begin and carry on an enterprise or activity" or "to do or take part in something"), www.merriam-webster.com/dictionary/engage. Many of the definitions they record—*e.g.*, "to take a part," "to … take part in something,"

"participate"—reflect the common-sense idea that one can engage in an activity without carrying out every part of the activity oneself.

As detailed above, the Trusts do much more than merely "take a part" or "participate" in the thousands of collection suits in which they appear as named plaintiffs. They play the starring role in that effort by virtue of their own conduct in bringing suit and in arranging for others to help by acting in the Trusts' name. Nor are the collection suits a mere incidental aspect of the Trusts' business: The Trusts were formed for the express purpose of acquiring and then collecting payment on the loans. *See* JA9.

The contracts governing the Trusts specifically provide that the Trusts are to "engage in" these activities. The Trust Agreement, for example, states that the Trusts' purpose is to "*engage in*" the "activities" of, among other things, "provid[ing] for … the servicing of the Student loans" and "*engag[ing] in* those activities and … enter[ing] into such agreements" as are necessary to carry out that purpose. JA107, §2.03(a) (emphasis added). Likewise, the Indenture provides that the Trusts "shall not *engage in* any business *other than*," among other things, "servicing the Financed Student Loans." JA182, §3.12 (emphasis added). The Trusts can hardly claim not to "engage in" servicing and debt collection when their own governing documents use exactly that language to describe their fundamental purpose.

This straightforward interpretation of "engage in" is confirmed by the statutory context in which the term appears. That context shows that artificial persons such as the Trusts, which by definition can act only through other persons, may nonetheless "engage in" the offering or provision of a consumer financial product or service. The CFPA defines "person" to include not only "an individual" but also many types of business entities. 12 U.S.C. § 5481(19). Notwithstanding that these entities can act only through others, the CFPA makes clear they may be covered persons. This is so both because it would be absurd for Congress to have limited this key part of the statute to natural persons and because many specific provisions in the Act confirm that it did not do so. *See, e.g.*, *id.* § 5481(25) (providing that a "director, officer … or controlling shareholder" of a non-bank "covered person" may themselves qualify as a covered person).

More broadly, it is apparent from the statute that Congress meant to, and did, empower the Bureau to effectively protect consumers from unfair and deceptive practices in the financial marketplace. *See id.* § 5511(a)-(b) (directing the Bureau to "enforce Federal consumer financial law consistently" for the purpose of "ensuring that … consumers are protected from unfair, deceptive, or abusive acts and practices"); *see also* S. Rep. No. 111-176, at 11 ("The CFPB will have enough flexibility to address future problems as they arise. … [C]onsumer protections must adapt to new practices and new industries.").

That express purpose is inconsistent with an interpretation of "engage in" that would allow entities to avoid designation as covered persons merely by arranging for others to help carry out their work. If the Bureau could not hold such entities to account, that would create significant new hurdles to the Bureau "enforc[ing] Federal consumer financial law consistently" to ensure "consumers are protected from unfair, deceptive, or abusive acts and practices." 12 U.S.C. § 5511(a)-(b). The Bureau would, in some cases, be consigned to playing whack-a-mole with a shifting cast of servicers, any one of which could be replaced with another that might carry on the same misconduct. These minions may also have limited assets available to compensate consumers injured by the violations. By authorizing the Bureau to pursue covered persons who, like the Trusts, engage in the offering or provision of financial products or services in part by arranging for others to do so in their name, the CFPA allows the Bureau to seek, and courts to award, effective monetary and injunctive relief for the protection of consumers.

## C.    The Trusts cannot hide their central role in collecting debt.

The Trusts dispute whether they can act at all. But the allegations in the amended complaint, governing law, the Trusts' founding documents, and the Trusts' own conduct in this and other litigation show that they can and do. Their other counterarguments fare no better.

19

*1.  The Trusts can and do act, including by engaging in debt collection.*

The Trusts' main argument why they do not engage in the offering or provision of debt collection is that the term "engage in" requires "active and volitional involvement." Opening Br. at 25. As self-described "passive securitization vehicles," the Trusts claim not only that they do not but that they *cannot* actively take part in debt collection—or any other activity. *See id.* at 19 ("the Trusts … cannot act for themselves"). This argument is contradicted by the amended complaint and by observable reality.

As explained, the amended complaint alleges that the Trusts play a direct and active role in consumer debt collection by routinely pursuing debt-collection suits and arranging for others to help them file such suits. The Trusts' repeated invocation of the term "passive securitization vehicle"—a label the Trusts do not define and that, in any event, does not appear in the amended complaint—fails to establish that, as a matter of law, the Trusts cannot engage in debt collection. Nor does it otherwise render implausible the specific allegations in the complaint. It merely assumes the premise the Trusts seek to establish: That they are wholly passive entities that cannot engage in anything. In this way, the Trusts' description of themselves as "passive" is really an improper (and incorrect) factual claim dressed up as a legal one.

The Trusts get no further with their related assertion (at 1) that they "cannot and do not *act* for themselves." If the Trusts simply mean that, as artificial persons lacking physical form, they can act in the world only through others, the Bureau agrees. *See, e.g.*, JA387, ¶29 (alleging just that). (The Bureau happens to be an artificial person itself.) So it is with all juridical entities. *See, e.g.*, *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1215 (Del. Ch. 2010) ("A corporation is an artificial being created by law. … Being artificial and the mere creature of the law, it can only act by its officers and agents."). It is common ground that the trust documents do not themselves file debt-collection suits—just as, for example, when a corporation is ordered to testify, that does not mean "that the certificate of incorporation [is] placed in the witness box." *Id.* That obvious truth does not alter the fact that, under law, actions that are actually (and necessarily) carried out in the world by others may be considered the actions of the business entity in whose name they are taken.

If the Trusts instead mean that something more specific to them precludes them from taking action, that is wrong. The statute under which the Trusts are organized provides that each Trust is considered "a separate legal entity" that may "act," may incur "obligations," and specifically "may sue and be sued." 12 Del. Code §§ 3801(i), 3803(c), 3804(a). And while the Trusts do not act through employees or officers, JA387, ¶29, that does not mean they do not act through

others, including through the owner trustee, *see* 12 Del. Code § 3806. This Court has already recognized the Trusts' ability to act, agreeing with the Trusts that they "retain the obligation to take various actions to protect their interests and enforce the obligations of persons doing business with them" and "have authority to appoint a new servicer." *In re NCSLT*, 971 F.3d at 446-47.

