No. 22-1864

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

CONSUMER FINANCIAL PROTECTION BUREAU,

*Plaintiff-Appellee*,

v.

NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST, ET AL.

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Delaware
No. 1-17-cv-1323
Hon. Stephanos Bibas, U.S. District Judge

_____

**BRIEF OF AMICUS CURIAE STUDENT BORROWER PROTECTION
CENTER ET AL. IN SUPPORT OF APPELLEE THE CONSUMER
FINANCIAL PROTECTION BUREAU AND URGING AFFIRMANCE**

_____

Benjamin J. Roesch
Jensen Morse Baker, PLLC
1809 Seventh Ave., Suite 410
Seattle, WA 98101
(206) 664-1835
benjamin.roesch@jmblawyers.com
*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF

## AUTHORSHIP AND FUNDING

In accordance with Federal Rule of Appellate Procedure 26-1, Amici Curiae Student Borrower Protection Center ("SBPC"), Community Legal Aid Society Inc. ("CLASI"), Community Legal Services, Inc. ("CLS"), New York Legal Assistance Group ("NYLAG"), and New Jersey Citizen Action by and through their attorneys, discloses that it is a registered non-profit corporation and has no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

The Student Borrower Protection Center further discloses that it is funded through and affiliated with the Shared Ascent Fund, a tax-exempt 501(c)(3) organization, and that no publicly held corporation owns 10% or more of Shared Ascent Fund's stock.

Each of the amici are authorized to file this amicus brief by its governing documents.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus further state that (i) no party's counsel authored this brief in whole or in part, (ii) no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and (iii) no person other than amicus curiae and its members and counsel contributed money intended to fund the preparation or submission of this brief.

Date: November 14, 2022

1

Jensen Morse Baker PLLC

*/s/ Benjamin J. Roesch*
Benjamin J. Roesch
Jensen Morse Baker, PLLC
1809 Seventh Ave., Suite 410
Seattle, WA 98101
(206) 664.1835
benjamin.roesch@jmblawyers.com

*Attorneys for Amici Curiae Student Borrower Protection Center; Community Legal Aid Society Inc.; Community Legal Services, Inc.; New York Legal Assistance Group; and New Jersey Citizen Action*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF
AUTHORSHIP AND FUNDING                                                    1

TABLE OF AUTHORITIES                                                      4

STATEMENT OF IDENTIFICATION AND INTEREST                                  1

SUMMARY OF THE ARGUMENT                                                   1

ARGUMENT                                                                  4

I.      The NCSLTs Are "Persons" That Admittedly "Engage In" Consumer
Financial Transactions.                                                   4

A.      The NCSLTs' governing documents – the Trust Agreements – establish that
the NCSLTs "sole purpose" is "to engage in" offering consumer financial products
and services.
**Error! Bookmark not defined.**

B.      The Trust Agreements State that the NCSLTs Would "Engage In" Covered
Activities Through Others, Confirming the District Court's Common-Sense
Interpretation of the Phrase "Engaging In."                               5

C.      The Context and Purpose of the CFPA Confirms the District Court's
Holding that the NCSLTs "Engage in" Providing Consumer Financial Products
and Services.                                                            9

II.     The NCSLTs' Unfair, Deceptive, and Abusive Acts or Practices In
Collections Lawsuits Harm Consumers Across the Board and Pose Particular
Problems for Borrowers of Color.                                          5

A.      Historic and Systemic Racial Disparities Mean that Students of Color Are
more likely to be exposed to the unlawful debt collection practices at issue in this
case.                                                                    15

B.      The NCSLT's Unlawful Collection Tactics Have Been Disproportionately
Deployed Against Borrowers of Color.                                     21

CONCLUSION                                                                           23

CERTIFICATE OF COUNSEL

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Tr.*,
575 F. Supp. 3d 505, 509 (D. Del. 2021)....................................................................3

*In re Nat'l Collegiate Student Loan Trusts Litig.*,
251 A.3d 116, 193 (Del. Ch. 2020)..........................................................................7

**Statutes**

12 U.S.C. § 5481(15)(A)(i)...........................................................................6, 7, 12, 13

12 U.S.C. § 5481(19).............................................................................................4, 11

12 U.S.C.A. § 5511(a)................................................................................................10

12 U.S.C. § 5511(b)(2)..............................................................................................10

12 U.S.C. § 5511(4)...................................................................................................10

12 U.S. Code § 5565(a)(2).........................................................................................13

**Other Authorities**

American Association of University Women, Deeper in Debt
(2017).........................................................................................................................20

Amy Traub et al*., The Asset Value of Whiteness: Understanding the Racial Wealth
Gap*, Demos (2017)...................................................................................................15

Assurance of Discontinuance,
*In re Transworld Systems, Inc.*, (Sept. 2020)..............................................................2

Bureau of Labor Statistics,
Median Weekly Earning by Educational Attainment in 2014
(Jan. 2015)..................................................................................................................18

Consumer Fin. Prot. Bureau,
*CFPB Takes Action Against National Collegiate Student Loan Trusts, Transworld Systems for Illegal Student Loan Debt Collection Lawsuits* (Sep. 18, 2017)........2, 7

Financial Industry Regulatory Authority, Financial Capability in the United States 2016 (2016)..................................................................................................19

Judith Scott-Clayton and Jing Li, *Black-white disparity in student loan debt more than triples after graduation*,
The Brookings Institute (Oct. 2016)..................................................................16,17

