No. 22-1864

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff-Appellee,

v.

NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUSTS, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Delaware

No. 1:17-cv-01323
The Honorable Stephanos Bibas

## BRIEF OF AMICI CURIAE ILLINOIS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, IDAHO, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VIRGINIA, WASHINGTON, AND WISCONSIN IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

KWAME RAOUL
Attorney General
State of Illinois

SARAH A. HUNGER
Deputy Solicitor General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
Sarah.Hunger@ilag.gov

JANE ELINOR NOTZ
Solicitor General

Attorneys for Amici States

*(Additional counsel on signature page)*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................ii

IDENTITY AND INTEREST OF AMICI STATES ................................... 1

SUMMARY OF ARGUMENT .................................................................. 2

ARGUMENT ........................................................................................... 6

I.    Predatory Debt Collection Practices Harm Consumers In The
      Amici States. ................................................................................. 6

      A.    Debt collectors file collection suits without the intent or
            ability to prove claims if contested .............................................. 7

      B.    Debt collection entities pursue time-barred debt. ..................... 13

      C.    Debt collectors submit false or misleading affidavits and
            testimony. ................................................................................. 17

II.   Predatory Debt Collection Practices Are Exacerbated By Debt
      Purchasing Entities Like The Trusts. ............................................. 22

CONCLUSION ...................................................................................... 32

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Barbato v. Greystone Alliance, LLC,*
916 F.3d 260 (3d Cir. 2019) ............................................................ 25

*Buchanan v. Northland Grp., Inc.,*
776 F.3d 393 (6th Cir. 2015) ........................................................... 15

*Daugherty v. Convergent Outsourcing, Inc.,*
836 F.3d 507 (5th Cir. 2016) ........................................................... 14

*Kaiser v. Cascade Cap., LLC,*
989 F.3d 1127 (9th Cir. 2021) .................................................... 13, 14

*LVNV Funding LLC v. Finch,*
463 Md. 586 (Md. 2019) .................................................................. 30

*McAdory v. M.N.S. & Assocs., LLC,*
952 F.3d 1089 (9th Cir. 2020) .................................................... 24, 25

*McMahon v. LVNV Funding, LLC,*
744 F.3d 1010 (7th Cir. 2014) ......................................................... 15

*Meade v. Avant of Colorado, LLC,*
No. 2017CV30377 (Colo. Dist. Ct. May 14, 2019) ...................... 30, 31

*Midland Funding LLC v. Brent,*
644 F. Supp. 2d 961 (N.D. Ohio 2009) ......................................... 19, 20

*Pantoja v. Portfolio Recovery Assocs., LLC,*
852 F.3d 679 (7th Cir. 2017) ...................................................... 15, 16

*Phillips v. Asset Acceptance, LLC,*
736 F.3d 1076 (7th Cir. 2013) ......................................................... 14

*Royal Fin. Grp., LLC v. Perkins,*
414 S.W.3d 501 (Mo. Ct. App. 2013) ........................................... 10, 11

*Tatis v. Allied Interstate, LLC,*
882 F.3d 422 (3d Cir. 2018) ............................................................ 14

ii

*Tepper v. Amos Fin., LLC,*
  898 F.3d 364 (3d Cir. 2018) ................................................................ 7

*Thompson v. Midland Funding, LLC,*
  375 F. Supp. 3d 774 (E.D. Ky. 2019) .................................................. 13

## STATUTES

940 Code Mass. Reg. § 7.03 ..................................................................... 28

Md. Code Ann., Cts. & Jud. Proc. § 5-1203 ............................................ 29

Minn. Stat. Ann. § 332.31 ....................................................................... 27

N.C. Gen. Stat. Ann. § 58-70-115 ........................................................... 29

Tex. Fin. Code Ann. § 392.307 ............................................................... 28

## OTHER AUTHORITIES

Breno Braga et al., Urb. Inst., Local Conditions and Debt in
  Collections (June 2016) ................................................................ 12, 13

CFPB, *47 States and D.C. Take Action Against JPMorgan Chase for
  Selling Bad Credit Card Debt and Robo-Signing Court
  Documents* (Jul. 8, 2015) ................................................................ 20

CFPB, *Small Business Review Panel for Debt Collector and Debt
  Buyer Rulemaking:  Outline of Proposals Under Consideration
  and Alternatives Considered* (July 27, 2016) ........................... 9, 11, 24

Cheryl R. Cooper, Congressional Research Service, The Debt
  Collection Market and Selected Policy Issues (June 22, 2021) ..... 9, 10

Fed. Res., *Consumer Credit – G.19* ......................................................... 4

Fed. Trade Comm'n., *The Structure and Practices of the Debt
  Buying Industry* (2013) ............................................................. 9, 23, 24

Peter A. Holland, *The One Hundred Billion Dollar Problem in Small
  Claims Court:  Robo-Signing and Lack of Proof in Debt Buyer Cases*,
  6 J. Bus. & Tech. L. 259 (2011) ............................................. 12, 18, 19

Robert M. Hunt, *Collecting Consumer Debt in America,* Fed. Res. Bank of Phila. Bus. Rev. 11 (2007) ......................................................... 8

Nat'l Consumer Law Ctr., Consumer Impact (Spring 2019) .................... 2

Nat'l Consumer Law Ctr., Fact and Figures About Debt Collection (Feb. 2018) ................................................................................................. 8

