No. 22-1864

In the

# United States Court of Appeals
## For the Third Circuit

———————————

Consumer Financial Protection Bureau,

*Plaintiff-Appellee,*

v.

National Collegiate Master Student Loan Trust, et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Delaware, Case No. 1:17-cv-1323
Honorable Stephanos Bibas

———————————

### JOINT REPLY BRIEF

———————————

Nicholas J. Giles
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

Francis J. Aul
McGuireWoods LLP
888 16th Street, N.W.
Suite 500
Washington, DC 20006

Jonathan Y. Ellis
McGuireWoods LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

*Counsel for Defendants-Appellants*
*(Additional Counsel Listed on Inside Cover)*

Allyson B. Baker
Meredith L. Boylan
Sameer P. Sheikh
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700
AllysonBaker@paulhastings.com

*Counsel for Intervenor-Appellant
Transworld Systems, Inc.*

Joshua Kipnees
George A. LoBiondo
PATTERSON BELKNAP WEBB &
    TYLER
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2838
jkipnees@pbwt.com

*Counsel for
Intervenor-Appellant
Ambac Assurance Corporation*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

ARGUMENT ....................................................................... 3

I.    THE TRUSTS ARE NOT "COVERED PERSONS" UNDER
      THE CFPA. .............................................................. 3

    A.    "Covered Persons" Are Only Those Entities Directly
            and Actively Involved in Offering or Providing a
            Consumer Financial Product or Service. ........................ 3

        1.    *The ordinary meaning of "engage" requires direct
                  and active involvement.* ............................... 3

        2.    *The CFPA's structure confirms the ordinary
                  meaning of the text.* .................................. 5

        3.    *The broader statutory context underscores
                  Congress's intent to target only specific entities for
                  enforcement.* .......................................... 7

        4.    *The CFPA's drafting history confirms that direct,
                  active involvement is required.* ....................... 8

    B.    The Trusts Do Not "Engage" in the "Offering or
            Providing" of Consumer Financial Products or Services. ..... 9

        1.    *The Trusts are not "engaged" in servicing student
                  loans by virtue of their purposes.* ................... 11

        2.    *The Trusts are not "engaged" in collecting debts by
                  virtue of collection suits brought in their names by
                  others.* .............................................. 13

        3.    *The Trusts are not "engaged" in servicing loans or
                  collecting debts by virtue of arranging for others to
                  do so.* ............................................... 14

II.  DISMISSAL IS ALSO WARRANTED TO REMEDY THE
     SEPARATION-OF-POWERS VIOLATION. ................................. 18

     A.  The Bureau's Decision To File This Enforcement
         Action, Not Its Decision To Amend the Complaint,
         Inflicted a "Here-And-Now Injury" on the Trusts. .............. 19

     B.  Because the Action Was Not Validly Ratified,
         Dismissal Is Required. ......................................... 22

     C.  *Collins* Does Not Apply. ...................................... 24

     D.  Even If *Collins* Applies, Dismissal Is Warranted................ 27

CONCLUSION ..................................................... 33

CERTIFICATE OF COMPLIANCE ...................................... 35

CERTIFICATE OF SERVICE.......................................... 36

# TABLE OF AUTHORITIES

**Page**

## Cases

*Advanced Disposal Services East, Inc. v. NLRB,*
820 F.3d 592 (3d Cir. 2016) ......................................................... 21, 22

*ALA, Inc. v. CCAIR, Inc.,*
29 F.3d 855 (3d Cir. 1994) .................................................................. 16

*Barbato v. Greystone Alliance, LLC,*
916 F.3d 260 (3d Cir. 2019) ................................................................ 17

*CFPB v. Access Funding, LLC,*
No. 16-3759, 2021 WL 2915118 (D. Md. July 12, 2021) ..................... 22

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ................................................................. *passim*

*Covington v. Int'l Ass'n of Approved Basketball Officials,*
710 F.3d 114 (3d Cir. 2013) ................................................................ 15

*FEC v. NRA Political Victory Fund,*
513 U.S. 88 (1994) .............................................................................. 22

*FEC v. NRA Political Victory Fund,*
6 F.3d 821 (D.C. Cir. 1993) ................................................................ 31

*Free Enterprise Fund v. Public Accounting Oversight Board,*
561 U.S. 477 (2010) ............................................................................ 30

*Garrett v. Wexford Health,*
938 F.3d 69 (3d Cir. 2019) ........................................................... 20, 21

*Henson v. Santander Consumer USA Inc.,*
137 S. Ct. 1718 (2017) .......................................................................... 7

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.,*
119 F.3d 1070 (3d Cir. 1997) ............................................................. 23

*United States ex rel. Landis v. Tailwind Sports Corp.*,
  98 F. Supp. 3d 8 (D.D.C. 2015) ...................................................... 13, 14

*Makell v. County of Nassau*,
  No. 19-6993, 2022 WL 1205096 (E.D.N.Y. Apr. 22, 2022) ................ 19

*Rop v. FHFA*,
  50 F.4th 562 (6th Cir. 2022) ................................................................. 33

*Seila Law LLC v. CFPB*,
  140 S. Ct. 2183 (2020) ..................................................... 18, 19, 25, 30

*Southwest Airlines Co. v. Saxon*,
  142 S. Ct. 1783 (2022) ...................................................................... 4, 9

*United States v. Morrison*,
  449 U.S. 361 (1981) ............................................................................. 24

