

1700 G Street NW, Washington, D.C. 20552

March 27, 2023

**<u>Via CM/ECF</u>**

Patricia S. Dodszuweit, Clerk of Court
United States Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

    Re:   *CFPB v. National Collegiate Master Student Loan Trust*, No. 22-1864 – Rule 28(j) Citation of Supplemental Authority

Dear Ms. Dodszuweit:

    The Bureau writes concerning new authority relevant to the Defendant-Trusts' claim that this public enforcement action should be dismissed because of an inoperative statutory removal provision. *See* Opening Br. at 40-67

    The Second Circuit rejected that argument in *CFPB v. Law Offices of Crystal Moroney, P.C.*, 2023 WL 2604254 (Mar. 23, 2023) (attached). It held that under *Collins v. Yellen*, 141 S. Ct. 1761 (2021), parties seeking "to void an agency action due to an unconstitutional removal protection … must show that the agency action would not have been taken *but for* the President's inability to remove the agency head." 2023 WL 2604254, at *3. It found that the respondent could not make that showing where the Bureau had pursued the case under "three different CFPB Directors appointed by two different presidents, each of whom has been subject to at-will removal." *Id.* The court did not find it necessary to address ratification. *See id.* at *2.

    In so ruling, the Second Circuit joined the Fifth, Sixth, Ninth, and Tenth Circuits in rejecting similar arguments, *see* Bureau Br. at 48, 51, and it expressly agreed with Judge Bibas's analysis in this case, *see* 2023 WL 2604254, at *3.

consumerfinance.gov

The Second Circuit's decision is also contrary to the Trusts' recent suggestion that this Court might delay resolution of the Trusts' appeal until the Supreme Court decides a different issue—not raised here—in *CFPB v. CFSA*, No. 22-448 (cert. granted Feb. 27, 2023). *See* ECF No. 94 (Trusts' letter about *CFSA*); *see also* ECF No. 95 (Bureau's response). The Second Circuit did not wait to see whether or how the Supreme Court might apply *Collins* in addressing the funding challenge in *CFSA* before it could apply *Collins*'s express remedial holding in rejecting the respondent's removal-provision challenge. It did not even wait before rejecting the funding challenge raised in *CFSA* and affirming that the Bureau's funding "is proper under the Appropriations Clause," *see* 2023 WL 2604254, at *4-6.

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-9268
kevin.friedl@cfpb.gov

cc:  Counsel of Record

2023 WL 2604254
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

CONSUMER FINANCIAL PROTECTION
BUREAU, Petitioner-Appellee,
v.
LAW OFFICES OF CRYSTAL
MORONEY, P.C., Respondent-Appellant.[*]

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

No. 20-3471

August Term 2021

Argued: January 18, 2022

Decided: March 23, 2023

Appeal from the United States District Court for the Southern District of New York, No. 20-cv-3240, Kenneth M. Karas, *Judge*.

**Attorneys and Law Firms**

Richard A. Samp (Michael P. DeGrandis, Jared McClain, on the brief), New Civil Liberties Alliance, Washington, DC, for Respondent-Appellant.

Kevin E. Friedl, Senior Counsel (Stephen Van Meter, Acting General Counsel; John R. Coleman, Deputy General Counsel; Steven Y. Bressler, Assistant General Counsel, on the brief), Consumer Financial Protection Bureau, Washington, DC, for Petitioner-Appellee.

Before: Kearse, Walker, and Sullivan, Circuit Judges.

**Opinion**

Richard J. Sullivan, Circuit Judge:

**\*1** Respondent-Appellant the Law Offices of Crystal Moroney ("Moroney") is a law firm that principally provides legal advice and services to clients seeking to collect debt. As the agency charged with regulating this industry, the Consumer Financial Protection Bureau ("CFPB") served on Moroney a civil investigative demand ("CID") for documents, which it subsequently petitioned to enforce in the district court. While that petition was pending, the Supreme Court issued its opinion in *Seila Law LLC v. CFPB*, ––– U.S. ––––, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020), holding that the provision that protected the Director of the CFPB from removal other than for cause was an unconstitutional limitation on the President's removal power. Concerned about the validity of its enforcement action following *Seila Law*, the CFPB filed a notice to ratify the CID and the enforcement action against Moroney. The district court (Karas, *J*.) ultimately granted the CFPB's petition to enforce the CID.

