**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1864
_____

CONSUMER FINANCIAL PROTECTION BUREAU

v.

NATIONAL COLLEGIATE MASTER STUDENT LOAN
TRUST; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2003-1; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2004-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2005-1;
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2005-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2005-3; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2006-3;
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2006-4; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-1; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-2; NATIONAL COLLEGIATE

STUDENT LOAN TRUST 2007-3; NATIONAL
COLLEGIATE STUDENT  LOAN TRUST 2007-4,
Delaware Statutory Trusts

NATIONAL COLLEGIATE MASTER STUDENT LOAN
TRUST; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2003-1; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2004-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2005-1;
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2005-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2005-3; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2006-3; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-4; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2007-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2007-3;
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2007-4; AMBAC ASSURANCE CORPORATION;
TRANSWORLD SYSTEMS INC,

Appellants

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-17-cv-01323)
Circuit Judge:  Honorable Stephanos Bibas[1]

_____

Argued on May 17, 2023

Before:  RESTREPO, ROTH and McKEE, <u>Circuit Judges</u>

(Opinion filed: March 19, 2024)

Seth Frotman
Steven Y. Bressler
Kevin E. Friedl                                    **(ARGUED)**
Kristin Bateman
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

        Counsel for Appellee Consumer
        Financial Protection Bureau

Jonathan Y. Ellis                                  **(ARGUED)**
McGuireWoods LLP
500 Fayetteville Street
Suite 500
Raleigh, NC 27061

_____

[1] Honorable Stephanos Bibas, United States Court of Appeals
Judge for the Third Circuit Court of Appeals, sitting by
designation.

Nicholas J. Giles
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

Francis J. Aul
McGuireWoods LLP
888 16th Street, NW
Black Lives Matter Plaza, Suite 500
Washington, DC 20006

Megan Ix Brison
Michael A. Weidinger
Pinckney Weidinger Urban & Joyce
2 Mill Road
Suite 204
Wilmington, DE 19806

Counsel for Appellants

Rebecca L Butcher
Jennifer L. Cree
Landis Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19801

Counsel for Intervenor Appellant GSS<br>Data Services LLC

Joshua A Kipnees
George A. LoBiondo
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036

     Counsel for Intervenor Appellant Ambac
     Assurance Corp

Allyson B. Baker
Meredith L. Boylan
Sameer P. Sheikh
Paul Hastings
2050 M Street NW
Washington, DC 20036

     Counsel for Intervenor Appellant
     Transworld Systems Inc

Stephen M. Nickelsburg
Clifford Chance US
2001 K Street NW
Washington, DC 20006

     Counsel for Amicus Appellant Chamber
     of Commerce of the United States of
     America and Securities Industry and
     Financial Markets Association

R. Trent McCotter
George Mason University
3301 Fairfax Drive
Arlington, VA 20001

> Counsel for Amicus Appellant Separation
> of Powers Clinic

Ellen V. Hollman
Cadwalader Wickersham & Taft
200 Liberty Street
One World Financial Center
New York, NY 10281

Rachel Rodman
Cadwalader Wickersham & Taft
700 Sixth Street NW
Washington, DC 20001

> Counsel for Amicus Appellant Structured
> Finance Association

Sarah A. Hunger
Office of Attorney General of Illinois
Solicitor General's Office
115 S LaSalle Street
23rd Floor
Chicago, IL 60603

> Counsel for Amicus Appellees State of
> Illinois, State of California, State of
> Colorado, State of Connecticut, State of
> Delaware District of Columbia, State of

Hawaii, State of Idaho, State of Maine,
State of Maryland, State of
Massachusetts, State of Michigan, State
of Minnesota, State of Nevada, State of
New Jersey, State of New Mexico, State
of New York, State of North Carolina,
State of Oregon, State of Rhode Island,
State of Commonwealth of Virginia, State
of Washington and State of Wisconsin

Benjamin J. Roesch
Jensen Morse Baker
1809 Seventh Avenue
Suite 410
Seattle, WA 98101

Counsel for Amicus Appellees Student
Borrower Protection Center,
Community Legal Aid Society Inc,
Community Legal Services Inc, New
York Assistance Group and New
Jersey Citizen Action

_____

O P I N I O N

_____

**ROTH**, <u>Circuit Judge</u>:

The issues before the Court on this interlocutory appeal are whether the Trusts are covered persons subject to the Consumer Financial Protection Act (CFPA), and whether the Consumer Financial Protection Bureau (CFPB) was required to ratify the underlying action. As a result of our review of the case, we will remand it to the District Court with our answers to the two questions certified.

## I.    BACKGROUND

### A.    *Formation and Obligations of the Trusts*

Between 2003 and 2007 there was a massive uptick in securitized assets.[2] Part of this increase in securitization was the privatization of student loans.[3] During this period, the fifteen appellant trusts (the Trusts), which are "offshoots of the National Collegiate Student Loan Master Trust," were formed "for the narrow purpose of acquiring and servicing a sizable

---

[2] *See* Sergei Chernenko et al., *The Rise and Fall of Demand for Securitizations*, HARVARD BUSINESS SCHOOL, 1 (2014), https://www.hbs.edu/ris/Publication%20Files/The%20Rise%20and%20Fall%20of%20Demand%20for%20Securitizations_26afb79a-342c-42d6-9b8e-184c0b9ec2f4.pdf.

[3] *See id.* at 5.

portfolio of student loans."[4]   Indeed, the Trusts have since amassed over eight hundred thousand private loans.[5]

"At their formation, each of the 15 Trusts and the Owner Trustee executed a Trust Agreement governed by Delaware law."[6]   This agreement defined the purpose of the Trusts.[7] Under the agreement, because the Trusts have no employees, the Owner Trustee "is empowered to 'act on behalf of the Trust[s].'"[8]   One way to do so is by entering into Administration Agreements.[9]   "[T]he Administration Agreements make clear the Administrator will 'perform' the 'duties of the [Trusts]' as well as 'the duties and obligations of the Owner Trustee on behalf of the [Trusts] under . . . the Trust Agreement.'"[10]   Therefore, "Administration Agreements . . . play a pivotal role in the overall structure of the securitization transaction."[11]

---

[4] *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 127 (Del. Ch. 2020) (hereinafter *In Re NCLST*).

