No. 22-1864

In the

# United States Court of Appeals
## For the Third Circuit

---

Consumer Financial Protection Bureau,

*Plaintiff-Appellee,*

v.

National Collegiate Master Student Loan Trust, et al.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Delaware, Case No. 1:17-cv-1323
Honorable Stephanos Bibas

---

## PETITION FOR REHEARING AND FOR REHEARING *EN BANC*

---

Nicholas J. Giles
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

Francis J. Aul
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Washington, DC 20006

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

*Counsel for Defendants-Appellants*
*(Additional Counsel Listed on Inside Cover)*

Joshua Kipnees
George A. LoBiondo
PATTERSON BELKNAP WEBB &
    TYLER
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2838
jkipnees@pbwt.com

*Counsel for*
*Intervenor-Appellant*
    *Ambac Assurance Corporation*

# RULE 35(b)(1) STATEMENT

Defendant-Appellants National Collegiate Master Student Loan Trust and associated numbered National Collegiate Student Loan Trusts ("the Trusts") are seeking rehearing, or in the alternative, rehearing *en banc*. I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to decisions of the Supreme Court of the United States, and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court. The panel's decision is contrary to *Collins v. Yellen*, 141 S. Ct. 1761 (2021), as well as decisions of several other Courts of Appeals to construe *Collins* in similar contexts. This appeal also involves a question of exceptional importance, *i.e.*, whether passive securitization trusts are "covered persons" under the Consumer Financial Protection Act.

Dated: May 3, 2024                    */s/ Jonathan Y. Ellis*
                                       Jonathan Y. Ellis

# TABLE OF CONTENTS

**Page**

RULE 35(b)(1) STATEMENT ..................................................... i

TABLE OF AUTHORITIES ..................................................... iii

INTRODUCTION ................................................................. 1

STATEMENT OF THE CASE ................................................. 2

ARGUMENT ...................................................................... 4

I.    PANEL REHEARING IS WARRANTED BECAUSE
THE COURT MISCONSTRUED THE CFPA AND
THE PARTIES' ARGUMENTS. .......................................... 5

    A.    The Court's interpretation of the "covered person"
provision misconstrued the statutory text and the
CFPB's arguments. ................................................ 5

    B.    The Court's treatment of constitutional "harm"
misapprehends the Trusts' argument under the
*Collins* majority. ................................................ 10

II.    THE COURT'S *EN BANC* REVIEW IS WARRANTED
IN THIS EXCEPTIONAL CASE. ...................................... 12

    A.    The panel's precedential opinion dramatically
expands the CFPB's authority and threatens the
vital securitization market. ..................................... 13

    B.    The panel's separation-of-powers holding is
inconsistent with the Supreme Court's decision in
*Collins* and other Circuits' decisions
interpretating it. ................................................. 17

CONCLUSION ................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bhatti v. FHFA*,
15 F.4th 848 (8th Cir. 2021) ........................................................ 19, 20

*CFPB v. Law Offices of Crystal Moroney, P.C.*,
63 F.4th 174 (2d Cir. 2023) ................................................................ 18

*CFPB v. Nationwide Biweekly Administration, Inc.*,
No. 18-15431, 2023 WL 566112 (9th Cir. Jan. 27, 2023) ................... 19

*Collins v. Yellen*,
141 S. Ct. 1761 (2021) ....................................... 3, 10, 11, 12, 17, 18, 19

*Community Fin. Services Ass'n of Am., Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) ..... 18

*Decker Coal Co. v. Pehringer*,
8 F.4th 1123 (9th Cir. 2021) .............................................................. 20

*Integrity Adv., LLC v. CFPB*,
48 F.4th 1161 (10th Cir. 2022), *cert. denied*, 143 S. Ct.
2610 (2023) ......................................................................................... 20

*Rop v. FHFA*,
50 F.4th 562 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 2608
(2023) ............................................................................................ 19, 20

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .............................................................................. 2

*Students for Fair Admissions, Inc. v. Harvard College*,
600 U.S. 181 (2023) ............................................................................ 18

## Statutes

12 U.S.C. § 5481(6) ......................................................................... 3, 5, 9

28 U.S.C. § 1292(b) ................................................................................. 3

## Other Authorities

American Bar Association, *Introduction to Securitizations*
  (Jan. 27, 2022), https://www.americanbar.org/groups/
  business_law/resources/business-law-today/2022-
  february/introduction-to-securitizations/ .......................................... 15

Scott Carpenter, *Asset-Backed Securities Face New Risks
  From a US Court Decision*, Bloomberg Law News (Mar.
  26, 2024), https://www.bloomberg.com/news/articles/2024-
  03-26/asset-backed-securities-face-new-risks-from-a-us-
  court-decision .............................................................................. 15, 16

Shannon Clark, *ABS Market Brace for Fallout from CFPB
  Court Victory*, Inside Mortgage Finance (Apr. 5, 2024),
  https://www.insidemortgagefinance.com/articles/230675-
  abs-market-braces-for-fallout-from-cfpb-court-
  victory?v=preview .................................................................................. 17

Dodd-Frank Wall Street Reform and Consumer Protection
  Act, H.R. 4173, 11th Cong. § 4002(9)(A) (2009) ............................... 8, 9

Adam Levitin, *Securitization Trusts Are Subject to the
  Consumer Financial Protection Act*, Credit Slips (Mar. 27,
  2023), https://www.creditslips.org/creditslips/2024/03/
  securitization-trusts-are-subject-to-the-consumer-
  financial-protection-act.html .............................................................. 16

*New NCSLT Ruling Could be Negative for U.S. Consumer
  Structured Finance*, Fitch Ratings (Apr. 3, 2024),
  https://www.fitchratings.com/research/structured-
  finance/new-ncslt-ruling-could-be-negative-for-us-
  consumer-structured-finance-03-04-2024 .......................................... 16

Sasha Padbidri, *CFPB lawsuit, potential rating downgrades
  add to NCSLT struggles*, Global Capital (Sept. 25, 2017),
  https://www.globalcapital.com/securitization/article/28mta
  fkevrmvtb35ui8zk/cfpb-lawsuit-potential-rating-
  downgrades-add-to-ncslt-struggles .................................................... 14

## INTRODUCTION

This is the exceptional case that warrants either rehearing or rehearing *en banc*.  The panel dramatically expanded the regulatory power of the CFPB, going considerably further than the agency itself requested.  And in a dynamic area of constitutional law, the panel misapplied the central precedent, broke with its sister circuits, and denied the Trusts even the *chance* to seek relief for an acknowledged separation-of-powers violation.

The panel made these missteps in an area of tremendous consequence.  Securitization plays a vital role in the national economy, allowing investors to spread the risk inherent in advancing consumer credit, making loans cheaper and more available, especially for borrowers with weaker credit.  As the Trusts and their *amici* explained to the panel, a holding that the CFPA reaches not just the loan servicers and debt collectors that engage in the covered practices, but the passive securitization vehicles themselves, upends investor expectations and threatens to destabilize the securitization market as a whole.  Rehearing—including by the full Court if necessary—is necessary to correct course.

1

## STATEMENT OF THE CASE[1]

This case began in 2017, when then-Director Richard Cordray filed the underlying enforcement action against the Trusts.  JA77-92.  Certain intervenors moved to dismiss, arguing (1) that the Trusts, as mere passive securitization vehicles,[2] were not "covered persons" under the CFPA, and (2) that Director Cordray lacked authority to initiate the action based on the CFPA's removal provision, held unconstitutional in *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020).  The district court (Noreika, J.) granted the intervenors' motion on the second ground, though she also expressed "some doubt that the Trusts are 'covered persons' under the plain language of the statute."  JA371.

The CFPB amended its complaint, and the case was later reassigned to Judge Bibas, sitting by designation.  JA381-402.  Again certain intervenors moved to dismiss, on both the statutory and the constitutional grounds.  But the district court denied the renewed motion, concluding first that the Trusts *were* "covered persons" under the CFPA

---

[1] For a detailed procedural history of the Trusts' interactions with the Bureau, *see* Trusts' Br. 14-19.

[2] For a detailed explanation of the Trusts' complex structure, *see* Trusts' Br. 9-14.

because they "engag[ed] in offering or providing a consumer financial product or service"—namely, the servicing of student loans and collection of debt. 12 U.S.C. § 5481(6)(A); *see* JA7-10. The removal question, the district court held, was answered by an intervening Supreme Court decision, *Collins v. Yellen*, 141 S. Ct. 1761 (2021). *See* JA5-7. Under *Collins*, the district court reasoned, "an unconstitutional removal restriction does not invalidate agency action so long as the agency head was properly appointed." JA5. But Judge Bibas recognized both the import and the closeness of the case, and he certified both questions for interlocutory review under 28 U.S.C. § 1292(b). JA11-20. This Court accepted review. JA21-22.

On appeal, the panel answered both questions in the Bureau's favor, though on grounds that differed somewhat from the district court's. First, the panel held that the Trusts were "covered persons" under the CFPA because they acquired loans, entered into agreements to ensure those loans would be serviced, and benefitted from collection suits brought by third parties. Op. 29-31 (attached as Exhibit 1). And second, the panel held that the unconstitutional removal provision did not void

Director Cordray's actions after *Collins* and that the Trusts failed to show that they were harmed by the provision.  Op. 32-38.

The Trusts now petition this Court for rehearing, or in the alternative, rehearing *en banc*.