The Trusts' capacity—indeed, their obligation—to engage in debt collection is confirmed by their own governing documents. As explained above, these contracts specifically acknowledge that the Trusts will "engage in" certain activities. The Trust Agreement further states that each Trust "will *act* solely in its own name" through the owner trustee or other agents. JA107, §2.03(b)(i) (emphasis added). These and other agreements impose obligations on the Trusts, thereby recognizing the Trusts' ability to act to fulfill those obligations. *See, e.g.*, JA148 (in Administration Agreement, noting that the Trusts "are required to perform certain duties in connection with the Student Loans"). And the very existence of some of these contracts, to which the Trusts are signatories, demonstrates the Trusts' capacity to conduct business. JA148, 171, 322.

Appearing before other courts, the Trusts have not only acknowledged but insisted upon their—the Trusts'—ability to act and to collect debt. *See, e.g.*, Trust's Opp'n to Mot. To Dismiss at 8, *Nat'l Collegiate Student Loan Trust 2006-1 v. Zahler*, No. 15-sc-1092 (Ga. State Ct. Apr. 29, 2019), 2019 WL 11890723

(arguing that "[t]his Court should … conclude, as have various state courts throughout Georgia and the nation, that NCSLT has the capacity and right of action to file suit in its own right"); Trust's Opp'n to Mot. To Dismiss at 5, *Nat'l Collegiate Student Loan Trust 2004-2 v. Martin*, No. 2015-cv-10002 (Ohio Com. Pl. Mar. 12, 2015), 2015 WL 13285077 (arguing that "NCSLT … has the capacity and standing to file suit in its own name, and routinely does so throughout the United States"); *Nat'l Collegiate Student Loan Tr. 2006-1 v. Thomas*, 322 So. 3d 374, 376 (La. Ct. App. 2021) (describing a Trust's argument that it "is an unincorporated association with the right, capacity, and standing to sue in its own name"); *Taylor v. Nat'l Collegiate Student Loan Tr. 2007-1*, No. 2:19-cv-00120, 2021 WL 673458, at *8 (D. Utah Feb. 22, 2021) (describing a Trust's claim "that as a Delaware statutory trust, it had the capacity and standing to sue in its own name"); *Nat'l Collegiate Student Loan Tr. 2007-3 v. Clayborn*, 850 S.E.2d 787, 788 (Ga. Ct. App. 2020) ("NCSLT contends that the trial court erred by failing to recognize its right, capacity, and standing to file suit in Georgia.").

In these and numerous other cases, the Trusts have opposed borrowers' motions to dismiss or for relief from default judgments by vigorously insisting on their right and ability to sue to collect debt—that is, their capacity to engage in debt collection. The Trusts cannot talk out of both sides of their (metaphorical, not actual) mouths, arguing when it is convenient to do so that they can sue to collect

debt, then cynically seeking to avoid liability here by claiming they do nothing of the sort.

That is not the only incoherence in the Trusts' position. If they were correct about their inability to act, how then, for example, do the Trusts fulfill their contractual obligations? How did they enter into those contracts in the first place, including contracts to retain the servicers who assist them? How did the Trusts retain counsel in this appeal, or notice the appeal? How do counsel representing the Trusts in collection suits fulfill their professional obligation to consult with their clients? *See generally* MODEL RULES OF PRO. CONDUCT r. 1.4 (Am. Bar Ass'n). The answer to these questions is, of course, that the Trusts, like other legal persons, can and do act, even if that necessarily means acting through others. *See Hamilton Partners*, 11 A.3d at 1215. That is how the Trusts file and recruit others for help in filing their many debt-collection suits.

### 2. *The Trusts' other arguments are unpersuasive.*

The Trusts and their amici offer other arguments why the Court should hold as a matter of law that the Trusts do not engage in the offering or provision of debt collection. These arguments fail.

*First*, the Trusts note (at 26-30) that the Bureau, like most agencies, regulates only within a defined sphere, and that this sphere is delineated in various

provisions of the CFPA. While correct, that observation itself sheds little light on whether the Trusts' actions fall within that sphere.

To the extent the Trusts mean to suggest that the multiple provisions of the Act dictating the coverage of the prohibitions on unfair and deceptive practices—*i.e.*, the definitions of "covered person," "service provider," and "related person," 12 U.S.C. § 5481(6), (25), (26)—evince an intent to *exclude*, the exact opposite is true. Congress's choice to extend the unfairness and deception prohibitions to these three broadly defined categories shows that Congress meant to sweep widely, not narrowly. *Cf. id.* § 5536(a)(3) (broadly prohibiting "any person" from knowingly or recklessly providing substantial assistance to a covered person's commission of unfair or deceptive practices).

The level of specific detail in the CFPA's definition provisions also demonstrates that, where Congress intended to exclude, it could and did do so expressly and with precision. *See, e.g.*, *id.* § 5481(15)(A)(vii)(I) (carving out from the definition of "financial product or service" the processing of financial data by a "merchant" that does so exclusively to initiate payments from a consumer in order to pay for a "nonfinancial good or service" that is "sold directly by [the merchant] to the consumer"). The Court thus should not read into those definition provisions limitations that not only do not appear in but are contrary to the ordinary meaning of the text itself.

25

*Second*, the Trusts claim (at 30-31, 37-38) support for their position in *Barbato v. Greystone Alliance, LLC*, 916 F.3d 260 (3d Cir. 2019). The Trusts badly misread that decision.

*Barbato* held that a self-described "passive debt owner" was a debt collector under the Fair Debt Collection Practices Act because its "principal purpose" was the collection of debt. *Id.* at 261; *see also* 15 U.S.C. § 1692a(6) (defining "debt collector" to mean, in part, "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts"). The company acquired consumer accounts but "d[id] not collect on the account[s] itself." *Barbato*, 916 F.3d at 262. Instead, it "hire[d] a debt collection law firm to file a collection lawsuit on its behalf." *Id.* This Court held that an entity whose "principal purpose" is debt collection "cannot avoid the dictates of the FDCPA merely by hiring a third party to do its collecting." *Id.* at 261. Although *Barbato* turned on different statutory language, Judge Bibas rightly saw that its reasoning and result lend indirect support to the Bureau's position here—not the Trusts'. JA9; *see also Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 404-06 (3d Cir. 2000) (similarly holding that purchaser of debt was a "debt collector" even though it "enlist[ed]" others "to collect debts on its behalf").