Katie Nodjimbadem, *The Racial Segregation of American Cities Was Anything But Accidental*, Smithsonian (2017)............................................................................15

Lincoln Quillian, et al., *Meta-analysis of field experiments shows no change in racial discrimination in hiring over time*,
114(41) Proceedings of the National Academy of Sciences of the United States of American 10870 (Oct. 2017)....................................................................................18

Lori Trawinski et al., *The Student Loan Debt Threat: An Intergenerational Problem*,
AARP Public Policy Institute (May 2019)..............................................................20

Mark Huelsman, *The Debt Divide: The Racial and Class Bias Behind the "New Normal" of Student Borrowing*,
Demos (2015)............................................................................................................15

Marshall Steinbaum and Kavya Vaghul, *How the student debt crisis affects African Americans and Latinos*,
Washington Center for Equitable Growth (Feb. 17, 2016)...............................19, 21

Michal Grinstein-Weiss et al., *Racial disparities in education debt burden among low- and moderate-income households*,
Children and Youth Services Review Vol. 65 (June 2016)....................................16

Peter Smith and Leslie Parrish, *Do Students of Color Profit from For-Profit College? Poor Outcomes and High Debt Hamper Attendees' Futures*,
Center for Responsible Lending (Oct. 2014)..........................................................17

S. Rep. No. 111-176 (2010)....................................................................................14

Student Borrower Protection Center, Co-Opting California Courts: How Private Creditors Have Turned the Judiciary into a Predatory Student Debt Collection Machine
(August 2021)......................................................................................8, 14

Student Borrower Protection Center, The Long Legacy of Predatory Private Student Loans:
Defrauding Borrowers and Lying to Courts (March 2020).........................18, 21, 23

The Urban Institute, Debt in America:
An Interactive Map (2018)..............................................................20, 21

Tressie McMillan Cottom, Lower Ed:
The Troubling Rise of For-Profit Colleges in the
New Economy (2017)...........................................................................18

## STATEMENT OF IDENTIFICATION AND INTEREST

Amici are non-profit organizations dedicated to protecting the interests of student loan borrowers, older people, minorities, and marginalized communities.

The Student Borrower Protection Center ("SBPC") is a non-profit organization focused on alleviating the burden of student debt for Americans by engaging in advocacy and policymaking to protect borrowers' rights and advance economic opportunity for the next generation of students.

Community Legal Aid Society Inc. ("CLASI") is a non-profit organization founded in 1946 to combat injustice through creative and persistent civil legal advocacy on behalf of vulnerable and underserved Delawareans. CLASI clients have suffered the consequences of student debt in ways that impose serious burdens on their ability to meet their basic needs.

Community Legal Services, Inc. ("CLS") is a non-profit organization which provides free legal assistance to low-income Philadelphians in civil matters. CLS attorneys represent consumers in a wide range of matters to maintain economic security, including direct representation of student loan borrowers facing collection lawsuits filed by National Collegiate Student Loan Trust.

Founded in 1990, New York Legal Assistance Group ("NYLAG") is a leading civil legal services organization that combats economic, racial, and social injustice by advocating for New Yorkers experiencing poverty or in crisis. NYLAG

1

represents and assists student loan borrowers in their cases against private student loan lenders and files affirmative actions against predatory lenders.

New Jersey Citizen Action is a statewide grassroots non-profit organization that fights for social, racial and economic justice, by combining on the ground organizing, legislative advocacy, and electoral campaigns.

## SUMMARY OF THE ARGUMENT

The National Collegiate Student Loan Trusts (collectively, the "NCSLTs") are one of the largest set of actors in the private student loan marketplace.  From 2001 to 2007, the NCSLTs acquired more than $12 billion in private student loans, including many loans to students at the for-profit colleges that proliferated during that period.[1]  Many of these risky loans defaulted, and the NCSLTs responded by engaging in aggressive collection efforts on a scale that dwarfed other private student lenders – for example, one analysis found that the NCSLTs were responsible for approximately two thirds of student loan collection cases filed in California Superior Court from 2012 to 2020.  The NCSLTs' current attempt to avoid foundational consumer protection law prohibiting unfair, deceptive, and abusive conduct is

---

[1] Consumer Fin. Prot. Bureau, *CFPB Takes Action Against National Collegiate Student Loan Trusts, Transworld Systems for Illegal Student Loan Debt Collection Lawsuits* (Sep. 18, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-national-collegiate-student-loan-trusts-transworld-systems-illegal-student-loan-debt-collection-lawsuits/; Assurance of Discontinuance, *In re Transworld Systems, Inc.*, 2 (Sept. 11, 2020), https://ag.ny.gov/sites/default/files/09.11.2020_tsi_aod_final.pdf.

particularly alarming in light of their position in the private student loan market and the practices that led to the Bureau's lawsuit.