Nat'l Consumer Law Ctr., Wage Garnishment for Consumer Debts: Reforms Needed in the Current Crisis and Beyond (2020) ............... 12

Note, *Improving Relief From Abusive Debt Collection Practices*, 127 Harv. L. Rev. 1447 (2014) ................................................................. 8, 9

Press Release, *AG Ferguson:  Renton-based Debt Collector Will Pay More Than $1.6 Million Over Deceptive Letters* (Sept. 8, 2021) ........ 16

Press Release, *AG Healey Secures $2.25 Million From National Debt Collection Company for Misleading and Harassing Students, Borrowers, and Low-Income Consumers* (Sept. 7, 2021) .................... 17

Press Release, *AG Healey Secures $4 Million from National Debt Buyer to Pay Back Consumers Harmed by Abusive Debt Collection Practices* (Nov. 11, 2019) ............................................................. 25, 26

Press Release, *AG Racine Announces Midland to Pay $6 Million for Illegal Debt Collection Practices* ..................................................... 27

Press Release, *Attorney General Alan Wilson announces South Carolina consumers have received more than $1.4 million as part of settlement in debt-buying case* (Apr. 18, 2019) ............................................. 26, 27

Press Release, *Attorney General Announces $6 Million Settlement With Debt Buyer* (Dec. 4, 2018) .................................................... 26, 27

Press Release, *Attorney General Hunter Announces Oklahoma Victims of Debt Collector's Robo-Signing Scheme to Receive More than $320,000 in Credit* ......................................................................... 20

Press Release, *Attorney General James Stops Debt Collection Company from Unlawful Practices Harming Thousands of Student Borrowers* (Sept. 14, 2020) ............................................................................... 21

Press Release, *Attorney General Kamala D. Harris Announces Settlement with JPMorgan Chase for Unlawful Debt-Collection Practices* (Nov. 2, 2015) .............................................................. 20, 21

Erika Rickard et al., PEW Charitable Trs., How Debt Collectors Are Transforming the Business of State Courts (2020) ................. 4, 10, 11

Mary Spector, *Litigating Consumer Debt Collection: A Study*, 31 Banking & Financial Services Policy Report 1 (Jan. 2012) ................. 8

Student Borrower Protection Ctr., Beyond Fresh Start: Addressing the Flaws of the Current Student Loan Collection System (Aug. 2022) ...................................................................................... 12

Rachel Terp, East Bay Cmty. Law Ctr., *Past Due: Why Debt Collection Practices and the Debt Buying Industry Need Reform Now* (2011) ...................................................................................... 8, 10

Claudia Wilner & Nasoan Sheftel-Gomes, Neighborhood Econ. Dev. Advocacy Project, et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers* (2010) ....... 18, 19

**IDENTITY AND INTEREST OF AMICI STATES**

Illinois, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Virginia, Washington, and Wisconsin ("amici States") submit this brief in support of Plaintiff-Appellee Consumer Financial Protection Bureau ("CFPB") pursuant to Federal Rule of Appellate Procedure 29(a)(2).

The amici States have a substantial interest in protecting the welfare and financial security of their residents, which includes protecting them from unlawful debt collection practices. That interest is implicated by this case, which addresses whether Defendants-Appellants—student loan trusts that are alleged to have engaged in illegal debt collection activities ("Trusts")—are "covered persons" subject to the prohibition on unfair debt collection practices under the Consumer Financial Protection Act of 2010 ("CFPA" or "Act").

Additionally, the amici States' own enforcement efforts are fortified by having a strong federal partner in the CFPB. The States play a vital role in policing unfair debt collection, and the CFPB is an

important partner in preventing unlawful debt collection practices and providing appropriate remedies to consumers harmed by illegal conduct, which is becoming more pervasive as the consumer debt industry continues to grow.[1]  The decision below—which confirmed that the CFPB may enforce the Act's consumer debt collection prohibitions against the Trusts—supports these state interests.  Accordingly, the amici States urge this Court to affirm the district court's decision to deny the Trusts' motion to dismiss.

## SUMMARY OF ARGUMENT

In 2017, the CFPB brought suit against the Trusts for engaging in a number of unlawful debt collection practices under the Consumer Financial Protection Act.  JA384 (¶ 9).  Among other misdeeds, the operative complaint alleged that debt collectors acting on behalf of the Trusts submitted false and misleading affidavits and testimony in support of 94,046 collections actions brought by the Trusts.  JA391-93 (¶¶ 51-70).  Additionally, the Trusts are alleged to have filed "at least 1,214 collections lawsuits against consumers even though the

---

[1]  Nat'l Consumer Law Ctr., Consumer Impact 10 (Spring 2019), https://bit.ly/3FCbDIS (consumers across the country submitted approximately "620,800 complaints about debt collection" in 2017).

documentation needed to prove they owned the loans was missing," JA394 (¶ 80), and at least another 812 "where the documentation did not support the Trusts' ownership of the loans," JA395 (¶ 82). Finally, the CFPB alleged that the Trusts filed at least 486 collections lawsuits outside of the applicable statutes of limitations. *Id.* (¶¶ 86-87).

The Trusts moved to dismiss the action, asserting that they could not be held liable for these alleged misdeeds because they do not "engage in" servicing and collecting debt, and thus are not "covered persons" under the Act. Trusts Br. 19. Instead, they argue, the Trusts' involvement was limited to purchasing, pooling, and securitizing the student loan debt, and then hiring third parties to collect on those debts. *Id.* at 19-20. In other words, they characterize themselves as "passive securitization vehicles" that were, at most, "indirectly involved in offering financial services." *Id.* at 19, 21 (emphasis omitted).