*United States v. Nagarwala*,
  438 F. Supp. 3d 821 (E.D. Mich. 2020) ................................................ 5

*United States v. Nasir*,
  17 F.4th 459 (3d Cir. 2021) .................................................................. 6

*Vermont Agency of Nat. Resources v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) ............................................................................. 14

**Statutes**

12 U.S.C. § 5481(6) .................................................................... 3, 11

12 U.S.C. § 5511(a) .......................................................................... 6

15 U.S.C. § 45(a) .............................................................................. 7

15 U.S.C. § 1692 ............................................................................... 8

15 U.S.C. § 1692a(6) ................................................................... 8, 17

15 U.S.C. § 1692f ............................................................................. 8

31 U.S.C. § 3730(b) ......................................................................... 14

Del. Code tit. 12 § 3806 .............................................................. 12

**Rules**

Fed. R. Civ. P. 15(c) .................................................................. 21

Fed. R. Civ. P. 17(a) ................................................................. 13

**Other Authorities**

17 C.F.R. § 229.1101(c)(2)(ii) ..................................................... 10

*Asset-Backed Securities*,
  70 Fed. Reg. 1506 (Jan. 7, 2005) .......................................... 10

H.R. 4173, 11th Cong. § 4002(9)(A) (2009) ................................. 9

## INTRODUCTION

All consumer protection statutes are not equal.  Some (like the FTC Act) target a wide range of conduct and a broad swath of actors.  Others (like the FDCPA) are more circumspect, taking aim at particular industries and specific types of entities.  The CFPA's UDAAP provision is an example of the latter.  Yet the Bureau ignores its limitations and asks this Court to disregard its text.

In their opening brief, Appellants explained that the Trusts are not "covered persons" under the CFPA because, as passive securitization vehicles, they do not "engage" in offering or providing a consumer financial product or service.  To "engage" requires direct and active participation, which does not describe the Trusts' conduct here.  A plain reading of the statute, guided by traditional tools of interpretation, confirms this straightforward conclusion.

Tellingly, the Bureau's response scrupulously avoids engaging with the statutory text.  After assuring the Court the "covered person" provision is sufficiently "broad," the agency pivots quickly to policy.  In the process, it distances itself from the district court's reasoning.  Judge Bibas offered one (incorrect) reason the Trusts "engaged" in covered-

person activity—namely, that they contracted with covered entities. But the Bureau goes much further, offering three—only one of which even echoes the district court's logic. The result is a maximally expansive view of the agency's UDAAP authority irreconcilable with the CFPA.

Appellants also explained in their opening brief that this action alternatively should have been dismissed because the Bureau initiated it while unconstitutionally structured and failed to timely ratify its decision. This follows from a straightforward application of traditional remedial rules that the Bureau has consistently acknowledged, followed, and even advocated for.

In response, the Bureau argues for a change in the law. But its colorful language attacking Appellants' position as a "blinkered" exercise in "magical thinking" does not change the fact that *Collins v. Yellen*, 141 S. Ct. 1761 (2021)—its only authority—is readily distinguishable. When tailoring remedies to constitutional injuries, the nature of the executive action matters. To the Bureau, it is an afterthought. Unaccountable enforcement indisputably inflicts a "here-and-now injury." Yet the Bureau's view would shrink the prospect of relief to a virtual nullity. That has never been and is not the law.

2

This Court should reverse, and this case should be dismissed.

## ARGUMENT

## I.    THE TRUSTS ARE NOT "COVERED PERSONS" UNDER THE CFPA.

Traditional tools of statutory construction—text, structure, context, history—all demonstrate that the Trusts are not subject to the CFPB's UDAAP enforcement authority because they do not qualify as "covered persons" under the CFPA. Rather than engage meaningfully with those ordinary tools of construction, the Bureau offers little more than an assertion that the "covered persons" provision is "broad" enough, before pivoting to policy considerations. None of its arguments is persuasive.

### A.    "Covered Persons" Are Only Those Entities Directly and Actively Involved in Offering or Providing a Consumer Financial Product or Service.

#### 1.    *The ordinary meaning of "engage" requires direct and active involvement.*

"Covered persons" under the CFPA are only those entities that "engage[] in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6). The ordinary meaning of the term "engage" requires direct and active conduct. *See* Br. 24-26. As the Supreme Court put it just last Term, the "common meaning" of "engage" is "direct[]

3

involve[ment]." *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788-89 (2022).

The Bureau's principal rejoinder (at 16-17) is the conclusory insistence that the ordinary meaning of "engage" is "broad" enough to encompass the Trusts. But this halfhearted attempt at statutory construction depends on a single authority and two dictionary definitions that do not support the Bureau's argument even on their face. The Bureau defines "engage" as "to take a part; to devote attention and effort; to employ one's self; to enlist; to carry on; to conduct; be busied; to occupy one's self"; "[t]o employ or involve oneself; to take part in; to embark on"; and "to begin and carry on an enterprise or activity" or "to do or take part in something." CFPB Br. 16. These definitions, the Bureau asserts, mean "one can engage in an activity without carrying out every part of the activity oneself." *Id.* at 17.