On appeal, Moroney argues that the CID cannot be enforced because (1) the CID was void *ab initio* under *Seila Law*, as the CFPB Director was shielded from presidential oversight by an unconstitutional removal provision at the time the CID was issued; (2) the funding structure of the CFPB violates the Appropriations Clause of Article I of the Constitution; (3) Congress violated the nondelegation doctrine when it created the CFPB's funding structure; and (4) the CID is an unduly burdensome administrative subpoena. We hold that the CID was not void *ab initio* because the CFPB Director was validly appointed, that the CFPB's funding structure is not constitutionally infirm under either the Appropriations Clause or the nondelegation doctrine, and that the CID served on Moroney is not an unduly burdensome administrative subpoena. Accordingly, we **AFFIRM** the order of the district court enforcing the CID.

**I. BACKGROUND**

In 2010, in response to the 2008 financial crisis, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010). Title X of that statute, the Consumer Financial Protection Act ("CFPA"), created the CFPB to consolidate the regulation of consumer financial products and services in a single agency. *See* CFPA, 124 Stat. at 1955–2113; S. Rep. No. 111-176, at 10–11 (2010). Among other responsibilities, the CFPB is charged with enforcing federal laws involving debt-collection practices.

The CFPB is funded through its enabling statute rather than Congress's annual appropriations. Congress authorized the CFPB to draw funds from the combined earnings of the Federal Reserve System – of which the CFPB is formally a part – up to a specified cap. *See* 12 U.S.C. § 5497(a). Since

2013, that cap has been set at twelve percent of the Federal Reserve System's 2009 operating expenses, adjusted annually to account for increases in labor costs. *Id*. § 5497(a)(2)(A)–(B). Congress also authorized the CFPB to seek additional funding through the annual appropriations process. *See id*. § 5497(e).

**\*2** The CFPB is headed by a single director who is appointed by the President, with the advice and consent of the Senate, for a five-year term. *See id*. § 5491. Originally, the President could only remove the CFPB Director for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). But in *Seila Law LLC v. CFPB*, ––– U.S. ––––, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020), the Supreme Court held that this removal restriction impeded the President's Article II executive authority and therefore violated the separation of powers. *See id*. at 2197. Because the Supreme Court determined that the removal provision was severable from the rest of the CFPA, the Supreme Court held that the CFPB could continue to operate with a Director who is removable by the President at will. *See id*. at 2211.

Like many law-enforcement agencies, the CFPB is authorized to issue administrative subpoenas known as civil investigative demands, or CIDs, in aid of its investigations. *See* 12 U.S.C. § 5562(c). The CFPB's regulations permit individuals and entities that receive CIDs to negotiate appropriate modifications to CIDs through a meet-and-confer process with CFPB staff. *See* 12 C.F.R. § 1080.6(c). The CFPB's rules further set out a procedure, similar to that used in ordinary civil discovery, by which CID recipients can assert claims of attorney-client privilege by providing the CFPB with a schedule of the withheld documents. *See* 12 C.F.R. § 1080.8. The CFPB may file a petition in district court to enforce compliance with a CID. 12 U.S.C. § 5562(e); 12 C.F.R. § 1080.10.

In June 2017, the CFPB issued a CID to Moroney. In compliance with the 2017 CID, Moroney produced thousands of pages of documents and other data but withheld a subset of documents, claiming that producing those documents would compromise its ethical obligations to its clients. In November 2019, after the meet-and-confer process proved futile, the CFPB sought to enforce the 2017 CID in district court. Just four days before the scheduled hearing, however, the CFPB withdrew the CID, and the district court denied the petition to enforce as moot. Shortly thereafter, the CFPB issued a second CID, demanding substantially similar documents and information as the 2017 CID. In April 2020, the CFPB moved to enforce the 2019 CID in district court. While the petition was pending, the Supreme Court issued its opinion in *Seila Law*. Apparently concerned about the validity of its enforcement actions in the wake of *Seila Law*, the CFPB filed a Notice of Ratification purporting to ratify the 2019 CID and the enforcement action. In August 2020, the district court granted the CFPB's petition to enforce the 2019 CID. Moroney filed a timely notice of appeal.