[5] *CFPB v. Nat'l Collegiate Master Student Loan Trust*, 575 F. Supp. 3d 505, 506 (D. Del. 2021), *motion to certify appeal granted*, No. 1:17-CV-1323-SB, 2022 WL 548123 (D. Del. Feb. 11, 2022) (hereinafter *CFPB II*).

[6] *In Re NCLST*, 251 A.3d at 132.   There is no discernable difference between the Trusts in *In Re NCLST* and the Trusts from *CFPB II*.

[7] *See infra* note 105.

[8] *In Re NCLST*, 251 A.3d at 131 (alteration in original).

[9] *See id.*

[10] *Id.* at 140 (quoting JA150).

[11] *Id.* at 133.

Part of the role played by the Administrator is contracting with third parties through Servicing Agreements.[12] "[F]or each Trust, the Administrator contracted with a [Special] Servicer (or a similar entity) in a Servicing Agreement.  In that agreement, the Servicer promised to 'provide and perform' certain services such as '[b]orrower communications,' '[p]rocedures for delinquency and default,' and '[d]isbursement.'"[13]  The Special Servicer, would, in turn, contract with subservicers that would "conduct[] collections" and "oversee[] . . . collection lawsuits against borrowers in the name of the Trusts."[14]  As such, in each suit, one of the Trusts was the named plaintiff and the primary beneficiary of any action in which it prevailed.[15]

In 2014, after noticing the practices of the Trusts and those acting on their behalf, the CFPB issued a civil investigative demand (CID) to each Trust for information on collections lawsuits brought against borrowers for defaulted

---

[12] *Id.* at 141.

[13] *Id.* at 141 (alterations in original) (footnote omitted).

[14] *CFPB II*, 575 F. Supp. 3d at 506–07 (alterations in original).

[15] *See* Amici Br. Student Borrower Protection Center at 15 (stating that, in California, "every time" a suit was brought against a delinquent debtor, the creditor was represented by counsel) (citing Mark Huelsman, *The Debt Divide: The Racial and Class Bias Behind the "New Normal" of Student Borrowing*, DEMOS (2015), https://www.demos.org/publication/debt-divide-racial-and-class-bias-behind-new- normal-student-borrowing).

student loans.[16]   In 2017, the CFPB initiated enforcement proceedings against the Trusts.[17]   The parties reached a settlement and asked the court to enter a consent decree.  The court declined to do so.[18]  The CFPB then filed this action.[19]

> B.      *Precedential Developments and Their Effect on the Instant Matter*

While the case was proceeding through the District Court, the Supreme Court issued two relevant opinions.  The first was *Seila Law LLC v. Consumer Financial Protection Bureau*.[20]  There, the Court addressed 12 U.S.C. § 5491(c), the statute establishing the CFPB and its Director.  According to the statute, the Director may be removed by the President only "for cause."[21]  However, the Constitution dictates that agency heads must be freely removable by the President.[22]  The Court

---

[16] *CFPB v. Nat'l Collegiate Master Student Loan Tr.*, No. CV 17-1323 (MN), 2021 WL 1169029, at *2 (D. Del. Mar. 26, 2021) (hereinafter *CFPB I*); JA367 (same); NCMSLT Br. at 14.

[17] *CFPB I*, 2021 WL 1169029, at *2.

[18] *CFPB II*, 575 F. Supp. 3d at 507.

[19] *CFPB I*, 2021 WL 1169029, at *2; JA367.

[20] 140 S. Ct. 2183 (2020).

[21] 12 U.S.C. § 5491(c)(3).

[22] *See Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (stating that executive officials "must fear and, in the performance of [their] functions, obey" (quotation omitted)).   Even though this removal power is not without limit, "[t]he parties do not ask us to reexamine any of these [limits], and [thus] we do not do so." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).

held that the CFPB's removal provision unconstitutionally insulated the Director of the CFPB from the president's removal authority because "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers."[23]

When an unconstitutional "provision violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court."[24]  The Court then evaluated 12 U.S.C. § 5491(c)(3) within the broader context of the Dodd-Frank Act.[25]  It noted that "[i]t has long been settled that 'one section of a statute may be repugnant to the Constitution without rendering the whole act void.'"[26]  "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing

---

[23] *Seila Law LLC*, 140 S. Ct. at 2197.  There was also a secondary basis for this decision: that the Director would be appointed every five years, and so a sitting President may not have the opportunity to appoint the agency head. *Id.* at 2204.  This is why the opinion refers to the Director as being "insulated by two layers of for-cause removal protection." *Id.* at 2198.  However, because the parties focus purely on the fact that the Director was unconstitutionally insulated because he could only be removed for cause, there is no need to address this secondary ground discussed in *Seila Law*.

[24] *Id.* at 2196 (citing *Bowsher*, 478 U.S., at 727 n.5).

[25] *Id.* at 2207, 2209.  The CFPA is contained within the Dodd-Frank Act.  Because the parties do not discuss Dodd-Frank outside the confines of the CFPA, the two terms may be used interchangeably.