## ARGUMENT

This appeal warrants either rehearing or rehearing *en banc* because it is an exceptionally important case in which the panel misapprehended the parties' arguments and misapplied the law.  To begin, panel rehearing is merited because the Court's decision turns on a fatally overbroad reading of the CFPA that no court has adopted and which the Bureau itself did not advance.  The panel should also grant rehearing because its decision disregarded a crucial aspect of the holding in *Collins* and overlooked the Trusts' remedy arguments as a result.  In the alternative, the Court should grant *en banc* review.  The panel decision breaks substantial new ground in how the law treats passive securitization trusts and conflicts with the Court's sister circuits on separation-of-power remedies.

I.   **PANEL REHEARING IS WARRANTED BECAUSE THE COURT MISCONSTRUED THE CFPA AND THE PARTIES' ARGUMENTS.**

Rehearing is warranted here for two reasons.  First, the Court's interpretation of the CFPA's "covered person" provision misapplies the central phrase: "engages in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6)(A).  In so doing, the Court adopted a reading of the statutory text far broader than what even the CFPB urged.  And second, the Court misapprehended (and so did not consider) the constitutional injury suffered by the Trusts, an injury grounded in the plain text of the *Collins* majority that the Court's opinion does not acknowledge.

A.   **The Court's interpretation of the "covered person" provision misconstrued the statutory text and the CFPB's arguments.**

As the Court recognized, "the primary statutory question" (Op. 25) is whether the Trusts "engage[] in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6)(A).  The CFPB argued that they do because "the Trusts 'engage in' the offering or provision of []  debt collection"—the only consumer financial service at issue—pointing principally to the "collection suits in which they appear as named plaintiffs."  CFPB Br. 12, 17.  This argument is flawed in itself, but the

Court's opinion goes even further, finding sufficient allegations that the Trusts engaged in activities that are indisputably *not* debt collection and *not* at issue in this suit.

First, the Court highlights the Trusts' acquisition of a pool of loans, suggesting this is sufficient to make them covered persons. *See* Op. 29. With the acquisition, the Court reasons, "the Trusts beg[an] . . . an enterprise . . . involv[ing] financial services." *Id.* But the Trusts' acquisition of the loans took place more than fifteen years ago—well prior to the CFPA's limitations period and before the CFPB (and CFPA) even existed. *See* Trusts' Br. 9 (citing JA305). For this good reason, those acquisitions have never been raised to this Court as the basis on which the Trusts may be sued here.

Second, the Court relies on the Trusts' agreements with certain third parties to carry out the duties and obligations of the Trusts. Op. 29-31. In doing so, the Court holds, "the Trusts involved themselves in consumer financial products or services." Op. 30. Here again, the Court's conclusion not only overshoots the CFPB's argument but also misapplies the statutory text. Even if the Trusts' agreements with third parties *could* trigger covered person status (and the Trusts maintain that they

cannot), tangential "involvement" with financial services is surely not enough. The CFPA already identifies and reaches certain actors ancillary to the covered person—"related persons," for instance, and "service providers." *See* Trusts' Br. 26-28. This careful statutory structure is undermined by a "covered person" definition that turns on agreements with anyone "involved." Yet the Court's opinion cast just such a wide net: "All we need to determine is whether the Trusts engaged in such agreements." Op. 30 & n.114.

Finally, the Court turns to the consumer financial services at issue—servicing loans and collecting debt. *See* Op. 31-32. But it once again goes further than the CFPB asked. According to the Bureau, it is the Trusts' "own conduct" that subjects them to the CFPA and "the Trusts themselves press [the] collection suits." CFPB Br. 14, 17. The Court sees it differently. In its view, it is enough that the Trusts entered into agreements for "third parties to collect the debt and service the loans." Op. 31 (brackets omitted).[3] "When suits are brought against borrowers

---

[3] The panel stated that the Administrator entered into the Servicing Agreements on behalf of the Trusts. *See* Op. 31 & n.121. That is incorrect. The panel based its finding on the inaccurate factual statement of another court, not on the Bureau's complaint. In fact, the

for the Trusts to collect on student loans, third parties are acting for the benefit of the Trusts." *Id.*

This is not a mere semantic difference. On the Court's logic, a person "engages" in covered-person activity whenever a third party undertakes such activity "for [his] benefit"—with no limiting principle such as knowledge, control, or agency. The Bureau itself did not advance such an extensive view of its reach under the statute, and the district court's holding stopped considerably short of this line. *Compare* JA8 (holding the definition of "engage" is "broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise").

Even more so than the district court's view, then, the Court's conception of the CFPA harkens back to a draft version of the statute that Congress rejected. In bill form, the CFPA attempted to define "covered person" in far broader terms, as "any person who engages *directly or indirectly* in a financial activity, in connection with the provision of a consumer financial product or service." Dodd-Frank Wall

Administrator is not a party to the Trusts' Servicing Agreements and did not enter them on behalf of the Trusts. JA322-55.

Street Reform and Consumer Protection Act, H.R. 4173, 11th Cong. § 4002(9)(A) (2009) (emphasis added); *see also* Trusts' Br. 31-33. But that formulation was rejected and the "directly or indirectly" language removed. *Compare* 12 U.S.C. § 5481(6). With no mention of this statutory history or of the Trusts' argument, the Court's opinion reads the rejected language back in, reviving the well-founded concerns of regulatory overbreadth that prompted its omission in the first instance.

As the Court correctly notes, "the parties dispute the definition of engage." Op. 29. What they do not dispute is that a covered person is one who "engages in *offering or providing a consumer financial product or service.*" 12 U.S.C. § 5481(6)(A) (emphasis added). But the Court's analysis overlooks that crucial portion of the statutory text, disregarding the alleged debt collection activity and appearing to hold that entities are covered persons if they are involved in any manner with the consumer financial service industry. Correcting this oversight is sufficiently important to warrant rehearing.

**B.    The Court's treatment of constitutional "harm" misapprehends the Trusts' argument under the *Collins* majority.**

In their briefing, the Trusts provide two alternative reasons why the unconstitutional removal provision caused them redressable injury. First, they suffered a "here-and-now injury" at the hands of an officer unaccountable to the President that warrants a remedy, a straightforward conclusion based on longstanding precedent that *Collins* does not disturb.  Trusts' Br. 43-45.  Second, even assuming *Collins* provided a new remedial framework that applies to this case, the Trusts suffered the precise harm outlined in Justice Alito's majority opinion in that case.  *See id.* at 60-62.  Specifically, President Trump made "public statement[s] expressing displeasure" with Director Cordray and "asserted that he would remove the Director if the statute did not stand in the way."  *Collins*, 141 S. Ct. at 1789.  And while he was unconstitutionally insulated from removal, Director Cordray initiated this action against the Trusts.  This precise scenario, the *Collins* majority held, "would clearly cause harm" meriting relief.  *Id.*

Nowhere does the Court engage with this second argument. Instead, the Court conflates it with the first and then faults the Trusts

for failing to "go far enough" under *Collins*. Op. 36. The Court insists, for instance, that the Trusts

> argue that harm from an unconstitutional statutory restriction on removal authority is "indistinguishable" from the "harm suffered under the authority of executive officers who were not properly appointed in the first instance."

*Id.* (citing Trusts' Br. 62). And such a "presupposition of harm," the Court continues, has been "foreclosed by *Collins*." *Id.* at 36-37. But that was not the Trusts' argument. The Trusts argued (*see* Trusts' Br. 62) that when "public evidence" demonstrates that the President wished to remove an officer before the challenged agency action but could not, *then* the harm caused by the actions of an official who should not hold his office is indistinguishable from the harm inflicted by an improper appointment. That argument is not "foreclosed by *Collins*"; it is pulled directly from it. *See Collins*, 141 S. Ct. at 1789.

The Trusts recognize that the Court found unpersuasive its arguments under the line of "here-and-now injury" cases such as *Free Enterprise* and *Bowsher*. But the Court appears to have misunderstood the Trusts' alternative argument regarding harm under *Collins*. Not only does the Court's opinion fail to engage with the Trusts' evidence of such harm, it overlooks the relevant portion of the *Collins* majority

entirely, relying instead on an inaccurate summation from a concurring opinion that is not binding law.  *See* Op. 18 & n.58 (citing *Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring)).  This misapprehension warrants rehearing.

## II.    THE COURT'S *EN BANC* REVIEW IS WARRANTED IN THIS EXCEPTIONAL CASE.

In the alternative, this appeal warrants *en banc* review because it is a case of exceptional importance in which the panel's precedential opinion broke new ground and diverged substantially from the approaches taken by sister circuits.  First, the panel's opinion is the first from any appellate court to hold that passive securitization trusts "engage" in offering or providing financial services and so are "covered persons" under the CFPA.  This holding marks an about-face from the way such trusts have been understood and regulated, including  by the SEC, and threatens to destabilize the asset-securitization market.  Second, the panel's opinion breaks from this Court's sister circuits in its treatment of compensable harm under *Collins*.

**A.    The panel's precedential opinion dramatically expands the CFPB's authority and threatens the vital securitization market.**

The Trusts are passive securitization vehicles, formed prior to the enactment of the CFPA, and designed solely to acquire, pool, and securitize a number of private student loans.  As the panel correctly notes, the Trusts have no employees or directors and so act only through a series of contracted third parties.  *See* Op. 9-10.  But because they exert no control over those third parties, it is not the Trusts themselves that *engage*, under the ordinary meaning of that word, in offering or providing any financial products or services.  *See* Trusts' Br. 24-33.  Beyond the text, the CFPA's structure, the broader regulatory structure in which it sits, and its legislative history all confirm that the CFPA's "covered person" provision does not reach passive trusts.  *See id.*

Reaching the opposite conclusion, the panel dramatically expands the regulatory reach of the CFPB.  Of course, the panel's opinion will extend the Bureau's authority to other passive securitization vehicles holding billions in collateral but that, by their design, do not actually *do* anything.  But fairly read, it will also reach other entities that acquired loans before the CFPA was passed (Op. 29), contract with unrelated third

parties merely "involved in" those loans (Op. 29-31), or even simply "benefit" from a third party's collection activities (Op. 31). This is far more than Congress intended.