The Trusts try to flip *Barbato* to their advantage, but they can do so only by misconstruing its central holding. *Barbato* recognized there are several ways to

qualify as a "debt collector" under the FDCPA. One way is by having the "principal purpose" of debt collection, as just described. Another is by "regularly collect[ing]" debts for another person to whom the debts are owed. *See* 15 U.S.C. § 1692a(6) ("any person … who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another"); *see also Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721-22 (2017) (holding that this provision excludes persons who collect debts owed to themselves, rather than to another).

In the Trusts' telling (at 38), *Barbato* held that the debt purchaser qualified as a debt collector under the "principal purpose" definition but, because the company hired others to do the actual work of collecting, it did not qualify as a debt collector under the "regularly collects" definition. That is all wrong. In reality, and as *Santander* confirms, the debt purchaser did not qualify under the "regularly collects" definition because, as the owner of the consumer accounts, it "was collecting debts on its own behalf and not *for another*." *Barbato*, 916 F.3d at 263-64 (emphasis added). For this reason—and not for the reason the Trusts claim—*Barbato* concerned "only the first definition" ("principal purpose") and not the second ("regularly collect[ing]" debts *owed another*). *Id.* at 261. The decision in no way supports the Trusts' creative reimagining.

27

*Third*, the Trusts try legislative history (at 31-33). They point out that the phrase "directly or indirectly" appeared in an earlier version of the covered-person definition but, as part of a broader revision to that definition, was omitted from the statute as enacted. The Trusts say that the omission of the phrase "directly or indirectly" shows that Congress meant to reach only "direct" and not "indirect" engagement. The Trusts contend that their only involvement here is "indirect."

The Trusts' argument fails at the outset because the amended complaint alleges their direct involvement in filing debt-collection suits and arranging for others to help them file such suits. Thus, it would not matter even if the Trusts were correct about the import of this drafting history because they directly "engaged in" the offering or provision of debt collection.

In any case, the Trusts are not correct. There is no logical reason to take the deletion of the words "directly" and "indirectly" from the definition as a signal that Congress meant to include, or at least imply, the word "directly" in that definition. If that had been Congress's intention, it could have kept the word "directly" where it was. It is at least as likely that the drafters chose to omit the phrase "directly or indirectly" because, being aware of the broad ordinary meaning of the term "engage in," *see above*, pp. 16-17, they reasonably concluded that there was no need to specify that engagement could happen both directly and indirectly.

This Court has warned against overinterpreting similarly ambiguous changes in legislative language. In *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Insurance Co.*, it declined to rely on such changes where—just as here—"the legislative history does not reveal what Congress intended by the [change in language]," the change was part of a broader revision to the relevant provision, and there were equally plausible alternative explanations for the change. 944 F.2d 1149, 1156-57 (3d Cir. 1991); *see also Milner v. Department of Navy*, 562 U.S. 562, 572 (2011) (emphasizing that while "clear evidence of congressional intent may illuminate ambiguous text," the Court would "not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language").

There is one more problem for the Trusts' argument. As Judge Bibas noted, JA9, other parts of the CFPA show that Congress knew how to limit a provision by requiring direct interaction with consumers when that was its intention. *See, e.g.*, 12 U.S.C. § 5517(a)(2)(A)(i) (limiting Bureau's authority with respect to certain merchants that "extend[] credit directly to a consumer"); *id.* § 5517(d)(2)(C) (same with respect to certain accountants that "only extend[] credit directly to a consumer"); *id.* § 5481(15)(A)(vii)(I) (carving out from definition provision certain payment processing by merchants for goods "sold directly by such person to the consumer"). The fact that Congress did not include similar language in the covered-person definition further shows that it did not intend the limitation the

Trusts suggest. *See Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 587-88 (3d Cir. 2020) (en banc) (explaining that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely").

*Fourth*, the Trusts argue (at 35-36) that the district court erred by not deciding whether the servicers who assist the Trusts qualify as their agents. The district court did not need to do so, however, because it properly found that the Trusts "engage in" the offering or provision of consumer debt collection by virtue of their own role in bringing collection suits and arranging for others to help them do so. JA8-9.

And even if it had been necessary to consider the servicers' status as agents, that still would not change the result here because the amended complaint alleges that the servicers act as agents of the Trusts. *See, e.g.*, JA382, ¶3. (There should also be no dispute that the attorneys who file and litigate the collection suits do so as agents of the Trusts. *See Pioneer Inv. Servs.*, 507 U.S. at 396-97.) The Trusts have not, and at this stage could not, establish that the allegations concerning the servicers are implausible. *See, e.g.*, *Canavan v. Beneficial Fin. Corp.*, 553 F.2d 860, 865 (3d Cir. 1977) ("Because the existence of an agency relationship hinges largely on the particular facts of each case, discovery was essential to the preparation of an agency theory argument in this case."); *Jurimex Kommerz*

*Transit G.M.B.H. v. Case Corp.*, 65 F. App'x 803, 808 (3d Cir. 2003) (reversing decision granting motion to dismiss and explaining that "the factual nature of the [agency] relationship alleged in the amended complaint would be better understood after discovery"). While the Trusts seek to rely on certain language in the servicing contracts, the parties' characterizations of their relationship in an agreement do not control the factual issue of whether the servicers acted as agents. *See* RESTATEMENT (THIRD) OF AGENCY § 1.02 (2006).

It may be that questions of agency will be relevant to the separate issue—not presented in this appeal—whether the Trusts violated the CFPA or can be held liable for others' violations. *But see AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1439-40 (3d Cir. 1994) (explaining that an entity may be liable for conduct even of non-agents when those non-agents act with apparent authority); RESTATEMENT (THIRD) OF AGENCY § 2.03 (same). But here, the Trusts dispute (and the district court decided) only the different question of whether the Trusts are covered persons. *Cf. Barbato*, 916 F.3d at 270 (emphasizing that whether the debt purchaser qualified as a "debt collector" under the FDCPA was a different question from whether it was liable for violations of the Act).