The District Court's holding that the NCSLTs are covered persons because they "engage in" offering or providing consumer financial products and services comports with the plain meaning of the Consumer Financial Protection Act ("CFPA"), and is confirmed by the NCSLTs' own governing documents. The Trust Agreements stated that the NCSLTs' "purpose" was "to engage in" activities that constitute "consumer financial products and services" and touch each aspect of the student loan "life-cycle" – i.e., the acquisition, servicing, and collection of private student loans. The Trust Agreements specified that the NCSLTs would carry out those purposes and engage in those activities through agents and other third parties. The manner in which the NCSLTs "engage in" these activities as described in their Trust Agreements also constitutes "engaging in" those activities for purposes of applying the CFPA. Thus, NCSLTs' own repeated use of the term "engage" is consistent with the District Court's common-sense interpretation of "engage" as "to embark in any business" or to "enter upon or employ oneself in an action" and its conclusion that the term "is broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise." *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Tr.*, 575 F. Supp. 3d 505, 509 (D. Del. 2021) (citing Oxford English Dictionary (2d ed. 2000)).

3

Finally, the NCSLTs' unfair, deceptive, and abusive practices are likely to fall most heavily on borrowers of color.  As a result of historic and systemic economic and educational barriers and the resulting racial wealth gap, borrowers of color are more likely to have taken on student loan debt, taken on more debt, and attended a predatory, for-profit college.  Due to ongoing and systemic discrimination in employment, borrowers of color are also more likely to default on their student loans, leaving them vulnerable to the NCSLTs' unlawful collection practices.  Indeed, an analysis of the NCSLTs' collection lawsuits in Maryland reveals that more than half were filed against borrowers in majority-minority zip codes.  Unless the NCSLTs are subject to the CFPA, their practices will negatively, and disproportionately, affect borrowers of color and their communities, perpetuating and even widening the racial wealth gap.

## ARGUMENT

## I.    The NCSLTs Are "Persons" That Admittedly "Engage In" Consumer Financial Transactions.

## A.    The NCSLTs' governing documents – the Trust Agreements – establish that the NCSLTs "sole purpose" is "to engage in" offering consumer financial products and services.

There is no dispute that the NCSLTs are "persons" under the CFPA.  12 U.S.C. § 5481(19) (defining "person" to include trusts).  Trusts, by their nature, necessarily act in their own names through others – i.e., the trustee and such other

4

persons as are hired to carry out the trust's business. The District Court correctly recognized that the NCSLTs "engage in" activities covered by the CFPA when they carry out their core business through their trustee(s), agents, and independent contractors.

Each of the NCSLTs was established through and is operated in accordance with its "Trust Agreement." *See* JA94.[2] Article II, Section 2.03 of each Trust Agreement sets forth the trust's "Purposes and Powers." *See* JA107. That section explicitly states that "The purpose of the Trust is ***to engage in the following activities***" before providing a list of that includes acquiring and collecting payments on Student Loans, "[t]o ***engage in those activities and to enter into such agreements*** that are necessary, suitable or convenient to accomplish the foregoing" and "[t]o ***engage in such other activities*** as may be required in connection with conservation of the Trust Property [i.e., Student Loans] and Distributions to Owners" from the profits from those loans. JA107(emphasis added).

The Trust Agreement's repeated use of the phrase "to engage in" cannot be reconciled with the NCSLTs' current attempt to avoid enforcement of foundational consumer protection law by claiming that they do not "engage" in the very activities for which they were formed. When filing their Trust Agreements with the Securities and Exchange Commission ("SEC"), the NCSLTs represented to the public, their

---

[2] Citations to the Joint Appendix are noted as "JA__."

investors, and the SEC that they would "engage in" their enumerated purposes. They cannot be heard now to claim otherwise. Instead, the Trust Agreement confirms that the NCSLTs understood and represented that they would be "engaging in" the activities that form their purpose by authorizing and entering into contracts directing others to act in their names and on their behalf.

The NCSLTs' first listed purpose is "[t]o acquire a pool of student loans." JA107. The NCSLT accomplished this through a series of agreements to purchase "Student Loan Notes" consisting of "education loans, to or for the benefit of students, originated under the Student Loan Programs," which are "programs for the origination of the Student Loans by each of the [identified] Loan Originators pursuant to the Loan Purchase Agreements." JA107. There is no question that the NCSLTs did, in fact, acquire the student loans. JA2. The NCSLTs therefore supported and facilitated the origination of the loans they purchased, and their acquisition of student loans falls squarely within the CFPA's definition of "consumer financial product or service," which includes "acquiring" or "purchasing" consumer credit. *See* 12 U.S.C. § 5481(15)(A)(i). As demonstrated below, the Trust Agreement and various amendments thereto authorized and directed the NCSLTs to "engage in" servicing and collection activities in each phase of their student loans' life cycles - payment, delinquency, default, and collections - in order to fulfill their ultimate purpose of returning money to their investors.

6

The District Court appropriately recognized that the NCSLTs' business function was converting one type of trust property (the student loans that they had acquired) into another kind of trust property (payments on those loans) for distribution to the Trust's owners.  The District Court further recognized that this can only be accomplished through servicing and collecting upon those loans.  Indeed, the Delaware Chancery Court has held that "the Trusts retained legal title to the Collateral [i.e., the Student Loans] *so that they could collect Student Loans* for distribution according to the Indenture Waterfall."  *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 193 (Del. Ch. 2020) (emphasis added).  The Trust Agreements confirm that "[t]he purpose of the Trust is to engage in the following activities and only these activities: … (ii) … to provide for … the servicing of the Student Loans."  JA107.[3]  There is no dispute that "servicing" and collecting on the student loans is a "consumer financial product or service."   12 U.S.C. § 5481(15)(A)(i).  The District Court correctly concluded that the NCSLTs were "covered persons" because they retained servicers, collection agencies, and law firms to collect student loans in the NCSLTS' names and on their behalf.