The amici States agree with the CFPB that the Trusts' interpretation of the Act, and their corresponding assertion of nonliability under it, is incorrect as a matter of law. As the CFPB explains, *see* CFPB Br. 12-34, the district court rightly concluded that the Trusts "engaged in" servicing and collecting debt when they

contracted with third parties to collect and service the debts that they purchased, JA8-9.

The amici States write separately to underscore the practical consequences of adopting the Trusts' narrow reading of the law, which would authorize the unlawful debt collection practices at issue, and lead to devastating effects on the financial welfare of their residents. Indeed, these illegal practices—from pursuing time-barred debt to submitting false affidavits in support of improper collections lawsuits— often place consumers at an insurmountable disadvantage that results in the entry of default judgments against them.  Given the amount of consumer debt—which reached $4.6 trillion in June 2022—and the corresponding increase of debts in collection, protecting consumers from such misconduct is as important now as ever.[2]

The use of these tactics, moreover, is exacerbated when debt purchasers are involved in debt collection.  In fact, the very premise of the debt purchasing business model is to collect on debts that original

---

[2] Fed. Res., *Consumer Credit – G.19*, https://bit.ly/3sOcbE1; *see* Erika Rickard et al., PEW Charitable Trs., How Debt Collectors Are Transforming the Business of State Courts 8 (2020), https://bit.ly/3gYF1Pp.

creditors have deemed uncollectable because, among other reasons, the debts are time-barred or lack the requisite underlying documentation to support a collections action.  These dynamics are further compounded by the presence of entities like the Trusts, which profit only when the third parties that they have hired are able to collect on the flawed debt portfolios that they have purchased.  Debt purchasing entities, including entities like the Trusts, are thus often even more likely than the original creditors to resort to unlawful tactics in undertaking collection activities.

In recognition of this growing problem, many States have applied their prohibitions on unlawful debt collection to *all* debt purchasers that seek to reap profits from these illegal activities, including those purchasers that outsource collection to third parties.  The CFPB's decision to do the same is appropriate under the Act, *see* CFPB Br. 12-34, and also as a practical matter.  In order to fully protect consumers from these abuses, debt purchasers must be held to account, regardless of whether they collect debts through their third-party agents.  Accordingly, the court should affirm the district court's decision denying the Trusts' motion to dismiss.

# ARGUMENT

## I.  Predatory Debt Collection Practices Harm Consumers In The Amici States.

The debt collection practices alleged in this case have long been employed by unscrupulous debt collectors seeking to take advantage of unsophisticated consumers across the country.  The States thus prohibit these and other unfair tactics, investigate complaints of such misconduct, and bring enforcement actions where appropriate.  But given the sheer amount of unlawful conduct in the debt collection industry and the fact that many illegal schemes are regional or national in character, the CFPB's continued ability to pursue all entities engaging in unlawful debt collection practices under the Act is critical to protecting consumers in the amici States, as Congress intended.

Indeed, the aggressive debt collection schemes at issue in this case infect nearly every phase of litigation and render it nearly impossible for most consumers to prevail in these collections lawsuits.  Just as the complaint alleged occurred here, debt collectors often file collection suits in state court without the intention, or the ability, to prove their claims if the consumers contest them.  Under a similar approach, debt collectors also frequently file suit on debts that they know to be time-

barred.  Finally, debt collectors often file affidavits or otherwise provide testimony during litigation that is false and misleading.

### A. Debt collectors file collection suits without the intent or ability to prove claims if contested.

To begin, debt collectors often file suit to collect debt without the intent or ability to prove the claims if contested, as is alleged by the CFPB in this case.  JA394-95 (¶¶ 80, 82).  This tactic arises in a variety of contexts, but perhaps most consistently when the debt has been purchased by another entity, as here.  As this court has recognized, the traditional model of debt collection—where "creditors simply hire debt collectors to serve their named role"—has largely been displaced by a system where "creditors sell debt to purchasers, who may again resell the debt, hire outside debt collectors to undertake collection efforts, or attempt to collect on their own."  *Tepper v. Amos Fin., LLC*, 898 F.3d 364, 366 (3d Cir. 2018).

The modern debt purchasing industry packages and sells portfolios of consumer debt "as assets for entities whose primary

business is collecting those debts."[3]  Original creditors sell these debts
to debt purchasers for "pennies on the dollar" because the debts "have
been deemed uncollectable by the original creditor."[4]  A debt purchasing
entity's primary goal is thus to "collect on a sufficient number of debts
to generate a profit."[5]  And by purchasing high volumes of uncollectable
consumer debt, debt purchasing entities "make a profit by collecting at
least a small percentage of those accounts."[6]

Indeed, when debts are sold, the purchasers "frequently obtain[]
only an electronic spreadsheet with minimal information about the
debts."[7]  These spreadsheets often contain "substantial deficiencies in
the quality and quantity of information," and they are typically not

---

[3]  Mary Spector, *Litigating Consumer Debt Collection:  A Study*, 31
Banking & Financial Services Policy Report 1 (Jan. 2012).

[4]  *Id.*; *see also* Robert M. Hunt, *Collecting Consumer Debt in
America,* Fed. Res. Bank of Phila. Bus. Rev. 11, 15 (2007) (estimating
the average price for purchase of an obsolete debt at $0.045 per dollar).