But the Bureau attacks a straw man. Appellants have never asserted that one must carry out "every part of [an] activity" to "engage" in it—only that one must actively participate in *some part of it*. And on this score, the Bureau's definitions undermine—rather than support— the agency's position. They are virtually indistinguishable from those

offered by Appellants and relied on by courts to require direct and active participation. *See* Br. 24-26. To "devote attention and effort," "employ one's self," "carry on," "conduct" or "bus[y]" oneself in offering a service is to be directly and actively involved in it. It involves, in short, "*doing* the activity," *United States v. Nagarwala*, 438 F. Supp. 3d 821, 826 (E.D. Mich. 2020), in a manner that the Trusts are not.

> 2. *The CFPA's structure confirms the ordinary meaning of the text.*

The structure of the CFPA confirms that Congress intended the ordinary meaning of "engage" to apply. Numerous, meticulously drafted definitions precisely identify the actors and entities whom the CFPA covers. The Bureau's kitchen-sink view of "covered person" would undermine this precision and subvert congressional design. *See* Br. 26-28.

The Bureau's response misfires again. The statutory "context," the Bureau claims (at 18), "shows that artificial persons . . . may nonetheless 'engage in' the offering or provision of a consumer financial product or service." Fair enough. But Appellants have never argued that only natural persons are subject to the Bureau's UDAAP enforcement authority. Rather, we pointed out that Congress specifically enumerated

when natural persons or artificial entities fall within the CFPB's UDAAP enforcement authority, and passive securitization vehicles like the Trusts do not fit the bill.

The Bureau incorrectly argues (at 25) that Congress's choice to carefully define the categories of persons subject to the agency's UDAAP enforcement authority does not "evince an intent to *exclude*" persons who do not fall into those categories. Of course it does. "As a familiar canon of construction states, *expressio unius est exclusio alterius*: the expression of one thing is the exclusion of the other." *United States v. Nasir*, 17 F.4th 459, 471-72 (3d Cir. 2021) (en banc). That canon applies with full force here.

Finally, the Bureau and its *amici* retreat to policy arguments. "Engage" must be read broadly, the agency asserts, because Congress "meant to, and did, empower the Bureau to effectively protect consumers" from UDAAP violations. CFPB Br. 18-19. And the Bureau insists that if the Trusts do not qualify as covered persons, the Bureau cannot "enforce Federal consumer financial law consistently" or effectively. *Id.* (quoting 12 U.S.C. § 5511(a)); *see* SBPC Amici Br. 10-11; States Amici Br. 6-31. Those concerns are misplaced. To start, the Bureau later claims—

6

*in the same brief* (at 33-34)—the government's ability to pursue the Trusts under either the FTCA or the FDCPA.  And although the Bureau purports to be concerned about pursuing only "minions" with "limited assets," *id.* at 19, it provides no reason to conclude that adhering to the text of the CFPA actually has impeded its effectiveness, or would.  *See* Br. 38-39.  Nor does it disavow any ability to recover funds from relief defendants not subject to direct liability.  *See* Br. 39.

In any event, policy arguments are not statutory interpretation. "[I]t is of course [the courts'] job to apply faithfully the law Congress has written." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017).

> **3.**    *The broader statutory context underscores Congress's intent to target only specific entities for enforcement.*

Appellants' straightforward reading of the CFPA's "covered person" provision finds further support from federal consumer protection laws more generally.

Congress knows how to confer wide-ranging authority in this area. It did so with the FTCA, which reaches all "persons, partnerships, or corporations," with limited and express exceptions.  15 U.S.C. § 45(a)(1)-(2).  It also knows how to target particular types of entities, as it did with

the FDCPA, which homes in on "debt collector[s]," as carefully defined and circumscribed. 15 U.S.C. § 1692, 1692a(6), 1692f. Congress adopted an even more targeted approach at defining the entities subject to the CFPB's UDAAP enforcement authority. The Bureau's expansive interpretation would undermine that judgment.

The Bureau never addresses this argument head on. The agency cites both the FTCA and the FDCPA (CFPB Br. 33), but only for the proposition that, in its view, both statutes—along with the CFPA—*also* reach the Trusts. Nowhere does the agency grapple with (or even consider) the stark differences in statutory language, or what they reveal about each statute's reach. *Cf.* CFPB Br. 26 (dismissing the "different statutory language" in the FDCPA as irrelevant). On the Bureau's telling, Congress legislates to the hilt or not at all. But the differences in the text and structure of FTCA, FDCPA, and CFPA tell a much different story. *See* Br. 29-31. This Court should not ignore it.

4.    *The CFPA's drafting history confirms that direct, active involvement is required.*

Finally, the CFPA's drafting history lends further support to the conclusion that the Trusts are not covered persons. Congress considered a version of the statute that would have reached "any person who engages

*directly or indirectly* in . . . the provision of a consumer financial product or service." H.R. 4173, 11th Cong. § 4002(9)(A) (2009). But the final version emerged narrowed, with the phrase "directly or indirectly" omitted. The deletion of this expansive language confirms that Congress did not intend "engage" to reach actors who only indirectly participate in consumer financial services. *See* Br. 31-33.

The Bureau argues (at 28) that to restrict "engage" to direct involvement, Congress would have had to retain the word "directly" in the statute. But the Supreme Court disagrees. As it recently observed, the concept of *direct* involvement is baked into the word "engage" itself. *See Saxon*, 142 S. Ct. at 1789. By removing the "directly or indirectly" modifier and thus retreating from broader language, Congress settled on that plain and ordinary meaning.