On appeal, Moroney argues that the CID cannot be enforced because (1) the CID was void *ab initio* under *Seila Law*, as the CFPB Director was shielded from presidential oversight by an unconstitutional removal protection at the time the CID was issued; (2) the funding structure of the CFPB violates the Appropriations Clause of Article I of the Constitution; (3) Congress violated the nondelegation doctrine when it created the CFPB's funding structure; and (4) the CID is an unduly burdensome administrative subpoena. We address each argument in turn.

## II. DISCUSSION

### A. The CID Was Not Void *Ab Initio*.

Moroney argues that the CID was void *ab initio* because, when the CID was issued, the CFPB Director was shielded by an unconstitutional removal provision. This argument is foreclosed by the Supreme Court's decision in *Collins v. Yellen*, ––– U.S. ––––, 141 S. Ct. 1761, 210 L.Ed.2d 432 (2021).

*Collins*, like *Seila Law*, concerned an independent agency that was headed by a single director who was protected from at-will presidential removal. *See id*. at 1771. In *Collins*, the Supreme Court held that under "[a] straightforward application of [its] reasoning in *Seila Law*," the removal restriction violated the separation-of-powers doctrine. *Id*. at 1784. The Supreme Court then excluded certain relief as inappropriate for an invalid removal restriction. It held that the relevant inquiry for determining whether an officer "lacked constitutional authority and that [her] actions were therefore void *ab initio*" is whether the officer "in question [was] properly *appointed*," not whether she was properly *removable*. *Id*. at 1787. Because "there was no constitutional defect in the statutorily prescribed method of appointment to that office," the Supreme Court held that "there is no reason to regard any of the actions taken by [the properly-appointed officer] as void." *Id*.; *see also Calcutt v. FDIC*, 37 F.4th 293, 311–17 (6th Cir. 2022), *mandate stayed pending petition for*

*writ of certiorari*, ––– U.S. ––––, ––––, ––– S.Ct. ––––, 213 L.Ed.2d 1157 (2022); *CFPB v. CashCall, Inc.*, 35 F.4th 734, 742 (9th Cir. 2022). Nevertheless, the Supreme Court left open the possibility that a party could be entitled to relief if it could show that "an unconstitutional provision ... inflict[ed] compensable harm" on the petitioner. *Collins*, 141 S. Ct. at 1789.

**\*3** In the wake of *Seila Law* and *Collins*, courts have disagreed as to how one could make such a showing. One view is that *Collins* requires a party to "show that the agency action would not have been taken *but for* the President's inability to remove the agency head." *CFPB v. Nat'l Collegiate Master Student Loan Tr.*, 575 F. Supp. 3d 505, 508 (D. Del. 2021) (emphasis added); *see also Calcutt*, 37 F.4th at 316 ("To invalidate an agency action due to a removal violation, that constitutional infirmity must *cause harm* to the challenging party" (emphasis added) (internal quotation marks omitted)); *CashCall*, 35 F.4th at 742 ("[T]he party challenging an agency's past actions must ... show how the unconstitutional removal provision *actually harmed* the party." (internal quotation marks omitted)). A less demanding view is that *Collins* merely requires a party to show that "the President's inability to fire an agency head *affected* the complained-of decision." *CFPB v. RD Legal Funding, LLC*, 592 F. Supp. 3d 258, 266 (S.D.N.Y. 2022) (emphasis added) (internal quotation marks omitted). According to this view, *Collins* requires only *some* nexus between the existence of the unlawful removal provision and the complained-of enforcement action. Unfortunately, the *Collins* majority opinion did not pronounce a definitive holding on this point. *See Collins*, 141 S. Ct. at 1788–89. But Justice Kagan, writing for herself, Justice Breyer, and Justice Sotomayor, did provide some helpful guidance.

Specifically, Justice Kagan "join[ed] in full the majority's discussion of the proper remedy" in *Collins* and, in so doing, suggested that a party seeking to void an agency action must first show but-for causation linking an unconstitutional removal protection to the complained-of agency action. *Id.* at 1801 (Kagan, J., concurring). According to Justice Kagan, an agency action should be undone only when voiding the agency's action is "needed to restore the [complaining party] to the position [it] 'would have occupied in the absence' of the removal problem." *Id.* (Kagan, J., concurring) (quoting *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)). Justice Kagan explained that "[g]ranting relief in any other case would, contrary to usual remedial principles, put the [complaining party] 'in a better position' than if no constitutional violation had occurred." *Id.* (Kagan, J., concurring) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