[26] *Id.* at 2208 (quoting *Loeb v. Columbia Twp. Trs.*, 179 U.S. 472, 490 (1900)).

any problematic portions while leaving the remainder intact."[27] Therefore, "[w]hen Congress has expressly provided a severability clause, [a court's] task is simplified."[28] Because "[t]he only constitutional defect [the Court] identified in the CFPB's structure is the Director's insulation from removal . . . . [the Court] must therefore decide whether the removal provision can be severed from the other statutory provisions relating to the CFPB's powers and responsibilities."[29]

The Dodd-Frank Act itself, which contains the CFPA, includes the following provision:  "If any provision of this Act . . . or the application of such provision . . . is held to be unconstitutional, the remainder of this Act, the amendments made by this Act, and the application of the provisions of such to any person or circumstance shall not be affected thereby."[30] Thus, because Dodd-Frank has an express severability clause, "[t]here is no need to wonder what Congress would have wanted if 'any provision of this Act' is 'held to be unconstitutional.'  Congress has told us: 'the remainder of this Act' shall 'not be affected.'"[31]  The Court found there to be no support for the notion that "Congress would have preferred *no* CFPB to a CFPB supervised by the President."[32]  The Court

---

[27] *Id.* at 2209 (quoting *Free Enter. Fund*, 561 U.S. at 508)); *see id.* at 2208 ("If the removal restriction is not severable, then we must grant the relief requested, promptly rejecting the demand outright.").

[28] *Id.*

[29] *Id.*

[30] 12 U.S.C. § 5302.

[31] *Seila Law*, 140 S. Ct. at 2209 (quoting 12 U.S.C. § 5302).

[32] *Id.*

concluded that "[t]he provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction."[33]

The Supreme Court then severed 12 U.S.C. § 5491(c), and remanded the action "to determine what to do about a petition to enforce a CID that the Bureau had filed while its structure was unconstitutional."[34] This conformed with the law at the time that constitutional defects had to be cured by ratification,[35] and "the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at the time the ratification was made."[36] The court concluded that, if the CFPB Director did not effectively ratify the underlying suit, the petition had to be dismissed.[37]

Turning to the case before us, the Trusts moved to dismiss the CFPB's complaint on several grounds.[38] However, the District Court felt it "need only address two" of those grounds:[39] first, whether the Trusts were "covered persons"

---

[33] *Id.*

[34] *CFPB I*, 2021 WL 1169029, at *4.

[35] *Id.*

[36] *Advanced Disposal Serv. E., Inc. v. N.L.R.B.*, 820 F.3d 592, 603 (3d Cir. 2016).

[37] *Id.* Ratification will be discussed in more depth below.

[38] More specifically, there were several entities that intervened in this matter, and they moved to dismiss in the wake of *Seila Law*. The Trusts joined the intervenors' motion to dismiss. *CFPB I*, 2021 WL 1169029, at *3.

[39] *Id.* at *3. These are, in essence, the two grounds in this appeal.

subject to the CFPA;[40] second, whether the suit had to be ratified because the action was initiated while there was a constitutional deficiency within the agency. The contention was that this suit was ratified after the statute of limitations had run and thus was untimely.[41]

The District Court agreed that the suit was untimely.[42] Relying on our opinion in *Advanced Disposal*, it concluded that "ratification is, in general, not effective when it takes place after the statute of limitations has expired."[43] The CFPB Director ratified the action more than three years after the date of discovery of these violations.[44] The District Court also rejected the CFPB's alternative argument that the statute of limitations be equitably tolled. The court found that the bureau did not "diligent[ly] pursu[e] . . . its rights" during the relevant period because "the Bureau was (as it should have been) acutely aware that there was doubt over the constitutionality of its enforcement authority."[45]

---

[40] *See id.*

[41] *Id.*; *see* 12 U.S.C. 5564(g)(1) (stating that "no action may be brought . . . more than 3 years after the date of discovery of the violation to which an action relates").

[42] The District Court did not thoroughly address whether the Trusts were "covered persons" under the CFPA, but it did "harbor[ ] some doubt" that they were. *CFPB I*, 2021 WL 1169029, at *3.

[43] *CFPB I*, 2021 WL 1169029, at *5 (citing *Benjamin v. V.I. Port Authority*, 684 F. App'x 207, 212 (3d Cir. 2017)).

[44] *Id.*

[45] *Id.* at *6.

With the court's leave, the CFPB filed an amended complaint. The CFPB's amended complaint emphasized that the Trusts are "covered persons" who "engage in" debt collection and are thus subject to the CFPA.[46] Again, the Trusts and several intervenors moved to dismiss, arguing that they are not "covered persons" under the statute and that the suit was untimely.[47]

Before the District Court decided these motions, the Supreme Court issued a new opinion, in *Collins v. Yellen*.[48] There, the Court was facing a situation similar to that in *Seila Law*. The underlying suit was brought against the Federal Housing Finance Authority (FHFA) on the ground that the FHFA Director was impermissibly insulated from the President's removal authority because he could only be removed for cause.[49] Because of this, the Shareholders argued that agency enforcement actions made while the FHFA Director was impermissibly insulated were void *ab initio*.[50]

The Court made quick work of the insulation issue. It found its decision in *Seila Law* to be "all but dispositive": "[a] straightforward application of [the] reasoning in *Seila Law*" required the Court to conclude that a for-cause restriction on the President's removal power violates separation of powers.[51]

---

[46] JA383–84.

[47] *CFPB II*, 575 F. Supp. 3d at 507.

[48] 141 S. Ct. 1761 (2021).

[49] *Id.* at 1784.

[50] *Id.* at 1787.

[51] *Id.* at 1783–84. Though there are obviously some differences between the CFPB and the FHFA, the Court did not "find any

However, unlike in *Seila Law*, the Court also addressed the question of whether the actions of agency heads lacking constitutional authority were void *ab initio*.[52] At the outset, it noted that "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office."[53] The Court concluded that whether agency action was void *ab initio* came down to whether an agency director was properly appointed.[54] More particularly, the Court held:

> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA . . . as void.[55]

---

of these distinctions sufficient to justify a different result." *Id.* at 1784.

[52] *Id.* at 1787.

[53] *Id.* at 1788 (citing *Seila Law*, 140 S. Ct. at 2207–11).

[54] *Id.* at 1787. There is no support for the notion that any CFPB director was improperly appointed, and neither party argues this point. *See* JA15 (stating that "the Bureau's director was properly appointed").