This concern about breadth is not just an academic one. A shift in the understood regulatory landscape (and associated loss risk) will have considerable impact on the securitization market. As *amici* SIFMA and the U.S. Chamber of Commerce argued, deeming passive securitization trusts to be "covered persons" subverts the expectations of investors, many of which are public pension plans and university endowments. *See* SIFMA Br. 22-24. A new risk of direct regulation could lead investors to reduce their securitization positions and prompt agencies to downgrade ratings. *See id.* Indeed, even the CFPB's *filing* of this suit led Finch to designate certain NCSLT transactions as "Ratings Watch Negative." *Id.* at 24 (citing Sasha Padbidri, *CFPB lawsuit, potential rating downgrades add to NCSLT struggles*, Global Capital (Sept. 25, 2017), https://www.globalcapital.com/securitization/article/28mtafkevrmvtb35 ui8zk/cfpb-lawsuit-potential-rating-downgrades-add-to-ncslt-struggles). The Structured Finance Association echoed similar concerns in an *amicus* brief of its own. *See* SFA Br. 15-25.

14

Perhaps counterintuitively, this could end up harming the very consumers the CFPB is charged with protecting.  Securitization is a ubiquitous feature of the national economy and has been since the 1970s. By spreading the associated risk, securitization makes consumer credit both more available and less expensive.  *See* SFA Br. 16 (citing American Bar Association, *Introduction to Securitizations* (Jan. 27, 2022), https://www.americanbar.org/groups/business_law/resources/business-law-today/2022-february/introduction-to-securitizations/).    As SIFMA explained to the panel, investors will compensate for the increased risk by "demand[ing] higher premiums," forcing borrowers "to pay higher interest rates so that loans remain attractive."  SIFMA Br. 24.  And crucially, direct action against trusts is far from the only way to protect borrowers from the misdeeds of loan servicers, who are indisputably "covered persons" subject to the CFPA.  Indeed, the CFPB has entered into a consent decree to resolve claims against the loan subservicers in *this very case.  See* Trusts' Br. 39.

Since the opinion's publication, industry commentators have amplified the concerns expressed by the Trusts and their *amici.  See, e.g.*, Scott Carpenter, *Asset-Backed Securities Face New Risks From a US*

*Court Decision*, Bloomberg Law News (Mar. 26, 2024), https://
www.bloomberg.com/news/articles/2024-03-26/asset-backed-securities-
face-new-risks-from-a-us-court-decision (noting that the panel's opinion
"could boost borrowing costs for firms that use securitizations by spurring
investors to demand higher yields to compensate for the risk the trusts
could be hit with lawsuits that would claw away funds"); *New NCSLT
Ruling Could be Negative for U.S. Consumer Structured Finance*, Fitch
Ratings (Apr. 3, 2024), https://www.fitchratings.com/research/
structured-finance/new-ncslt-ruling-could-be-negative-for-us-consumer-
structured-finance-03-04-2024 (noting that this Court's "recent ruling . . .
could increase the risk of unforeseen monetary losses" which "could
significantly affect transaction performance and introduce increased
rating volatility in U.S. structured finance transactions backed by
consumer assets"); Adam Levitin, *Securitization Trusts Are Subject to the
Consumer Financial Protection Act*, Credit Slips (Mar. 27, 2023),
https://www.creditslips.org/creditslips/2024/03/securitization-trusts-are-
subject-to-the-consumer-financial-protection-act.html (noting that the
panel's opinion "could shake things up in the securitization world" and
observing that "language in the opinion suggests that merely holding the

loans would be sufficient" for the CFPA to apply); Shannon Clark, *ABS Market Brace for Fallout from CFPB Court Victory*, Inside Mortgage Finance (Apr. 5, 2024), https://www.insidemortgagefinance.com/articles/230675-abs-market-braces-for-fallout-from-cfpb-court-victory?v=preview (warning that the panel's opinion "will alter [the] dynamic" and "could have a 'chilling effect' on the broader securitization market").

The panel's paradigm-shifting opinion on a topic of such consequence merits the full Court's review.

**B.    The panel's separation-of-powers holding is inconsistent with the Supreme Court's decision in *Collins* and other Circuits' decisions interpretating it.**

This case warrants *en banc* review for the additional reason that the panel's opinion is inconsistent with *Collins* and diverges from the approaches taken by other Circuits construing it.

The *Collins* majority offered straightforward guidance on when "an unconstitutional [removal] provision inflict[s] compensable harm." 141 S. Ct. at 1789. Where the President has made clear his desire to remove an officer but is thwarted by the unlawful restriction, "the statutory provision would clearly cause harm." *Id.* Such an officer holds his position thanks *only* to the unconstitutional provision and in this regard

is no different than an officer improperly appointed. The panel disregarded this notion of harm, choosing instead to rely on Justice Kagan's opinion, concurring in part and dissenting in part, that offered an entirely different standard. *See supra* Part I.B.

To be fair, the panel was not alone in following Justice Kagan's partial concurrence, rather than the *Collins* majority. *See, e.g.*, *CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 180 (2d Cir. 2023); *Community Fin. Services Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023). But a concurring opinion cannot override a majority decision. Nor is it a reliable guide how to interpret that decision. *Cf. Students for Fair Admissions, Inc. v. Harvard College*, 600 U.S. 181, 230 (2023) ("A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion."). This Court should not make the same mistake.

The panel also disregarded the Supreme Court's guidance with respect to remand. After summarizing the parties' competing positions on harm, the *Collins* Court noted that their "arguments should be resolved in the first instance by the lower courts." 141 S. Ct. at 1789. Yet although the district court here never even *considered* these arguments—

Case: 22-1864    Document: 108    Page: 25    Date Filed: 05/03/2024


let alone "resolved" them—the panel saw "no need to remand" on the question of harm. Op. 38.

In this respect, the panel broke ranks with several of this Court's sister circuits. In *Bhatti v. FHFA*, for instance, the Eighth Circuit noted simply that *Collins* "prescribed remand to determine whether the unconstitutional removal restriction caused compensable harm to shareholders" and felt duty-bound to do the same. 15 F.4th 848, 854 (8th Cir. 2021); *see also Rop v. FHFA*, 50 F.4th 562, 564 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 2608 (2023) ("We remand to the district court to determine whether, considering *Collins*, the unconstitutional removal restriction inflicted harm on shareholders."); *CFPB v. Nationwide Biweekly Administration, Inc.*, No. 18-15431, 2023 WL 566112, at *1 (9th Cir. Jan. 27, 2023) (questions surrounding "Nationwide's showing of harm . . . should be resolved in the first instance by the district court"). Even where courts have declined to remand, moreover, it has typically been because the challengers made no effort to substantiate their claims of harm. *See, e.g.*, *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021) (noting that the plaintiff "never submitted additional evidence or post-hearing argument" on the topic "despite obtaining two extensions

to do so"); *Integrity Adv., LLC v. CFPB*, 48 F.4th 1161, 1170 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 2610 (2023).

Here, the Trusts have already made a showing of harm, based on the pleadings and judicially noticeable facts, that is sufficient under *Collins*. That is enough for this Court to dismiss the CFPB's action now. Alternatively, the Court (as several of its sister Circuits have done) could remand with instructions for the district court to make this "harm" determination in the first instance.[4] *See Bhatti*, 15 F.4th at 848; *Rop*, 50 F.4th at 564. At the very least, the Court should make clear it is not *foreclosing* this affirmative defense now, at the pleading stage, before any discovery has taken place. If the panel declines to follow that course, this case would merit *en banc* review.

---

[4] Notably, the district court did not undertake that inquiry. *Collins* was decided two days before the Trusts submitted their motion to dismiss. Although the district court requested supplemental briefing on certain specific questions, whether *Collins*' "compensable harm" standard had been satisfied was not among them. *See* Trusts' Br. 66-67.

# CONCLUSION

For the foregoing reasons, the Trusts respectfully request rehearing, or in the alternative rehearing by the full Court *en banc*.


Dated: May 3, 2024                    Respectfully submitted,

                                      */s/ Jonathan Y. Ellis*
                                      N.C. Bar No. 41220

Nicholas J. Giles                     Jonathan Y. Ellis
McGuireWoods LLP                      McGuireWoods LLP
Gateway Plaza                         501 Fayetteville St.
800 East Canal Street                 Suite 500
Richmond, VA 23219                    Raleigh, NC 27601
                                      (919) 755-6688
Francis J. Aul                        jellis@mcguirewoods.com
McGuireWoods LLP
888 16th Street, N.W.
Suite 500
Washington, D.C. 20006

*Counsel for Defendants-Appellants*

Joshua Kipnees
George A. LoBiondo
PATTERSON BELKNAP WEBB &
    TYLER
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2838
jkipnees@pbwt.com

*Counsel for*
*Intervenor-Appellant*
    *Ambac Assurance Corporation*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Fed. R. App. P. 40(b)(1) because:

- This document contains 3,898 words.