*Fifth*, amici for the Trusts contend that a Securities and Exchange Commission regulation governing certain reporting requirements on asset-backed securities shows that the amended complaint in this case is deficient. *See* Amicus

31

Br. of Securities Industry and Financial Markets Ass'n and Chamber of Commerce at 15-22, App. Doc. 46 ("SIFMA Br."). But that investor-protection rule "address[es] … the registration, disclosure and reporting requirements for asset-backed securities under the Securities Act of 1933 and the Securities Exchange Act of 1934." 70 Fed. Reg. 1506, 1506 (Jan. 7, 2005). The way the SEC chose to define the term "asset-backed security" for purposes of the rule's reporting requirements has no relevance here. This case is about illegal debt-collection practices, not securitization. And even if the rule's definition were relevant, it specifically recognizes that entities engaged in issuing asset-backed securities may also engage in "other activities reasonably incidental" to "owning or holding the pool of assets," 17 C.F.R. § 229.1101(c)(2)(ii)—activities that would seem naturally to include servicing and collecting on the loan assets.

*Sixth*, and finally, the same amici predict far-reaching consequences in the securitization market if the Trusts are barred from engaging in unfair and deceptive practices in their collection suits. SIFMA Br. at 22-24. Even assuming that the amici's policy arguments are relevant here—and the Trusts insist that they are not, *see* Opening Br. at 38-39 ("In interpreting a federal statute, it is the role of the court to declare what the law is, not what one might think the law should be." (quotation marks omitted))—those arguments are unpersuasive.

32

More than 5 years have passed since the Bureau filed this suit alleging that the Trusts are covered persons, and nearly 1 year has passed since Judge Bibas ruled that they were. The Bureau has consistently held to that position across the leadership of multiple different Directors. Yet the only negative impact that the amici can identify in all that time is that, shortly after the Bureau brought suit, a credit rating agency considered downgrading "17 tranches of NCSLT transactions." SIFMA Br. at 24. The amici do not identify any negative effect on market participants not alleged to have violated the law. Nor do they claim that the Trusts' conduct is typical of other market participants.

There is a more fundamental problem with the amici's argument. Even if the Trusts were not covered persons (and they are), they would still be subject to the prohibition on unfair and deceptive practices in the Federal Trade Commission Act. *See* 15 U.S.C. § 45(a)(1). As the Trusts themselves emphasize (at 7, 29-30), the FTC's authority to enforce that prohibition is broad and is not limited to covered persons. Similarly, the Trusts appear to qualify as "debt collectors" under the FDCPA because a principal purpose of their business is the collection of debt. *See Barbato*, 916 F.3d at 261. The Trusts therefore would also be subject to the FDCPA's prohibitions on unfair and deceptive collection practices. *See* 15 U.S.C. §§ 1692e, 1692f. What this shows is that the Trusts are already barred from unfair

and deceptive collection practices, including but not only because they are covered persons. In an efficient market, this risk is already priced in.

## II.  *Collins* forecloses the Trusts' request to dismiss the amended complaint based on a statutory removal provision that caused them no harm.

As a fallback, the Trusts claim the amended complaint must be dismissed because a provision of the CFPA formerly purported to limit the grounds on which the President could remove the Bureau's Director. 12 U.S.C. § 5491(c)(3). For two reasons, that claim is foreclosed by *Collins v. Yellen*, 141 S. Ct. 1761 (2021).

### A.  Under *Collins*, the Trusts' argument fails because they challenge an action the Bureau took under a fully removable Acting Director.

*Collins* considered the validity of a removal restriction that applied to the head of the Federal Housing Finance Agency. *Id.* at 1771. Finding *Seila Law* "all but dispositive," the Supreme Court held the provision invalid. *Id.* at 1783.

The Court then considered whether the invalidity of that provision affected the validity of the FHFA's past actions. Some actions had been taken while the agency was headed by Senate-confirmed Directors to whom the removal provision applied; others were taken while the agency was headed by Acting Directors to whom the provision did not apply. *Id.* at 1781-83. The Court held that the latter category of actions could not be challenged based on the removal provision's constitutional infirmity. Because the statute "does not restrict the removal of an Acting Director," the Court explained, "any harm resulting from actions taken

34

under an Acting Director would not be attributable to a constitutional violation." *Id.* at 1781; *see also Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1305 (Fed. Cir. 2022) ("[T]he *Collins* court … explained that … because the acting Director was removable at will, his actions were not constitutionally infirm.").

Here, the Trusts challenge an action taken while the Bureau was headed by an Acting Director who was removable at will. Specifically, the Trusts moved to dismiss an amended complaint that the Bureau filed in April 2021. JA402. At the time the Bureau filed that complaint, its Acting Director, David Uejio, was indisputably removable at will, both by virtue of his acting status, *see Collins*, 141 S. Ct. at 1781-83, and as a result of the Supreme Court's ruling the year before in *Seila Law.* Under *Collins*, the Trusts cannot invoke the removal provision to challenge an action the Bureau took only after it was clear that the removal provision was without force or effect. *See id.* at 1781, 1787. For all the ink spilled on this issue, including below, that is all the Court need decide to resolve it.

It does not alter this analysis that the initial complaint was filed prior to *Seila Law*. JA40. "In general, an amended pleading supersedes the original pleading and renders the original pleading a nullity. Thus, the most recently filed amended complaint becomes the operative pleading." *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019) (internal citations omitted). "Of course, the original pleading is not entirely without effect. When the original pleading has been superseded, an

amended pleading still may relate back to the filing date of the original pleading for statute of limitations purposes." *Id.* at 82 n.18.

The Trusts cannot win dismissal of the amended complaint with arguments that might apply to the superseded initial complaint (which was filed under a Director purportedly protected by the removal provision) but do not apply to the operative amended complaint. "Once an amended pleading is interposed, the original pleading no longer performs any function in the case and *any subsequent motion made by an opposing party should be directed at the amended pleading*." 6 Wright & Miller, Fed. Prac. & Proc. Civ. § 1476 (3d ed.) (emphasis added). The Trusts have failed to direct their arguments to the amended complaint. Their opening brief offers no explanation why an alleged defect with the initial complaint could justify dismissing an amended complaint that does not suffer the same alleged defect.[3] That would turn the rules of civil procedure upside down: A proper amended pleading *cures* the problem with an initial filing; it is not rendered deficient by that initial problem.