---

[3] Consumer Fin. Prot. Bureau, *CFPB Takes Action Against National Collegiate Student Loan Trusts, Transworld Systems for Illegal Student Loan Debt Collection Lawsuits* (Sep. 18, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpbtakes-action-against-national-collegiate-student-loan-trusts-transworld-systems-illegal-student-loan-debt-collectionlawsuits/.

**B.    The Trust Agreements State that the NCSLTs Would "Engage In" Covered Activities Through Others, Confirming the District Court's Common-Sense Interpretation of the Phrase "Engaging In."**

The NCSLTs' argument that they do not "engage in" the covered activities that constitute their core purposes because they and their agents hire others to service and collect loans on their behalf is flatly inconsistent with the Trust Agreements. The Trust Agreements' standards for "the operations of the trust" specify how the NCSLTs' above-referenced "Purposes and Powers" shall be fulfilled and exercised, stating that "***[t]he Trust will act solely in its own name*** and the ***Owner Trustee or other agents*** selected in accordance with this Agreement ***will act on behalf of the Trust.***" JA107 (emphasis added).  For example, Article  IV, Article 4.01(b)(i) explicitly authorizes lawsuits against borrowers "***in the ordinary course of business by the Trust or its agents or nominees for collection on the Student Loans owned by the Trust***." JA111.[4]  This language confirms that the NCSLTs will "act" and do so "in their own name," as well as through various agents and independent contractors.  For example, the NCSLTs would presumably not dispute that they were engaged in collection activities if they filed collections lawsuits themselves (presumably, as all lawsuits filed by organizations, through attorneys).  And in fact the various NCSLTs have filed such collections lawsuits in their own names. JA388,

---

[4] Student Borrower Protection Center, Co-Opting California Courts: How Private Creditors Have Turned the Judiciary into a Predatory Student Debt Collection Machine, 17 (August 2021).

¶37; JA391, ¶51-52.   They have offered no explanation why the text or structure of the CFPA allows them to escape the statute's reach if the same collection lawsuits are filed, or other collection actions taken, by their "agents or nominees" pursuant to the NCSLTs' authorization (however expressed).

Considering the other end of the NCSLTs' student loan transactions confirms that people routinely "engage in" loan-related activities through others acting on their behalf.   For example, many student loan borrowers authorize automatic payments by their loan servicer (which then effectively acts on behalf of both borrower and creditor), or use their bank's online bill pay service to make monthly student loan payments.[5]   These borrowers need not read their monthly billing statements or take any action whatsoever—their servicer or bank transmits the monthly payment on their behalf without any active involvement.   The borrower is "passive" each month–as opposed to actively submitting a payment online or mailing it in—but the bill is paid.   But even though the servicer or bank does all the "work," there could be no dispute that the borrower is "engaged" in paying off their loan within any reasonable meaning of the term.   The same is true of the NCSLTs'

---

[5] For example, the federal Department of Education encourages borrowers to "[s]ign up for automatic debit through your federal loan servicer to have your payments automatically taken from your bank account." https://studentaid.gov/manage-loans/make-payment.   Financial advice websites encourage private student loan borrowers to do the same, or use their bank's bill-paying service.  See, e.g.,  https://studentloanhero.com/featured/3-ways-auto-pay-helps-student-debt/ (last accessed Nov. 12, 2022).

demands for repayment and receipt of borrowers' funds through the servicers and collectors selected to act on their behalf, or collections lawsuits filed in the NCSLTs' names.

## C.    The Context and Purpose of the CFPA Confirms the District Court's Holding that the NCSLTs "Engage in" Providing Consumer Financial Products and Services.

The District Court should be affirmed because its interpretation of "engages in" is consistent with Congress' purpose in enacting the CFPA and its stated objective for the Bureau. When Congress enacted the CFPA, it repeatedly emphasized its goal of consistent implementation and enforcement and defined the Bureau's purpose as follows: "The Bureau *shall* seek to implement and, where applicable, enforce Federal consumer financial law *consistently* for the purpose of ensuring that *all consumers* have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive."  12 U.S.C.A. § 5511(a) (emphasis added).  Similarly, Congress identified the Bureau's objectives to include exercising its authority to ensure that "consumers are protected from unfair, deceptive, or abusive acts and practices" and "[f]ederal consumer financial law is *enforced consistently*…."  12 U.S.C. § 5511(b)(2) and (4) (emphasis added).  Adopting the NCSLTs' interpretation of "engages in" would fundamentally undermine these Congressional purposes and objectives by exempting trusts or any other actors within the financial

markets from compliance with generally applicable law.  This would give trusts (and those who profit from them) an unfair competitive advantage over other "persons" who were required to abide by the CFPA.

Moreover, Congress knew, when it enacted the CFPA in 2010 as a response to the 2008 financial crisis and ongoing foreclosure crises, how securitization, trusts, and asset-backed securities—like the Trusts' pooling of Student Loans and issuance of Notes to investors—worked. [6]   Congress undoubtedly understood that securitization trusts acted through their trustees, other agents, and independent contractors.  Congress nevertheless explicitly included "trusts" in the definition of "persons."  12 U.S.C. § 5481(19).  Including trusts as "persons" would be all but pointless if they could not also be "covered persons" based upon their purposes and the actions of those acting in their names and on their behalf.  Congress' inclusion of trusts therefore implicitly recognized—like the District Court—that a trust may be a "covered person" when it "engages in" the acquisition, servicing, and collection of credit by arranging for agents and independent contractors to do so on its behalf.