[5]  Note, *Improving Relief From Abusive Debt Collection Practices*, 127
Harv. L. Rev. 1447, 1449 (2014).

[6]  Rachel Terp, East Bay Cmty. Law Ctr., *Past Due:  Why Debt
Collection Practices and the Debt Buying Industry Need Reform Now* 3
(2011).

[7]  Nat'l Consumer Law Ctr., Fact and Figures About Debt Collection
(Feb. 2018), https://bit.ly/3STIDiL.

accompanied by any supporting documentation, such as account statements or the terms and conditions of credit.[8] This problem is compounded by the fact that the purchases "undergo little review of creditor data to check for potential inaccuracies or unreliability."[9]

Instead, the purchasers seek to collect on the debt by bringing suit against the consumer, even where they lack "the underlying documentation" necessary to defend a claim or where they have not reviewed the relevant financial documents.[10] This approach is based on the "assumption that consumers often fail to show up to contest the case," and thus will not contest the accuracy and enforceability of the debt.[11] Indeed, the goal in filing suit with deficient documentation is to

---

[8] CFPB, *Small Business Review Panel for Debt Collector and Debt Buyer Rulemaking: Outline of Proposals Under Consideration and Alternatives Considered*, at 6 (July 27, 2016), https://bit.ly/3WlI2Jw; Fed. Trade Comm'n., *The Structure and Practices of the Debt Buying Industry*, at iii (2013), https://bit.ly/3TPxsJg.

[9] Cheryl R. Cooper, Congressional Research Service, The Debt Collection Market and Selected Policy Issues 13 (June 22, 2021), https://bit.ly/3TUEyMu.

[10] *Id.*

[11] *Improving Relief From Abusive Debt Collection Practices*, *supra* note 5, at 1149.

win a default judgment.[12]  And this strategy has proven successful, as "more than 70 percent of debt collection lawsuits" end "with default judgments for the plaintiff."[13]  Winning these judgments typically does not require debt purchasers to prove the underlying claims, and, in fact, "frequently requires little more than the name, address and alleged balance of the consumer[s]" to assert in the complaint.[14]

By way of one example, in 2008, a debt collection agency purchased a portfolio of consumer debt deemed uncollectable by the original creditor.  *Royal Fin. Grp., LLC v. Perkins*, 414 S.W.3d 501, 502 (Mo. Ct. App. 2013).  The portfolio consisted of a spreadsheet of delinquent debts that was missing information about "the lender, borrower, or amount of charges" on many of the debts.  *Id.*  Indeed, the debt collection agency lacked information, or any underlying documentation, on whether the debt at issue in this case was previously assigned or whether the debt was accurate, complete, and enforceable. *Id.* at 503.  The court ultimately levied sanctions and dismissed the debt

---

[12]  Cooper, *supra* note 9, at 13.

[13]  Rickard, *supra* note 2, at 2.

[14]  Terp, *supra* note 6, at 5.

collection action because the agency failed to demonstrate the ability to "actually prove the claim it filed." *Id.* at 506.

These tactics "exact heavy tolls on consumers."[15]  For the minority of consumers who succeed in defending against debt collection suits, they "may incur financial costs, loss of time, or other burdens in disputing the debt, providing information to the collector, retaining counsel, or complaining to government agencies."[16]  For those consumers subject to a default judgment, the amount owed is substantial, as courts "routinely order consumers to pay accrued interest as well as court fees, which together can exceed the original amount owed."[17]

Default judgments also open consumers to a host of collection methods unavailable during the pre-litigation process, such as wage garnishment.[18]  Under federal law, a creditor can garnish up to 25% of a

---

[15]  Rickard, *supra* note 2, at 2, 17.

[16]  CFPB, *supra* note 8, at 7.

[17]  Rickard, *supra* note 2, at 2.

[18]  CFPB, *supra* note 8, at 12.

consumer's paycheck.[19]  Instead of going "to pay for necessities such as rent, food, and child care," the money goes to pay old (and oftentimes unprovable) debt.[20]  As of 2019, the wages of "more than 4.5 million workers were garnished for consumer debts."[21]

Finally, the consequences of these and other unlawful debt collection practices are often felt by individuals in vulnerable communities who owe relatively small amounts of consumer debt.  Such debts often can be collected in "overburdened 'small claims courts,' where the state court formal rules of evidence typically do not apply."[22]  Indeed, those defaulting on debt "are disproportionately likely to be from low-income backgrounds and communities of color, older, single, and living in severe financial precarity."[23]  The Trusts' view of the law,

---

[19]  Nat'l Consumer Law Ctr., Wage Garnishment for Consumer Debts: Reforms Needed in the Current Crisis and Beyond (2020), https://bit.ly/3SSflkH.

[20]  *Id.*

[21]  *Id.*

[22]  Peter A. Holland, *The One Hundred Billion Dollar Problem in Small Claims Court:  Robo-Signing and Lack of Proof in Debt Buyer Cases*, 6 J. Bus. & Tech. L. 259, 261 (2011).

[23]  Student Borrower Protection Ctr., Beyond Fresh Start:  Addressing the Flaws of the Current Student Loan Collection System 9 (Aug. 2022), https://bit.ly/3h1aMaB; *see also, e.g.*, Breno Braga et al., Urb. Inst.,

if accepted, would render these communities more susceptible to these practices, and thus should be rejected.