**B.    The Trusts Do Not "Engage" in the "Offering or Providing" of Consumer Financial Products or Services.**

Under a proper understanding of the statute, the Trusts are not "covered persons." As passive securitization vehicles, they do not "engage" in the offering or provision of any relevant consumer financial products or services. Instead, through a series of transactions that the

Bureau all but ignores, the Trusts granted "all rights, powers and options" to an "independent contractor"—one "not subject to the supervision of the Trusts"—who went on to hire the subservicers that serviced and collected the defaulted debt at issue. JA230, 322-25, 328, 336, 476; *see* Br. 9-14. None of the Bureau's allegations or arguments plausibly demonstrates otherwise.

As an initial matter, the Bureau's professed confusion (at 20) regarding passive securitization vehicles rings hollow. Not only have Appellants and their *amici* adequately explained the term (*see* Br. 8; SIFMA Amici Br. 3-6; SFA Amicus Br. 6-13), but sources of which the Bureau is undoubtedly aware make clear this is no novel concept. *See Asset-Backed Securities*, 70 Fed. Reg. 1506, 1511 (Jan. 7, 2005) ("[T]here is essentially no business or management . . . of the issuing entity, which is designed to be a solely passive entity."); 17 C.F.R. § 229.1101(c)(2)(ii).

The Bureau's complaint (at 24) of "incoherence" in Appellants' description of such passive entities is likewise misplaced. Of course Appellants recognize that the Trusts can enter contracts and otherwise accomplish certain objectives "through others." *Id.* The question is whether the Trusts—which accomplish those objectives *only* through

others—"engage" in offering or providing the relevant financial services. The Bureau insists the answer is yes, offering three principal arguments why. Even the district court endorsed only one of the three. But each simply restates the agency's policy preference and finds support only in a flawed understanding of the statutory text.[1]

> 1.    *The Trusts are not "engaged" in servicing student loans by virtue of their purposes.*

The Bureau first claims the Trusts "engage in" loan servicing and debt collection because, under the Trust Agreement, the "*purpose* of the Trust is to engage in" certain activities, including "'to provide for . . . the servicing of the Student Loans.'" CFPB Br. 13 (quoting JA107) (emphasis added); *see* SBPC Amici Br. 4-10. But the CFPA defines a "covered person" by its *actions—i.e.*, by the conduct it "engages in," 12 U.S.C. § 5481(6)—not by its *purpose*.

In all events, the referenced provision of the Trust Agreement articulates the Trusts' purpose to "engage in" only those activities necessary for *others* to provide the relevant financial services. The

---

[1] As the Bureau concedes (at 31), whether the Trusts are covered persons is a "separate issue" from "whether the Trusts violated the CFPA or can be held liable for others' violations." *See* Br. 35 n.5.

Trusts' purposes include, for example, "acquir[ing]" the student loans, "execut[ing]" the Indenture Agreement and secured notes, and "enter[ing] into . . . Trust Related Agreements." JA107. Importantly, however, with regard to servicing, the Trusts' purpose is only to "*provide for* the . . . servicing of the Student Loans," JA107 (emphasis added), not to themselves service the loans. And the Indenture Agreement's provision stating that the Trusts will *not* engage in any "business" outside of those defined purposes, or in any "manner" not contemplated by the governing documents, obviously does not establish that the Trusts do more than the Trust Agreement provides. JA182; *cf.* CFPB Br. 17.

Delaware law, under which the Trusts were created, supports Appellants' reading. A statutory trust's governing instruments must "provide for the establishment of designated series of trustees [and] beneficial owners," while stating a "business purpose or investment objective." Del. Code tit. 12 § 3806(b)(2). But it falls to the trustees and "other persons" designated in those instruments to conduct the trust's "business and affairs." *Id.* § 3806(a). The Trusts' stated "purpose," therefore, simply does not establish which entities engaged in which activities.

> **2.    The Trusts are not "engaged" in collecting debts by virtue of collection suits brought in their names by others.**

Next, the Bureau claims (at 13-16) that the Trusts engage in the collection of student-loan debt because they appear as named plaintiffs in collections suits brought by the subservicers.  But while the Bureau assures this Court that "the Trusts themselves press these collection suits" (CFPB Br. 14), this is pure legal conclusion.  The Bureau points to no factual allegations in this regard, offering instead its own conjecture about what the borrowers "would naturally understand" and its own interpretation of what level of participation model ethics rules require.  *Id.* at 14-15.  That is insufficient to show active participation in the suits.

All these collection suits reveal is that the actions were brought in the Trusts' name—with good reason as an "action must be prosecuted in the name of the real party in interest."  Fed. R. Civ. P. 17(a).  That does not mean the Trusts themselves press the suits.  As the governing instruments demonstrate—and the Bureau eventually acknowledges (at 15)—they do not.  The suits are brought by the subservicers.  A real party in interest need not control litigation.  And if it does not, it cannot be said to be directly engaged in those efforts.

Consider, for example, *qui tam* suits in which the United States declines to intervene. *See, e.g.*, 31 U.S.C. § 3730(b) ("private persons" may "bring a civil action . . . in the name of the Government"). Those suits are brought in the United States' name, but the United States neither presses nor participates in them. *See United States ex rel. Landis v. Tailwind Sports Corp.*, 98 F. Supp. 3d 8, 11 (D.D.C. 2015) ("the United States is a real party in interest even if it does not control the False Claims Act suit [or] guide[] the litigation"). Similar to the Trusts' appointment of others to sue in their name, the False Claim Act's *qui tam* provisions are "a partial assignment of the Government's damages claim." *Vermont Agency of Nat. Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). But in neither instance is the nominal plaintiff "engaged in" the litigation. And the attorneys prosecuting the collection suits are thus no more the Trusts' agents than a relator's attorneys are agents of the United States.