We find Justice Kagan's logic to be persuasive. Requiring but-for causation in these cases properly matches the constitutional injury to the requested remedy. *See id*. at 1789 (Thomas, J., concurring) ("[T]o the extent a [g]overnment action violates the Constitution, the remedy should fit the injury."). Such a requirement is also consistent with long-established remedial principles articulated by the Supreme Court and our own precedents, *see Mt. Healthy*, 429 U.S. at 285–87, 97 S.Ct. 568; *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) ("[T]he nature of the [constitutional] violation determines the scope of the remedy."); *United States v. City of Yonkers*, 197 F.3d 41, 55 (2d Cir. 1999) ("[T]he nature of the ... remedy is to be determined by the nature and scope of the constitutional violation." (quoting *Milliken*, 433 U.S. at 280, 97 S.Ct. 2749)). We therefore hold that to void an agency action due to an unconstitutional removal protection, a party must show that the agency action would not have been taken *but for* the President's inability to remove the agency head.

In this case, there is no dispute that the CFPB Director who issued the CID was properly appointed. And Moroney does not even argue that the Director would not have issued the CID but for the unconstitutional removal provision. Nor could it. The investigation into Moroney has spanned the tenures of five CFPB Directors appointed by three different Presidents, and all but the first were at some point subject to at-will removal. Since the CID was issued, there have been three different CFPB Directors appointed by two different presidents, each of whom has been subject to at-will removal at some point in their tenure. There is nothing to suggest that the Director's removal protection affected the issuance of the CID or the investigation into Moroney.

**\*4** Moroney contends that *Collins* is distinguishable because it concerned retrospective relief (disgorgement of funds), whereas this case involves prospective relief (production of withheld documents). We decline to read *Collins* so narrowly. The petitioners' only "live claim" before the Supreme Court in *Collins* was for retrospective relief, and so that is all the Supreme Court addressed. *Collins*, 141 S. Ct. at 1787. But the Supreme Court's reasoning that an officer's actions are valid so long as she was validly appointed applies with equal force regardless of the relief sought by the

party challenging the officer's actions. *See Calcutt*, 37 F.4th at 316 ("[W]hether an unconstitutional removal protection inflicted harm remains the same whether the petitioner seeks retrospective or prospective relief." (internal quotation marks omitted)). Moroney's distinction between this case and *Collins* therefore does not make a difference.

**B. The CFPB's Funding Structure Is Proper Under the Appropriations Clause.**

Moroney next contends that the CID is not enforceable because the CFPB's funding structure violates the Appropriations Clause of the Constitution. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Clause "was intended as a restriction upon the disbursing authority of the Executive department" and "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321, 57 S.Ct. 764, 81 L.Ed. 1122 (1937). "[I]n other words, the payment of money from the Treasury must be authorized by a statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). There can be no dispute that the CFPB's funding structure was authorized by the CFPA – a statute passed by Congress and signed into law by the President. *See* 124 Stat. at 1955–2113.

Nevertheless, Moroney argues that the CFPB's funding structure violates the Appropriations Clause because the Executive Branch "decides how much funding is 'reasonably necessary' to carry out the agency's mission, without any meaningful guidance, limitation, or control by the Legislative Branch." Moroney Br. at 21. As a threshold matter, Moroney cites no support for a "meaningful guidance" test under the Appropriations Clause. *Cf. Cincinnati Soap*, 301 U.S. at 321, 57 S.Ct. 764 ("The contention ... that any attempted appropriation is bad, because the particular uses to which the appropriated money are to be put have not been specified, is without merit."). But, in any event, Moroney's statement is simply an inaccurate description of how the CFPB is funded.

In enacting the CFPA, Congress provided that "[f]unds obtained by, transferred to, or credited to the [CFPB] ... shall remain available until expended[ ] to pay the expenses of the [CFPB] in carrying out its duties and responsibilities." 12 U.S.C. § 5497(c)(1). Congress also limited the amount of funding the CFPB can draw from the Federal Reserve System to – at most – twelve percent of the Federal Reserve System's 2009 Operating Expenses with adjustments for increases in labor costs. *Id.* § 5497(a)(2)(A)–(B). To receive funding in addition to the twelve-percent limit, the CFPB must seek Congressional appropriations through the annual appropriations process. *Id.* § 5497(e). Because the CFPB's funding structure was authorized by Congress and bound by specific statutory provisions, we find that the CFPB's funding structure does not offend the Appropriations Clause.