[55] *Collins*, 141 S. Ct. at 1787.

In so holding, the Court rejected the claim that agency actions are void unless "ratified by an Acting Director who was removable at will by the President."[56]

The Court further clarified that actions taken by an improperly insulated director are not "void" and do not need to be "ratified" unless a plaintiff can show that the removal provision harmed him.[57]    "[P]laintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision."[58]   In other words, if there is no harm derived from the President's inability to remove the agency head, then the agency action will not be unwound.[59]

Because in *Seila Law* there was a "dispute [about] the possibility that the unconstitutional removal restriction caused any such harm," the Court held that such disputes should be resolved by the lower courts and remanded the action to the

---

[56] *Id.* In *Collins*, the petitioning shareholders argued that an unconstitutionally insulated "Director's action would be void unless lawfully ratified," *id.* at 1788, based on the fact that the Court in *Seila Law* remanded "to consider whether the civil investigative demand was validly ratified," *Seila Law*, 140 S. Ct. at 2211.  However, the Court in *Collins* noted that it never mentioned "whether ratification was necessary" when agency action was taken at the behest of an unconstitutionally insulated agency director.  *Collins*, 141 at 1788.

[57] *Id.* at 1788–89.

[58] *Id.* at 1801 (Kagan, J., concurring in part).

[59] *Id.*

court of appeals.[60]  In so doing, the Court in *Collins* extended the rule established in *Seila Law* to permit consideration of harm and, as a result of doing so, to determine if the agency action had to be rewound.

Against this backdrop of *Collins* and *Seila Law*, the District Court considered the underlying action.  It addressed two questions:  whether the CFPB needed to ratify this action (which necessarily addresses the suit's timeliness) and whether the Trusts were "covered persons" under the CFPA.[61]  Based on *Collins*, the District Court held that the agency head was properly appointed, and that the agency would have filed the action regardless of the President's ability to remove the agency head.  More particularly, it held:

> This suit would have been filed even if the director had been under presidential control.  It has been litigated by five directors of the CFPB, four of whom were removable at will by the President.  And the CFPB did not change its litigation strategy once the removal protection was eliminated.  This is strong evidence that this suit would have been brought regardless. Thus, the CFPB's initial decision to bring this suit was not ultra vires.[62]

---

[60] *Id.* at 1789; s*ee, e.g.*, *id.* at 1795 (Thomas, J., concurring) ("The Fifth Circuit can certainly consider this issue on remand."); *id.* at 1802 (Kagan, J., concurring in part) (stating that the "Court of Appeals already considered and decided the issue remanded").

[61] *See CFPB II*, 575 F. Supp. 3d at 506.

[62] *Id.* at 508 (citation omitted).

This conclusion resolved the first question.

The District Court then considered whether the Trusts were "covered persons" under the CFPA.[63]   Section 5584(a) of the statute, which governs the CFPB's enforcement authority, states that "[t]he CFPB may bring enforcement actions to 'prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice.'"[64]   Under the CFPA, a "covered person," is "any person that engages in offering or providing a consumer financial product or service."[65]   Because "[t]he Trusts do not deny that their subservicers collected debt or serviced loans" the District Court noted that "this dispute boils down to the breadth of the word 'engage.'"[66]   The central question in evaluating this inquiry was:   "Does a person 'engage' in an activity if he *contracts* with a third party to do that activity on his behalf?"[67]   The court's answer was "Yes."[68]

Relying on multiple dictionaries, the District Court determined that "'[e]ngage' means to 'to embark in any business' or to 'enter upon or employ oneself in an action.'"[69]

---

[63] *See id.* at 509.

[64] *Id.* (quoting 12 U.S.C. § 5531(a)).

[65] 12 U.S.C. § 5481(6)(A).

[66] *CFPB II*, 575 F. Supp. 3d at 509.

[67] *Id.* (emphasis added).

[68] *Id.*

[69] *Id.* (citing *Engage* (def. 16), Oxford English Dictionary (2d ed. 2000)); *see also Engage*, Black's Law Dictionary (11th ed. 2019) ("To employ or involve oneself; to take part in; to embark on.").

This definition, it found, was "broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise."[70] The court found that "[t]he Trusts 'embark[ed] in [the] business' of collecting debt and servicing loans when they contracted with the servicers and subservicers to collect their debt and service their loans."[71] The court continued, "[t]he Trusts cannot claim that they were not 'engaged in' a key part of their business just because they contracted it out."[72]

Shortly thereafter, the Trusts and intervenors timely filed a motion for interlocutory appeal. The District Court certified two questions for review: first, the statutory question whether the Trusts are "'covered persons' subject to the [CFPB's] enforcement authority" under the CFPA;[73] second, the constitutional question, whether, after *Collins*, "the Bureau need[ed] to ratify this suit before the statute of limitations ran, having first filed it while the Bureau's director was improperly insulated from presidential removal[.]"[74]

---

[70] *CFPB II*, 575 F. Supp. at 509.

[71] *Id.*

[72] *Id.* at 509–10 (citing *Barbato v. Greystone All., LLC*, 916 F.3d 260, 266–68 (3d Cir. 2019) (finding that a "passive debt owner" counted as a "debt collector" under the Fair Debt Collection Practices Act when it contracted with a third party to collect debt on its behalf)).

[73] JA20.

[74] JA20.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Trusts petitioned us for review pursuant to 28 U.S.C. § 1292(b).[75] We have jurisdiction under that same provision.[76] We also have jurisdiction pursuant to 28 U.S.C. § 1331. We review questions certified for interlocutory review *de novo*.[77]

## III.    DISCUSSION

### A.    *Statutory Question*

The statutory dispute between the parties boils down to a central question: Are the Trusts "covered persons" under the CFPA because they *engage* in consumer financial products or services?[78]

In interpreting a statute, we begin our analysis with the plain language of the statute. Just as the District Court did, we "[s]tart with the text."[79] That text begins with 12 U.S.C. § 5531(a), which dictates the CFPB's enforcement authority. The statute states the following:

---

[75] NCMSLT Br. at 4–5.