This document complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This document has been prepared in a proportionally spaced 14-point Century Schoolbook font using Microsoft Word.

At least one of the attorneys whose names appear on this document is a member of the bar of this Court.

The electronic version of this document has been scanned for viruses using CrowdStrike Falcon Sensor, Version 7.04.17605.0, and no virus was detected.

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2024, the foregoing was filed with the Clerk of the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Jonathan Y. Ellis*
Jonathan Y. Ellis

# Exhibit 1

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1864

_____

CONSUMER FINANCIAL PROTECTION BUREAU

v.

NATIONAL COLLEGIATE MASTER STUDENT LOAN
TRUST; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2003-1; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2004-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2005-1;
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2005-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2005-3; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2006-3;
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2006-4; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-1; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-2; NATIONAL COLLEGIATE

STUDENT LOAN TRUST 2007-3; NATIONAL
COLLEGIATE STUDENT  LOAN TRUST 2007-4,
Delaware Statutory Trusts

NATIONAL COLLEGIATE MASTER STUDENT LOAN
TRUST; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2003-1; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2004-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2005-1;
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2005-2; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2005-3; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2006-3; NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-4; NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-1; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2007-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST 2007-3;
NATIONAL COLLEGIATE STUDENT LOAN TRUST
2007-4; AMBAC ASSURANCE CORPORATION;
TRANSWORLD SYSTEMS INC,

Appellants

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-17-cv-01323)
Circuit Judge:  Honorable Stephanos Bibas[1]

_____

Argued on May 17, 2023

Before:  RESTREPO, ROTH and McKEE, <u>Circuit Judges</u>

(Opinion filed: March 19, 2024)

Seth Frotman
Steven Y. Bressler
Kevin E. Friedl                               **(ARGUED)**
Kristin Bateman
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

                    Counsel for Appellee Consumer
                    Financial Protection Bureau

Jonathan Y. Ellis                             **(ARGUED)**
McGuireWoods LLP
500 Fayetteville Street
Suite 500
Raleigh, NC 27061

_____

[1] Honorable Stephanos Bibas, United States Court of Appeals
Judge for the Third Circuit Court of Appeals, sitting by
designation.

Nicholas J. Giles
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

Francis J. Aul
McGuireWoods LLP
888 16th Street, NW
Black Lives Matter Plaza, Suite 500
Washington, DC 20006

Megan Ix Brison
Michael A. Weidinger
Pinckney Weidinger Urban & Joyce
2 Mill Road
Suite 204
Wilmington, DE 19806

Counsel for Appellants

Rebecca L Butcher
Jennifer L. Cree
Landis Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19801

Counsel for Intervenor Appellant GSS
Data Services LLC

Joshua A Kipnees
George A. LoBiondo
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036

                Counsel for Intervenor Appellant Ambac
                Assurance Corp

Allyson B. Baker
Meredith L. Boylan
Sameer P. Sheikh
Paul Hastings
2050 M Street NW
Washington, DC 20036

                Counsel for Intervenor Appellant
                Transworld Systems Inc

Stephen M. Nickelsburg
Clifford Chance US
2001 K Street NW
Washington, DC 20006

                Counsel for Amicus Appellant Chamber
                of Commerce of the United States of
                America and Securities Industry and
                Financial Markets Association

R. Trent McCotter
George Mason University
3301 Fairfax Drive
Arlington, VA 20001

> Counsel for Amicus Appellant Separation of Powers Clinic

Ellen V. Hollman
Cadwalader Wickersham & Taft
200 Liberty Street
One World Financial Center
New York, NY 10281

Rachel Rodman
Cadwalader Wickersham & Taft
700 Sixth Street NW
Washington, DC 20001

> Counsel for Amicus Appellant Structured Finance Association

Sarah A. Hunger
Office of Attorney General of Illinois
Solicitor General's Office
115 S LaSalle Street
23rd Floor
Chicago, IL 60603

> Counsel for Amicus Appellees State of Illinois, State of California, State of Colorado, State of Connecticut, State of Delaware District of Columbia, State of

Hawaii, State of Idaho, State of Maine,
State of Maryland, State of
Massachusetts, State of Michigan, State
of Minnesota, State of Nevada, State of
New Jersey, State of New Mexico, State
of New York, State of North Carolina,
State of Oregon, State of Rhode Island,
State of Commonwealth of Virginia, State
of Washington and State of Wisconsin

Benjamin J. Roesch
Jensen Morse Baker
1809 Seventh Avenue
Suite 410
Seattle, WA 98101

Counsel for Amicus Appellees Student
Borrower Protection Center,
Community Legal Aid Society Inc,
Community Legal Services Inc, New
York Assistance Group and New
Jersey Citizen Action

————————

O P I N I O N

————————

**ROTH**, <u>Circuit Judge</u>:

The issues before the Court on this interlocutory appeal are whether the Trusts are covered persons subject to the Consumer Financial Protection Act (CFPA), and whether the Consumer Financial Protection Bureau (CFPB) was required to ratify the underlying action. As a result of our review of the case, we will remand it to the District Court with our answers to the two questions certified.

## I.     BACKGROUND

### A.     *Formation and Obligations of the Trusts*

Between 2003 and 2007 there was a massive uptick in securitized assets.[2]  Part of this increase in securitization was the privatization of student loans.[3]  During this period, the fifteen appellant trusts (the Trusts), which are "offshoots of the National Collegiate Student Loan Master Trust," were formed "for the narrow purpose of acquiring and servicing a sizable

---

[2] *See* Sergei Chernenko et al., *The Rise and Fall of Demand for Securitizations*, HARVARD BUSINESS SCHOOL, 1 (2014), https://www.hbs.edu/ris/Publication%20Files/The%20Rise%20and%20Fall%20of%20Demand%20for%20Securitizations_26afb79a-342c-42d6-9b8e-184c0b9ec2f4.pdf.

[3] *See id.* at 5.

portfolio of student loans."[4]  Indeed, the Trusts have since amassed over eight hundred thousand private loans.[5]

"At their formation, each of the 15 Trusts and the Owner Trustee executed a Trust Agreement governed by Delaware law."[6]  This agreement defined the purpose of the Trusts.[7] Under the agreement, because the Trusts have no employees, the Owner Trustee "is empowered to 'act on behalf of the Trust[s].'"[8]  One way to do so is by entering into Administration Agreements.[9]  "[T]he Administration Agreements make clear the Administrator will 'perform' the 'duties of the [Trusts]' as well as 'the duties and obligations of the Owner Trustee on behalf of the [Trusts] under . . . the Trust Agreement.'"[10]  Therefore, "Administration Agreements . . . play a pivotal role in the overall structure of the securitization transaction."[11]

---

[4] *In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 127 (Del. Ch. 2020) (hereinafter *In Re NCLST*).

[5] *CFPB v. Nat'l Collegiate Master Student Loan Trust*, 575 F. Supp. 3d 505, 506 (D. Del. 2021), *motion to certify appeal granted*, No. 1:17-CV-1323-SB, 2022 WL 548123 (D. Del. Feb. 11, 2022) (hereinafter *CFPB II*).

[6] *In Re NCLST*, 251 A.3d at 132.  There is no discernable difference between the Trusts in *In Re NCLST* and the Trusts from *CFPB II*.

[7] *See infra* note 105.

[8] *In Re NCLST*, 251 A.3d at 131 (alteration in original).

[9] *See id.*

[10] *Id.* at 140 (quoting JA150).

[11] *Id.* at 133.

Part of the role played by the Administrator is contracting with third parties through Servicing Agreements.[12] "[F]or each Trust, the Administrator contracted with a [Special] Servicer (or a similar entity) in a Servicing Agreement. In that agreement, the Servicer promised to 'provide and perform' certain services such as '[b]orrower communications,' '[p]rocedures for delinquency and default,' and '[d]isbursement.'"[13] The Special Servicer, would, in turn, contract with subservicers that would "conduct[] collections" and "oversee[] . . . collection lawsuits against borrowers in the name of the Trusts."[14] As such, in each suit, one of the Trusts was the named plaintiff and the primary beneficiary of any action in which it prevailed.[15]

In 2014, after noticing the practices of the Trusts and those acting on their behalf, the CFPB issued a civil investigative demand (CID) to each Trust for information on collections lawsuits brought against borrowers for defaulted

---

[12] *Id.* at 141.

[13] *Id.* at 141 (alterations in original) (footnote omitted).

[14] *CFPB II*, 575 F. Supp. 3d at 506–07 (alterations in original).

[15] *See* Amici Br. Student Borrower Protection Center at 15 (stating that, in California, "every time" a suit was brought against a delinquent debtor, the creditor was represented by counsel) (citing Mark Huelsman, *The Debt Divide: The Racial and Class Bias Behind the "New Normal" of Student Borrowing*, DEMOS (2015), https://www.demos.org/publication/debt-divide-racial-and-class-bias-behind-new- normal-student-borrowing).

student loans.[16]    In 2017, the CFPB initiated enforcement proceedings against the Trusts.[17]    The parties reached a settlement and asked the court to enter a consent decree.  The court declined to do so.[18]  The CFPB then filed this action.[19]

> B.    *Precedential Developments and Their Effect on the Instant Matter*

While the case was proceeding through the District Court, the Supreme Court issued two relevant opinions.  The first was *Seila Law LLC v. Consumer Financial Protection Bureau*.[20]  There, the Court addressed 12 U.S.C. § 5491(c), the statute establishing the CFPB and its Director.  According to the statute, the Director may be removed by the President only "for cause."[21]  However, the Constitution dictates that agency heads must be freely removable by the President.[22]  The Court

---

[16] *CFPB v. Nat'l Collegiate Master Student Loan Tr.*, No. CV 17-1323 (MN), 2021 WL 1169029, at *2 (D. Del. Mar. 26, 2021) (hereinafter *CFPB I*); JA367 (same); NCMSLT Br. at 14.