---

[3] In the district court, the Trusts made the related statute-of-limitations argument that the amended complaint is untimely and does not relate back to the initial complaint because the removal provision meant the initial complaint was not "validly filed." D.Ct. Doc. 370, at 2. As explained below, p. 38, *Collins* forecloses that argument by showing that the initial complaint was validly filed and not void. The amended complaint relates back to that validly filed initial complaint because it asserts the same claims. *See* Fed. R. Civ. P. 15(c)(1)(B).

For example, this Court held in *Garrett* that an amended complaint filed by a former prisoner could not be dismissed merely because the initial complaint—filed while the plaintiff was in prison—was subject to dismissal for failure to satisfy the Prison Litigation Reform Act. 938 F.3d at 84. "When he filed the [amended complaint], Garrett was no longer a prisoner and therefore was not subject to the PLRA's administrative exhaustion requirement. Thus, because it relates back to the original complaint, the [amended complaint] cures the original filing defect." *Id*. (footnote omitted). As the Court explained, what matters "is [the plaintiff's] status at the time of the amendment and not at the time of the original filing." *Id.* at 82.

Under *Collins*, and consistent with common sense, the Trusts cannot set aside an action overseen by an at-will-removable Acting Director on the grounds that there was once uncertainty about the removability of a different official, one who resigned three-and-a-half years before the challenged action occurred.

## B. Under *Collins*, the Trusts' argument fails because the removal provision did not otherwise cause them harm.

*Collins* forecloses the Trusts' argument for a second reason as well. It holds that even actions overseen by an official subject to an invalid removal provision are not void, and that parties are entitled to relief with respect to such actions only insofar as they can show that the removal provision caused them actual harm. The Trusts cannot make that showing. So they are not entitled to the windfall they seek.

*1. The removal provision had no effect on this action.*

In addition to considering actions by at-will-removable Acting Directors, *Collins* considered actions by confirmed Directors to whom the invalid removal provision applied. The Supreme Court rejected the notion that such officials "lacked constitutional authority" or that "their actions were … void *ab initio*," dismissing that view as "neither logical nor supported by precedent." 141 S. Ct. at 1787. It disagreed that *Seila Law* and *Bowsher v. Synar*, 478 U.S. 714 (1986), provided even "implicit support" for setting aside the confirmed Directors' actions. *Collins*, 141 S. Ct. at 1787-88. And it held that properly appointed officials retain "the power to undertake the … responsibilities of [their] office" despite an invalid removal provision. *Id.* at 1788 & n.23; *see also CFPB v. CashCall, Inc.*, 35 F.4th 734, 742 (9th Cir. 2022) (explaining that *Collins* "made clear that despite the unconstitutional limitation on the President's authority to remove the Bureau's Director, the Director's actions were valid when they were taken").

The Court held that to garner relief with respect to a specific action, a party must show that the removal provision actually "inflicted harm." *Collins*, 141 S. Ct. at 1788-89. This standard, the Court emphasized, requires a party to do more than merely "show[] that it was harmed by an action that was taken by [an unconstitutionally insulated] officer and that the [party] alleges was void." *Id.* at 1788 n.24. Rather, the removal provision itself must have had an impact on the

38

challenged action. *See id.* at 1789 (explaining that the removal provision would cause harm where the President "express[ed] displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way"); *see also id.* at 1801 (Kagan, J., concurring in part) ("agree[ing]" with majority that relief is available only where a removal provision "affected the complained-of decision"); *Calcutt v. FDIC*, 37 F.4th 293, 315 (6th Cir. 2022) ("To establish such harm, [parties] need to show that the removal restriction *specifically* impacted the agency actions of which they complained.").

The Trusts cannot make that showing because it is undisputed that the removal provision had no impact on this case. Since this suit began, the Bureau has pursued it under the leadership of five successive Directors or Acting Directors (all properly appointed) chosen by three different Presidents.[4] Four of these officials were indisputably removable at will. Had either President Trump or President Biden disapproved of this suit, he could easily have made his preferences known and, if necessary, put in place a new Director to carry out those preferences. Neither did. *Cf. CFPB v. RD Legal Funding, LLC*, No. 1:17-cv-00890, 2022 WL 799429, at *7 (S.D.N.Y. Mar. 16, 2022) (surveying the Bureau's "years of

---

[4] These officials were: Director Cordray, selected by President Obama; Acting Director Mick Mulvaney and Director Kraninger, selected by President Trump; and Acting Director Uejio and Director Chopra, selected by President Biden.

unbroken prosecution" of an enforcement action under multiple fully removable Directors and concluding that "[w]hatever harms might have flowed from" the invalid removal provision, "this enforcement action against these Defendants was not one of them").

More than that: Officials selected by and removable at will by both President Trump and President Biden affirmatively approved the Bureau's pursuit of this enforcement action. First, Director Kraninger formally approved this action not long after *Seila Law* confirmed that President Trump, who appointed her, could remove her at will. JA318; D.Ct. Doc. 308-1. Second, Acting Director Uejio authorized the filing of the amended complaint—rather than simply letting this case come to an end after Judge Noreika dismissed the initial complaint—while indisputably removable at will by President Biden. Thus, it is clear that this suit was and is consistent with the policy preferences of both the Trump and Biden administrations, and that prior questions about the Director's removability had no impact on the case or the amended complaint.

### 2. *The Trusts' belated effort to find harm falls short.*

In the district court, the Trusts and intervenors were unable to explain how they could satisfy *Collins* by showing not just that they were subject to actions overseen by an official to whom a removal provision applied, but that the provision specifically harmed them. *See* JA416-17 (response to the Bureau's notice about

*Collins*, arguing that "[a]ll that matters" is whether the Bureau timely ratified this suit); JA421-22 (response to a second Bureau notice, again focusing solely on the timeliness of ratification); JA434-443 (in a nearly 5,000-word supplemental brief, addressing *Collins* but failing to explain how the removal provision had any effect on this case).