Moreover, the NCSLTs' narrow definition of "engages in" to exclude persons who act through servicing and collection agents is not necessarily limited to securitization trusts.  If adopted, this interpretation will be invoked by a variety of "persons" claiming to be "passive" and seeking to avoid accountability.  To take one

---

[6] *Id.*

11

example, if a wealthy individual created an LLC to acquire student loans—or mortgages, or any other sort of consumer debt—in a manner somehow falling outside the meaning of 12 U.S.C. § 5481(15)(A)(i) and then hired third parties to service and collect that debt, would the LLC be a "covered person"? What if the LLC hired an asset manager that in turn contracted with servicers and collectors? What type and level of involvement or oversight by the debt owner in what type of decisions related to servicing and collection may be deemed "passive" under the NCSLTs' theory, and what would constitute "engaging in" the actions of the LLC's agents and independent contractors? Instead of opening the courthouse doors to cases in which the owners of consumer debt ask courts to exempt them from compliance with the CFPA through increasingly obtuse line-drawing exercises, the Court should affirm the District Court's common-sense, dictionary-supported interpretation of "engages in," and hold that the Bureau has adequately alleged that the NCSLTs are "covered persons."

Exempting the NCSLTs—despite their acquisition, servicing and collection activities—would also frustrate Congressional intent to provide all consumers who have suffered unfair, deceptive, or abusive practices with full relief. For example, 12 U.S. Code § 5565(a)(2) provides for the "rescission or reformation of contracts," but it is unclear whether the District Court could order that relief if the contract owner—for example, the NCSLTs that own student loans—were not a "covered

person" subject to the CFPA.  Thus, exempting the NCSLTs from the CFPA by adopting their unreasonably narrow' interpretation may result in effectively denying Congressionally-approved remedies to large swaths of borrowers, merely because their loans were sold after origination into a trust, rather than being held by the lender or sold to another type of investor tha thte NCSLTs would concede was sufficiently "active."  For this reason, the "acquiring" of consumer credit is a critical component of the CFPA's definition of offering or providing a consumer financial product or service, *see* 12 U.S.C. § 5481(15)(A)(i), because it ensures that all "persons" who acquire consumer credit are "covered persons."  There is no dispute that the NCSLTs engaged in acquiring the student loans that form their assets, or that Congress intended the CFPA's relief to reach them.

## II.    The NCSLTs' Unfair, Deceptive, and Abusive Acts or Practices In Collections Lawsuits Harm Consumers Across the Board and Pose Particular Problems for Borrowers of Color.

The legislative history of the CFPA reveals that Congress intended to give the Bureau broad oversight over providers of consumer financial products or services to "protect consumers from unfair, deceptive, and abusive" acts, particularly racial minorities who lenders deliberately targeted for the subprime mortgages that gave rise to the CFPB's enabling act. S. Rep. No. 111-176, at 9, 14-15 (2010).  The Bureau's oversight (and corresponding enforcement authority) is equally important

in the student loan context, where racial disparities are similarly stark.[7]  As set forth below, many of the same systemic inequities that drove disparities in the mortgage market also result in students of color being more likely to enroll in predatory for-profit schools, incur student loan debt, borrow more, and become delinquent and default after separation from school.

This current action against the NCSLTs for filing false affidavits in violation of the Act fits precisely within the ambit of that congressional mandate. The Bureau has alleged a widespread pattern of misconduct by the NCSLTs and their agents in the collection of defaulted student loans, particularly in collections lawsuits.  And there are a lot of defaults and a lot of lawsuits.

The NCSLTs have come to be known as the "worst-performing student loan investment vehicles ever created by Wall Street,"[8] with as many as four in ten NCSLT-owned student loans having defaulted nationwide.[9] To ameliorate the cost of the bad loan origination and servicing, the NCSLTs aggressively pursued defaulted borrowers in court.  For example, an analysis of approximately 12,500

---

[7] See generally Hannah Grabenstein, Student loan debt has a listing effect on Black borrowers, despite the latest freeze in payments (PBS Newshour April 11, 2022), https://www.pbs.org/newshour/economy/student-loan-debt-has-a-lasting-effect-on-black-borrowers-despite-the-latest-freeze-in-payments.

[8] Student Borrower Protection Center, Co-Opting California Courts: How Private Creditors Have Turned the Judiciary into a Predatory Student Debt Collection Machine, 19 (August 2021).

[9] *Id.* at 20.

student loan debt collection lawsuits filed in California from 2008 to 2020 found that 8,059—nearly two thirds of the cases examined—were filed by an NCSLT entity.[10] The NCSLTs filed almost four times as many collections lawsuits as the next creditor on the list, Sallie Mae and the SLM Private Student Loan Trusts.[11]

False affidavits and other misconduct in collections lawsuits is particularly pernicious because borrowers are ill-equipped to recognize and address it in legal proceedings. The SBPC's analysis of student loan debt collection lawsuits in California revealed that only 10 percent of borrowers sued in California Superior Court had an attorney, while the creditor was represented by counsel every time.[12] Pro se defendants struggle to defend themselves at all in an adversarial system, let alone when the represented creditor engages in misconduct.