## B.    Debt collection entities pursue time-barred debt.

In addition to pursuing claims without the requisite supporting materials, debt collectors also often pursue debts that are barred by the applicable state statutes of limitations, and thus not legally collectable. There are several approaches that these entities take when pursuing time-barred debt.  Here, the Trusts are alleged to have pursued time-barred debt by filing nearly 500 lawsuits "outside the applicable statute of limitations."  JA395 (¶86) (Compl.).  As the Ninth Circuit has recognized, this practice—bringing suit to collect on time-barred debt— "is patently unfair to the consumer."  *Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1133 (9th Cir. 2021); *see also, e.g.*, *Thompson v. Midland Funding, LLC*, 375 F. Supp. 3d 774, 781 (E.D. Ky. 2019).

---

Local Conditions and Debt in Collections 2 (June 2016) (defaulted debt more prevalent in areas with lower educational attainment and more African Americans and Latinos, and also "in neighborhoods with lower health insurance coverage, lower housing values and homeownership rates, more delinquent and underwater mortgages, higher unemployment rates, and lower household incomes").

As with the debt collection suits discussed above, *see supra* Section I.A., and for substantially the same reasons, "the vast majority of suits on time-barred debt will lead to default judgments, even though the debts are unenforceable, because 90% or more of consumers sued in these actions do not appear in court to defend." *Kaiser*, 989 F.3d at 1133 (internal quotations omitted). And "[e]ven the rare consumer who understands that the statute of limitations could be raised as a defense is likely to 'give in rather than fight the lawsuit because she must still expend energy and resources and subject herself to the embarrassment of going into court.'" *Id.* (quoting *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1079 (7th Cir. 2013)).

Another, similar strategy that debt collectors employ to pursue time-barred debt is to send letters to consumers that include offers to settle those debts. *E.g.*, *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 429-30 (3d Cir. 2018); *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679, 684 (7th Cir. 2017); *Daugherty v. Convergent Outsourcing, Inc.*, 836 F.3d 507, 513 (5th Cir. 2016). As many courts have recognized, use of "the words 'settlement' and 'settlement offer'" may mislead a consumer into thinking a collector could "legally enforce the

[time-barred] debt." *Tatis*, 822 F.3d at 430; *see also, e.g.*, *Buchanan v. Northland Grp., Inc.*, 776 F.3d 393, 395 (6th Cir. 2015); *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1021 (7th Cir. 2014).

These letters are improper for the additional reason that they lead "an unsophisticated debtor who cannot afford the settlement" to believe "that some payment is better than no payment." *Buchanan*, 776 F.3d at 399. But in this circumstance, that is not true, because, in many jurisdictions, partial repayment typically restarts the clock on an otherwise time-barred debt, making the remainder of the debt collectable—a point "almost assuredly not within the ken of most people." *Id.*

Employing a similar tactic, debt collection agencies will also send letters asking consumers to make a "down payment" on a time-barred debt. *E.g.*, *Pantoja*, 852 F.3d at 682. This offer achieves two purposes, neither of which is proper. First, "[o]nly the rarest consumer-debtor will recognize" that making any down payment will waive an "otherwise absolute defense under the statute of limitations." *Id.* at 684. Second, the offer to settle gives "the impression that" debt collectors have "only chosen not to sue, not that [they are] legally barred from doing so." *Id.*

15

at 686. "The only reason to use such carefully ambiguous language is the expectation that at least some unsophisticated debtors will misunderstand and will choose to pay on the ancient, time-barred debts because they fear the consequences of not doing so." *Id.* at 687.

States have uncovered a number of debt collection schemes to improperly pursue time-barred debt in recent years. For instance, the Washington Attorney General investigated a collection agency that sent more than 80,000 letters to Washingtonians making "settlement offers" on debt that was time-barred under the State's six-year statute of limitations.[24] In 2021, the agency agreed to a nationwide injunction prohibiting it from using the words "settle" or "settlement offer" when pursuing time-barred debts and paid more than $1.6 million, much of which went to restitution for the harmed consumers.[25] That same year, the Massachusetts Attorney General settled for $2.25 million with a

---

[24] Press Release, *AG Ferguson:  Renton-based Debt Collector Will Pay More Than $1.6 Million Over Deceptive Letters* (Sept. 8, 2021), https://bit.ly/3FzDj14.

[25] *Id.*

national debt collection company that similarly attempted to collect on time-barred debt in violation of state law.[26]

In short, given the serious repercussions of pursuing time-barred debt in court or through improper settlement demands—including entry of default judgment or reviving debt that would otherwise be time-barred—a decision insulating entities like the Trusts from liability under the CFPA would harm consumers.

### C.    Debt collectors submit false or misleading affidavits and testimony.

Once debt collection actions are filed, debt collectors often engage in further misconduct by submitting affidavits that are false or misleading, or that are improperly notarized, as is alleged here.  JA391-93 (¶¶ 51-70).  There are several ways in which affidavits can be false or misleading in this context.  As discussed, *see supra* Section I.A., some debt collectors proceed with collections actions even though they lack complete information about the amount or nature of the debt at issue.

---

[26]  Press Release, *AG Healey Secures $2.25 Million From National Debt Collection Company for Misleading and Harassing Students, Borrowers, and Low-Income Consumers* (Sept. 7, 2021), https://bit.ly/3No7mL5.