    3.    *The Trusts are not "engaged" in servicing loans or collecting debts by virtue of arranging for others to do so.*

At last, the Bureau reasserts (at 28) the only rationale offered by the district court: that the Trusts "engage" in offering or providing consumer financial services when they "arrang[e] for others to help them"

14

do so.  *See* CFPB Br. 15-16.  Even here, the agency declines to embrace the district court's reasoning in full.    While the district court conspicuously refused to find that any of the relevant actors were the Trusts' agents, the Bureau insists that the loan servicers qualify.  *Id.* at 16, 30-31.  But even if agency principles provided the relevant standard, the Bureau's reliance on those principles encounters a problem of its own making.  Nothing in the complaint or incorporated agreements—beyond the Bureau's *ipse dixit*—establishes such a relationship.  *See* Br. 35-38.

Indeed, the incorporated agreements demonstrate precisely the opposite.  An agency relationship requires that the principal "control[] and direct[] the acts of the agent."  *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 120 (3d Cir. 2013).  In the relevant trust documents, however, the Trusts have expressly disclaimed the right to control—and in many cases, to even *select*—the various servicers and subservices that service the loans at issue.  *See* Br. 36.  For this reason, the law of agency is no refuge for the Bureau.

The Bureau urges (at 31) the Court to look past the "language in the servicing contracts" because it "do[es] not control the factual issue of whether the servicers acted as agents."  But whether the servicers acted

as agents of the Trusts is a legal conclusion, not a factual allegation that must be credited. And that legal conclusion rests on whether the Trusts had the right to control the servicers' conduct. None of the Bureau's allegations establish that the Trusts possess such control. And even if the Court might otherwise credit the Bureau's conclusory assertions of agency at the motion-to-dismiss stage, the contrary language of the incorporated agreements makes that inappropriate here. *See ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994).

Finally, the Bureau falls back, like the district court, on this Court's decision in *Barbato*. But, as explained, that decision strongly supports our view of the case, not the Bureau's. To be sure, as the district court stated, *Barbato* held that "a 'passive debt owner' counted as a 'debt collector' under the [FDCPA] when it contracted with a third party to collect debt on its behalf." JA9. But that is only because the Court relied on the "principal purpose" prong of the definition of "debt collector" in the FDCPA that has no analogue in the CFPA. *See* Br. 37-38.

In its response, the Bureau doubles down. It claims "indirect support" from *Barbato*'s holding "that an entity whose 'principal purpose' is debt collection 'cannot avoid the dictates of the FDCPA merely by

hiring a third party to do its collecting.'"  CFPB Br. 26 (quoting *Barbato v. Greystone Alliance, LLC*, 916 F.3d 260, 262 (3d Cir. 2019)).  But neither those words ("principal purpose") nor that concept appears anywhere in the CFPA's definition of "covered person," which looks only to what an entity *does*.  The Bureau simply ignores that critical distinction.  Contrary to the Bureau's remarkable suggestion (at 26), "differen[ces in] statutory language" *do* matter for a question of statutory interpretation.

The Bureau further suggests (at 27) that the debt owner in *Barbato* would also have qualified as a "debt collector" under the "regularly collects" prong if it had contracted for the collection of debts it did not own.  No such conclusion appears in *Barbato* itself, however, and despite the Bureau's heated rhetoric, it is not at all clear how, even if true, that would be relevant.  Indeed, if true, it would only be because the "regularly collects" prong of the FDCPA's "debt collector" definition reaches those who collect debts "directly *or indirectly*."  15 U.S.C. § 1692a(6) (emphasis added).  As *Barbato* explained in words the Bureau should heed: "the 'directly or indirectly' qualification is necessary because one could reasonably interpret 'collect' to refer to only direct efforts to collect—it is, after all, a verb that requires action."  916 F.3d at 268.  As discussed,

such a "directly or indirectly" qualifier was intentionally omitted from the CFPA's "covered person" definition.

## II.  DISMISSAL IS ALSO WARRANTED TO REMEDY THE SEPARATION-OF-POWERS VIOLATION.[2]

The district court also erred by failing to dismiss this action as a remedy for the acknowledged separation-of-powers violation.  Director Cordray initiated this enforcement action while unconstitutionally insulated from presidential supervision.  That inflicted "a 'here-and-now' injury" on the Trusts that must be "remedied."  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020).  While the Bureau tried to cure that injury by ratifying Director Cordray's decision following *Seila Law*, that ratification came too late.  Dismissal is therefore the only available and appropriate remedy left.  *See* Br. 40-67.

In response, the Bureau does not suggest that it prevails under that remedial framework.  It argues instead that the framework does not apply—first by recasting the Trusts' injury to its own benefit, and next by asserting that *Collins v. Yellen*, *supra*, fundamentally altered the law. Neither argument is persuasive.

---

[2] Transworld continues to take no position on this question.