**C. We Decline to Follow the Fifth Circuit's Decision in *Community Financial Services Association of America, Ltd. v. CFPB*.**

Our colleagues on the Fifth Circuit recently held that the CFPB's "funding apparatus cannot be reconciled with the Appropriations Clause and the [C]lause's underpinning, the constitutional separation of powers." *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB (CFSA)*, 51 F.4th 616, 642 (5th Cir. 2022), *cert. granted sub nom. CFPB v. Com. Fin. Services Ass'n*, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2023 WL 2227658, No. 22-448 (Feb. 27, 2023). Specifically, the Fifth Circuit concluded that Congress "cede[d] *direct* control over the [CFPB]'s budget by insulating it from annual or other time limited appropriations" and "ceded *indirect control* by providing that [the CFPB]'s self-determined funding be drawn from a source that is itself outside the appropriations process," namely, the Federal Reserve System. *Id.* at 638–39. This structure, according to the Fifth Circuit, constitutes "a double insulation from Congress's purse strings," *id.* at 639, which runs "afoul of the separation of powers embodied in the Appropriations Clause," *id.* at 640. We respectfully disagree.

**\*5** As a threshold matter, we cannot find any support for the Fifth Circuit's conclusion in Supreme Court precedent. To the contrary, the Court has consistently interpreted the Appropriations Clause to mean simply that "the payment of money from the Treasury must be *authorized by a statute.*" *Richmond*, 496 U.S. at 424, 110 S.Ct. 2465 (emphasis added); *see also Cincinnati Soap*, 301 U.S. at 321, 57 S.Ct. 764 ("[The Appropriations Clause] means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."); *Knote v. United States*, 95 U.S. 149, 154, 24 L.Ed. 442 (1877); *Republic Nat. Bank of Miami v. United States*, 506 U.S. 80, 94–95, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992); *Maine Cmty. Health Options v. United States*, —— U.S. ——, 140 S. Ct. 1308, 1319–20, 206 L.Ed.2d 764 (2020). We are not aware of any Supreme Court decision holding (or even suggesting) that the Appropriations Clause requires more than this "straightforward and explicit

command." *Richmond*, 496 U.S. at 424, 110 S.Ct. 2465. Here, Congress expressly appropriated the CFPB's funding by enacting the CFPA, *see* 124 Stat. at 1955–2113, and we are "not at liberty to depart from binding Supreme Court precedent, 'unless and until the [Supreme] Court reinterprets' [such] precedent" itself. *OneSimpleLoan v. U.S. Sec'y of Educ.*, 496 F.3d 197, 208 (2d Cir. 2007) (quoting *Agostini v. Felton*, 521 U.S. 203, 238, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)) (alterations omitted).

We likewise find no support for the Fifth Circuit's reasoning in the Constitution's text. The Appropriations Clause states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Nothing in the Constitution, however, requires that agency appropriations be "time limited" or that appropriated funds be drawn from a particular "source." *CFSA*, 51 F.4th at 639. Certainly, "if the Framers of the Constitution had thought it necessary to" impose these limits, "they would have" done so. *Clinton v. Jones*, 520 U.S. 681, 706, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997). Indeed, in the section preceding the Appropriations Clause, the Constitution expressly provides that "no Appropriation of Money" to raise and support an army "shall be for *a longer Term than two Years*." U.S. Const. art. I, § 8, cl. 12 (emphasis added). By "negative implication," the absence of any restrictions in the Appropriations Clause other than that Congress must authorize government funding in a prior statute "precludes the sort of implicit ... limit[s]" that the Fifth Circuit chose to impose in *CFSA*. *Jennings v. Rodriguez*, ––– U.S. ––––, 138 S. Ct. 830, 844, 200 L.Ed.2d 122 (2018); *see also* 1 Joseph Story, Commentaries on the Constitution of the United States § 625 (Edmund H. Bennett ed. 3d ed. 1858) ("It would seem but fair reasoning upon the plainest principles of interpretation, that when the [C]onstitution established certain qualifications, ... it meant to exclude all others.").