[76] NCMSLT Br. at 4.

[77] *Barbato*, 916 F.3d at 264.

[78] *See* NCMSLT Br. at 24, 33; CFPB Br. at 12.

[79] *CFPB II*, 575 F. Supp. 3d at 509; *see Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019) ("We begin 'where all [statutory interpretation] inquiries must begin: with the language of the statute itself.'" (quoting *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) (cleaned up))).

> The Bureau may take any action . . . to prevent a *covered person* or service provider from committing or *engaging in* an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a *consumer financial product or service*, or the offering of a *consumer financial product or service*.[80]

A "covered person" is defined by § 5481(6)(A) as "any person that engages in offering or providing a consumer financial product or service."[81]   To apply the statutory interpretive framework above, and thus determine whether the Trusts are "covered persons" subject to the CFPB's enforcement

---

[80] 12 U.S.C. § 5531(a) (emphases added).

[81] 12 U.S.C. § 5481(6)(A).   The omitted portion of this provision states the following:  "and any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person."   While we do agree that servicers were "central" to the Trusts' "enterprise," *see* JA14, neither party argues at this time that the Trusts should be liable for the acts of the servicers.  Indeed, that would likely be an entirely different matter.  *See* CFPB Br. at 31; *Barbato*, 916 F.3d at 269–70 (illustrating that whether one can be liable for the actions of another is a different question from the one presented on appeal).  As such, we need not evaluate affiliate liability, especially if the Trusts can be said to "engage" on their own accord.  Thus, the relevant inquiry is not whether the servicers are an affiliate of the Trusts, but whether the Trusts "engaged" others to proliferate their business.

authority, we must look to "engage" in its statutory context.[82] To streamline this process, we will define this context first so that we can then apply "engage" against that background.

A "person," under the CFPA, "means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity."[83] "Trusts" are explicitly mentioned here. Additionally, the Trusts are statutory trusts formed under Section 3801 of Title 12 of the Delaware Code.[84] Title 12 of the Delaware Code states that statutory trusts are defined as "unincorporated associations."[85] Congress's intent is clear: the Trusts were to be included as "persons" under the CFPA.[86]

A similarly inevitable conclusion is reached when defining "consumer financial product[s and] service[s]."[87] In

---

[82] *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *see* JA14.

[83] 12 U.S.C. § 5481(19).

[84] *CFPB I*, 2021 WL 1169029, at *1.

[85] 12 Del. Code § 3801(i).

[86] "If the language of the statute expresses [the legislature's] intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms." *Gregg*, 226 F.3d at 257 ("If the language of the statute expresses [the legislature's] intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms.").

[87] 12 U.S.C. § 5481(5).

defining this phrase,[88] the statute directs us to the definition of "financial product or service."[89]  Under § 5481(15), a financial product or service may include "extending credit and servicing loans."[90] The Trusts themselves state in their opening brief that they "were formed to acquire a pool of private student loans, to issue securitized notes on those loans, and to *provide for the servicing of the loans* and the distribution to noteholders of the loan payments made by borrowers."[91]     Thus, they unambiguously fall within the statute.[92]

We then turn to the primary statutory question:  whether the Trusts "engage."  If they do "engage," they are covered persons under the CFPA; if they do not, they do not fall within the purview of the CFPA.  The District Court found "room for reasonable disagreement" in the definition of "engage."[93]  For this reason, we will look to other interpretative measures to

---

[88] *See supra* notes 80–81 and accompanying text.

[89] 12 U.S.C. § 5481(5).

[90] *Id.* § 5481(15)(A)(i).  Thus, the terms of § 5481(15) are included in § 5481(5).

[91] NCMSLT Br. at 10 (emphasis added) (citing JA107, which is part of the trust agreement).

[92] This point does not seem to be disputed by the parties.  *See* Amici Br. Securities Ind. & Fin. Mkts. Assoc. at 15 (stating that the Trusts "do not, and cannot, 'engage in' offering or providing consumer financial products or services *such as the debt collection services at issue here*" (emphasis added)); *see also* JA13–14 ("True, third parties, not the Trusts, collected the debt and serviced the loans.  But the loan servicing and debt collection were crucial to the Trusts' business and could not have happened without their say-so.").

[93] JA14.

define this term.  To do so, we will review how this definition has been applied in earlier cases.[94]

In *Southwest Airlines Co. v. Saxon*, the Supreme Court had to determine whether a "class of workers *engaged in* foreign or interstate commerce."[95]  Southwest Airlines attempted to enforce an arbitration agreement against Saxon under the Federal Arbitration Act (FAA).[96]  In response,

---

[94] Unfortunately, Dodd-Frank's legislative history does not adequately define "engage."  Thus, we cannot glean much by examining CFPA's history.  Something we can glean, though, is that when Dodd-Frank was before Congress, its purpose was broad: "This is a time to bring certainty back into the market and reasonable regulation and reasonable enforcement back to the financial system."  156 Cong. Rec. H5223-02, 156 Cong. Rec. H5223-02, H5231.  But Congress addressed the concern that the Act was too broad:  "One of the initial concerns we heard was that companies who do not engage in consumer financial business would be regulated by [Dodd-Frank].  We fixed that.  Merchants, retailers, doctors, realtors, and others— some suggested the butcher, the baker, the candlestick maker—let's be clear, they're exempt from [Dodd-Frank] as was intended and as they should be."  155 Cong. Rec. H14762-01, 155 Cong. Rec. H14762-01, H14773.  So when Congress walked back Dodd-Frank's broad grant of enforcement authority, it retained the notion that Dodd-Frank applies to those taking part in the financial system and consumer financial business.  As such, it is clear that Congress intended the Dodd-Frank to apply to the consumer financial industry.

[95] *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022) (emphasis added) (internal quotations omitted).