[17] *CFPB I*, 2021 WL 1169029, at *2.

[18] *CFPB II*, 575 F. Supp. 3d at 507.

[19] *CFPB I*, 2021 WL 1169029, at *2; JA367.

[20] 140 S. Ct. 2183 (2020).

[21] 12 U.S.C. § 5491(c)(3).

[22] *See Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (stating that executive officials "must fear and, in the performance of [their] functions, obey" (quotation omitted)).    Even though this removal power is not without limit, "[t]he parties do not ask us to reexamine any of these [limits], and [thus] we do not do so." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).

held that the CFPB's removal provision unconstitutionally insulated the Director of the CFPB from the president's removal authority because "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers."[23]

When an unconstitutional "provision violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court."[24]  The Court then evaluated 12 U.S.C. § 5491(c)(3) within the broader context of the Dodd-Frank Act.[25]  It noted that "[i]t has long been settled that 'one section of a statute may be repugnant to the Constitution without rendering the whole act void.'"[26]  "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing

---

[23] *Seila Law LLC*, 140 S. Ct. at 2197.  There was also a secondary basis for this decision: that the Director would be appointed every five years, and so a sitting President may not have the opportunity to appoint the agency head.  *Id.* at 2204.  This is why the opinion refers to the Director as being "insulated by two layers of for-cause removal protection." *Id.* at 2198.  However, because the parties focus purely on the fact that the Director was unconstitutionally insulated because he could only be removed for cause, there is no need to address this secondary ground discussed in *Seila Law*.

[24] *Id.* at 2196 (citing *Bowsher*, 478 U.S., at 727 n.5).

[25] *Id.* at 2207, 2209.  The CFPA is contained within the Dodd-Frank Act.  Because the parties do not discuss Dodd-Frank outside the confines of the CFPA, the two terms may be used interchangeably.

[26] *Id.* at 2208 (quoting *Loeb v. Columbia Twp. Trs.*, 179 U.S. 472, 490 (1900)).

any problematic portions while leaving the remainder intact."[27] Therefore, "[w]hen Congress has expressly provided a severability clause, [a court's] task is simplified."[28] Because "[t]he only constitutional defect [the Court] identified in the CFPB's structure is the Director's insulation from removal . . . . [the Court] must therefore decide whether the removal provision can be severed from the other statutory provisions relating to the CFPB's powers and responsibilities."[29]

The Dodd-Frank Act itself, which contains the CFPA, includes the following provision: "If any provision of this Act . . . or the application of such provision . . . is held to be unconstitutional, the remainder of this Act, the amendments made by this Act, and the application of the provisions of such to any person or circumstance shall not be affected thereby."[30] Thus, because Dodd-Frank has an express severability clause, "[t]here is no need to wonder what Congress would have wanted if 'any provision of this Act' is 'held to be unconstitutional.' Congress has told us: 'the remainder of this Act' shall 'not be affected.'"[31] The Court found there to be no support for the notion that "Congress would have preferred *no* CFPB to a CFPB supervised by the President."[32] The Court

---

[27] *Id.* at 2209 (quoting *Free Enter. Fund*, 561 U.S. at 508)); *see id.* at 2208 ("If the removal restriction is not severable, then we must grant the relief requested, promptly rejecting the demand outright.").

[28] *Id.*

[29] *Id.*

[30] 12 U.S.C. § 5302.

[31] *Seila Law*, 140 S. Ct. at 2209 (quoting 12 U.S.C. § 5302).

[32] *Id.*

concluded that "[t]he provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction."[33]

The Supreme Court then severed 12 U.S.C. § 5491(c), and remanded the action "to determine what to do about a petition to enforce a CID that the Bureau had filed while its structure was unconstitutional."[34]  This conformed with the law at the time that constitutional defects had to be cured by ratification,[35] and "the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at the time the ratification was made."[36]  The court concluded that, if the CFPB Director did not effectively ratify the underlying suit, the petition had to be dismissed.[37]

Turning to the case before us, the Trusts moved to dismiss the CFPB's complaint on several grounds.[38]  However, the District Court felt it "need only address two" of those grounds:[39]  first, whether the Trusts were "covered persons"

---

[33] *Id.*

[34] *CFPB I*, 2021 WL 1169029, at *4.

[35] *Id.*

[36] *Advanced Disposal Serv. E., Inc. v. N.L.R.B.*, 820 F.3d 592, 603 (3d Cir. 2016).

[37] *Id.*  Ratification will be discussed in more depth below.

[38] More specifically, there were several entities that intervened in this matter, and they moved to dismiss in the wake of *Seila Law*.  The Trusts joined the intervenors' motion to dismiss. *CFPB I*, 2021 WL 1169029, at *3.

[39] *Id.* at *3.  These are, in essence, the two grounds in this appeal.

subject to the CFPA;[40] second, whether the suit had to be ratified because the action was initiated while there was a constitutional deficiency within the agency.  The contention was that this suit was ratified after the statute of limitations had run and thus was untimely.[41]

The District Court agreed that the suit was untimely.[42] Relying on our opinion in *Advanced Disposal*, it concluded that "ratification is, in general, not effective when it takes place after the statute of limitations has expired."[43]  The CFPB Director ratified the action more than three years after the date of discovery of these violations.[44]  The District Court also rejected the CFPB's alternative argument that the statute of limitations be equitably tolled.  The court found that the bureau did not "diligent[ly] pursu[e] . . . its rights" during the relevant period because "the Bureau was (as it should have been) acutely aware that there was doubt over the constitutionality of its enforcement authority."[45]

---

[40] *See id.*

[41] *Id.*; *see* 12 U.S.C. 5564(g)(1) (stating that "no action may be brought . . . more than 3 years after the date of discovery of the violation to which an action relates").

[42] The District Court did not thoroughly address whether the Trusts were "covered persons" under the CFPA, but it did "harbor[ ] some doubt" that they were. *CFPB I*, 2021 WL 1169029, at *3.

[43] *CFPB I*, 2021 WL 1169029, at *5 (citing *Benjamin v. V.I. Port Authority*, 684 F. App'x 207, 212 (3d Cir. 2017)).

[44] *Id.*

[45] *Id.* at *6.

With the court's leave, the CFPB filed an amended complaint. The CFPB's amended complaint emphasized that the Trusts are "covered persons" who "engage in" debt collection and are thus subject to the CFPA.[46] Again, the Trusts and several intervenors moved to dismiss, arguing that they are not "covered persons" under the statute and that the suit was untimely.[47]

Before the District Court decided these motions, the Supreme Court issued a new opinion, in *Collins v. Yellen*.[48] There, the Court was facing a situation similar to that in *Seila Law*. The underlying suit was brought against the Federal Housing Finance Authority (FHFA) on the ground that the FHFA Director was impermissibly insulated from the President's removal authority because he could only be removed for cause.[49] Because of this, the Shareholders argued that agency enforcement actions made while the FHFA Director was impermissibly insulated were void *ab initio*.[50]

The Court made quick work of the insulation issue. It found its decision in *Seila Law* to be "all but dispositive": "[a] straightforward application of [the] reasoning in *Seila Law*" required the Court to conclude that a for-cause restriction on the President's removal power violates separation of powers.[51]

---

[46] JA383–84.

[47] *CFPB II*, 575 F. Supp. 3d at 507.

[48] 141 S. Ct. 1761 (2021).

[49] *Id.* at 1784.

[50] *Id.* at 1787.

[51] *Id.* at 1783–84. Though there are obviously some differences between the CFPB and the FHFA, the Court did not "find any

However, unlike in *Seila Law*, the Court also addressed the question of whether the actions of agency heads lacking constitutional authority were void *ab initio*.[52]  At the outset, it noted that "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office."[53]  The Court concluded that whether agency action was void *ab initio* came down to whether an agency director was properly appointed.[54]  More particularly, the Court held:

> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA . . . as void.[55]

_____

of these distinctions sufficient to justify a different result." *Id.* at 1784.

[52] *Id.* at 1787.

[53] *Id.* at 1788 (citing *Seila Law*, 140 S. Ct. at 2207–11).

[54] *Id.* at 1787.  There is no support for the notion that any CFPB director was improperly appointed, and neither party argues this point.  *See* JA15 (stating that "the Bureau's director was properly appointed").

[55] *Collins*, 141 S. Ct. at 1787.

17

In so holding, the Court rejected the claim that agency actions are void unless "ratified by an Acting Director who was removable at will by the President."[56]

The Court further clarified that actions taken by an improperly insulated director are not "void" and do not need to be "ratified" unless a plaintiff can show that the removal provision harmed him.[57] "[P]laintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision."[58] In other words, if there is no harm derived from the President's inability to remove the agency head, then the agency action will not be unwound.[59]

Because in *Seila Law* there was a "dispute [about] the possibility that the unconstitutional removal restriction caused any such harm," the Court held that such disputes should be resolved by the lower courts and remanded the action to the

---

[56] *Id.* In *Collins*, the petitioning shareholders argued that an unconstitutionally insulated "Director's action would be void unless lawfully ratified," *id.* at 1788, based on the fact that the Court in *Seila Law* remanded "to consider whether the civil investigative demand was validly ratified," *Seila Law*, 140 S. Ct. at 2211. However, the Court in *Collins* noted that it never mentioned "whether ratification was necessary" when agency action was taken at the behest of an unconstitutionally insulated agency director. *Collins*, 141 at 1788.