In their opening brief in this appeal, the Trusts for the first time attempt to offer a theory of actual harm. Even assuming this issue has not been waived at this point, the Trusts fail to show harm.

They contend (at 60-62) that they were harmed by the removal provision because certain press reports suggest President Trump wanted to fire Director Cordray (who headed the Bureau when it filed the now-superseded initial complaint) but the removal provision "was among the forces constraining him." The reporting on which the Trusts rely is outside the pleadings and, in any event, proves nothing.[5] *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, No. 21-50826, 2022 WL 11054082, at *10 (5th Cir. Oct. 19, 2022) ("*CFSA*") (rejecting similar

---

[5] For example, one article the Trusts cite attributes President Trump's decision not to remove Cordray to political calculations—not a fear of offending the removal provision. *See* Elizabeth Dexheimer, *Trump Said to Weigh Political Risks of Firing CFPB's Cordray*, BLOOMBERG (March 10, 2017) (reporting that President Trump was concerned it would "spur a political backlash" to "revamp[] a regulator set up to protect consumers from abusive lending"), www.bloomberg.com/news/articles/ 2017-03-10/trump-said-to-weigh-political-consequences-of-firing-cfpb-chief.

attempt to show harm by relying on "secondhand accounts of President Trump's supposed intentions"). But even if it were otherwise, the Trusts still would not have met their burden under *Collins* to show that the removal provision "cause[d]" or "inflict[ed]" "harm." 141 S. Ct. at 1789.

But-for causation is "[t]he traditional way to prove that one event was a factual cause of another" and a "familiar part of our legal tradition." *Paroline v. United States*, 572 U.S. 434, 449-50 (2014). Judge Bibas thus correctly understood *Collins* as requiring a party to show that the removal provision was a but-for cause of its harm. JA5-6; *see also CFSA*, 2022 WL 11054082, at *10 (applying *Collins* and asking whether, "but for the removal restriction," "the Bureau would have acted differently as to the [challenged action]"); *Calcutt*, 37 F.4th at 315 (explaining that a party must "establish that an unconstitutional removal protection specifically caused an agency action in order to be entitled to judicial invalidation of that action"). The Trusts' claims about President Trump's intentions to remove Director Cordray do not show that the removal provision was the but-for cause of this action. "Even accepting [the Trusts'] premise as true, … it does not follow that, once [Director Cordray was] removed, Director Cordray's successor would have declined to bring this enforcement action. In fact, we know the opposite to be true." *See RD Legal Funding*, 2022 WL 799429, at *7.

And even if but-for causation were not the standard, at the very least "there must be *some* nexus between the existence of the unlawful removal provision and the bringing of (or maintenance of) this enforcement action." *Id.*; *accord Bayview Loan Servicing, LLC v. 6364 Glenolden St. Tr.*, No. 19-17544, 2021 WL 4938115, at *2 (9th Cir. Oct. 22, 2021) (observing that a party can obtain relief under *Collins* "only by causally linking a specific, tangible harm to the for-cause removal provision").

The Trusts do not contend that the removal provision was a but-for cause of this suit or the amended complaint. They do not claim there was any causal connection at all. They rely instead on magical thinking. In their view (at 62-63), it is enough to show that the initial complaint was filed at a time when the removal provision prevented the President from removing the Director.

On this blinkered view, it does not matter that the removal provision did not affect the filing or prosecution of this case. It does not matter that officials President Trump put in charge of the Bureau, and whom he could unquestionably remove at will, allowed and even expressly approved the continued prosecution of this action. On the Trusts' view, it would not have mattered if President Trump had announced that he wanted the Bureau to continue to pursue the case. Indeed, even if the President had wanted to remove a Director precisely because he feared the

Director was going to *drop* this case, the Trusts' proposed test would require dismissing the case.

This makes no sense. (And it would directly undermine, rather than protect, the President's Article II authority to take care that the laws are faithfully executed.) Merely showing that a removal provision thwarted the President's ability to remove an official does not on its own establish that the provision "cause[d]" or "inflict[ed]" "harm" to a specific litigant. *Collins*, 141 S. Ct. at 1789; *see also Rop v. FHFA*, 50 F.4th 562, 576 (6th Cir. 2022) (explaining that what matters under *Collins* is not just whether the President "would have actually removed [the official]" but "whether [the official's] replacement would have" acted differently in some relevant way); *CFSA*, 2022 WL 11054082, at *10 (same).

The Trusts purport (at 60-61) to derive their per se test from an example the *Collins* Court used to illustrate how a removal provision might inflict harm: "suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way." 141 S. Ct. at 1789. The Trusts ignore that this is a far cry from what happened here.

As an initial matter, not even the Trusts claim that President Trump "made a public statement" "assert[ing] that he would remove the Director if the statute did not stand in the way." *Id.* Instead, the Trump administration's "public

44

statement[s]" established that President Trump's position was that the removal provision was unconstitutional and invalid. *See, e.g.*, Br. for United States, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Mar. 17, 2017), 2017 WL 1035617 (arguing that the removal provision was unconstitutional and severable). Nor did President Trump make any public statement "expressing displeasure" with this action—to the contrary, his administration expressly approved it.

More fundamentally, the Trusts are wrong to take the Court's stylized example for a per se rule that would govern no matter what the other facts may be. The Court did not say, for example, that the President's stated desire to remove an official would be enough to show harm even with respect to those actions the President had not "express[ed] displeasure with." And certainly it did not say so for actions, such as this case, that the President or his subordinates specifically approved and wanted to move forward. For *those* actions, it is irrelevant whether a removal provision thwarted (or merely delayed) the President's ability to put in place an official who would simply continue pursuing the action.

Indeed, *Collins* itself shows that additional facts may be relevant to the harm analysis. In remanding that case for further proceedings, the Court held open the possibility that the government could show on remand that, "irrespective of the President's power to remove the FHFA Director," the removal provision did not

cause the challengers harm because the President otherwise retained sufficient authority to supervise the disputed actions. *Collins*, 141 S. Ct. at 1789.