The results are dire. Sixty-six percent of cases examined resulted in a judgment against the borrower, with the majority of these being default judgments.[13]

---

[10] *Id.* at 22.

[11] *See, e.g.,* Amy Traub et al*., The Asset Value of Whiteness: Understanding the Racial Wealth Gap*, Demos (2017), http://www.demos.org/publication/asset-value-whiteness-understanding-racial-wealth-gap; Katie Nodjimbadem, *The Racial Segregation of American Cities Was Anything But Accidental*, Smithsonian (2017), https://www.smithsonianmag.com/history/how-federal-government-intentionally-racially-segregated-american-cities-180963494/.

[12] Mark Huelsman, *The Debt Divide: The Racial and Class Bias Behind the "New Normal" of Student Borrowing*, Demos (2015), https://www.demos.org/publication/debt-divide-racial-and-class-bias-behind-new-normal-student-borrowing.

[13] Judith Scott-Clayton and Jing Li, *Black-white disparity in student loan debt more than triples after graduation*, p. 3, The Brookings Institute (Oct. 2016),

Moreover, only about 7.5 percent of the judgments examined had been paid—as evidenced by the filing of a satisfaction of judgment—while creditors sought to execute on 39 percent through garnishment or other means, and the rest continued to accrue interest.[14] These judgments—including those secured through false affidavits—can have a debilitating impact on borrowers for years or decades. Judgment debtors are subject to wage and account garnishment, liens and execution on property, and other harsh collection actions that can go on for years or decades.[15] Unfortunately, in a repeat of the foreclosure crisis which precipitated Congress' enactment of the CFPA, borrowers of color will almost certainly bear a disproportionate share of this harm.

## A.    Historic and Systemic Racial Disparities Mean that Students of Color Are More Likely to be Exposed to the Unlawful Debt Collection Practices at Issue in This Case.

Students of color face additional barriers in repaying student loan debt due to structural inequities in family wealth, education, and employment.  Holding the NCSLTs accountable for unfair, deceptive, and abusive acts or practices is critical for addressing racial disparities in student loan and other economic outcomes.

---

https://www.brookings.edu/wp-content/uploads/2016/10/es_20161020_scott-clayton_evidence_speaks.pdf.

[14] Michal Grinstein-Weiss et al., *Racial disparities in education debt burden among low- and moderate-income households*, 166 Children and Youth Services Review Vol. 65 (June 2016).

[15] See *https://www.consumerfinance.gov/ask-cfpb/what-should-i-do-if-a-creditor-or-debt-collector-sues-me-en-334/*.

First, Black students are forced to take on more student loan debt than their white peers. For generations, government-sanctioned policies like redlining, restrictive covenants, lending discrimination, and encouraging neighborhood segregation kept African-American families from accumulating wealth.[16] With less familial wealth, Black students are more likely than other racial groups to borrow—and to borrow more—for their education.[17] A 2016 analysis found that Black students on average graduated with about $7,400 more student loan debt than their white peers.[18] Disparities in income alone do not explain the gap,[19] and these disparities only widen after graduation.[20]

---

[16] Judith Scott-Clayton and Jing Li, *Black-white disparity in student loan debt more than triples after graduation*, p. 3, The Brookings Institute (Oct. 2016), https://www.brookings.edu/wp-content/uploads/2016/10/es_20161020_scott-clayton_evidence_speaks.pdf.

[17] Leadership Conference on Civil & Human Rights, *Gainful Employment: A Civil Rights Perspective*, p. 2, Center for Responsible Lending (Nov. 2014), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/2014-Gainful-Employment-A-Civil-Rights-Perspective-Oct.pdf; Peter Smith and Leslie Parrish, *Do Students of Color Profit from For-Profit College? Poor Outcomes and High Debt Hamper Attendees' Futures*, Center for Responsible Lending (Oct. 2014), http://www.responsiblelending.org/student-loans/research-policy/CRL-For-Profit-Univ-FINAL.pdf.

[18] Tressie McMillan Cottom, Lower Ed: The Troubling Rise of For-Profit Colleges in the New Economy 32 (2017) [hereinafter Lower Ed].

[19] *See* Student Borrower Protection Center, The Long Legacy of Predatory Private Student Loans: Defrauding Borrowers and Lying to Courts, p. 3 (March 2020) (citing various NCSLT collection acts against students of for-profit schools), https://protectborrowers.org/wp-content/uploads/2021/01/SBPC-PSL-Issue-Brief-Maryland.pdf.

[20] *See, e.g.*, Lincoln Quillian, et al., *Meta-analysis of field experiments shows no change in racial discrimination in hiring over time*, 114(41) Proceedings of the

Second, students of color are more likely to attend for-profit schools that leave all students ill-equipped for the job market. Black and Latino students are overrepresented in high-cost, low-quality for-profit institutions, which impose greater amounts of debt while failing to provide increased employment prospects and earning power through which to pay it off.[21] For example, while 1-in-20 college students overall are enrolled in a for-profit college, 1-in-10 Black students are enrolled in a for-profit college.[22] Moreover, an analysis by the Student Borrower Protection Center found that students at for-profit schools are over a third more likely to rely on private student loans than students at not-for-profit institutions.[23] And while data on private student loan outcomes is scarce, private student loan borrowers who attend for-profit schools are more than three times more likely to default on their federal student loans than students attending schools in other sectors.[24] Many of the risky, subprime loans made through the NCSLTs' designated "Student Loan Programs" (JA238) and then acquired by the NCSLTs were made to students at

---

National Academy of Sciences of the United States of America 10870 (Oct. 2017), https://www.pnas.org/content/pnas/early/2017/09/11/1706255114.full.pdf.