And as support for those actions, they submit affidavits attesting to information that they do not have in their possession.[27]

Another way in which debt collection entities create false or misleading affidavits is by robo-signing, a practice where employees sign hundreds or thousands of affidavits each day.[28]  In other words, they sign affidavits "so quickly that they could not possibly have verified the information in the document under review."[29]  According to a study of debt collection practices in New York, for example, a single individual identified himself as the "custodian of records" for three companies, "and provided an affidavit in support of every default judgment sought by these three companies, swearing that he had 'personal knowledge of the facts' of each case."[30]  If true, that would mean that the "affiant would have signed 47,503 affidavits in the year

---

[27]  Holland, *supra* note 22, at 261-63.

[28]  *Id.* at 261.

[29]  *Id.*

[30]  Claudia Wilner & Nasoan Sheftel-Gomes, Neighborhood Econ. Dev. Advocacy Project, et al., *Debt Deception:  How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers*, 14 (2010), https://bit.ly/3fq5NQ3.

2007 alone, claiming to have personal knowledge of the facts of each and every one of these cases."[31]

Former employees of debt collection agencies have spoken out about these practices. For instance, one employee reported signing "an affidavit on average every 13 seconds," and another "admitted to signing 4,000 documents per day as officer of—on average—5 different banks per day."[32] Likewise, in *Midland Funding LLC v. Brent*, 644 F. Supp. 2d 961 (N.D. Ohio 2009), the court catalogued evidence of employees admitting to signing between 200-400 affidavits a day in support of collections petitions. *Id.* at 966-67. As the court explained, although the employees in that case had the ability to verify the underlying information in a computer database prior to signing the affidavits, the cases in which that would occur were "very few and far between." *Id.* at 967 (internal quotations omitted). Based on this evidence and the sheer number of affidavits signed each day, the court recognized that the affiants did not and could not have had personal

---

[31] *Id.*

[32] Holland, *supra* 22, at 269.

knowledge of the information contained in those affidavits,

notwithstanding their attestations to the contrary.  *Id.* at 967-69.

Finally, federal and state regulators have uncovered similar

practices during investigations of debt collection entities.[33]  In 2015, for

example, the CFPB, 47 States, and the District of Columbia

investigated JPMorgan Chase for widespread credit card debt collection

abuses.  The parties ultimately entered into a stipulated judgment

providing $50 million to consumers nationwide to resolve these

allegations of misconduct.[34]  California's investigation of these acts and

practices showed that in California alone, the company filed more than

125,000 collections lawsuits based on "illegally robo-signed sworn

documents" and submitted "false declarations regarding military

---

[33] *E.g.*, Press Release, *Attorney General Hunter Announces Oklahoma Victims of Debt Collector's Robo-Signing Scheme to Receive More than $320,000 in Credit*, https://bit.ly/3DMlpqp (multistate coalition reached nationwide settlement with a debt collection company for signing and filing "affidavits to collect consumer debt without verifying the information contained in the affidavits").

[34] CFPB, *47 States and D.C. Take Action Against JPMorgan Chase for Selling Bad Credit Card Debt and Robo-Signing Court Documents* (Jul. 8, 2015), https://bit.ly/3zwvKUX; Press Release, *Attorney General Kamala D. Harris Announces Settlement with JPMorgan Chase for Unlawful Debt-Collection Practices* (Nov. 2, 2015), https://bit.ly/3TSGdlU.

service" to obtain "default judgments against servicemembers on active duty."[35]

Likewise, in 2020 the New York Attorney General settled with a debt collection company that "developed and implemented an aggressive strategy" to collect defaulted debt that relied heavily on false information on behalf of the Trusts here, including by filing suits that "falsely identified" the original creditor, creating false documents about the debts for the purpose of litigation, and submitting sworn affidavits by employees who falsely asserted they "had personal knowledge of certain business records when, in fact, they lacked such knowledge."[36] These practices harmed consumers in many ways, such as by hindering their "ability to defend themselves by disguising who they were being sued by and on which loans."[37]

In sum, there is a substantial amount of unlawful conduct taking place in the debt collection industry, and those misdeeds inflict untold

---

[35] Press Release, *supra* note 34.

[36] Press Release, *Attorney General James Stops Debt Collection Company from Unlawful Practices Harming Thousands of Student Borrowers* (Sept. 14, 2020), bit.ly/3htgJNI.

[37] *Id.*

harm on consumers across the country. Constraining the CFPB's continued ability to curtail those abuses, as the Trusts suggest, would result in even more harm to these consumers, many of whom represent vulnerable communities.

## II.    Predatory Debt Collection Practices Are Exacerbated By Debt Purchasing Entities Like The Trusts.

As explained, the Trusts are alleged to have engaged in unlawful debt collection practices that affected tens of thousands of consumers across the country. JA382. Nevertheless, they argue that the CFPA does not apply to them because of a purported distinction between debt purchasers that attempt to collect debt on their own and those that hire third parties to collect, which they denote as "passive" entities. *See* Trusts Br. 19-21. But as the CFPB explains, this self-characterization does not "establish that, as a matter of law, the Trusts cannot engage in debt collection." CFPB Br. 20. On the contrary, the Trusts—which file collections lawsuits and enter into contracts with third parties to collect debt—engage in debt collection under the Act. *See* CFPB Br. 19-24.