**A.    The Bureau's Decision To File This Enforcement Action, Not Its Decision To Amend the Complaint, Inflicted a "Here-And-Now Injury" on the Trusts.**

When an unaccountable officer initiates an enforcement action, he inflicts "a 'here-and-now' injury" on the targeted defendant. *Seila Law*, 140 S. Ct. at 2196. It is that action that the Trusts challenge and that injury for which they seek redress. The Bureau cannot dodge that challenge by insisting the Trusts actually challenge the agency's decision to file an "amended complaint." CFPB Br. 35. That is pure fiction. The Trusts have always asserted—consistent with what the law provides— that the Bureau's decision *to initiate this action* inflicted the injury that now demands a remedy. *See* Br. 40, 43-44, 46, 57-58. The decision to amend cannot simply erase the injury that was inflicted "there-and-then" when the action was filed.

That the original complaint is a procedural "nullity," CFPB Br. 35, does not change matters. As one court has cautioned, "[t]he original complaint is a nullity only regarding the determination of whether the amended complaint states a plausible claim." *Makell v. County of Nassau*, No. 19-6993, 2022 WL 1205096, at *3 (E.D.N.Y. Apr. 22, 2022). "It continues to have force and effect for all other purposes." *Id.*

In particular, the circumstances of the action's initiation—*e.g.*, when it was filed and by whom—remain unaltered by amendment. Indeed, the timeliness of the Bureau's amended complaint *depends* on them. When the amended complaint was filed in April 2021, the three-year statute of limitations had long since run on its claims. *See* Br. 50-51. As the Bureau recognizes (at 35-36), the only way the amended complaint could be timely is if it related back to the date of the original filing. At base then, the Bureau asks this Court to act as if *nothing* occurred prior to the filing of the amended complaint, while at the same time asking to preserve the legal fiction that the amended complaint was filed in 2017. The Bureau cannot have it both ways.

*Garrett v. Wexford Health*, 938 F.3d 69 (3d Cir. 2019), is not to the contrary. There, this Court held that the Prison Litigation Reform Act (PLRA) did not require a plaintiff who was no longer a prisoner to satisfy the PLRA's exhaustion requirements before filing an amended complaint. "It has long been the rule," this Court observed, "that where a party's status determines a statute's applicability . . . his status at the time of the amendment . . . determines whether a statutory precondition to suit has been satisfied." *Id.* at 82. But this is not a case under the PLRA nor

any other statute with a "precondition to suit." *Id.* *Garrett* says nothing about when an enforcement action inflicts constitutional injury, or when or how that injury is remedied.

Far from reflecting "common sense" (CFPB Br. 37), the Bureau's position would effectively create a new remedy (amendment) for the unconstitutional initiation of an enforcement action—in addition to ratification or dismissal. Appellants are unaware of any case that has endorsed this theory. The Bureau cites to none. And recognizing such a novel remedy would circumvent the requirements of ratification for enforcement actions. Ratification requires that the principal "*still have the authority to take the action to be ratified.*" *Advanced Disposal Services East, Inc. v. NLRB*, 820 F.3d 592, 602 (3d Cir. 2016) (emphasis added); *see* Br. 50-51. The relation back doctrine, however, operates in precisely the opposite manner, *excusing* a plaintiff's expired authority by allowing an amended pleading to relate back where the same "conduct, transaction, or occurrence" is at issue. Fed. R. Civ. P. 15(c). This Court should reject the Bureau's transparent effort to avoid the untimely nature of its failed attempt to ratify.

## B.    Because the Action Was Not Validly Ratified, Dismissal Is Required.

The remedy for the Trusts' "here-and-now injury" in this case is dismissal unless the agency validly ratified the suit's initiation. And because the Bureau's attempt at ratification came more than three years after it discovered the Trusts' alleged violations, the Bureau's attempted ratification was invalid. *See* Br. 49-53; *see, e.g.*, *CFPB v. Access Funding, LLC*, No. 16-3759, 2021 WL 2915118, at *16 (D. Md. July 12, 2021) (considering "whether [the Article II] defect has been cured by ratification or whether dismissal is required" instead).

The Bureau does not contend that it ratified within the three-year limitations period. Instead, it argues (at 52-53) that its ratification was somehow valid because it "satisfied the limitations provision" at the *outset* of the case. But that simply is not how ratification works. As the Supreme Court and this Court has explained, effective ratification requires the authority to take the ratified action *at the time of ratification*. *See FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994); *Advanced Disposal*, 820 F.3d at 602.

The Bureau wrongly urges this Court (at 53) to ignore what the Supreme Court said in *NRA Political Victory Fund* about ratification

principles (and presumably what this Court said in *Advanced Disposal*) because those cases "concerned an action . . . that no entity with proper authority took before the applicable deadline" and this one, the Bureau says, does not. The Bureau fails to explain why or how that alters the general principles articulated in those cases. It does not, as evidenced by the many courts that have articulated the exact same ratification principles on facts virtually indistinguishable from those presented here. *See, e.g.*, Br. 46-48 (collecting cases). And whatever the import of *Collins* on this case, *see infra*, that case said absolutely nothing about the elements of valid ratification, when required.

In a last-ditch effort, the Bureau argues (at 53 n.8) that its ratification should be considered timely via equitable tolling. But the agency's footnote does little more than assert its conclusion and fails entirely to respond to Appellants' arguments (Br. 52-53) why tolling cannot apply. The short shrift the Bureau gives the argument is thus not enough to preserve it. *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived[.]").

In any event, the tolling argument fails. Most critically, while the Bureau assures this Court it acted diligently, it does not explain why it did nothing to gird against the constitutional challenge it should have known was coming. As Appellants pointed out (Br. 53), Acting Director Mulvaney prophylactically ratified at least three pending enforcement actions during his tenure—all *before* the Supreme Court's decision in *Seila Law*. But this case was not among them—something the Bureau fails even to acknowledge, let alone justify.