Nor do we find support for the Fifth Circuit's reasoning in the history of the Appropriations Clause. "The concept of appropriations as developed through the centuries in England and as adopted by the colonies encompassed dual limitations on both *amount* and *object*." Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1353 (1988) (emphasis added) (footnotes, internal quotation marks omitted). Consistent with this concept, "[t]he design of the Constitution in [the Appropriations Clause] was ... to secure ... that the *purpose*, the *limit*, and the *fund* of every expenditure should be ascertained by a previous law." 7 Alexander Hamilton, The Works of Alexander Hamilton 532 (John C. Hamilton ed. 1851) (hereinafter "Hamilton") (third emphasis added); *see also id.* ("[N]o money can be expended, but for an *object*, to an extent, and *out of a fund*, which the laws have prescribed").

Here, Congress prescribed the "*purpose*" (or "*object*"), "*limit*," and "*fund*" of its appropriation for the CFPB in the CFPA. Hamilton, at 532. As to the *purpose*, Congress specified five "objectives" for the CFPB, including that "(1) consumers are provided with timely and understandable information ... about financial transactions; (2) consumers are protected from unfair, deceptive, or abusive acts ... and from discrimination; (3) outdated, unnecessary, or unduly burdensome regulations are regularly identified and addressed ... ; (4) Federal consumer financial law is enforced consistently ... ; and (5) markets for consumer financial products and services operate transparently and efficiently." 12 U.S.C. § 5511(b)(1)–(5). With respect to the *fund* and *limit* of the appropriation, Congress directed the Board of Governors to "transfer to the [CFPB] *from the combined earnings of the Federal Reserve System* [an] amount determined by the [CFPB's] Director to be reasonably necessary to carry out [its] authorities," 12 U.S.C. § 5497(a)(1) (emphasis added), but which amount "*shall not exceed [twelve percent] of the total operating expenses of the Federal Reserve System*, as reported in the Annual Report, 2009, of the Board of Governors," *id.* § 5497(a)(2)(A) (emphasis added). Although such funding does not fall under the annual appropriations process typical of most Congressional spending, we cannot conclude that Congress "abdicate[d] [its appropriation] obligation entirely" in establishing the CFPB's funding structure. *CFSA*, 51 F.4th at 642 (quoting *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 241 (5th Cir. 2022) (Jones, J., concurring)). Consistent with the historical practices of English, colonial, and state governments that formed the basis of the Founders' understanding of the appropriations process at the time of the Constitution's enactment, Congress specified "the *purpose*, the *limit*, and the *fund*" of its appropriation for the CFPB in "a previous law," Hamilton, at 532 (emphasis added).

**\*6** For all these reasons, we respectfully decline to follow the Fifth Circuit's decision in *CFSA*.

### D. The CFPB's Funding Structure Is Proper Under the Nondelegation Doctrine.

Moroney next argues that, even if the CFPB's funding structure is proper under the Appropriations Clause, Congress violated the nondelegation doctrine in enacting the CFPA because it did not articulate an "intelligible principle"

circumscribing the President's discretion in appropriating funds. Moroney Br. at 22. Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation," and Congress "may not transfer to another branch powers which are strictly and exclusively legislative." *Gundy v. United States*, ––– U.S. ––––, 139 S. Ct. 2116, 2123, 204 L.Ed.2d 522 (2019) (internal quotation marks omitted). Nevertheless, Congress can "obtain[ ] the assistance of its coordinate Branches," including by empowering executive agencies. *Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The difference between an improper delegation of Congress's legislative powers and a proper delegation is whether Congress has "la[id] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928).[1]

1    In its history, the Supreme Court has found an improper delegation only twice – in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), and in *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Although a lively scholarly debate regarding the scope of the nondelegation doctrine has developed in recent years, *compare* Julian Davis Mortensen & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021), *with* Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490 (2021), "since 1935, the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards," *Gundy*, 139 S. Ct. at 2130–31 (Alito, J., concurring).