[96] *See Id.*

"Saxon [argued] that the [FAA] did not apply because she was a member of a 'class of workers engaged in foreign or interstate commerce,' and therefore exempted by § 1 of the [FAA]."[97] To determine whether this exemption applied, the Supreme Court had to define "engage."[98]

The Court, "begin[ning] with the text," stated that the word "'engaged' . . . mean[s] 'occupied,' 'employed,' or 'involved' in [something]."[99] In applying this definition, the Court held that Southwest Airlines interpreted the statute too narrowly, and that Saxon, as a ramp supervisor for the airline, was part of a "'class of workers engaged in foreign or interstate commerce' to which [the statutory] exemption applies."[100]

This interpretation is consistent with colloquial and legal dictionaries that define "engage." *Merriam-Webster's Dictionary* contemporarily defines engage as "to begin and carry on an enterprise or activity" and "to do or take part in something."[101] *Black's Law Dictionary* defines engage as: "To employ or involve one's self; to take part in; to embark on."[102] This definition has remained remarkably consistent over time,

---

[97] *Saxon v. Sw. Airlines Co.*, 993 F.3d 492, 495 (7th Cir. 2022).

[98] *Saxon*, 596 U.S. at 463.

[99] *Id.* (citing Webster's New International Dictionary 725 (1922) and Black's Law Dictionary 661 (3d ed. 1933) (defining "engage")).

[100] *Id.*

[101] *Engage*, Merriam-Webster's Dictionary.

[102] *Engage*, Black's Law Dictionary (11th ed. 2019). This definition is also consistent with the one used by the District Court. *See CFPB II*, 575 F. Supp. 3d at 509.

and is the same definition referred to by the Supreme Court in *Saxon*.[103]

Using this definition, we can now determine whether the Trusts "engage" in consumer financial products or services. If the Trusts meet any of the aforementioned definitions, they can be said to "engage." For example, if they "embark on" or "take part in" collecting debt or servicing loans, they can be said to engage in those consumer financial products or services.[104] And if they engage, they will come under the purview of the CFPA.

The Trust Agreement that each Trust entered into states the following:

> The purpose of the Trust is to *engage in* the following activities and *only* these activities: (i) To acquire a pool of Student Loans, to execute the Indenture and to issue the Notes; (ii) To *enter into* the Trust Related Agreements and to provide to the administration of the Trusts and servicing of the Student Loans; (iii) To *engage in* those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and (iv) To *engage in* other such activities as may be

---

[103] *Compare Engage*, Black's Law Dictionary (3d ed. 1933) *with Engage*, Black's Law Dictionary (11th ed. 2019).

[104] The District Court found "debt collection and loan servicing [to be] core aspects of the Trusts' business model." *CFPB II*, 575 F. Supp. 3d at 509.

> required in connection with conservation of the
> Trust Property and Distributions to Owners.[105]

Thus, the Agreement itself states that the Trusts "engage" in these activities, which include consumer financial products or services. Nonetheless, because the parties dispute the definition of engage, we will apply it to each purpose mentioned in the Trust Agreement.

First, in "acquir[ing] a pool of Student Loans,"[106] the Trusts "beg[an] . . . an enterprise or activity,"[107] with that enterprise[108] "involv[ing]"[109] financial products or services. As the Trusts themselves state in their brief, "the defendants are 15 statutory trusts formed to purchase, pool, and securitize student-loan debt."[110] Moreover, it seems unlikely that one can acquire[111] something without "involv[ing] one's self."[112]

Second, the Trusts "carr[ied] on [their] enterprise" through Administration Agreements.[113] These Agreements "make clear the Administrator will 'perform' the 'duties of the

---

[105] JA107 (emphasis added).

[106] *Id.*

[107] *See supra* note 101.

[108] *See Enterprise*, Black's Law Dictionary (11th ed. 2019) ("An organization or venture, esp[ecially] for business purposes.").

[109] *Engage*, Black's Law Dictionary (11th ed. 2019).

[110] NCMSLT Br. at 1.

[111] *See Acquire*, Black's Law Dictionary (11th ed. 2019) ("To gain possession or control of; to get or obtain.").

[112] NCMSLT Br. at 1.

[113] *See supra* note 101.

[Trusts].'"[114]  More particularly, "[t]he Administrator shall prepare for execution . . . , or shall cause the preparation . . . of, all such documents, reports, filings, instruments, certificates and opinions . . . of the [Trusts] . . . pursuant to the Trust Related Agreements."[115]  In this vein, "the Administrator need not await instructions before pursuing ordinary course lawsuits initiated 'by the [Trust] or its agents . . . for the collection of the Student Loans owned by the [Trust].'"[116]  Therefore, through the Administration Agreements, the Trusts "involv[ed]"[117] themselves in consumer financial products or services.

Third, the Trusts "carr[ied] on [their] enterprise"[118] by further "involv[ing]"[119] themselves in agreements for the servicing of loans.[120]  Another such set of agreements were Servicing Agreements, which were entered into by the

---

[114] *In re NCLST*, 251 A.3d at 140 (alteration in original) (quoting JA150).  While the Trusts purport that the Administrator is separate from the Trusts, *see* NCMSLT Br. at 11 (arguing that "the Administrator is 'not . . . subject to the supervision of the [Trusts] or the Owner Trustee with respect to the manner in which it accomplishes the performance of its obligations'"), we need not address this claim.  It is a bridge too far.  All we need to determine is whether the Trusts engaged in such agreements.

[115] JA149.

[116] *In re NCLST*, 251 A.3d at 140–41 (alteration in original) (quoting JA151).

[117] *Engage*, Black's Law Dictionary (11th ed. 2019).

[118] *See supra* note 101.

[119] *Engage*, Black's Law Dictionary (11th ed. 2019).

[120] *See supra* note 101.