[57] *Id.* at 1788–89.

[58] *Id.* at 1801 (Kagan, J., concurring in part).

[59] *Id.*

court of appeals.[60]  In so doing, the Court in *Collins* extended the rule established in *Seila Law* to permit consideration of harm and, as a result of doing so, to determine if the agency action had to be rewound.

Against this backdrop of *Collins* and *Seila Law*, the District Court considered the underlying action.  It addressed two questions:  whether the CFPB needed to ratify this action (which necessarily addresses the suit's timeliness) and whether the Trusts were "covered persons" under the CFPA.[61]  Based on *Collins*, the District Court held that the agency head was properly appointed, and that the agency would have filed the action regardless of the President's ability to remove the agency head.  More particularly, it held:

> This suit would have been filed even if the director had been under presidential control.  It has been litigated by five directors of the CFPB, four of whom were removable at will by the President.  And the CFPB did not change its litigation strategy once the removal protection was eliminated.  This is strong evidence that this suit would have been brought regardless. Thus, the CFPB's initial decision to bring this suit was not ultra vires.[62]

---

[60] *Id.* at 1789; s*ee, e.g.*, *id.* at 1795 (Thomas, J., concurring) ("The Fifth Circuit can certainly consider this issue on remand."); *id.* at 1802 (Kagan, J., concurring in part) (stating that the "Court of Appeals already considered and decided the issue remanded").

[61] *See CFPB II*, 575 F. Supp. 3d at 506.

[62] *Id.* at 508 (citation omitted).

This conclusion resolved the first question.

The District Court then considered whether the Trusts were "covered persons" under the CFPA.[63]   Section 5584(a) of the statute, which governs the CFPB's enforcement authority, states that "[t]he CFPB may bring enforcement actions to 'prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice.'"[64]  Under the CFPA, a "covered person," is "any person that engages in offering or providing a consumer financial product or service."[65]  Because "[t]he Trusts do not deny that their subservicers collected debt or serviced loans" the District Court noted that "this dispute boils down to the breadth of the word 'engage.'"[66]   The central question in evaluating this inquiry was:  "Does a person 'engage' in an activity if he *contracts* with a third party to do that activity on his behalf?"[67]  The court's answer was "Yes."[68]

Relying on multiple dictionaries, the District Court determined that "'[e]ngage' means to 'to embark in any business' or to 'enter upon or employ oneself in an action.'"[69]

---

[63] *See id.* at 509.

[64] *Id.* (quoting 12 U.S.C. § 5531(a)).

[65] 12 U.S.C. § 5481(6)(A).

[66] *CFPB II*, 575 F. Supp. 3d at 509.

[67] *Id.* (emphasis added).

[68] *Id.*

[69] *Id.* (citing *Engage* (def. 16), Oxford English Dictionary (2d ed. 2000)); *see also Engage*, Black's Law Dictionary (11th ed. 2019) ("To employ or involve oneself; to take part in; to embark on.").

This definition, it found, was "broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise."[70]  The court found that "[t]he Trusts 'embark[ed] in [the] business' of collecting debt and servicing loans when they contracted with the servicers and subservicers to collect their debt and service their loans."[71]  The court continued, "[t]he Trusts cannot claim that they were not 'engaged in' a key part of their business just because they contracted it out."[72]

Shortly thereafter, the Trusts and intervenors timely filed a motion for interlocutory appeal.  The District Court certified two questions for review:  first, the statutory question whether the Trusts are "'covered persons' subject to the [CFPB's] enforcement authority" under the CFPA;[73] second, the constitutional question, whether, after *Collins*, "the Bureau need[ed] to ratify this suit before the statute of limitations ran, having first filed it while the Bureau's director was improperly insulated from presidential removal[.]"[74]

---

[70] *CFPB II*, 575 F. Supp. at 509.

[71] *Id.*

[72] *Id.* at 509–10 (citing *Barbato v. Greystone All., LLC*, 916 F.3d 260, 266–68 (3d Cir. 2019) (finding that a "passive debt owner" counted as a "debt collector" under the Fair Debt Collection Practices Act when it contracted with a third party to collect debt on its behalf)).

[73] JA20.

[74] JA20.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Trusts petitioned us for review pursuant to 28 U.S.C. § 1292(b).[75]  We have jurisdiction under that same provision.[76]  We also have jurisdiction pursuant to 28 U.S.C. § 1331.  We review questions certified for interlocutory review *de novo*.[77]

## III.    DISCUSSION

### A.    *Statutory Question*

The statutory dispute between the parties boils down to a central question:  Are the Trusts "covered persons" under the CFPA because they *engage* in consumer financial products or services?[78]

In interpreting a statute, we begin our analysis with the plain language of the statute.  Just as the District Court did, we "[s]tart with the text."[79]  That text begins with 12 U.S.C. § 5531(a), which dictates the CFPB's enforcement authority. The statute states the following:

---

[75] NCMSLT Br. at 4–5.

[76] NCMSLT Br. at 4.

[77] *Barbato*, 916 F.3d at 264.

[78] *See* NCMSLT Br. at 24, 33; CFPB Br. at 12.

[79] *CFPB II*, 575 F. Supp. 3d at 509; *see Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019) ("We begin 'where all [statutory interpretation] inquiries must begin: with the language of the statute itself.'" (quoting *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) (cleaned up))).

> The Bureau may take any action . . . to prevent a *covered person* or service provider from committing or *engaging in* an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a *consumer financial product or service*, or the offering of a *consumer financial product or service*.[80]

A "covered person" is defined by § 5481(6)(A) as "any person that engages in offering or providing a consumer financial product or service."[81]    To apply the statutory interpretive framework above, and thus determine whether the Trusts are "covered persons" subject to the CFPB's enforcement

---

[80] 12 U.S.C. § 5531(a) (emphases added).

[81] 12 U.S.C. § 5481(6)(A).    The omitted portion of this provision states the following:  "and any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person."    While we do agree that servicers were "central" to the Trusts' "enterprise," *see* JA14, neither party argues at this time that the Trusts should be liable for the acts of the servicers.    Indeed, that would likely be an entirely different matter.    *See* CFPB Br. at 31; *Barbato*, 916 F.3d at 269–70 (illustrating that whether one can be liable for the actions of another is a different question from the one presented on appeal).    As such, we need not evaluate affiliate liability, especially if the Trusts can be said to "engage" on their own accord.    Thus, the relevant inquiry is not whether the servicers are an affiliate of the Trusts, but whether the Trusts "engaged" others to proliferate their business.

authority, we must look to "engage" in its statutory context.[82] To streamline this process, we will define this context first so that we can then apply "engage" against that background.

A "person," under the CFPA, "means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity."[83] "Trusts" are explicitly mentioned here. Additionally, the Trusts are statutory trusts formed under Section 3801 of Title 12 of the Delaware Code.[84] Title 12 of the Delaware Code states that statutory trusts are defined as "unincorporated associations."[85] Congress's intent is clear: the Trusts were to be included as "persons" under the CFPA.[86]

A similarly inevitable conclusion is reached when defining "consumer financial product[s and] service[s]."[87] In

---

[82] *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *see* JA14.

[83] 12 U.S.C. § 5481(19).

[84] *CFPB I*, 2021 WL 1169029, at *1.

[85] 12 Del. Code § 3801(i).

[86] "If the language of the statute expresses [the legislature's] intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms." *Gregg*, 226 F.3d at 257 ("If the language of the statute expresses [the legislature's] intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms.").

[87] 12 U.S.C. § 5481(5).

defining this phrase,[88] the statute directs us to the definition of "financial product or service."[89]  Under § 5481(15), a financial product or service may include "extending credit and servicing loans."[90] The Trusts themselves state in their opening brief that they "were formed to acquire a pool of private student loans, to issue securitized notes on those loans, and to *provide for the servicing of the loans* and the distribution to noteholders of the loan payments made by borrowers."[91]     Thus, they unambiguously fall within the statute.[92]

        We then turn to the primary statutory question:  whether the Trusts "engage."  If they do "engage," they are covered persons under the CFPA; if they do not, they do not fall within the purview of the CFPA.  The District Court found "room for reasonable disagreement" in the definition of "engage."[93]  For this reason, we will look to other interpretative measures to

---

[88] *See supra* notes 80–81 and accompanying text.

[89] 12 U.S.C. § 5481(5).

[90] *Id.* § 5481(15)(A)(i).  Thus, the terms of § 5481(15) are included in § 5481(5).

[91] NCMSLT Br. at 10 (emphasis added) (citing JA107, which is part of the trust agreement).

[92] This point does not seem to be disputed by the parties.  *See* Amici Br. Securities Ind. & Fin. Mkts. Assoc. at 15 (stating that the Trusts "do not, and cannot, 'engage in' offering or providing consumer financial products or services *such as the debt collection services at issue here*" (emphasis added)); *see also* JA13–14 ("True, third parties, not the Trusts, collected the debt and serviced the loans.  But the loan servicing and debt collection were crucial to the Trusts' business and could not have happened without their say-so.").