This Court should reject the Trusts' claims that they were harmed by a removal provision that not even they suggest had any causal connection to this case. Because the evidence here—including the express approval of this action by fully removable appointees of President Trump and President Biden—is overwhelming, the Court should also reject the Trusts' request (at 66-67) for more proceedings on this issue once the case returns to the district court. At this point, that would only further delay this action and eventual relief for injured borrowers—and after the Trusts themselves sought this Court's resolution of the issue via interlocutory appeal (along with a stay of proceedings in the district court). *Cf. Calcutt*, 37 F.4th at 317 (declining to remand for further proceedings where "[t]he record is sufficiently clear that the removal protections did not cause harm"); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021) ("While *Collins* remanded for further factual development on the issue of harm, … we need not to do so here, as the record is clear.").[6]

---

[6] Where courts have remanded, they have done so where the district court had not yet had a chance to apply *Collins* and to consider whether a removal provision caused harm. *See Rop v. FHFA*, 50 F.4th 562, 575 n.6 (6th Cir. 2022) ("[R]emand is the appropriate remedy under *Collins* since this should be resolved in the first instance by the lower court." (brackets and quotation marks omitted)). That is not the situation here, where Judge Bibas already applied *Collins* and found no harm.

### C.    The Trusts cannot avoid the clear holdings of *Collins*.

The Trusts devote the bulk of their argument about the removal provision to claiming that *Collins* does not apply and, at times, to simply ignoring that decision. But by now, multiple courts of appeals have confirmed what is plain from *Collins* itself: The Supreme Court's holdings in that case broadly govern attempts—such as the Trusts'—to challenge agency actions based on an invalid removal provision.

The Trusts offer three grounds to distinguish *Collins*. None hold water.

*First*, the Trusts note (at 57-58) that *Collins* involved an affirmative challenge to agency action rather than a defense to an enforcement suit. But the actions at issue in *Collins*, no less than the Bureau's filing of the amended complaint here, were executive in nature. *See Collins*, 141 S. Ct. at 1785-86 (explaining that the FHFA's actions involved "the very essence of 'execution' of the law"). And while those actions may or may not have directly "compel[led]" the *Collins* challengers (shareholders in Fannie Mae and Freddie Mac) to do anything, *see* Opening Br. at 58, the challengers "claim[ed] that the FHFA transferred the value of their property rights in Fannie Mae and Freddie Mac to Treasury" to the tune of billions of dollars, *Collins*, 141 S. Ct. at 1779, 1774. No doubt the *Collins* challengers viewed the FHFA's exercise of executive authority as being at least as significant as the Trusts do the Bureau's amended complaint.

Moreover, *Collins* broadly held that an invalid removal restriction does not strip a properly appointed official "of the power to undertake the … responsibilities of his office" or provide any "basis for concluding that [such officials] lack[] the authority to carry out the functions of the office." *Id.* at 1787-88 & n.23. The Court's remedial holdings were in no way limited to the particular "function[] of the office" being exercised, *see CFSA*, 2022 WL 11054082, at *9, or which side of the "v." the challengers happened to be on. Thus, courts have properly understood *Collins* to govern removal challenges arising in other contexts, including where the challengers were subject to agency enforcement proceedings. *See, e.g.*, *Integrity Advance, LLC v. CFPB*, 48 F.4th 1161, 1169-71 (10th Cir. 2022) (applying *Collins* in appeal for review of Bureau administrative enforcement proceeding); *CFPB v. CashCall, Inc.*, 35 F.4th 734, 742-43 (9th Cir. 2022) (same for Bureau civil enforcement action); *Calcutt*, 37 F.4th at 313-17 (same for FDIC administrative enforcement proceeding).

*Second*, the Trusts describe *Collins* (at 58-59) as inapplicable to agency actions that are "initiated" under an official who is subject to a removal provision. The Trusts again misread *Collins*. The Court explained that parties can raise an invalid removal provision to contest actions taken by officials to whom the provision applied, but not actions (including, there, the initial adoption of the disputed agency policy) by officials to whom the provision did not apply. 141 S.

Ct. at 1787. The Court said nothing to suggest that its remedial holding was limited to the particular order in which the FHFA's challenged actions happened to occur. And even if the Court had cabined its holding in the arbitrary way the Trusts imagine, that still would not help the Trusts because the agency action they challenge here—the amended complaint—was "initiated" under a fully removable Acting Director.

*Third*, the Trusts suggest (at 59-60) this Court should not apply *Collins* because they "seek dismissal only of a single suit," while the relief sought in *Collins* might have unwound significant financial dealings between the government, Fannie Mae, and Freddie Mac. But if the Court had meant to limit *Collins* to its facts, it would have said so. (Justice Gorsuch's partial dissent proposed reading the decision this way, but no other Justice subscribed to his view. *See Collins*, 141 S. Ct. at 1799 (Gorsuch, J., dissenting in part).) Instead, Justice Alito's majority opinion broadly addressed the effect of an invalid removal provision on the authority of agency officials to "carry out the functions of the[ir] office." *Id.* at 1788 (majority op.). Thus, numerous courts have correctly understood *Collins* to apply beyond its particular facts, including to cases in which parties sought dismissal of an agency enforcement suit.

Elsewhere (at 43-45), the Trusts try to avoid *Collins* by focusing on earlier decisions holding that parties have standing to challenge removal provisions where

they are subject to an agency's exercise of executive authority. But as the Trusts acknowledge, these decisions specifically held that the "here-and-now" effect of a removal provision gives parties standing to seek declaratory relief *that the provision is invalid*. *See* Opening Br. at 43-44 (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010), and *Bowsher v. Synar*, 478 U.S. 714 (1986)). This is the same form of relief the Court granted in *Seila Law* and *Collins* (and that the Trusts have already received here as a result of *Seila Law*).

Those decisions do not hold that merely being subject to the authority of an agency with a removal restriction entitles a party to more than that. *See Free Enter.*, 561 U.S. at 513 (rejecting challengers' claim to "broad injunctive relief" against the agency but agreeing "they are entitled to declaratory relief"). Under *Collins*, additional relief, beyond a declaration as to a removal provision's validity, requires parties to make the additional showing that the removal provision actually caused them harm. *See Collins*, 141 S. Ct. at 1787-88; *see also id.* at 1788 n.24 (emphasizing that "[w]hat we said about standing in *Seila Law* [that a party need not show that the government's actions would have been different in a 'counterfactual world' in which the provision did not exist] should not be misunderstood as a holding on a party's entitlement to relief" (citing *Seila Law*, 140 S. Ct. at 2195-96)); *id.* at 1794 (Thomas, J., concurring) (explaining that "*Seila*

50

*Law* … do[es] not help the shareholders on the lawfulness of the Government actions question").