[21] Bureau of Labor Statistics, Median Weekly Earnings By Educational Attainment in 2014 (Jan. 2015), https://www.bls.gov/opub/ted/2015/median-weekly-earnings-by-education-gender-race-and-ethnicity-in-2014.htm.

[22] American Association of University Women, Deeper In Debt, p. 28 (2017), https://www.aauw.org/resource/deeper-in-debt/.

[23] See Student Borrower Protection Center, Private Student Lending, p. 11 (April 2020), https://protectborrowers.org/wp-content/uploads/2020/04/PSL-Report_042020.pdf.

[24] Id.

predatory, for-profit colleges,[25] and the NCSLTs' poor financial performance and aggressive collection practices against defaulted borrowers confirms that these negative outcomes disproportionately affect borrowers of color.

Third, systemic discrimination in the labor market represents another barrier to repayment.[26] The Bureau of Labor Statistics finds that once in the workforce, graduates of color have lower wages than their white peers, even when controlling for education level.[27]  Because of the persistent income gap, African Americans are more likely to earn less money after college with which to repay their (higher) student loans.   A study by the American Association of University Women concluded that "[g]ender and race gaps in pay can explain much of the differences in how quickly college graduates can repay their student loans."[28]

---

[25] *See* Marshall Steinbaum and Kavya Vaghul, *How the student debt crisis affects African Americans and Latinos*, Washington Center for Equitable Growth (Feb. 17, 2016), http://equitablegrowth.org/how-the-student-debt-crisis-affects-african-americans-and-latinos/.

[26] Financial Industry Regulatory Authority, Financial Capability in the United States 2016, p. 24 (2016), http://www.usfinancialcapability.org/downloads/NFCS_2015_Report_Natl_Findings.pdf.

[27] American Association of University Women, Deeper in Debt, p. 30 (2017), https://www.aauw.org/resource/deeper-in-debt/.

[28] Lori Trawinski et al., *The Student Loan Debt Threat: An Intergenerational Problem*, p. 8, AARP Public Policy Institute (May 2019), https://www.aarp.org/content/dam/aarp/ppi/2019/05/the-student-loan-debt-threat.doi.10.26419-2Fppi.00064.001.pdf.

Against these headwinds, students of color are more likely to experience financial distress on their student loans than their white counterparts,[29] with Black and Latino borrowers reporting higher rates of late payments compared to white borrowers.[30] One study found that "[f]our years after graduation 57 percent of Black women college graduates paying off their student loans were unable to meet all of their essential expenses at some point in the past year."[31] Older borrowers of color also experience significantly more distress than their white counterparts. AARP found that "Among people ages 50 and older, there were significant differences by race. African Americans/Blacks and Hispanics were significantly more likely to exhibit signs of distress (46 and 49 percent, respectively) than Whites (29 percent)."[32]

These month-by-month struggles accumulate to a stark disparity in default rates for students of color and their white counterparts. The Urban Institute found that in Pennsylvania, 10% of white borrowers had student loan debt in collections,

---

[29] The Urban Institute, Debt in America: An Interactive Map (2018), https://apps.urban.org/features/debt-interactive-map/?type=student&variable=perc_stud_debt.
[30] Id.
[31] American Association of University Women, Deeper in Debt, p. 2 (2017), https://www.aauw.org/resource/deeper-in-debt/.
[32] Marshall Steinbaum and Kavya Vaghul, How the student debt crisis affects African Americans and Latinos, Washington Center for Equitable Growth (Feb. 17, 2016), http://equitablegrowth.org/how-the-student-debt-crisis-affects-african-americans-and-latinos/.

compared with 25 percent of non-white borrowers.[33]  In New Jersey, it is 7 percent of white borrowers and 17 percent of nonwhite borrowers.[34]  In Delaware, it is 12 percent and 20 percent.[35]  The results are devastating:

> These racial disparities in default rates extend beyond borrowers' immediate families and into their surrounding communities. Research by the Washington Center for Equitable Growth found that zip codes with higher shares of African Americans or Latinos show much higher delinquency rates on their student loans.  When combined with the government's collection practices described above, servicer misconduct systematically strips wealth from families and communities which are already economically disadvantaged and disproportionately of color.[36]

The systemic barriers to repayment mean that students of color are more likely than their white peers to be exposed to unfair, deceptive, and abusive acts or practices in student loan debt collection—including those alleged by the Bureau in this case.  Indeed, research by the Bureau shows that a significantly higher percentage of borrowers in majority Black (2.4 percent) and Hispanic (1.3 percent) census tracts had a dispute flag on their student loans than those in majority White

---

[33] The Urban Institute, Debt In America: An Interactive Map (2018), https://apps.urban.org/features/debt-interactive-map/?type=student&variable=perc_stud_debt.

[34] *Id.*

[35] *Id.*

[36] Student Borrower Protection Center, The Long Legacy of Predatory Private Student Loans: Defrauding Borrowers and Lying to Courts, p. 4 (March 2020) (citing various NCSLT collection acts against students of for-profit schools), https://protectborrowers.org/wp-content/uploads/2021/01/SBPC-PSL-Issue-Brief-Maryland.pdf.