In addition to being flawed as a matter of law, there is likewise no basis to draw that distinction as a functional matter. Instead, the risk of harm to consumers when their debts are sold to debt purchasers is

greater when a "passive" debt purchaser (i.e., a debt purchaser that relies on third party agents for collections) is involved.  And in recognition of these dangers, many States, including some of the amici States, have investigated, brought enforcement actions against, and regulated entities like the Trusts for their role in unlawful debt collection practices aimed at their residents.  Just as those States have not distinguished between debt purchasers that perform their own collections activities, on the one hand, and entities like the Trusts that rely on agents, on the other, there is no reason to believe that Congress would have drawn such a counterintuitive distinction in regulating the debt collection industry.

To start, debt entities like the Trusts are as harmful, if not more so, than debt purchasers that collect on their own debts.  By purchasing debts at a high volume, debt purchasing entities can choose to contract with third-party debt collectors as a "cost-efficient" alternative to collecting on the delinquent debt themselves, as the Trusts have done here.[38]  Whereas small creditors may find it "impractical or inefficient" to collect on small sums of delinquent consumer debt, debt purchasers

---

[38]  FTC, *Structure and Practices*, *supra* note 8, at 11; Trusts Br. 19-21.

can afford third party collection services because of the reduced price for the purchase of delinquent debt.[39]  The misconduct discussed above, *see supra* Section I, is thus compounded where, as here, an original creditor sells a delinquent debt to a debt purchaser, who then outsources to yet another debt collector, often years down the line.

Furthermore, debt purchasing entities like the Trusts, which are designed to profit from collection, "lack market incentives that deter the sort of abusive debt collection practices" at issue here.  *McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1095 (9th Cir. 2020).  This is because "consumer choice provides little, if any, constraint on the behavior of collectors."[40]  While a consumer can exercise choice with regard to an original creditor, "when a consumer does default, that consumer has no alternative but to deal with whatever collector the debt owner has chosen."[41]  But by holding the debt owners accountable for their choice, the law incentivizes debt owners to choose a law-abiding debt collector.

---

[39]  FTC, *Structure and Practices, supra* note 8, at 11-12.

[40]  CFPB, *Small Business Review Panel, supra* note 8, at 1.

[41]  *Id.*

And as this court observed, "[u]nlike a traditional creditor, such as a bank or a retail outlet that has its own incentive to cultivate good will among its customers and for which debt collection is one of perhaps many parts of its business, an independent debt collector . . . has only one need for consumers:  for them to pay their debts." *Barbato v. Greystone Alliance, LLC*, 916 F.3d 260, 268-69 (3d Cir. 2019).  Debt purchasers thus "face greater financial pressure to cut corners" than original creditors.  *McAdory*, 952 F.3d at 1095 n.3.

These observations by courts and commentators are consistent with the amici States' experience with debt purchasing entities that are structured like the Trusts.  The Massachusetts Attorney General, for example, opened an investigation into a debt purchaser and its subsidiary after receiving hundreds of consumer complaints about their improper debt collection practices.[42]  The investigation uncovered an aggressive debt collection strategy that included "demanding consumers pay debts that the company could not substantiate; misleading

---

[42]  Press Release, *AG Healey Secures $4 Million from National Debt Buyer to Pay Back Consumers Harmed by Abusive Debt Collection Practices* (Nov. 11, 2019), https://bit.ly/3gXkXNp.

consumers about protections for exempt sources of income; and routinely failing to verify the accuracy of consumer information it reported to credit reporting agencies."[43]  These tactics "were particularly harmful to low-income, elderly, and disabled consumers," especially those who relied on "exempt sources of income such as social security, social security disability, and supplemental security income."[44] Indeed, consumers with exempt sources of income reported that the company pressured them "to pay money they should have been entitled to keep."[45]

Similarly, in 2018, following a six-year investigation, a 43-state coalition secured a settlement with debt-buyer Encore Capital Group Inc. and its subsidiary Midland Funding, LLC for unlawful debt collections practices.[46]  Encore Capital Group purchased large portfolios of consumer debt and outsourced collection to its subsidiaries.[47]  Like

---

[43]  *Id.*

[44]  *Id.*

[45]  *Id.*

[46]  Press Release, *Attorney General Announces $6 Million Settlement With Debt Buyer* (Dec. 4, 2018), https://bit.ly/3SUgMPz.

[47] Press Release, *Attorney General Alan Wilson announces South Carolina consumers have received more than $1.4 million as part of*

many other debt purchasing entities, Encore, through its subsidiaries, "illegally attempted to collect debts it had not verified through robo-signing and other illegal practices."[48] As part of the settlement, the coalition secured $6 million in restitution for consumers and prohibited Encore from continuing to engage in predatory practices.[49]

In addition to investigating debt purchasers and bringing enforcement actions against them, many States have enacted laws or promulgated regulations making clear that state-level prohibitions on unfair conduct in debt collection apply to debt purchasers, including entities like the Trusts. For example, in Minnesota, the term "collection agencies" is defined to include debt buyers, regardless of "whether the business collects the account, bill, or other indebtedness, hires a third party for collection, or hires an attorney for litigation related to the collection." Minn. Stat. Ann. § 332.31. And in Massachusetts, the term "creditor" is now defined as including "a buyer of delinquent debt who

---

*settlement in debt-buying case* (Apr. 18, 2019), https://bit.ly/3gS2Hop; Press Release, *AG Racine Announces Midland to Pay $6 Million for Illegal Debt Collection Practices*, https://bit.ly/3zyzYvn.

[48] Press Release, *supra* note 47.