### C.    *Collins* Does Not Apply.

*Collins* does not dictate a different result. Constitutional injuries require tailored remedies. *See United States v. Morrison*, 449 U.S. 361, 364 (1981). Distinct injuries, it follows, may demand distinct remedies. *Collins* should not be read, therefore, to change the remedial landscape for injuries fundamentally different than those that were before the Court. *See* Br. 53-60. Relying on nonbinding decisions from other courts, the Bureau dismisses (at 47) Appellants' three distinctions of *Collins* as failing to "hold water." But the Bureau misapprehends our arguments. And to the extent other courts have similarly misread *Collins*, this Court should not follow them.

First, while the Bureau acknowledges (at 47) that *Collins* was not a government enforcement action, it disregards that fact as irrelevant because the *Collins* plaintiffs were suing for "billions of dollars" and considered the executive action "significant." That misses the point. What matters is that the Bureau's "enforcement authority," which "includes the power to seek daunting monetary penalties . . . in federal court," is "a quintessentially executive power," *Seila Law*, 140 S. Ct. at 2200, in a way that acting as a conservator of a government-sponsored entity is not.

When an officer targets and trains executive power on a single series of entities (as here), the impact is fundamentally different than when an officer causes dividends to be transferred against the wishes of a handful of private investors (as in *Collins*). Both may seem "significant" to the parties (CFPB Br. 47), but they are different manifestations of executive power and need not be remedied in the same way.

Second, the Bureau dismisses the fact that the agency action at the core of *Collins*—the adoption of the third amendment—was initiated by an acting director not subject to an invalid removal provision. But the Bureau again misconstrues (or at least misunderstands) Appellants'

argument.  Appellants do not claim that *Collins* is "inapplicable to agency actions" (CFPB Br. 48) initiated by an unconstitutionally insulated official.  Instead, we contend that the appropriate remedy for actions impermissibly taken to *implement* a validly initiated agency policy (as in *Collins*) may not be the same as the appropriate remedy for the impermissible *initiation* of agency action (as here).  Voiding entirely a generally applicable third amendment that was constitutionally adopted (even if unconstitutionally implemented) would in no way be tailored to the constitutional harm suffered by the *Collins* plaintiffs.  By contrast, dismissing without prejudice a single enforcement action that was unconstitutionally initiated against the Trusts is precisely tailored to the harm suffered by the Trusts here.

Third, the Bureau asks this Court to ignore the differences—highlighted by Appellants (*see* Br. 59-60)—between the relief sought in *Collins* and here.  But in doing so the Bureau just falls back on a truism.  *Collins* should be read broadly, the agency urges, because "if the Court had meant to limit *Collins* to its facts, it would have said so."  CFPB Br. 49.  It is neither the Supreme Court's obligation nor its practice to delineate every instance in which different facts may (or may not) counsel

a different result.  And in any event, Appellants are not seeking to "limit *Collins* to its facts."  *Id.*  Rather, Appellants observe that *Collins* rejected the plaintiffs' unprecedented sweeping request to undo the transfer of billions of dollars between governmental entities without any showing of harm to the individual plaintiffs.  Here, by contrast, the Trusts seek only a well-settled remedy to address the injury caused by an enforcement action directed specifically against them.

### D.    Even If *Collins* Applies, Dismissal Is Warranted.

Finally, dismissal is warranted even under *Collins* because the Trusts suffered the "harm" articulated by the *Collins* Court.  Specifically, President Trump expressed his desire to remove Cordray as Director but for the removal provision held unconstitutional in *Seila Law*.  Cordray then went on to initiate this action against the Trusts.  Under *Collins*, that is enough to "clearly" show "harm" warranting retrospective relief.  *See* Br. 60-67.

The Bureau urges this Court (at 39, 42, 45) to ignore the majority opinion in *Collins*—dismissing critical language as a mere "stylized example"—and to rely instead on Justice Kagan's partial concurrence, as well as other decisions not binding on this Court.  Like the district court,

the Bureau contends (at 42) that *Collins* requires a party to show that "the removal provision was a but-for cause of its harm" to warrant relief. And it insists (at 39-40) that the Trusts cannot make that showing where successive directors after Cordray did not abandon this action. Neither contention has any basis in *Collins* and both would essentially foreclose any retrospective relief—if not *all* relief—for removal violations. *See* Br. 62-67.

*Collins* nowhere conditions relief on proving that the agency action was abandoned as soon as constitutional accountability was restored. And with good sense, as there are plenty of reasons a properly accountable agency head, who would not have *initiated* an action, may still choose not to *abandon* it midstream. There is a difference, in other words, between singling out an entity for enforcement and opting against voluntary dismissal.

Moreover, while the Bureau touts that Director Kraninger and Acting Director Uejio chose to continue this action four and five years after it had commenced, it ignores again that Acting Director Mulvaney chose *not* to ratify its initiation (even while he ratified the initiation of other suits) shortly after it was filed, when such a choice would have been

legally relevant.  In the face of that choice, there is no basis to conclude that the initiation of the suit was "clear[ly] . . . consistent with the policy preferences" of the President.  CFPB Br. 40.