The CFPA states that the CFPB's budget is to be used to "pay the expenses of the [CFPB] in carrying out its duties and responsibilities." 12 U.S.C. § 5497(c)(1). The CFPA further explains that the purpose of the CFPB is to "seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." *Id.* § 5511(a). The CFPA goes on to list five "objectives" and six "primary functions" for the CFPB. *Id.* § 5511(b)–(c). Under the nondelegation doctrine's lenient standard, Congress has plainly provided an intelligible principle to guide the CFPB in setting and spending its budget. *See Mistretta*, 488 U.S. at 372–73, 109 S.Ct. 647 ("[I]t [is] constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." (internal quotation marks omitted)). We therefore conclude that the CFPB's funding structure is proper under the nondelegation doctrine.[2]

2    Adopting the Fifth Circuit's reasoning in *CFSA* with respect to the Appropriations Clause would also require us to circumvent the Supreme Court's nondelegation doctrine cases. As discussed *supra*, the CFPA's specification of five "objectives," six "primary functions," and the twelve-percent limit on the amount of funding it may draw from the Federal Reserve System, 12 U.S.C. §§ 5497(a)(2), 5511(b)–(c), "clearly delineates the general policy" and "boundaries of this delegated [budgetary] authority." *Mistretta v. United States*, 488 U.S. 361, 372–73, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (citation omitted). Under the Fifth Circuit's view, however, Congress must not only "lay down ... an intelligible principle" in delegating its budgetary authority, *J.W. Hampton*, 276 U.S. at 409, 48 S.Ct. 348, but it must also assert "direct control" over the CFPB's budget "on the front end" and review of the CFPB's expenditures "on the back end," *CFSA*, 51 F.4th at 638–39. Clearly, these additional requirements are at odds with the Supreme Court's guidance that Congress' articulation of an "intelligible principle" directing the agency's exercise of legislative authority is all that is required to satisfy separation of powers concerns under the Constitution, *J.W. Hampton*, 276 U.S. at 409, 48 S.Ct. 348.

### E. The CID Was an Enforceable Administrative Subpoena.

**\*7** Finally, Moroney argues that the CID is unenforceable because it is unduly burdensome. "The courts' role in a proceeding to enforce an administrative subpoena is extremely limited." *In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995) (internal quotation marks omitted). "To win judicial enforcement of an administrative subpoena, [an agency] must show [1] that the investigation will be conducted pursuant to a

legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the [agency's] possession, and [4] that the administrative steps required have been followed." *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (internal quotation marks omitted). It is the respondent's burden to show that an agency subpoena is unreasonable – a burden that "is not easily met." *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1056 (2d Cir. 1973).

Moroney first argues that the CID was not issued for a proper purpose because it seeks information implicating the practice of law. To be sure, Congress specifically prohibited the CFPB from exercising enforcement authority over attorneys engaged in the practice of law. *See* 12 U.S.C. § 5517(e)(1). The CFPB nonetheless has enforcement authority over attorneys engaged in "the offering or provision of a consumer financial product or service ... that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship." *Id.* § 5517(e)(2). Here, Moroney is engaged in both debt collection and the practice of law, but the CID is addressed only to its debt-collection practices and possible violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* The CID was therefore issued pursuant to a legitimate purpose under the statute. *See* 12 U.S.C. § 5517(e)(2).

Next, Moroney argues that the CID seeks information protected by attorney-client privilege and Moroney's duty of confidentiality to its clients. But, as the district court correctly noted, Moroney has not identified specific documents that it claims are privileged. Instead, Moroney makes broad declarations of privilege in the apparent hope that those blanket assertions will defeat the CID *in toto*. As this Court has long recognized, the proper way to address claims of privilege in response to a CID is for the objecting party to submit a privilege log. *See United States v. Constr. Prods. Rsch., Inc.*, 73 F.3d 464, 473 (2d Cir. 1996). And, of course, the burden is on "the party invoking the privilege" to "provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege," absent which the "claim will be rejected." *Id.* (internal quotation marks omitted). Because Moroney has not met its burden of showing that the documents sought by the CID are privileged, the district court was correct to reject its privilege claims.

Finally, Moroney argues that it has already responded to the CFPB's 2017 CID and that much of the material requested by the 2019 CID is duplicative of what it has already produced. But here again, Moroney has failed to meet its burden. While Moroney claims that the requests are duplicative, it never explains how the 2019 CID is duplicative of the 2017 CID or which documents have already been produced. Because the burden is on Moroney to show that the 2019 CID is unreasonable and Moroney has not met this burden, *see Brigadoon Scotch*, 480 F.2d at 1056, the district court was correct to enforce the CID.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the order of the district court.

**All Citations**

--- F.4th ----, 2023 WL 2604254

End of Document     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW     © 2023 Thomson Reuters. No claim to original U.S. Government Works.     7