Administrator.[121]  Servicing Agreements were a necessary part of their business.[122]  Again, as the Trusts mention in their brief, "[t]hey have no employees and no directors."[123]  So, in order to fulfill their obligation of "servicing . . . student loans"[124] they had to enter into agreements with "third parties [to] collect[] the debt and service[] the loans," which "could not have happened without [the Trusts'] say-so."[125]  Indeed, without these agreements, the Trusts could not have "embark[ed] on"[126] the servicing of student loans.

Finally, the Trust Agreement states that the Trusts are to "engage in *other activities*" that may be "required in connection or conservation of Trust Property . . . ."[127]  Trust Property, according to the Trust Agreement, is defined as "all right, title and interest of the Trust or the Owner Trustee on behalf of the Trust in and to any property contributed to the Trust."[128]  And "the Trusts retained legal title to the Collateral [i.e., the Student Loans] so that they could collect Student Loans for distribution . . . ."[129]  When suits are brought against borrowers for the Trusts to collect on student loans, third parties are acting for the benefit of the Trusts.[130]  As such, the

---

[121] *In re NCLST*, 251 A.3d at 131.

[122] JA14.

[123] NCMSLT Br. at 1.

[124] *See supra* note 105.

[125] JA13.

[126] *Engage*, Black's Law Dictionary (11th ed. 2019).

[127] *See supra* note 105.

[128] JA105.

[129] *In Re NCSLT*, 251 A.3d at 194.

[130] *See supra* note 15 and accompanying text.

Trusts cannot claim that they did not "take part in" collecting debts.[131]

The Trust Agreement's purpose indicates that the Trusts engage in both student loan servicing and debt collection. As such, the Trusts fall within the purview of the CFPA because they "engage" in a known "consumer financial product or service" and are necessarily subject to the CFPB's enforcement authority.[132]

### B.    Constitutional Question

We now turn to the constitutional question that was certified: Ratification of agency action. The Trusts argue that the underlying suit needed to be ratified by the Director of the CFPB because it was initiated while the agency head was improperly insulated; and since that ratification came after the statute of limitations had run, the suit was untimely.[133] Moreover, they claim that action undertaken while an agency head is impermissibly insulated creates a "here-and-now injury."[134] The CFPB responds by arguing that ratification was not necessary in the wake of *Collins* because the agency head was properly appointed and the statute did not cause harm to the Trusts.[135]

To properly evaluate these arguments, we must briefly revisit our discussion of *Collins*. As the District Court found,

---

[131] *See supra* notes 15, 91, 104, and accompanying text.
[132] 12 U.S.C. § 5584(a).
[133] NCMSLT Br. at 49–53.
[134] NCMSLT Br. at 21.
[135] CFPB Br. at 34–54.

"[t]he [*Collins*] Court explained that actions taken by an improperly insulated director are not 'void' and do not need to be 'ratified' unless a plaintiff can show that the removal provision harmed him."[136]  The parties do not dispute whether the CFPB Director was properly appointed.[137]  Thus, the heart of the issue is whether the insulation provision, 12 U.S.C. § 5491(c), caused harm.[138]  This is not an issue of first impression.  We begin by evaluating the approaches our sister circuits have taken in interpreting *Collins*.

The Second Circuit Court of Appeals in *CFPB v. Law Offices of Crystal Moroney, P.C.*,[139] addressed whether a civil investigative demand (CID), often the first step in an enforcement suit by the CFPB "was void *ab initio* because, when the CID was issued, the CFPB Director was shielded by an unconstitutional removal provision."[140]  The court held that "[t]his argument is foreclosed by the Supreme Court's decision in *Collins*."[141]  It interpreted the Court in *Collins* as "h[olding] that the relevant inquiry for determining whether an officer 'lacked constitutional authority and that [her] actions were

---

[136] JA16 (citing *Collins*, 141 S. Ct. at 1787–88).

[137] JA15.  However, the Trusts do argue that the harm from impermissible insulation is "indistinguishable" from harm of improper appointment.

[138] *Cf. Kaufmann v. Kijakazi*, 32 F.4th 843, 849–50 (9th Cir. 2022) (holding that, when an agency head is impermissibly insulated, the matter is to be decided based on whether the statute itself caused harm).

[139] 63 F.4th 174 (2d Cir. 2023).  A Petition for Writ of Certiorari has been docketed.

[140] *Id.* at 179.

[141] *Id.*

therefore void *ab initio*' is whether the officer in question [was] properly *appointed*,' not whether she was properly *removable*."[142]   Like our interpretation of *Collins* today, the circuit court also noted that a party could, nevertheless, "be entitled to relief if it could show that 'an unconstitutional provision . . . inflict[ed] compensable harm' on the petitioner."[143]   In determining the nature of that harm, the circuit court relied on Justice Kagan's concurrence to determine that "[r]equiring but-for causation in these cases properly matches the constitutional injury to the requested remedy."[144]   The circuit court found this interpretation to be consistent with its own and with Supreme Court precedents.[145]

The Ninth Circuit Court of Appeals in *Kaufmann v. Kijakazi*,[146] further defined the requisite harm.   There, the circuit court was faced with deciding whether an impermissibly insulated agency head violated the separation of powers, and if so, whether the agency action was necessarily void.[147]   At the outset, the court noted that, "[f]or the purpose of the constitutional analysis, the Commissioner of Social Security is indistinguishable from the Director of the FHFA discussed in *Collins* and the Director of the CFPB discussed in

---

[142] *Id.* (alterations in original) (quoting *Collins*, 141 S. Ct. at 1787).  Again, we agree that the CFPB's Director was properly appointed.  *See* JA15 (stating that "the Bureau's director was properly appointed").

[143] *Id.* (quoting *Collins*, 141 S. Ct. at 1789).

[144] *Id.* at 180.

[145] *Id.*

[146] 32 F.4th 843 (9th Cir. 2022).

[147] *Kaufmann*, 32 F.4th at 846.