[93] JA14.

define this term.  To do so, we will review how this definition has been applied in earlier cases.[94]

In *Southwest Airlines Co. v. Saxon*, the Supreme Court had to determine whether a "class of workers *engaged in* foreign or interstate commerce."[95]    Southwest Airlines attempted to enforce an arbitration agreement against Saxon under the Federal Arbitration Act (FAA).[96]    In response,

---

[94] Unfortunately, Dodd-Frank's legislative history does not adequately define "engage."  Thus, we cannot glean much by examining CFPA's history.  Something we can glean, though, is that when Dodd-Frank was before Congress, its purpose was broad: "This is a time to bring certainty back into the market and reasonable regulation and reasonable enforcement back to the financial system."  156 Cong. Rec. H5223-02, 156 Cong. Rec. H5223-02, H5231.  But Congress addressed the concern that the Act was too broad:  "One of the initial concerns we heard was that companies who do not engage in consumer financial business would be regulated by [Dodd-Frank]. We fixed that. Merchants, retailers, doctors, realtors, and others— some suggested the butcher, the baker, the candlestick maker—let's be clear, they're exempt from [Dodd-Frank] as was intended and as they should be."  155 Cong. Rec. H14762-01, 155 Cong. Rec. H14762-01, H14773.  So when Congress walked back Dodd-Frank's broad grant of enforcement authority, it retained the notion that Dodd-Frank applies to those taking part in the financial system and consumer financial business.  As such, it is clear that Congress intended the Dodd-Frank to apply to the consumer financial industry.
[95] *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022) (emphasis added) (internal quotations omitted).
[96] *See Id.*

"Saxon [argued] that the [FAA] did not apply because she was a member of a 'class of workers engaged in foreign or interstate commerce,' and therefore exempted by § 1 of the [FAA]."[97]  To determine whether this exemption applied, the Supreme Court had to define "engage."[98]

The Court, "begin[ning] with the text," stated that the word "'engaged' . . . mean[s] 'occupied,' 'employed,' or 'involved' in [something]."[99]  In applying this definition, the Court held that Southwest Airlines interpreted the statute too narrowly, and that Saxon, as a ramp supervisor for the airline, was part of a "'class of workers engaged in foreign or interstate commerce' to which [the statutory] exemption applies."[100]

This interpretation is consistent with colloquial and legal dictionaries that define "engage."  *Merriam-Webster's Dictionary* contemporarily defines engage as "to begin and carry on an enterprise or activity" and "to do or take part in something."[101]  *Black's Law Dictionary* defines engage as: "To employ or involve one's self; to take part in; to embark on."[102]  This definition has remained remarkably consistent over time,

---

[97] *Saxon v. Sw. Airlines Co.*, 993 F.3d 492, 495 (7th Cir. 2022).

[98] *Saxon*, 596 U.S. at 463.

[99] *Id.* (citing Webster's New International Dictionary 725 (1922) and Black's Law Dictionary 661 (3d ed. 1933) (defining "engage")).

[100] *Id.*

[101] *Engage*, Merriam-Webster's Dictionary.

[102] *Engage*, Black's Law Dictionary (11th ed. 2019).  This definition is also consistent with the one used by the District Court.  *See CFPB II*, 575 F. Supp. 3d at 509.

and is the same definition referred to by the Supreme Court in *Saxon*.[103]

Using this definition, we can now determine whether the Trusts "engage" in consumer financial products or services. If the Trusts meet any of the aforementioned definitions, they can be said to "engage."  For example, if they "embark on" or "take part in" collecting debt or servicing loans, they can be said to engage in those consumer financial products or services.[104]  And if they engage, they will come under the purview of the CFPA.

The Trust Agreement that each Trust entered into states the following:

> The purpose of the Trust is to *engage in* the following activities and *only* these activities: (i) To acquire a pool of Student Loans, to execute the Indenture and to issue the Notes; (ii) To *enter into* the Trust Related Agreements and to provide to the administration of the Trusts and servicing of the Student Loans; (iii) To *engage in* those activities and to enter into such agreements that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and (iv) To *engage in* other such activities as may be

---

[103] *Compare Engage*, Black's Law Dictionary (3d ed. 1933) *with Engage*, Black's Law Dictionary (11th ed. 2019).
[104] The District Court found "debt collection and loan servicing [to be] core aspects of the Trusts' business model."  *CFPB II*, 575 F. Supp. 3d at 509.

> required in connection with conservation of the
> Trust Property and Distributions to Owners.[105]

Thus, the Agreement itself states that the Trusts "engage" in these activities, which include consumer financial products or services. Nonetheless, because the parties dispute the definition of engage, we will apply it to each purpose mentioned in the Trust Agreement.

First, in "acquir[ing] a pool of Student Loans,"[106] the Trusts "beg[an] . . . an enterprise or activity,"[107] with that enterprise[108] "involv[ing]"[109] financial products or services. As the Trusts themselves state in their brief, "the defendants are 15 statutory trusts formed to purchase, pool, and securitize student-loan debt."[110] Moreover, it seems unlikely that one can acquire[111] something without "involv[ing] one's self."[112]

Second, the Trusts "carr[ied] on [their] enterprise" through Administration Agreements.[113] These Agreements "make clear the Administrator will 'perform' the 'duties of the

---

[105] JA107 (emphasis added).

[106] *Id.*

[107] *See supra* note 101.

[108] *See Enterprise*, Black's Law Dictionary (11th ed. 2019) ("An organization or venture, esp[ecially] for business purposes.").

[109] *Engage*, Black's Law Dictionary (11th ed. 2019).

[110] NCMSLT Br. at 1.

[111] *See Acquire*, Black's Law Dictionary (11th ed. 2019) ("To gain possession or control of; to get or obtain.").

[112] NCMSLT Br. at 1.

[113] *See supra* note 101.

[Trusts].'"[114]  More particularly, "[t]he Administrator shall prepare for execution . . . , or shall cause the preparation . . . of, all such documents, reports, filings, instruments, certificates and opinions . . . of the [Trusts] . . . pursuant to the Trust Related Agreements."[115]  In this vein, "the Administrator need not await instructions before pursuing ordinary course lawsuits initiated 'by the [Trust] or its agents . . . for the collection of the Student Loans owned by the [Trust].'"[116]  Therefore, through the Administration Agreements, the Trusts "involv[ed]"[117] themselves in consumer financial products or services.

Third, the Trusts "carr[ied] on [their] enterprise"[118] by further "involv[ing]"[119] themselves in agreements for the servicing of loans.[120]  Another such set of agreements were Servicing Agreements, which were entered into by the

---

[114] *In re NCLST*, 251 A.3d at 140 (alteration in original) (quoting JA150).   While the Trusts purport that the Administrator is separate from the Trusts, *see* NCMSLT Br. at 11 (arguing that "the Administrator is 'not . . . subject to the supervision of the [Trusts] or the Owner Trustee with respect to the manner in which it accomplishes the performance of its obligations'"), we need not address this claim.  It is a bridge too far.   All we need to determine is whether the Trusts engaged in such agreements.

[115] JA149.

[116] *In re NCLST*, 251 A.3d at 140–41 (alteration in original) (quoting JA151).

[117] *Engage*, Black's Law Dictionary (11th ed. 2019).

[118] *See supra* note 101.

[119] *Engage*, Black's Law Dictionary (11th ed. 2019).

[120] *See supra* note 101.

Administrator.[121]  Servicing Agreements were a necessary part of their business.[122]  Again, as the Trusts mention in their brief, "[t]hey have no employees and no directors."[123]  So, in order to fulfill their obligation of "servicing . . . student loans"[124] they had to enter into agreements with "third parties [to] collect[] the debt and service[] the loans," which "could not have happened without [the Trusts'] say-so."[125]  Indeed, without these agreements, the Trusts could not have "embark[ed] on"[126] the servicing of student loans.

Finally, the Trust Agreement states that the Trusts are to "engage in *other activities*" that may be "required in connection or conservation of Trust Property . . . ."[127]  Trust Property, according to the Trust Agreement, is defined as "all right, title and interest of the Trust or the Owner Trustee on behalf of the Trust in and to any property contributed to the Trust."[128]  And "the Trusts retained legal title to the Collateral [i.e., the Student Loans] so that they could collect Student Loans for distribution . . . ."[129]  When suits are brought against borrowers for the Trusts to collect on student loans, third parties are acting for the benefit of the Trusts.[130]  As such, the

---

[121] *In re NCLST*, 251 A.3d at 131.

[122] JA14.

[123] NCMSLT Br. at 1.

[124] *See supra* note 105.

[125] JA13.

[126] *Engage*, Black's Law Dictionary (11th ed. 2019).

[127] *See supra* note 105.

[128] JA105.

[129] *In Re NCSLT*, 251 A.3d at 194.

[130] *See supra* note 15 and accompanying text.

Trusts cannot claim that they did not "take part in" collecting debts.[131]

The Trust Agreement's purpose indicates that the Trusts engage in both student loan servicing and debt collection. As such, the Trusts fall within the purview of the CFPA because they "engage" in a known "consumer financial product or service" and are necessarily subject to the CFPB's enforcement authority.[132]

### B.    Constitutional Question

We now turn to the constitutional question that was certified:  Ratification of agency action.  The Trusts argue that the underlying suit needed to be ratified by the Director of the CFPB because it was initiated while the agency head was improperly insulated; and since that ratification came after the statute of limitations had run, the suit was untimely.[133] Moreover, they claim that action undertaken while an agency head is impermissibly insulated creates a "here-and-now injury."[134]  The CFPB responds by arguing that ratification was not necessary in the wake of *Collins* because the agency head was properly appointed and the statute did not cause harm to the Trusts.[135]

To properly evaluate these arguments, we must briefly revisit our discussion of *Collins*.  As the District Court found,

---

[131] *See supra* notes 15, 91, 104, and accompanying text.
[132] 12 U.S.C. § 5584(a).
[133] NCMSLT Br. at 49–53.
[134] NCMSLT Br. at 21.
[135] CFPB Br. at 34–54.