The Trusts also err in claiming (at 45-53) the Bureau was required to formally ratify this action. *Collins* proves otherwise. That decision, again, held that an invalid removal provision does not deprive an agency of authority to act and does not render its actions void. Because the Bureau had the actual authority to bring this suit and file the amended complaint, and did so validly, it did not need to ratify those actions in order to give them effect. *See generally* RESTATEMENT (THIRD) OF AGENCY § 4.02 (2006) (defining the effect of ratification as "retroactively creat[ing] the effects of actual authority").

Judge Bibas thus correctly concluded that under *Collins*, the Bureau's actions "are not 'void' and do not need to be 'ratified,' unless a plaintiff can show that the removal provision harmed him." JA5. Numerous courts have agreed. *See Integrity Advance*, 48 F.4th at 1170 (holding that *Collins* showed that ratification was unnecessary); *CashCall*, 35 F.4th at 742 (finding it "unnecessary to consider ratification" after *Collins*); *CFSA*, 2022 WL 11054082, at *10 (explaining that, under *Collins*, "we need not address the Bureau's alternative argument" about ratification); *RD Legal*, 2022 WL 799429, at *5 ("Because the CFPB, under Director Cordray, brought this enforcement action in February 2017 with the

necessary authority and within the applicable statute of limitations, no ratification was necessary.").[7]

If that were somehow not enough, the Bureau *did* validly ratify this action when Director Kraninger formally approved it. JA318; D.Ct. Doc. 308-1. That ratification would suffice to resolve any harm to the Trusts stemming from the removal provision, had there been any. *See Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 602-06 (3d Cir. 2016) (holding that ratification "was sufficient to cure" any prejudice stemming from agency official's improper appointment).

The Trusts' claim (at 49-53) that the ratification was ineffective because the Bureau lacked authority to pursue this suit at the time Director Kraninger ratified it simply does not survive *Collins*. Per that decision, the Bureau had the authority to sue at the time it did, and thus the Bureau's initial complaint satisfied the statute of limitations. *See* 12 U.S.C. § 5564(g)(1); *see also* JA5 ("the CFPB stopped the

---

[7] The Trusts imply (at 49) that because the Bureau ratified this and some other cases and argued that such ratification would resolve any problem stemming from the removal provision, the Bureau must agree that ratification is required, even after *Collins*. That does not follow. Moreover, the Bureau consistently took the position here—even before *Collins*—that the district court did not need to reach ratification to uphold the amended complaint. *See, e.g.*, JA409 (in brief opposing dismissal, explaining that "the Court no longer needs to address ratification issues at all"); JA414 (in notice about *Collins*, emphasizing that the court need not "even reach[] the issue of ratification"); JA426-27 (in supplemental brief, arguing that the court could "allow this case to move forward without reaching ratification").

clock when it sued"). Because the Bureau satisfied the limitations provision at the outset, that provision (which governs when the Bureau can initially file suit) did not deprive the Bureau of authority to ratify this action at the time Director Kraninger did so. For that reason, this case is utterly unlike *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88 (1994), which concerned an action (the filing of a petition for certiorari) that no entity with proper authority took before the applicable deadline had lapsed and therefore could not be ratified.[8]

Finally, the Trusts suggest (at 45-46, and throughout) that dismissal is the remedy appropriately "tailored" for the circumstances here. Far from it. The Trusts have already received significant relief as a result of *Seila Law*: They can rest assured that the Bureau's pursuit of this case is consistent with the will of the executive and will remain subject to oversight by the President, "the most democratic and politically accountable official in Government." *Seila Law*, 140 S. Ct. at 2203. Under *Collins*, additional relief requires a showing that the removal provision caused harm. The Trusts cannot make that showing—and do not even

_____

[8] Even if the Court thought ratification were required after *Collins*, and even if it thought Director Kraninger's ratification would otherwise be untimely, her ratification still would be effective because the statute of limitations should be equitably tolled. The removal provision's existence was an extraordinary circumstance beyond the Bureau's control, and the Bureau has diligently pursued its claims for years, including by filing a new complaint after the first was dismissed. *See Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (listing requirements for equitable tolling).

claim the provision had any causal connection to this case. They can hardly argue therefore that dismissal of this public enforcement action—with no adjudication of the merits of the Bureau's allegations and no relief for injured student-loan borrowers—is a properly calibrated "remedy" for a statutory provision that not even they suggest had any impact on this case. The Court should reject that transparent appeal for a windfall that could effectively immunize the Trusts for their wrongdoing and preclude relief for the consumers they harmed.

## CONCLUSION

The Court should affirm the district court's order and allow this public enforcement action to proceed.

Dated:  November 7, 2022                    Respectfully submitted,

                                            */s/ Kevin E. Friedl*

                                            Seth Frotman
                                              *General Counsel*
                                            Steven Y. Bressler
                                              *Acting Deputy General Counsel*
                                            Kristin Bateman
                                              *Acting Assistant General Counsel*
                                            Kevin E. Friedl
                                              *Senior Counsel*
                                            Consumer Financial Protection Bureau
                                            1700 G Street NW
                                            Washington, DC 20552
                                            (202) 435-9268
                                            kevin.friedl@cfpb.gov

## COMBINED CERTIFICATIONS

1.  Government counsel are not required to be members of the bar of this Court.

2.  This brief complies with the requirements of Federal Rule of Appellate Procedure 32(a). It contains 12,957 words, excluding the parts exempted by Rule 32(f).

3.  On Nov. 7, 2022, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

4.  The text of the electronic version of this brief is identical to the text of the paper copies that will be provided.

5.  This brief was scanned for viruses using CylancePROTECT (Version 2.1574.39), software that continuously scans for viruses, and no virus was detected.


*/s/ Kevin E. Friedl*
Kevin E. Friedl