(0.9 percent) census tracts.[37]   The disproportionate number of disputes over the accuracy of student loan credit reporting in Black and Hispanic communities is a harbinger for the targeting of those same communities for the filing of false affidavits in collection litigation.

## B.    The NCSLT's Unlawful Collection Tactics Have Been Disproportionately Deployed Against Borrowers of Color.

In light of the NCSLTs' aggressive and widespread collections efforts and the systemic problems that result in higher student loan default rates among borrowers of color, it is unsurprising that borrowers of color appear to be particularly affected by NCSLTs' tactics.   For example, a 2020 analysis by the Student Borrower Protection Center concluded that:

> When Marylanders defaulted on these loans, NCSLT was relentless in its use of the state's court system to pursue these defaulted debts. NCSLT filed over 1,250 cases against Maryland borrowers in the past five years alone. These lawsuits disproportionately target communities of color in the state. More than half of all NCSLT lawsuits filed in Maryland are against borrowers in majority-minority zip codes. Additionally, more than 25 percent of all NCSLT lawsuits filed in Maryland were filed in Prince George's County, a majority-Black county.[38]

---

[37] See Consumer Financial Protection Bureau, Disputes on Consumer Credit Reports, p. 9 (October 2021), https://files.consumerfinance.gov/f/documents/cfpb_disputes-on-consumer-credit-reports_report_2021-11.pdf.

[38] Student Borrower Protection Center, The Long Legacy of Predatory Private Student Loans: Defrauding Borrowers and Lying to Courts, p. 4 (March 2020) (citing various NCSLT collection acts against students of for-profit schools), https://protectborrowers.org/wp-content/uploads/2021/01/SBPC-PSL-Issue-Brief-

Because student loan defaults (and the resulting collections lawsuits) are driven by systemic conditions across the country, this pattern is almost certainly repeated within the Third Circuit. These unlawful collection practices have the capacity to perpetuate and even widen these unjust socioeconomic disparities.

## CONCLUSION

The NCSLTs' narrow interpretation of the terms "engages in" and "covered person" would leave major players in the private student loan market—including but not necessarily limited to the NCSLTs—unaccountable for their unlawful practices, harming consumers and distorting the market by granting them an unfair competitive advantage over those who must comply with the law. Neither the CFPA's text or purpose, or the NCSLTs' own governing documents, require such a result.

Left unchecked, the NCSLTs' unfair, deceptive, and abusive practices will continue to disproportionately harm borrowers of color and have the capacity not just to harm the borrowers themselves, but to perpetuate and increase the very systemic barriers to socioeconomic advancement that higher education is supposed to break down. Congress did not intend to exempt the NCSLTs or other major players in the private student loan market from the CFPA's reach. Amici therefore

---

Maryland.pdf.

respectfully request that this Court affirm the District Court's ruling that the Bureau has adequately alleged that the NCSLTs are "covered persons" subject to the CFPA.

Date: November 14, 2022

JENSEN MORSE BAKER PLLC

*/s/ Benjamin J. Roesch*
Benjamin J. Roesch
Jensen Morse Baker PLLC
1809 Seventh Ave., Suite 410
Seattle, WA 98101
(206) 664-1835
benjamin.roesch@jmblawyers.com

*Attorneys for Amici Curiae Student Borrower Protection Center; Community Legal Aid Society Inc.; Community Legal Services, Inc.; New York Legal Assistance Group; and New Jersey Citizen Action*

# CERTIFICATE OF COUNSEL

I, Benjamin J. Roesch, hereby certify as follows:

1.      I am a member of the bar of this Court.

2.      The text of the electronic version of this brief is identical to the text of the paper copies.

3.      A virus detection program was run on the file and no virus was detected.

4.      This brief contains 5,257 words in compliance with Fed. R. App. Proc. 29(a)(5). In making this certificate, I have relied on the word count of Microsoft Word, the word-processing system used to prepare the brief.


Date:  November 14, 2022


                    JENSEN MORSE BAKER PLLC


                    */s/ Benjamin J. Roesch*
                    Benjamin J. Roesch
                    Jensen Morse Baker, PLLC
                    1809 Seventh Ave., Suite 410
                    Seattle, WA 98101
                    (206) 664-1835
                    benjamin.roesch@jmblawyers.com

                    *Attorneys for Amici Curiae Student Borrower
                    Protection Center; Community Legal Aid Society
                    Inc.; Community Legal Services, Inc.; New York
                    Legal Assistance Group; and New Jersey Citizen
                    Action*

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2022, I electronically filed the foregoing Motion for Leave to File Amicus Curiae Brief in Support of Appellee with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I also caused seven copies of the foregoing brief to be served by Federal Express to the Clerk of the Court for the United States Court of Appeals for the Third Circuit.

Date: November 14, 2022

JENSEN MORSE BAKER PLLC

*/s/ Benjamin J. Roesch*
Benjamin J. Roesch
Jensen Morse Baker, PLLC
1809 Seventh Ave., Suite 410
Seattle, WA 98101
(206) 664-1835
benjamin.roesch@jmblawyers.com

*Attorneys for Amici Curiae Student Borrower Protection Center; Community Legal Aid Society Inc.; Community Legal Services, Inc.; New York Legal Assistance Group; and New Jersey Citizen Action*