[49] Press Release, *supra* note 46.

hires a third party or an attorney to collect such debt," in addition to "any person and his or her agents, servants, employees, or attorneys engaged in collecting a debt owed or alleged to be owed to him or her by a debtor." 940 Code Mass. Reg. § 7.03.

Likewise, Texas enacted a statute in 2019 that defines a "debt buyer" as "a person who purchases or otherwise acquires a consumer debt . . . regardless of whether the person collects the consumer debt" or "hires a third party to collect the consumer debt." Tex. Fin. Code Ann. § 392.307(a)(2). The statute also prohibits buyers from "directly or indirectly" filing suit after the expiration of the statute of limitations, protects consumers from reviving time-barred debt by making "a payment of the consumer debt," and requires debt buyers to attach a statutory notice to debt collection letters on time-barred debt explaining that the consumer will not be sued for that debt. *Id.* § 392.307(c)-(e).

For its part, North Carolina has addressed the problems discussed above by making clear that when a "collection agency is a debt buyer or acting on behalf of a debt buyer," it is prohibited from collecting or attempting to collect on debt where "the collection agency knows, or reasonably should know, that such collection is barred by the applicable

statute of limitations" or where the agency lacks "valid documentation that the debt buyer is the owner of the specific debt instrument or account at issue" or "reasonable verification of the amount of the debt allegedly owed by the debtor." N.C. Gen. Stat. Ann. § 58-70-115(4)-(5). Similarly, Maryland requires debt buyers "or a collector acting on behalf of a debt buyer" to possess, among other items, documentary proof of the existence of the debt, its terms and conditions, and the nature of the debt before filing suit against a consumer. Md. Code Ann., Cts. & Jud. Proc. § 5-1203(a).

The CFPA should be read consistent with these statutes—that is, to sweep in, rather than carve out, "passive" entities. Such an interpretation is consistent with the text of the Act, as the CFPB explains. *See* CFPB Br. 12-19. But, as discussed, it is also consistent with the consensus view among consumer-protection enforcers that there is no meaningful difference between a purchasing entity that hires debt collectors and an entity that collects its own debt. Indeed, courts in other jurisdictions, when similarly confronted with statutes that (like the Act) do not expressly distinguish between these categories

of entities, have had no difficulty holding that their statutes apply to entities like the Trusts.

For instance, the Court of Appeals of Maryland recently determined that the term "collection agency" under its consumer protection statute includes all "debt buyers who engaged directly or indirectly in the business of collecting consumer debt that they owned and that was in default when they acquired it." *LVNV Funding LLC v. Finch*, 463 Md. 586, 604 (Md. 2019).  In reaching this decision, the court expressly rejected the debt purchaser's argument that it should be exempted because it is a passive entity that "had no employees and did nothing more than turn accounts over to [a third party], which *was* a licensed collection agency."  *Id.* at 604-05 (emphasis in original).

Similarly, a 2019 Colorado court decision concluded that two trusts were "creditors" for purposes of the Colorado Uniform Consumer Credit Code, even though the trusts claimed to not be "involved in the collection of payments from Colorado consumers."  Order, *Meade v. Avant of Colorado, LLC*, No. 2017CV30377 (Colo. Dist. Ct. May 14, 2019).  According to the court, the trusts are creditors because they

receive income from the payments made by consumers, regardless of whether they collect that income directly. *Id.*

In short, debt purchasers like the Trusts that rely on third-party agents pose serious problems to consumers throughout the country, especially if left unregulated. The CFPB's decision to pursue claims against the Trusts is not only appropriate as a matter of law, *see* CFPB Br. 12-34, but also reflects the fact that as a practical matter, these debt purchasers are as problematic as debt purchasers that collect on their own debt. The Trusts' request to be treated differently because of their decision to hire third party agents to collect on the debts that they have purchased (and reap the profits on) should be rejected.

# CONCLUSION

For these reasons, this Court should affirm the order below.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
Sarah.Hunger@ilag.gov

ROB BONTA
*Attorney General*
*State of California*
300 South Spring St., Suite 1702
Los Angeles, CA 90013

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

KARL A. RACINE
*Attorney General*
*District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

HOLLY T. SHIKADA
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI 96813

LAWRENCE G. WASDEN
*Attorney General*
*State of Idaho*
700 W. Jefferson Street
Boise, ID 83720

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

MAURA HEALEY
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 MLK Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
*Attorney General*
*State of New Mexico*
Post Office Drawer 1508
Santa Fe, NM 87504

LETITIA JAMES
*Attorney General*
*State of New York*
The Capitol
Albany, NY 12224

JOSHUA H. STEIN
*Attorney General*
*State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
1125 Washington St. SE
Olympia, WA 98504

JASON S. MIYARES
*Attorney General*
*Commonwealth of Virginia*
202 North 9th Street
Richmond, VA 23219

JOSH KAUL
*Attorney General*
*State of Wisconsin*
P.O. Box 7857
Madison, Wisconsin 53707

November 14, 2022

# CERTIFICATE OF COMPLIANCE

1.      Pursuant to Third Circuit Local Appellate Rule 46.1(d), I certify that I am a member of the bar of this Court.

2.      I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,800 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  This brief complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

3.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that the text of the electronic copy of this brief is identical to the text in the paper copies of the brief.

4.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that a virus detection program was performed on this electronic brief and that no virus was detected.

/s/ Sarah A. Hunger
SARAH A. HUNGER

November 14, 2022

# CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2022, I electronically filed the foregoing Brief of Amici Curiae Illinois et al. with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger
SARAH A. HUNGER