The Bureau is no more successful in defending its version of "but for" causation.  The Bureau insists (at 42) that but-for causation is the "traditional" way to show compensable harm and so *must have* been what the *Collins* Court intended.  But the Trusts have plainly satisfied the traditional showing of causation for its harm.  The Trusts challenge the initiation of an enforcement suit by an executive official unconstitutionally unaccountable to the President and seek its dismissal. That challenged action is indisputably the "but for" cause of both a "here-and-now injury" that the Supreme Court has repeatedly recognized and additional tangible harm the Trusts have incurred in defending against the Bureau's claims.

The Bureau would demand more.  It insists the Trusts prove that, but for Congress's enactment of the unconstitutional removal restriction, the unaccountable Director would not have initiated this action.  As it recognized in *Seila Law*, the Supreme Court has never required a litigant challenging agency conduct on the basis of a removal restriction to prove

"that the Government's course of conduct would have been different in a 'counterfactual world.'" 140 S. Ct. at 2196 (quoting *Free Enterprise Fund v. Public Accounting Oversight Board*, 561 U.S. 477, 512 n.12 (2010)). *Collins* did not do so either.

Nowhere in *Collins* does the Court mandate proof that the agency action would not have been brought but for the removal restriction. Instead, the Court reasoned that, if, as here, a party can identify a public statement from the President "expressing displeasure with actions"—not the challenged action—"taken by a Director" and "assert[ing] that he would remove the Director if the statute did not stand in the way," it would have identified harm warranting relief. *Collins*, 141 S. Ct. at 1789. That makes sense. A challenge to subsequent agency action in those circumstances is not meaningfully different than a challenge to actions taken by officers who were never lawfully appointed in the first place. Either way, the officer would not possess executive authority if not for the unconstitutional provision. And *Collins* holds that relief is warranted in either case.

Under the Bureau's overreading of *Collins*, by contrast, virtually no litigant would be able to secure retrospective relief for removal violations.

The task of proving what an agency would have done "but for" the faulty provision is simply too daunting. After all, what litigant could hope to recover if he must prove that *the President* publicly expressed displeasure *with his individual case*? As Appellants pointed out, this would undermine *sub silentio* two pillars of the Court's Article II jurisprudence—its promise of standing for Article II injuries and its stated aim to create incentives to seek their redress. *See* Br. 63-65.

Indeed, under the CFPB's theory, even the litigant who first challenged an unconstitutional removal restriction in a motion to dismiss an enforcement action would not be entitled to dismissal—*i.e.*, the only relief available as a defendant—unless it could show that the enforcement action would not have been brought by a properly accountable officer. That cannot be right. *See FEC v. NRA Political Victory Fund*, 6 F.3d 821, 828 (D.C. Cir. 1993).

The Bureau fails to respond to these concerns. Instead, it raises a feeble one of its own. According to the Bureau (at 43-44), the Trusts' approach would require a court to dismiss an enforcement action even if the President had expressly confirmed his desire that the suit continue. But this alarm is utterly misplaced. Appellants argue only that a litigant

raising a meritorious separation-of-powers challenge to agency action should not be required to make the all-but-impossible counterfactual showing that the particular challenged action would not have been taken but for the unconstitutional provision. Appellants have never argued that, should the agency make the equally unlikely opposite showing, a court would nevertheless be required to invalidate the presidentially approved action. A federal court in that instance, with the discretion to tailor a remedy to the violation, could reasonably conclude that dismissal was not warranted.

In any case, there is not a shred of evidence that President Trump publicly endorsed this action. Had he done so, perhaps it would have been among those that Mulvaney ratified during his tenure as Acting Director. Such a ratification would have been timely, and under this Court's precedent would have cured the constitutional injury that attended Director Cordray's unaccountable initiation of this suit. That is the path that courts have paved through Article II issues like this one

for decades.  Only now, when the Bureau failed to ratify in a timely fashion, does it suddenly "make[] no sense."  CFPB Br. 44.[3]

## CONCLUSION

For the foregoing reasons, the district court's order should be reversed.

Dated: December 28, 2022

Respectfully submitted,

*/s/ Jonathan Y. Ellis*
N.C. Bar No. 41220

Nicholas J. Giles
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

Francis J. Aul
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Washington, D.C. 20006

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville St.
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

*Counsel for Defendants-Appellants*

---

[3] In the alternative, this Court should remand for the district court to take up the question whether the Trusts suffered "harm" under *Collins*. *See* Br. 67; *e.g.*, *Rop v. FHFA*, 50 F.4th 562, 564 (6th Cir. 2022).

<u>/s/ Allyson B. Baker</u>
Allyson B. Baker
Meredith L. Boylan
Sameer P. Sheikh
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700
AllysonBaker@paulhastings.com

*Counsel for Intervenor-Appellant*
*Transworld Systems, Inc.*

<u>/s/ Joshua Kipnees</u>
Joshua Kipnees
George A. LoBiondo
PATTERSON BELKNAP WEBB &
  TYLER
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2838
jkipnees@pbwt.com

*Counsel for*
*Intervenor-Appellant*
*Ambac Assurance Corporation*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because:

- This brief contains 6,483 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Century Schoolbook font using Microsoft Word.

The text of the electronic brief is identical to the text in the paper copies.

At least one of the attorneys whose names appear on this brief is a member of the bar of this Court.

The electronic version of this brief has been scanned for viruses using CrowdStrike Falcon Sensor, Version 6.40.15406.0, and no virus was detected.

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2022, the foregoing was filed with the Clerk of the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system, which will also serve counsel of record.

/s/ Jonathan Y. Ellis
Jonathan Y. Ellis