*Seila Law.*"[148]   Much like *Seila Law*, the circuit court also found "the removal provision . . . severable from the remainder of the statute," and that the remainder of the statute was capable of functioning independently of the impermissible provision.[149]   Still, the circuit court also noted that "[a] party challenging an agency's past actions must . . . show how the unconstitutional removal provision *actually harmed* the party."[150]   "[*U*]*nless* a claimant demonstrates actual harm, the unconstitutional provision has *no effect* on the claimant's case. Because Claimant has not shown actual harm, we uphold the Commissioner's decision."[151]

Here, as discussed above, the Trusts claim that an unconstitutional provision violating the separation of powers caused them harm.[152]   But a mere allegation that the unconstitutional provision inherently caused them harm is insufficient.  There must be something more.[153]  For example, if the CFPA suggested "any link whatsoever between the removal provision and [c]laimant's case," then the Trusts may be entitled to some type of relief.[154]

---

[148] *Id.* at 849.

[149] *Id.* ("[O]ne provision of a [statute] may be invalid by reason of its not conforming to the Constitution, while all the other provisions may be subject to no constitutional infirmity.") (quoting *Seila Law*, 140 S. Ct. at 2208)) (alteration in original).

[150] *Id.*

[151] *Id.* at 850 (emphasis added).

[152] That harm is the purported "here-and-now" injury.  *See supra* note 134 and accompanying text; *infra* note 159 and accompanying text.

[153] *Id.* at 849–50.

[154] *Id.* at 850.

We cannot find such a link. The statute, in relevant part, states: "The Director shall serve for a term of 5 years"; "An individual may serve as Director after the expiration of the term for which appointed, until a successor has been appointed and qualified"; and "The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office."[155] There is no notion in this statute that the CFPB would have taken this action but for the President's inability to remove the Director.[156] On the contrary, as the District Court noted, there "is strong evidence that this suit would have been brought regardless" of a president's authority to remove because the CFPB's litigation strategy has been consistent across five directors, four of whom were removable at will.[157]

While the Trusts argue that the unconstitutional provision, in and of itself, created a here-and-now injury,[158] their analysis of the injury does not go far enough. They argue that harm from an unconstitutional statutory restriction on removal authority is "indistinguishable" from the "harm suffered under the authority of executive officers who were not properly appointed in the first instance."[159] This presupposition of harm, as discussed above, is foreclosed by

---

[155] 12 U.S.C. § 5491.

[156] *See Kaufmann*, 32 F.4th at 850.

[157] *See CFPB II*, 575 F. Supp. 3d at 508; *supra* notes 61–62 and accompanying text.

[158] NCMSLT Br. at 21 ("An enforcement action initiated by an unconstitutionally structured agency inflicts a 'here-and-now' injury, that demands a remedy tailored 'to the injury suffered.'") (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981))) (cleaned up).

[159] NCMSLT Br. at 62.

*Collins* and its progeny because there must be an actual, compensable harm in order for there to be an injury from an impermissible insulation provision.[160] Again, the circuit court in *Kaufmann* held that an impermissible insulation provision does not, on its own, cause harm, and "*unless* a claimant demonstrates actual harm, the unconstitutional provision has *no effect* on the claimant's case."[161]

Additionally, the Trusts' interpretation of their purported injury seems to be in discord with other precedential examples of "here-and-now" injuries. For example, the Supreme Court has noted that "subjection to an illegitimate proceeding, led by an illegitimate decisionmaker" is a manifestation of a "here-and-now" injury.[162] There is no support in the record for the notion that instant proceeding was similarly illegitimate because, like *Kaufmann*, there is no indication that this suit would have been undertaken *but-for* a president's authority to remove the CFPB's Director, or that the CFPB was able to target the Trusts via the unconstitutional provision.[163] In another example, in *Sherley v. Sebelius*, the D.C. Circuit Court of Appeals found there to be a "here-and-now injury" when doctors would have to invest additional time and resources because of a loss, or different allocation, of funding.[164] In both of these examples, there was a compensable and identifiable harm. Here, there is no such thing.

---

[160] *Kaufmann*, 32 F.4th at 850.

[161] *See id.* (emphasis added).

[162] *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 903 (2023).

[163] *See CFPB II*, 575 F. Supp. 3d at 508.

[164] 610 F.3d 69, 74 (D.C. Cir. 2010).

The Trusts argue, contrary to these precedents, that *Collins* did not actually change the legal landscape, and that the matter before us still needed to be ratified by a properly appointed director after the constitutional defect was cured via severing pursuant to 12 U.S.C. § 5491(c).[165] This notion is directly counter to the Supreme Court's holding in *Collins*. It is also counter to guidance provided by our sister courts. For example, the Tenth Circuit Court of Appeals in *Integrity Advance, LLC v. CFPB* held that "*Collins* put to rest" the argument that ratification was necessary for actions taken while the agency was unconstitutionally structured.[166] And the Ninth Circuit Court of Appeals had nearly the same interpretation of a post-*Collins* world: "We find it unnecessary to consider ratification because [*Collins*] has made clear that despite the unconstitutional limitation on the President's authority to remove the Bureau's Director, the Director's actions were valid when they were taken."[167]

We see no need to remand the ratification issue. As our sister courts have noted, "[w]hile *Collins* remanded for further factual development on the issue of harm, we need not do so here, as the record is clear."[168] The record is also clear here: There is no indication that the unconstitutional limitation on the President's authority harmed the Trusts.

---

[165] NCMSLT Br. at 53–67.
[166] 48 F.4th 1161, 1170 (10th Cir. 2022), *cert. denied*, No. 22-838, 2023 WL 3937614 (June 12, 2023).
[167] *CFPB v. CashCall, Inc.*, 35 F.4th 734, 742 (9th Cir. 2022).
[168] *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021) (citation omitted).

## CONCLUSION

For the above reasons, we will respond to the District Court's queries by holding that (1) the Trusts are covered persons subject to the CFPA's enforcement authority because they "engage" in the requisite activities and (2) the CFPB did not need to ratify this action before the statute of limitations had run.