"[t]he [*Collins*] Court explained that actions taken by an
improperly insulated director are not 'void' and do not need to
be 'ratified' unless a plaintiff can show that the removal
provision harmed him."[136]  The parties do not dispute whether
the CFPB Director was properly appointed.[137]  Thus, the heart
of the issue is whether the insulation provision, 12 U.S.C. §
5491(c), caused harm.[138]   This is not an issue of first
impression.  We begin by evaluating the approaches our sister
circuits have taken in interpreting *Collins*.

The Second Circuit Court of Appeals in *CFPB v. Law
Offices of Crystal Moroney, P.C.*,[139] addressed whether a civil
investigative demand (CID), often the first step in an
enforcement suit by the CFPB "was void *ab initio* because,
when the CID was issued, the CFPB Director was shielded by
an unconstitutional removal provision."[140]  The court held that
"[t]his argument is foreclosed by the Supreme Court's decision
in *Collins*."[141]  It interpreted the Court in *Collins* as "h[olding]
that the relevant inquiry for determining whether an officer
'lacked constitutional authority and that [her] actions were

---

[136] JA16 (citing *Collins*, 141 S. Ct. at 1787–88).

[137] JA15.  However, the Trusts do argue that the harm from
impermissible insulation is "indistinguishable" from harm of
improper appointment.

[138] *Cf. Kaufmann v. Kijakazi*, 32 F.4th 843, 849–50 (9th Cir.
2022) (holding that, when an agency head is impermissibly
insulated, the matter is to be decided based on whether the
statute itself caused harm).

[139] 63 F.4th 174 (2d Cir. 2023).   A Petition for Writ of
Certiorari has been docketed.

[140] *Id.* at 179.

[141] *Id.*

therefore void *ab initio*' is whether the officer in question [was] properly *appointed*,' not whether she was properly *removable*."[142]   Like our interpretation of *Collins* today, the circuit court also noted that a party could, nevertheless, "be entitled to relief if it could show that 'an unconstitutional provision . . . inflict[ed] compensable harm' on the petitioner."[143]   In determining the nature of that harm, the circuit court relied on Justice Kagan's concurrence to determine that "[r]equiring but-for causation in these cases properly matches the constitutional injury to the requested remedy."[144]   The circuit court found this interpretation to be consistent with its own and with Supreme Court precedents.[145]

The Ninth Circuit Court of Appeals in *Kaufmann v. Kijakazi*,[146] further defined the requisite harm.   There, the circuit court was faced with deciding whether an impermissibly insulated agency head violated the separation of powers, and if so, whether the agency action was necessarily void.[147]   At the outset, the court noted that, "[f]or the purpose of the constitutional analysis, the Commissioner of Social Security is indistinguishable from the Director of the FHFA discussed in *Collins* and the Director of the CFPB discussed in

---

[142] *Id.* (alterations in original) (quoting *Collins*, 141 S. Ct. at 1787).  Again, we agree that the CFPB's Director was properly appointed.  *See* JA15 (stating that "the Bureau's director was properly appointed").

[143] *Id.* (quoting *Collins*, 141 S. Ct. at 1789).

[144] *Id.* at 180.

[145] *Id.*

[146] 32 F.4th 843 (9th Cir. 2022).

[147] *Kaufmann*, 32 F.4th at 846.

*Seila Law.*"[148]   Much like *Seila Law*, the circuit court also found "the removal provision . . . severable from the remainder of the statute," and that the remainder of the statute was capable of functioning independently of the impermissible provision.[149]   Still, the circuit court also noted that "[a] party challenging an agency's past actions must . . . show how the unconstitutional removal provision *actually harmed* the party."[150]  "[*U*]*nless* a claimant demonstrates actual harm, the unconstitutional provision has *no effect* on the claimant's case. Because Claimant has not shown actual harm, we uphold the Commissioner's decision."[151]

Here, as discussed above, the Trusts claim that an unconstitutional provision violating the separation of powers caused them harm.[152]   But a mere allegation that the unconstitutional provision inherently caused them harm is insufficient.  There must be something more.[153]  For example, if the CFPA suggested "any link whatsoever between the removal provision and [c]laimant's case," then the Trusts may be entitled to some type of relief.[154]

---

[148] *Id.* at 849.

[149] *Id.* ("[O]ne provision of a [statute] may be invalid by reason of its not conforming to the Constitution, while all the other provisions may be subject to no constitutional infirmity.") (quoting *Seila Law*, 140 S. Ct. at 2208)) (alteration in original).

[150] *Id.*

[151] *Id.* at 850 (emphasis added).

[152] That harm is the purported "here-and-now" injury.  *See supra* note 134 and accompanying text; *infra* note 159 and accompanying text.

[153] *Id.* at 849–50.

[154] *Id.* at 850.

We cannot find such a link. The statute, in relevant part, states: "The Director shall serve for a term of 5 years"; "An individual may serve as Director after the expiration of the term for which appointed, until a successor has been appointed and qualified"; and "The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office."[155] There is no notion in this statute that the CFPB would have taken this action but for the President's inability to remove the Director.[156] On the contrary, as the District Court noted, there "is strong evidence that this suit would have been brought regardless" of a president's authority to remove because the CFPB's litigation strategy has been consistent across five directors, four of whom were removable at will.[157]

While the Trusts argue that the unconstitutional provision, in and of itself, created a here-and-now injury,[158] their analysis of the injury does not go far enough. They argue that harm from an unconstitutional statutory restriction on removal authority is "indistinguishable" from the "harm suffered under the authority of executive officers who were not properly appointed in the first instance."[159] This presupposition of harm, as discussed above, is foreclosed by

---

[155] 12 U.S.C. § 5491.

[156] *See Kaufmann*, 32 F.4th at 850.

[157] *See CFPB II*, 575 F. Supp. 3d at 508; *supra* notes 61–62 and accompanying text.

[158] NCMSLT Br. at 21 ("An enforcement action initiated by an unconstitutionally structured agency inflicts a 'here-and-now' injury, that demands a remedy tailored 'to the injury suffered.'" (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981))) (cleaned up).

[159] NCMSLT Br. at 62.

*Collins* and its progeny because there must be an actual, compensable harm in order for there to be an injury from an impermissible insulation provision.[160] Again, the circuit court in *Kaufmann* held that an impermissible insulation provision does not, on its own, cause harm, and "*unless* a claimant demonstrates actual harm, the unconstitutional provision has *no effect* on the claimant's case."[161]

Additionally, the Trusts' interpretation of their purported injury seems to be in discord with other precedential examples of "here-and-now" injuries. For example, the Supreme Court has noted that "subjection to an illegitimate proceeding, led by an illegitimate decisionmaker" is a manifestation of a "here-and-now" injury.[162] There is no support in the record for the notion that instant proceeding was similarly illegitimate because, like *Kaufmann*, there is no indication that this suit would have been undertaken *but-for* a president's authority to remove the CFPB's Director, or that the CFPB was able to target the Trusts via the unconstitutional provision.[163] In another example, in *Sherley v. Sebelius*, the D.C. Circuit Court of Appeals found there to be a "here-and-now injury" when doctors would have to invest additional time and resources because of a loss, or different allocation, of funding.[164] In both of these examples, there was a compensable and identifiable harm. Here, there is no such thing.

---

[160] *Kaufmann*, 32 F.4th at 850.

[161] *See id.* (emphasis added).

[162] *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 903 (2023).

[163] *See CFPB II*, 575 F. Supp. 3d at 508.

[164] 610 F.3d 69, 74 (D.C. Cir. 2010).

The Trusts argue, contrary to these precedents, that *Collins* did not actually change the legal landscape, and that the matter before us still needed to be ratified by a properly appointed director after the constitutional defect was cured via severing pursuant to 12 U.S.C. § 5491(c).[165]  This notion is directly counter to the Supreme Court's holding in *Collins*.  It is also counter to guidance provided by our sister courts.  For example, the Tenth Circuit Court of Appeals in *Integrity Advance, LLC v. CFPB* held that "*Collins* put to rest" the argument that ratification was necessary for actions taken while the agency was unconstitutionally structured.[166]  And the Ninth Circuit Court of Appeals had nearly the same interpretation of a post-*Collins* world:  "We find it unnecessary to consider ratification because [*Collins*] has made clear that despite the unconstitutional limitation on the President's authority to remove the Bureau's Director, the Director's actions were valid when they were taken."[167]

We see no need to remand the ratification issue.  As our sister courts have noted, "[w]hile *Collins* remanded for further factual development on the issue of harm, we need not do so here, as the record is clear."[168]  The record is also clear here:  There is no indication that the unconstitutional limitation on the President's authority harmed the Trusts.

---

[165] NCMSLT Br. at 53–67.

[166] 48 F.4th 1161, 1170 (10th Cir. 2022), *cert. denied*, No. 22-838, 2023 WL 3937614 (June 12, 2023).

[167] *CFPB v. CashCall, Inc.*, 35 F.4th 734, 742 (9th Cir. 2022).

[168] *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021) (citation omitted).

## CONCLUSION

For the above reasons, we will respond to the District Court's queries by holding that (1) the Trusts are covered persons subject to the CFPA's enforcement authority because they "engage" in the requisite activities and (2) the CFPB did not need to ratify this action before the statute of limitations had run.